UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

**ED FRIEDMAN**

    *Plaintiff,*

v.

**CENTRAL MAINE POWER COMPANY,**

    *Defendant.*

CIVIL ACTION

NO.

## COMPLAINT

NOW COMES, Plaintiff Ed Friedman, through undersigned counsel, who states as follows:

### PARTIES

1. Plaintiff **Ed Friedman** is a resident of Bowdoinham, ME. He is a person with a disability. See 42 U.S.C. § 12132. Upon information and belief he respectfully represents the facts and causes of action pled herein against the Defendant.

2. Defendant **Central Maine Power Company** ("CMP") is a Maine business corporation, with charter number 19050014 D. CMP is a subsidiary of AVANGRID, and serves more than 620,000 electricity customers in an 11,000 square-mile service area in central and southern Maine. Eighty-five percent owned by the Spanish energy giant company, Iberdrola SA, AVANGRID owns eight electricity, natural gas or combination utilities in Connecticut, Maine, Massachusetts, and New York and has a business presence in 24 states.

### JURISDICTION AND VENUE

3. Plaintiff's claim arises under federal civil rights laws. This Court has jurisdiction over Plaintiff's claims of federal rights violations under the Americans With Disabilities Amendments Act, 42 U.S. Code § 12101 *et seq.*; the Rehabilitation Act of 1973 as Amended, 29 U.S.C. § 701 *et seq.*; and the Fair Housing Amendments Act, 42 U.S.C. § 3601 *et seq.*; which are enforceable in this Court pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). The venue is proper in this District

under 28 U.S.C. §1391(b)(2).  A substantial part of the events giving rise to the claim occurred in the District of Maine.

## INTRODUCTION

4. Plaintiff Ed Friedman has an incurable form of lymphoma.

5. To mitigate the progression of his disease, Plaintiff's oncologist says he should not be exposed to any excess radiation in his home, including radiation from Defendant Central Maine Power Company's ("CMP") electrical "smart" meters.

6. CMP will allow Plaintiff to opt out of the smart meter program – but he will have to pay an extra, monthly opt-out fee.

7. Plaintiff asked CMP to waive the opt-out fee as an accommodation to his disability.

8. CMP refused to waive the fee, even as an accommodation.

9. This refusal has already been ruled to be likely illegal in at least one other jurisdiction. In *Metallo v. Orlando Utilities Commission*, 14-cv-1975, R. Doc. 45 (M.D. Fl., Sept. 1, 2015), a court decided that a utility company's failure to waive a smart meter opt-out fee was sufficient to allege that a plaintiff was "denied the benefits of [the utility's] services, and that such exclusion was because of his disability."

10. To Plaintiff, avoiding the opt-out fee is not merely a financial consideration. The fee means being reminded every single month of how his cancer is affecting him, and how the cancer is limiting him and causing him to have to do things he does not want to do.

11. Plaintiff has enough of those reminders in his life.

12. Plaintiff now sues to enforce his rights under federal anti-discrimination laws.

## FACTS

13. Plaintiff has an incurable form of cancer called lymphoplasmacytic lymphoma.

14. According to his oncologist, "[e]xposure to radiation may exacerbate the progression of his disease and exacerbate the symptoms of it, including fatigue, cognitive difficulty, and memory issues."

15. CMP is a public utility providing electricity to approximately 600,000 customers.

16. CMP measures its customers' electricity usage through meters placed in or on their homes.

17. CMP's customers can either have a "smart" meter, EMF-emitting digital meter or an electro-mechanical/analog meter.

18. CMP's smart meters operate by transmitting information via radiofrequency radiation signals thousands of times per day.

19. Under Section 12.11 of CMP's Terms & Conditions, a customer who wishes to opt out of the smart meter program a pay an Initial Charge of $40 plus a Recurring Monthly Charge, which until recently was $15.71 per month.

20. Effective July 1, 2020, CMP has increased that fee to $16.05 per month.

21. This opt-out was required by the Maine Public Utilities Commission. *See Boxer-Cook et al. v. Maine Public Utilities Commission*, Docket No. 2010-345 Order (Part I) (Me. P.U.C. May 19, 2011) and (Part II (Me. P.U.C. June 22, 2011) (MPUC ordering Central Maine Power to provide two alternatives for customers and to retain enough electromechanical or analog meters to provide any ratepayer requesting one).

22. Because of his disability, and on the advice of his doctors, Plaintiff chose not to have a smart meter installed in his home.

23. But Plaintiff also thought it was not fair for him to pay extra to <u>not</u> have something installed in his home, based on his disability. And so he did not pay the opt-out fee.

24. For a period of several years, the Maine PUC allowed opt-out fees to be withheld pending an investigation into smart meters.

25. During that period, Plaintiff paid normal CMP charges, but not the opt-out fee.

26. On August 10, 2016, CMP issued a "Disconnection Notice" to Plaintiff, saying that his power would be disconnected in fifteen days if he did not pay $665.55 – the compounded sum of the opt-out fee and late fees. CMP also indicated that he would be charged a reconnection fee if the power was disconnected, and an additional charge if a CMP employee "visits your service location to disconnect service."

27. On August 16, 2016, Plaintiff wrote a letter, making a "request to accommodate" his "disabling medical Condition," explaining that it was "especially urgent due to the fact electromagnetic field EMF-emitting invoicing tools and digital meters may aggravate my disability causing further deterioration of my health."

28. Specifically, Plaintiff asked that CMP permit him to keep his "electromechanical invoicing tool (analog meter) without additional unlawful costs."

29. In his letter, he explained that:

> My disability, lymphoplasmacytic lymphoma (also known as Waldenstrom's macroglobulinemia) is a non- Hodgkins lymphoma for which there is no cure and is a disabling condition exacerbated by radiation, as is most any cancer. As such, I minimize my exposure to electromagnetic fields (EMF) from wireless devices, other sources of radiofrequency radiation (RFR) and microwave emissions as well as sources of adverse power quality issues (a. k. a. dirty power or electricity) creating excessive harmonics and transients (like a direct current EMF-emitting invoicing tool running in an alternating current grid or power line communication invoicing tools).

30. Plaintiff offered to provide "authorization or a letter from my treating physician requesting accommodation" and asked that CMP engage in an "interactive dialogue" with him.

31. On August 22, 2016, Plaintiff called CMP to inquire as to his request for accommodation. He was not able to get an answer.

32. On August 23, 2016, CMP sent Plaintiff a letter, acknowledging that the Americans with Disabilities Act might cover his health issue. But CMP concluded that

no modifications are needed because all customers have the ability to opt-out of using smart meters for whatever reason they choose. The opt-out fees do not in any way restrict the ability of a customer, whether or not he or she considers himself or herself to be RF-sensitive or otherwise disabled, to choose an electromechanical meter instead of a smart meter. Nor do the fees discriminate in any way against customers based on their medical or any other status; all opt-out customers pay these charges to cover opt-out costs, and do so irrespective of any other factor.

33. CMP explained that "your request for a waiver from the opt-out fees is contrary to CMP's approved tariff and therefore is not allowed" and so "CMP intends to proceed with the scheduled disconnection on August 30th."

34. On August 25, 2016, Plaintiff responded, asking CMP to engage in "an interactive dialogue with me" and therefore requesting a "disconnection postponement until October 30, 2016, while we resolve this matter?"

35. Later on August 25, Plaintiff received an automated phone call from CMP saying he needed to make a payment or he would be disconnected.

36. On August 26, 2016, CMP responded to Plaintiff's letter and said "there is no basis for compromise" other than Plaintiff paying the opt-out fee.

37. On August 28, 2016, Plaintiff sent another letter noting that CMP makes a public commitment that they would "not disconnect a customer for a disputed bill amount," and pointing out that his bill with CMP was disputed. That did not, however, pause the process.

38. Late on August 29th, Plaintiff received an email denying his request for accommodation.

39. At 8:15 a.m. on August 30, CMP disconnected Plaintiff's electricity.

40. On November 30, 2016, Plaintiff's oncologist and hemotologist, Dr. David Benton, wrote a letter his condition, explaining that:

> My patient suffers from lymphoplasmacytic lymphoma, a type of non-Hodgkins lymphoma Waldenstrom's Macroglobulinemia (WM), a medical condition for which there is no cure. Treatment goals are to slow disease progression if possible.
>
> We are concerned that low-level non-ionizing radiation exposure of the type and level emitted by Electromagnetic Frequency (EMF) invoicing tools may exacerbate problems already experienced by my patient including fatigue, cognitive difficulties, memory issues

and multiple cancer types.

It is my recommendation Mr. Friedman's request for reasonable accommodation without penalty be granted to minimize his risk of disease progression symptoms exacerbation.

41. Plaintiff sent Dr. Benton's letter to CMP, but CMP did not change its mind about the opt-out fee.

42. In fact, the situation got worse: on December 1, 2016, a representative CMP came to Plaintiff's home, removed his electromechanical meters and installed an EMF-emitting meter in their place.

43. Plaintiff made several phone calls to CMP to remove the meter. CMP came back later that afternoon, replacing the wireless meter with a plug to seal the meter housing.

44. Plaintiff has been disconnected from CMP's electricity ever since.

45. Plaintiff would like to reconnect to electricity, so long as he does not have to pay a discriminatory opt-out fee.

## CAUSES OF ACTION

### I. Violation of the Americans With Disabilities Amendments Act ("ADAA") and the Rehabilitation Act of 1973 as Amended ("RehabAct")

46. Plaintiff realleges and incorporates each and every foregoing paragraph.

47. Title III of the ADAA prohibits discrimination against persons with disabilities by places of public accommodation. *Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 128 (2005) ("Title III of the ADA prohibits discrimination against the disabled in the full and equal enjoyment of public accommodations, 42 U.S.C. § 12182(a), and public transportation services, § 12184(a).");

48. A public entity denies the benefits of its services to a disabled person when it provides services that are not equal to services provided to non-disabled persons. 28 C.F.R. § 35.130(b)(1)(ii).

49. A public entity engages in discriminatory conduct when it "place[s] a surcharge on a particular individual with a disability or any group of individuals with disabilities to cover the costs of measures . . . that are required to provide that individual or group with the nondiscriminatory treatment required by the [ADAA]." 28 C.F.R. § 35.130(f).

50. Under Section 12184(a)(2) of the ADAA, discrimination includes the failure of an entity to "make reasonable modifications consistent with those required under section 12182(b)(2)(A)(ii) of this title."

51. Practices that have a discriminatory effect against the disabled may violate the ADAA even absent intentional discrimination. *Oxford House, Inc. v. Cherry Hill*, 799 F. Supp. 450, 461 (D.N.J. 1992).

52. To the extent that CMP, by virtue of its role as a utility, is considered a quasi-public entity, it is also subject to anti-discrimination provisions of Title II of the ADAA.

53. Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794. The Rehabilitation Act extends relief to "any person aggrieved" by discrimination in violation thereof. 29 U.S.C. § 794a(a)(2).

54. Under Section 504, companies receiving federal funds must provide "the opportunity for handicapped individuals to participate in and benefit from programs receiving federal assistance." *Alexander v. Choate*, 469 U.S. 287, 304 (1985).

55. The fact that the opt-out fee is applied to persons with and without disabilities alike does not mean Ed's request to waive the fee should be denied.

56. According to the U.S. Department of Housing and Urban Development:

> Since rules, policies, practices, and services may have a different effect on persons with disabilities than on other persons, treating persons with disabilities exactly the same as others will sometimes deny persons with disabilities an equal

opportunity to enjoy a dwelling or participate in the program. Not all persons with disabilities will have a need to request a reasonable accommodation. However, all persons with disabilities have a right to request or be provided a reasonable accommodation at any time.[1]

57. There are several examples of circumstances where facially neutral fees (fees applied to disabled and non-disabled people equally) were nonetheless unlawful when they were applied to people with disabilities by virtue of their disability. *See* 28 CFR 35.136 ("Generally, a public entity shall modify its policies, practices, or procedures to permit the use of a service animal by an individual with a disability … A public entity shall not ask or require an individual with a disability to pay a surcharge, even if people accompanied by pets are required to pay fees, or to comply with other requirements generally not applicable to people without pets.").

58. At all times relevant to this action, Ed Friedman suffered from an impairment that substantially limited his life activities and met the definition of a disability within the meaning of the ADAA, 42 U.S.C. § 12102(2), and the Rehabilitation Act, 29 U.S.C. § 705(9*).*

59. Defendant Central Maine Power Company is a place of public accommodation.

60. Defendant Central Maine Power Company receives federal funds.

61. For example, Defendant received approximately $96 million from US Department of Energy Award No. DE-OE0000312 for CMP's Advanced Metering Infrastructure (AMI or smart meter) Project.

62. CMP's excuse for why it believes its fee is not discriminatory is that it charges everyone an opt-out fee for the analog meter.

63. But this is no excuse at all. Suppose a store has both stairs and a wheelchair ramp, and it charges everyone a "stairs opt-out fee" to use the ramp. The opt-out fee is lawful as applied to non-disabled customers who can use stairs or the ramp equally well. But the store is illegally

---

[1] https://www.hud.gov/program_offices/fair_housing_equal_opp/reasonable_accommodations_and_modifications#_Reasonable_Accommodations

discriminating against wheelchair users who, by virtue of their disability, require a ramp in order to access the store. This is true even if the store charges everyone the fee to use the ramp.

64. The same logic applies here. CMP charges the smart meter opt-out fee to everyone, and it is lawful as applied to non-disabled people. However, Plaintiff's medical condition means he cannot have a smart meter at his home. Therefore, just as a wheelchair user requires a ramp for access to services, Plaintiff requires a non-radiation emitting meter for access to electricity. Plaintiff should not have to pay extra to access this in his own home.

## II. Fair Housing Amendments Act ("FHAA")

65. The FHAA outlaws discrimination "in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap" of an individual. 42 U.S.C. § 3604(f)(2).

66. Electricity, water, and heat are among the services that are essential to a safe living environment. *Pogue v. HACSA*, No. 6:17-cv-01731-AA, 2018 U.S. Dist. LEXIS 55764, at *7-8 (D. Or. Apr. 2, 2018) (citing 24 C.F.R, §§ 982.401(e)(1), (f)(1), (i)).

67. "By its express terms, Section 3604 applies to 'the provision of services or facilities' to a dwelling, such as sewer service." *Community Services Inc. v. Wind Gap Mun. Auth.*, 421 F.3d 170, 184 (3d Cir. 2005).

68. As is noted in the Federal Register Vol. 78, No. 32, Page 11461 on February 15, 2013, the FHAA's language prohibiting discrimination in housing is "broad and inclusive." And "HUD has consistently concluded the Act is violated by facially neutral practices that have an unjustified discriminatory effect on the basis of a protected characteristic, regardless of intent."

69. The Supreme Court has held that the FHAA encompasses disparate impact discrimination. *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.,* 135 S. Ct. 2507 (2015). Accordingly, housing practices with a discriminatory effect can violate the FHAA regardless of discriminatory motive.

70. In order to make a *prima facie* case of disparate impact the plaintiff "has the burden of proving that a challenged practice caused or predictably will cause a discriminatory effect." 24 C.F.R. § 100.500(c)(1). This requires the plaintiff to show "that the housing practice actually or predictably results in discrimination as defined under section 3604, or results in a disproportionate burden on members of a class protected by [the statute]."

71. Further, under 42 U.S.C. § 3604(f)(3)(B), discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling."

72. Plaintiff is a person with a handicap as defined by the FHAA.

73. Here, CMP is engaging in discrimination on the basis of disability in the provision of a service to housing, and in its refusal to make reasonable accommodation per Plaintiff's request.

74. That is because CMP's opt-out fee results in a disproportionate burden on persons with disabilities like Ed Friedman.

75. Persons without disabilities have a choice – they can choose to accept CMP's smart meter and pay no extra fee, or choose to opt out and pay initial and monthly fees.

76. Persons with disabilities like Plaintiff, however, have no choice under CMP's policy – they must opt out and pay extra for the same use and enjoyment of their dwelling the non-disabled have.

77. Thus, some or all of persons with disabilities like Plaintiff will be paying the opt-out fee, while very few persons without disabilities will be.

**RELIEF REQUESTED**

78. Wherefore Plaintiff requests judgment be entered against Defendants and that the Court grant the following:

A. Declaratory relief;

B. Compensatory damages;

C. Legal costs and attorneys fees;

D. A permanent injunction requiring Defendant to comply with the requirements of the ADAA/RehabAct/FHAA and to waive the opt-out fee for Ed; and

E. Other and further relief, at law or in equity, to which Plaintiff may be justly entitled.

                Respectfully Submitted,

                /s/Bruce M. Merrill
                Bruce M. Merrill
                Law Offices of Bruce M. Merrill
                225 Commercial Street, Suite 501
                Portland, ME 04101 Phone : (207) 775-3333
                Fax : (207) 775-2166
                E-mail: mainelaw@maine.rr.com

                William Most, *Pro Hac Vice to Be Filed*
                Sarah Chervinsky, *Pro Hac Vice to Be Filed*
                Law Offices of William Most
                201 St. Charles Avenue
                New Orleans, LA 70170
                Phone:(504)509-5023
                Fax:(504)
                E-mail: williammost@gmail.com

                ATTORNEYS FOR PLAINTIFF