**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

ED FRIEDMAN,                                  )
                                              )
      Plaintiff,                          )
                                              )        2:20-cv-00237-JDL
v.                                            )
                                              )
CENTRAL MAINE POWER COMPANY,                  )
                                              )
      Defendant                           )
                                              )

## DEFENDANT'S MOTION TO DISMISS
## WITH INCORPORATED MEMORANDUM OF LAW

The Defendant Central Maine Power Company ("CMP"), through counsel, moves to dismiss the Complaint on the following grounds:

1. First, because the Plaintiff is bound by the Public Utility Commission's prior finding that the standard "smart" meters used by CMP to deliver electricity are safe, he is collaterally estopped from asserting the claims included in his Complaint, all of which depend, for their validity, upon a judicial determination that smart meters pose a risk to his health;

2. Second, the Complaint does not state a claim upon which relief can be granted because it does not plausibly allege that there is a nexus between the Plaintiff's disability and the modification of CMP standard practice – being provided a non-standard electro-mechanical meter – for which he is charged a fee;

3. Third, the Complaint does not state a claim upon which relief can be granted because it does not allege that CMP differentiates between the disabled and the non-disabled when charging customers who exercise their right to have non-standard meters installed in their homes ; and

1

4.  Fourth, because the PUC requires that CMP charge the plaintiff a fee for a non-
    standard meter, his disparate impact claim under the Fair Housing Amendments
    Act (FHAA) fails as a matter of law

The grounds for CMP's motion are set forth in more detail in the Memorandum of
Law incorporated below, pursuant to Local Rule 7(a).

## MEMORANDUM OF LAW

In this action the Plaintiff, Ed Friedman, alleges that CMP is violating his rights under
federal law by charging him a fee for the use of a non-standard, electro-mechanical meter, instead
of CMP's "smart meter" – a standard component of CMP's advanced metering infrastructure
(AMI) system – to measure his electricity usage.  Every CMP customer has the right to use an
electro-mechanical meter, but must pay a fee to do so.  The fees that are charged by CMP to each
individual customer who opts out of AMI, which have been ordered by the Maine Public Utilities
Commission (PUC), defray the additional expense the company incurs – expense which otherwise
would be passed along to all its customers – whenever any individual customer chooses not to take
advantage of the cost-saving efficiencies afforded by the AMI system.  Mr. Friedman alleges that
he should not have to pay the fees because his decision to opt out is the result of a disability, not a
personal preference.  As CMP argues below, however, Mr. Friedman's claim must be dismissed
for several reasons.

First, Mr. Friedman has already litigated before the Maine PUC, and lost, a case wherein a
factual issue that is essential to the claims he asserts here was resolved against him.   In that case
the PUC found that "AMI, including the use of smart meters, as implemented and operated by
CMP, does not present a credible threat of harm to the health and safety of CMP's customers and
. . . is, therefore, safe."  That factual determination is binding on Mr. Friedman, and it bars the

claims asserted in this action, all of which fail in the absence of a nexus between his disability and his insistence on having a non-standard meter – that is, in the absence of proof that his medical condition makes a non-standard meter "necessary" for his equal enjoyment of CMP's goods and services.   Simply put, an accommodation cannot be "necessary" under the Americans with Disabilities Act, the Rehabilitation Act, or the Fair Housing Amendments Act – and charging a fee for it cannot be not characterized as a discriminatory surcharge – if, even in its absence, the product or service offered by a place of public accommodation is perfectly safe.

Second, even if the PUC finding were not preclusive, Mr. Friedman's claims would be deficient because he does not sufficiently allege the existence of an actual causal nexus between his medical condition and his refusal to have a smart meter in his home.   Mr. Friedman alleges that he has a form of lymphoma; that his doctor has told him that exposure to RF emissions "may exacerbate" his physical problems; and that he can "minimize his risk of disease progression symptoms exacerbation" [sic] by avoiding exposure to RF emissions.   Under federal pleading standards, those assertions are not sufficient to "plausibly" allege that Mr. Friedman, by reason of his lymphoma, suffers from an "impairment" that can actually be ameliorated by the requested accommodation.   Mr. Friedman's factually-unsubstantiated fear that he "may" be harmed by having a smart meter in his home, and his desire to "minimize" a risk that has not been shown to exist in fact, does not entitle him to an exemption from the charge that CMP levies – and that the PUC has said CMP must levy – whenever a customer opts out of AMI technology.

Third, the law provides that a fee – even a fee that has the effect of alleviating discomfort or inconvenience that a disabled person would otherwise experience – is not an unlawful surcharge if it is borne by the disabled and the non-disabled alike.   Because the opt-out fees charged by CMP

are charged to every customer who opts out of the AMI system, regardless of their reasons, it is not an unlawful surcharge.

Finally, insofar as the Plaintiff is asserting a "disparate impact" claim under the Fair Housing Amendments Act, the claim fails because the practice of which he complains is dictated by the PUC, which has mandated that CMP charge a specified fee to each customer who opts out of AMI technology. CMP cannot be held liable, even on a disparate impact theory, for carrying out a policy devised and promulgated by the PUC.

## STANDARD OF REVIEW

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. at 555 (citation omitted). *See In re Curran*, 855 F.3d 19, 25 (1st Cir. 2017) (quoting *Shay v. Walters*, 702 F.3d 76, 82 (1st Cir. 2012)) (in assessing the sufficiency of the allegations in a complaint, "the court 'need not give weight to bare conclusions, unembellished by pertinent facts'").

The plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* 556 U.S. at 557 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. at

557).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'"  *Id.*

Furthermore, "[o]n a motion to dismiss brought pursuant to Rule 12(b)(6), a court may consider, in addition to what is alleged in the complaint, "documents the authenticity of which are not disputed by the parties; … official public records; . . .  documents central to plaintiffs' claim; [and] documents sufficiently referred to in the complaint."  *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993).  These may include records of prior judicial proceedings.  *See Rodi v. Southern New England School of Law,* 389 F.3d 5, 19 (1st Cir. 2004) (where plaintiff alleged that statute of limitations was tolled by savings statute, court could take notice of proceedings in earlier action litigated in New Jersey federal court).

## FACTS

### A.  THE FACTS ALLEGED IN THE COMPLAINT.

The Complaint makes the following allegations.

CMP measures its customers' electricity usage through meters placed in or on their homes.  Complaint ¶16.  CMP's customers can either have a "smart" meter, which emits radio-frequency radiation, or an electro-mechanical/analog meter, which does not.  Complaint ¶17.  CMP's smart meters operate by transmitting information via radiofrequency radiation signals thousands of times per day.  Complaint ¶18.

In order to opt out of the smart meter program, CMP customers must pay an initial fee and a recurring monthly charge.  Complaint ¶¶19-20.  This opt-out was required by the PUC.  Complaint ¶21.

The Plaintiff, Ed Friedman, has an incurable form of lymphoma called lymphoplasmacytic lymphoma.  Complaint ¶¶4 & 13.  His oncologist "says he should not be exposed to any excess

5

radiation in his home, including radiation from [CMP's] electrical 'smart' meters."  Complaint ¶5.

More specifically, Plaintiff's oncologist and hematologist, Dr. David Benton, has said of Mr.

Friedman:

> My patient suffers from lymphoplasmacytic lymphoma, a type of non-Hodgkins lymphoma Waldenstrom's Macroglobulinemia (WM), a medical condition for which there is no cure. Treatment goals are to slow disease progression if possible.
>
> We are concerned that low-level non-ionizing radiation exposure of the type and level emitted by Electromagnetic Frequency (EMF) invoicing tools may exacerbate problems already experienced by my patient including fatigue, cognitive difficulties, memory issues and multiple cancer types.
>
> It is my recommendation Mr. Friedman's request for reasonable accommodation without penalty be granted to minimize his risk of disease progression symptoms exacerbation.

Complaint ¶ 40.

 Mr. Friedman has opted out of the smart meter program.  Complaint ¶ 22.  CMP has billed

him to exercise that option.  Complaint ¶ 26.  Mr. Friedman asked to be excused from having to

pay the fee, as an accommodation of a "disabling medical condition."  Complaint ¶¶ 27-30.  CMP

declined, and after Mr. Friedman failed to pay the opt-out fees that accrued over a period of

months, the company eventually disconnected his electricity.  Complaint ¶¶ 32-44.

Mr. Friedman has now brought a Complaint containing two counts: one under the

Americans with Disabilities Act (ADA) and the Rehabilitation Act of 1973, and one under the Fair

Housing Amendments Act (FHA).  He contends that the opt-out fee, although "facially neutral,"

is discriminatory in its impact because he, as a person with a disability, "requires a non-radiation

emitting meter for access to electricity."  Complaint ¶¶ 51, 55-58, and 62-64.  He further alleges

that CMP's refusal to waive the opt-out fee violates the FHA because the fee "results in a

disproportionate burden on persons with disabilities," such as him.  Complaint ¶¶ 73-77.

**B.  FACTS OUTSIDE THE PLEADINGS.**

In addition to the facts alleged in the Complaint itself, the Court can and should judicially notice the federal regulatory framework within which CMP has implemented its AMI technology, as well as prior state litigation involving the issues raised by the Complaint.

### 1.  The FCC's Regulation of Radio-Frequency Emissions

The National Environmental Policy Act, 42 U.S.C. §§ 4321-4335 (NEPA), conferred upon the Federal Communications Commission (FCC) the responsibility to set standards for RF emissions.  *See* Federal Communications Commission, *Resolution of Notice of Inquiry, Second Report and Order, Notice of Proposed Rulemaking, and Memorandum of Opinion and Order* (hereinafter "FCC 2019 RF Order") at 3 (December 4, 2019) (citing, *inter alia*, Telecommunications Act of 1996, Pub. L. No. 104-104, § 704(b), 101 Stat. 56, 152, directing FCC to "prescribe and make effective rules regarding the environmental effects of radio frequency emissions"), and 47 U.S.C. §332(c)(7)(B)(iv) (recognizing Commission's predominant role in regulating RF emissions by proscribing state and local regulation of placement, construction, and modification of FCC-compliant personal wireless service facilities based on environmental effects of such RF emissions)).  A copy of the FCC 2019 RF Order is attached as Exhibit 2.

Accordingly, in 1996, the FCC "established a set of guidelines for evaluating the environmental effects of RF exposure," *Guidelines for Evaluating the Environmental Effects of Radiofrequency Radiation*, ET Docket No. 93-62, *Report and Order*, 11 FCC Rcd 15123 (1996) (hereinafter *FCC 1996 RF Order*) (Attached as Exhibit 1), which included limits for specific absorption rate (SAR, the metric for highly-localized, close-in exposure at commonly-used frequencies) and maximum permissible exposure (MPE, the measure for more-distant, whole-body exposure and for whole-body exposure at higher frequencies).  Because "smart meters are designed

7

generally to be used in such a way that a separation distance of at least 20 centimeters is normally maintained between the transmitter's radiating structure(s) and the bodies of any nearby persons [they] qualify for exposure evaluation using MPE limits rather than SAR limits. *FCC 2019 RF Order* at 17, n. 92. Compliance with the FCC's requirements, including RF exposure limits, was ensured by having smart meters "tested and evaluated in certified laboratories prior to sale to utility companies." Maine PUC, Docket Nos. 2011-00262 & 2012-00412, *Order re: Safety of Advanced Metering Infrastructure (AMI)* (hereinafter "PUC December 19, 2014 Order") (Attached as Exhibit 5) at 16.

In 2019, the FCC completed a re-evaluation and analysis of the evidence concerning the safety of RF emissions. After weighing the evidence, the FCC reaffirmed its conclusion that the guidelines with which CMP complied when it implemented its smart meter program are adequate – indeed, far more than adequate – to protect the public's health. "Despite requests from some to increase and others to decrease the existing limits," the FCC concluded that "they reflect the best available information concerning safe levels of RF exposure for workers and members of the general public, including inputs from our sister federal agencies charged with regulating safety and health and from well-established international standards." *FCC 2019 RF Order* at 2. The FCC found "no scientific evidence establish[ing] a causal link between wireless device use and cancer or other illnesses." *Id*. at 8.

In particular, the FCC addressed the lack of attention in the 1996 guidance to the "non-thermal" effects of RF emissions. The FCC explained:

> The *2013 RF Order and Notice* took note of a number of comments concerning possible "non-thermal" biological effects of RF and the brain, but rationally excluded considering these "non-thermal" effects when classifying the pinnae as extremities for SAR compliance, limiting the decision to the consideration of tissue composition and thermal properties only within the pinnae themselves, alongside the support of expert determinations of the

> FDA and of the IEEE, while deferring such other "non-thermal" considerations raised for consideration in our *Inquiry*. In terminating our *Inquiry*, we have rigorously analyzed our existing RF exposure framework and have dismissed the notion that the existing framework should be altered on account of any "non-thermal" effects.

*Id.* at 72 (footnotes omitted).

### 2. The State Case Which Established the Right to Opt Out of AMI and the Circumstances under Which That Right May Be Exercised.

In Paragraph 21 of his Complaint, the Plaintiff alludes to the fact that the Maine PUC required CMP to give its customers the right to opt out of AMI, and he cites a two-part Order which imposed that requirement. The orders to which he refers, hereinafter referred to a "Opt-Out Order Part I" and "Opt-Out Order Part II," are attached as Exhibits 3 and 4, respectively.

Mr. Friedman was not a party to the case that produced the Opt-Out Orders. In the course of deciding a case later brought by Mr. Friedman, however, the Maine Supreme Judicial Court succinctly summarized those proceedings:

> In [2010], the Commission received a number of complaints from customers against CMP regarding the AMI project. These complaints raised concerns about the health and safety of smart-meter technology associated with the AMI project – particularly the health effects of radio frequency (RF) radiation emitted by the wireless smart meters – and regarding the technology's potential to violate individuals' privacy and property rights. The complainants expressed concerns that CMP did not allow customers the opportunity to opt out of the AMI project.
>
> In response, the Commission consolidated the complaints and initiated an investigation to "determine whether CMP's act or practice of not allowing individual customers to choose not to have a smart meter installed or to otherwise opt-out of the program is unreasonable, insufficient or unjustly discriminatory." After conducting the investigation, the Commission issued an order in two parts, known as the Opt–Out Orders. Part I . . . , entered in May 2011, ordered CMP to provide two alternatives for customers who choose not to have the standard wireless smart meter installed on their premises and provided for charges for those customers who elect to participate in the opt-out program. Part II . . . , entered in June 2011, addressed the background, analysis, and reasoning underlying the Commission's decision.

*Friedman v. Public Utilities Comm'n*, 2012 ME 90, ¶¶2-3, 48 A.3d 794, 796-97 (hereinafter "*Friedman v. PUC I*") (citations and footnotes omitted).

In that first proceeding the PUC carefully considered the question of who should be responsible for absorbing the additional costs that CMP – and thus its customer base – would incur as a result of individual customers opting out of the smart meter program.  The Commission described AMI as "an important technology that will ultimately reduce utility operational costs, improve customer service and provide customers with necessary tools to use electricity more efficiently and lower their electricity bills." *Opt-Out Order Part II*, at 2 (quoting PUC, *Order Approving Installation of AMI Technology,* Docket No. 2007-215 (II) at 2 (July 28, 2009)).  As the Order explains, the PUC had elected to examine, among other things, "[t]he cost . . . of opt-out options, including whether customers that choose an opt-out should pay any additional cost." *Id.* at 7.  The way that question was approached and resolved has important implications for this case.

First, PUC staff proposed that each customer choosing to opt out be charged an initial fee and a monthly charge, with the amount of those charges to depend on whether customers chose to retain their existing meters or to accept smart meters with the transmitters off.  In each instance, the additional charges proposed were based on staff's assessment of the "incremental costs . . . initially estimated by CMP," adjusted as a result of staff's "reduc[tion] or eliminat[ion] [of] certain costs it considered to be unsubstantiated, not incremental, or unduly speculative." *Id.* at 9 n.6.  Several parties opposed any requirement that customers have to pay to opt out, arguing, *inter alia*, that "no one should have to compromise when it comes to their health and privacy concerns in their own homes and the additional opt-out costs would be small if charged to all ratepayers." *Id.* at 11.

The PUC started its analysis by "affirm[ing] [its] support for CMP's AMI initiative and

smart grid technology more generally," as the technology was expected to give customers the ability to lower their electricity bills, and also "result in more efficient electric grid and utility operational improvements for the benefit of all electricity users."  The Commission then noted that CMP had "responded reasonably and prudently to the State's policy regarding smart grid technology," and "found CMP's AMI project to be cost-effective and technically sound."  *Id*. at 12.  The PUC acknowledged CMP's assertion that there was no "credible scientific evidence" that smart meters are harmful, but said that CMP's assertion "misse[d] the point."  Since CMP is a monopoly, the Commission reasoned, the company should be responsive to customer concerns, whatever their basis.  Thus, the Commission held, it would be "an unreasonable act and practice for a utility to ignore the concerns of a significant number of its customers and refuse to permit a smart meter opt-out option *if* doing so is technically and economically feasible and *those customers assume and bear the additional cost.*"  *Id.* (emphasis added).

Finally, the PUC rejected the argument of some intervenors, "that the incremental cost of providing the opt-out alternatives should not be charged directly to the opt-out customers, but paid for by all of CMP's ratepayers."  *Id*. at 14.  The Commission noted that AMI smart meters had become CMP's standard meter, and that there was no reason to deviate from the "general ratemaking principle [that] customers that request non-standard services should pay the incremental costs of those services."  *Id*.  The PUC concluded: "In our view, it would be inconsistent with ratemaking principles and basically inequitable for CMP to recover the costs caused by an individual customer's decision to opt out of receiving a standard wireless meter from its general body of ratepayers."  *Id.*

### 3.   The Case Which Established the Safety of Radio-Frequency Emissions from CMP's Smart Meters

The second relevant state case was commenced by Mr. Friedman.  That case, too, has been

well summarized by the Law Court:

> In July 2011, Ed Friedman and eighteen other CMP customers filed a complaint with the Commission against both the Commission and CMP pursuant to 35–A M.R.S. § 1302 (2011). Friedman's complaint explained:
>
>> [T]he complaint is directed not only at CMP for levying what, given the facts, must be an unreasonable, unjust and discriminatory fee against ratepayers choosing to opt out of the smart meter program, but also at the PUC because of its May 19 and June 22, 2011 Orders (Part I and Part II) requiring CMP customers to pay the utility, should they, the ratepayer, elect to opt out of the program.
>
> Friedman's complaint requested that the Commission "open an investigation" to consider "new and important evidence specifically addressing non-ionizing radiation of the type emitted by smart meters," which the complaint noted had been published since the Commission issued Opt–Out Order Part I. The complaint also cited Fourth Amendment concerns regarding privacy and "electronic trespass" and included citations to various articles and studies addressing those issues. In particular, Friedman's complaint cited a press release from the World Health Organization, dated May 31, 2011, that classified RF radiation as "possibly carcinogenic to humans." In addition to other relief, the complaint requested that the Commission order the stay of further installation of smart meters.
>
> The Commission dismissed Friedman's complaint, without a hearing, by an order entered in August 2011. *See Order Dismissing Complaint,* No. 2011–262, Order (Me.P.U.C. Aug. 31, 2011) [hereinafter Aug. 31 Order]. In its decision, the Commission concluded, "All of the issues raised by the complainants in this matter were raised by one or more of the complainants in the Opt–Out Investigation and were considered by the Commission and resolved during that investigation or in subsequent orders on motions for reconsideration." *Id.* at 5. The Commission also concluded that section 1302 does not authorize a complaint against the Commission itself. *Id.* Friedman filed a motion for reconsideration that was denied by operation of law on the expiration of the twenty-day period for processing such motions. *See* 9 C.M.R. 65–407 110–33 § 1004 (1996).

*Friedman v. PUC I*, ¶¶4-5

Mr. Friedman appealed the PUC's dismissal to the Law Court, which vacated it in part. The Court determined that although the Commission had "*considered*, to a limited extent, the health and safety issues Friedman raised, . . . it did not *resolve* those issues." Thus, the Court reasoned that the Commission, "[h]aving never determined whether smart-meter technology is safe, [was] in no position to conclude . . . that requiring customers who elect either of the opt-out alternatives to pay a fee is not 'unreasonable or unjustly discriminatory.'" *Id*., ¶11.

On remand, the PUC initiated an investigation and conducted extensive discovery. In the course of its investigation the Commission considered over one-hundred peer-reviewed scientific studies, *Dec. 19, 2014 Order at 11*; an investigation performed by the Maine Centers for Disease Control, *id. at 74-75*; exposure regulations in the United States and Canada, *id. at 76-78*[1]; "data showing that smart meters comply with RF exposure regulations promulgated by the FCC," *id. at 35 & 64*; and "extensive field-testing of smart meters." *Id. at 65-67.* The PUC also received pre-filed testimony, and ultimately conducted two days of live testimonial hearings.

---

[1] In the proceedings before the PUC, CMP "demonstrate[d] that [its] smart meters result in RF exposure levels that are below the FCC limit." *PUC December 19, 2014 Order* at 18. *See also id*. at 64 (Opinion of Commissioner Van Noy) ("No party has contested the fact that, prior to CMP acquiring Trilliant's Smart Meter and Mesh system, the safety of that equipment was established through the FCC application process by Trilliant for the FCC Grant of Equipment Authorization."). On the basis of this evidence, CMP argued that the PUC was precluded from making independent findings regarding the safety of RF emissions, and that the sole question should be whether CMP's smart meters complied with FCC RF emission standards. *PUC December 19, 2014 Order* at 9. The Office of the Public Advocate (OPA) joined CMP in advancing this position, and added that "[t]he measurements taken for the OPA Study showed that even when combined with other RF signals occurring in an urban setting, the aggregate level of RF emissions was, on average, roughly 20 times lower than the FCC standards." *PUC December 19, 2014 Order* at 23.

The PUC rejected CMP's preemption argument, reasoning that "the applicability of the FCC standards [was] 'a matter that should be further explored through evidence and argument.'" *PUC December 19, 2014 Order* at 9 (quoting PUC Docket No. 2011-00262, *Order Denying Motion for Order on Scope of Proceeding* at 2 (Oct. 10, 2012)). Commissioner Littell, in particular, expressed the view that the FCC's guidelines for RF exposure, promulgated in 1996, were outdated, and that they did not take into account a "growing body of research on potential non-thermal effects of RF radiation." *Id.* at 34-35 (Opinion of Commissioner Littell). *See also id.* at 68-69 (Opinion of Commissioner Vannoy) (finding it "unclear" whether Maine could adopt a "state-specific RF emission standard for any RF emitting device," and deeming it unnecessary to reach the question).

After the hearing, the Commission found that "AMI, including the use of smart meters, as implemented and operated by CMP, does not present a credible threat of harm to the health and safety of CMP's customers and, based on the record of this proceeding is, therefore, safe." *Dec. 19, 2014 Order at 23*.  The two Commissioners who joined in the decision took "slightly different approach[es] regarding customers with medical treatment recommendations to avoid the AMI meters." *Id.*  One Commissioner (Littell) would have had CMP provide "an AMI meter with transmitter off" as an option for customers who objected to RF exposure at any level, while the other (Vannoy) would not have imposed that requirement.  However, "[b]oth Commissioner Littell and Commissioner Vannoy concur[red] that this difference in approach [did] not vitiate their concurrence regarding the safety of the AMI meters and network in use in Maine." *Id.*

Mr. Friedman appealed again.  This time, the Law Court affirmed the decision of the PUC. *Friedman v. Public Utilities Comm'n*, 2016 ME 19, 132 A.3d 183 (2016) (hereinafter "*Friedman v. PUC II*").  The Court agreed with the Commission that CMP was not required to "ensure" safety beyond all doubt, reasoning that "evidence of a hypothetical future risk is not sufficient to preclude a finding that CMP satisfied its burden; rather, the threat of harm must be probable and convincing." *Id.*, ¶¶7-8.  The Law Court agreed that Mr. Friedman had not established a "probable" threat of harm; to the contrary, the Commission had properly determined that "'there have been no studies provided or cited that even purport to indicate negative health effects from the . . . RF exposure levels from smart meters.'" *Id.*, ¶14 (citing *December 19, 2014 Order at 69*) (emphasis added).  It was not enough, the Court said, for Mr. Friedman to present "evidence of *potential future risk* posed generally by RF exposure." *Id.* (emphasis added).  Because the evidence in the record "was insufficient to conclude that smart meters amount to a credible threat of harm," CMP had met its burden of proving that its system for delivering electricity was "safe."

**LEGAL ARGUMENT**

A.  **IN ORDER TO STATE A CLAIM UNDER EITHER COUNT I OR COUNT II OF HIS COMPLAINT, THE PLAINTIFF MUST PLAUSIBLY ALLEGE THAT HE IS BEING CHARGED A FEE TO AVAIL HIMSELF OF AN ACCOMMODATION WHICH IS "NECESSARY" TO HIS EQUAL ENJOYMENT OF THE SERVICE CMP PROVIDES.**

In Count I of his Complaint, the Plaintiff seeks relief under Title III of the Americans with Disabilities Act, Complaint ¶¶ 47-51 & 78(D); "[t]o the extent that CMP, by virtue of its role as a utility, is considered a quasi-public entity," under Title II of the ADA, Complaint ¶¶ 52 & 78(D); and under the Rehabilitation Act.  Complaint ¶¶ 54 & 78(D).  In Count II, he seeks relief under the Fair Housing Amendments Act (FHAA).  Complaint ¶¶ 65-77.  Underlying each of these statutory schemes is a common, irreducible requirement: in order to make out a claim for relief, Mr. Friedman must plausibly allege, and ultimately prove, that he has a disability which limits his ability to enjoy the service offered by CMP, and that a modification in the company's policies or practices is necessary to put him on an equal footing with its customers who are not disabled.

The modification Mr. Friedman says he is entitled to is the ability to have a meter other than a smart meter in his home.  It is undisputed that Mr. Friedman, like every CMP customer, has the right to a non-standard meter.  It is also undisputed that Mr. Friedman has exercised the right. He alleges, however, that CMP has violated the law by requiring him to pay to do so.  The fees he is charged by CMP, he says, are unlawful surcharges.

In order to evaluate whether the fees constitute a surcharge that violates the ADA, the Court should "conduct a two-part inquiry."  *Dare v. California*, 191 F.3d 1167, 1171 (9th Cir. 1999), *cert. denied*, 531 U.S. 1190 (2001).  First, the Court must consider whether the opt-out "is 'required to provide that individual or group nondiscriminatory treatment' as mandated by the ADA."  *Id.* (quoting 28 C.F.R. § 35.130(f)).  If the opt-out is not required under the ADA, "the inquiry ends;

28 C.F.R. § 35.130(f) only forbids surcharges for 'required' measures." *Id.*[2]  *See Meagley v. City of Little Rock,* 639 F.3d 384, 390-91 (8th Cir. 2011) (where zoo made scooters available not because they were "required" to provide access to disabled visitors, but as "a convenience for all zoo visitors," the charge was not an illegal surcharge on the disabled); *Robishaw v. The Providence Prob. Court,* 206 F. Supp. 3d 723, 730-31 (D.R.I. 2016) ("[C]harges for services violate the ADA (1) when the fee pays for services required by the ADA; and (2) when nondisabled people do not also incur the fee.").

The Plaintiff's claims falter at the first step of the two-step inquiry.  Although he alleges that his use of a non-standard meter is "required" by law[3], Mr. Friedman is bound by the PUC's factual determination that the RF emissions from CMP's smart meters are safe.  Because those emissions are safe, he cannot establish that the modification of CMP's standard practice for which he is being charged – his use of an electro-mechanical meter, instead of a smart meter – is "necessary" for him to avail himself of the electricity CMP provides.  Thus, the modification is not "required" to afford him "nondiscriminatory treatment" under the ADA, the Rehabilitation Act, or the FHAA.

---

[2] The second question, if the Court reaches it, is whether the opt-out fee "constitutes a charge that nondisabled people would not incur." *Dare v. California*, 191 F.3d at 1171 ("If nondisabled people pay the same fee for an equivalent service, the charge to disabled people would not constitute a surcharge on a 'required' measure," and it does not run afoul of the ADA).  As explained below, at page 28, the Plaintiff's claims fail that second step in the analysis as well.

[3] See Complaint ¶49 (opt-out fee "'place[s] a surcharge on a particular individual with a disability or [a] group of individuals with disabilities to cover the cost of measures . . . that are required to provide that individual or group with the nondiscriminatory treatment required by the [ADAA]'") (quoting 28 C.F.R. 35.130(f)); id.  ¶¶63-64 ("[J]ust as a wheelchair user requires a ramp for access to services, Plaintiff requires a non-radiation emitting meter for access to electricity.  Plaintiff should not have to pay extra to access this in his own home.").

1.  **Title III of the ADA requires that a place of public accommodation modify its policies or practices only when "necessary" to afford a member of the public equal access to its services, facilities, privileges, or accommodations.**

Title III of the ADA, which governs the conduct of private (non-governmental) actors, provides:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C.A. §12182(a).  The statute defines discrimination to include "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are *necessary* to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities."  *Id.* §12182(b)(2)(A) (emphasis added).

2.  **Title II of the ADA requires that a public entity modify its policies or practices only when "necessary" to afford a member of the public equal access to its programs or services.**

Title II of the ADA governs the operations of public entities, including "any department, agency . . . or other instrumentality of a State . . . or local government."  42 U.S.C. § 12131(1)(B). Section 202 of the Act, 42 U.S.C. § 12132, provides,

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

The text of Title II, unlike that of Title III, does not explicitly identify the circumstances under which a covered entity must modify it policies or standard practices.  However, the Department of Justice has promulgated regulations to implement Title II, which impose an obligation to accommodate that mirrors the obligation imposed by Title III.  Under the DOJ regulations, public entities are required to "make reasonable modifications in policies, practices,

or procedures when the modifications are *necessary* to avoid discrimination on the basis of disability." 28 C.F.R. §35.130 (emphasis added).  Consistent with this regulation, several federal courts, including the First Circuit, have recognized that Congress, in enacting the ADA, "'intend[ed] that the forms of discrimination prohibited by [Title II] be identical to those set out in the applicable provisions of titles I and III.'"  *Theriault v. Flynn*, 162 F.3d 46, 53 n. 10 (1ˢᵗ Cir. 1998) (quoting H.R. Rep. 101-485, at 84 (1990), *reprinted in* 1990 U.S.C.C.A.N. 267, 367).  *See also Mary Jo C. v. New York State & Local Ret. Sys.,* 707 F.3d 144, 158 n.6 (2d Cir. 2013) ("Courts have read the requirements of Title II and Title III as being consistent with each other.").

Thus, although CMP disputes the assertion that it is a "public entity," the Court need not resolve that dispute in order to decide this motion.  Whether the Plaintiff's claim lies under Title III or Title II of the ADA, he can prevail only by proving that CMP is charging him a fee for a variance from company practice that is "necessary" for his equal enjoyment of CMP's electrical service.

> **3. The Rehabilitation Act requires that an entity which receives federal funding modify its policies or practices only when "necessary" to afford a member of the public equal access to its programs or services.**

 Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794. The Rehabilitation Act extends relief to "any person aggrieved" by discrimination in violation thereof. 29 U.S.C. § 794a(a)(2).

"[T]he same standards   apply   to   claims   under Title III of   the ADA and   §504   of the Rehabilitation Act."  *Collins v. Dartmouth-Hitchcock Med. Ctr.,* 2015 WL 268842, at *6 (D.N.H. Jan. 21, 2015) *(citing Argenyi v. Creighton Univ.,* 703 F.3d 441, 445 (8th Cir. 2013)).  *See*

*Kendall v. Sec'y, Dep't of Veterans Affairs,* 682 F. App'x 761, 765 (11th Cir. 2017) ("Claims

brought under the Rehabilitation Act are analyzed under the same standards as set forth in Title III

of the ADA.").  Thus, in an action alleging failure to accommodate under the Rehabilitation Act,

a plaintiff must prove that the accommodation he seeks is "necessary" for his enjoyment of a

"program or activity" that receives federal funding.  *Berardelli v. Allied Serv. Inst. Of Rehab. Med.*,

900 F.3d 104, 123-24 (3rd Cir. 2018).  *See Wisconsin Community Serv., Inc. v. City of Milwaukee*,

465 F.3d 737, 751 (7th Cir. 2006) (under ADA, accommodation is "only . . .  required when

necessary to avoid discrimination on the basis of disability," and the Rehabilitation Act has also

been construed as containing a similar "necessity requirement").

> **4.  The Fair Housing Amendments Act requires that an entity which supplies
> facilities or services in connection with a dwelling modify its policies,
> practices, or services only when "necessary" to afford a handicapped
> person equal opportunity to use the dwelling.**

The Fair Housing Amendments Act makes it unlawful

> To discriminate against any person in the terms, conditions, or privileges of
> sale or rental of a dwelling, or in the provision of services or facilities in
> connection with such dwelling, because of a handicap of--
>
> **(A)** that person; or
>
> **(B)** a person residing in or intending to reside in that dwelling after
> it is so sold, rented, or made available; or
>
> **(C)** any person associated with that person.

42 U.S.C.A. §3604(f)(2).  Under the FHA, "discrimination" includes "a refusal to make reasonable

accommodations in rules, policies, practices, or services, when such accommodations may be

*necessary* to afford such person equal opportunity to use and enjoy a dwelling."  *Id.* §3604(f)(3)(B)

(emphasis added).

As the language italicized above makes clear, the concept of "necessity" is central to the protection afforded by the Fair Housing Amendments Act, just as it is under the ADA and the Rehabilitation Act.  The purpose of the FHAA is to ensure that handicapped persons have "equal opportunity" to "live in the same residences and communities as non-disabled individuals, insofar as that can be accomplished through a reasonable accommodation or modification."  *Hollis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 541 (6th Cir. 2014).  "The statute links the term 'necessary' to the goal of equal opportunity."  *Smith & Lee Assocs., Inc. v. City of Taylor, Mich.*, 102 F.3d 781, 795 (6th Cir. 1996) (citing 42 U.S.C. § 3604(f)(3)(B) ("accommodation . . . necessary to afford . . . equal opportunity")).  "[T]he statute does not talk in terms of accommodations and/or modifications that are simply convenient to a handicapped individual's use or enjoyment of the property"; thus, "the duty to make a reasonable accommodation does not simply spring from the fact that the handicapped person . . . wants such an accommodation made." *Gavin v. Spring Ridge Conservancy, Inc.,* 934 F. Supp. 685, 687 (D. Md. 1995), *aff'd,* 92 F.3d 1178 (4th Cir. 1996).  Rather, to demonstrate "necessity," "[p]laintiffs must show that, but for the accommodation, they likely will be denied an equal opportunity to enjoy the housing of their choice."  *Smith & Lee Assocs., Inc. v. City of Taylor, Mich.*, 102 F.3d at 795.

## B. THE PLAINTIFF IS PRECLUDED FROM ESTABLISHING, AND IN ANY EVENT HAS NOT PLAUSIBLY ALLEGED, THAT A NON-STANDARD METER IS "NECESSARY" FOR HIM TO HAVE EQUAL ACCESS TO CMP'S SERVICES, OR AN EQUAL OPPORTUNITY TO USE HIS HOME.

### 1. Because the PUC has made a binding factual determination that the RF emissions from CMP's smart meters are safe, the Plaintiff's claims are barred by collateral estoppel.

When a federal court is presented with a case that was previously adjudicated by a state agency, it "must give the [state] agency's factfinding the same preclusive effect to which it would be entitled in the State's courts.'"  *University of Tennessee v. Elliott,* 478 U.S. 788, 799 (1986).

Because Maine courts "treat such agency findings as a proper basis for precluding relitigation," this Court must do the same. *Bath Iron Works Corp. v. Director, Office of Workers' Comp. Programs, U.S. Dep't of Labor*, 125 F.3d 18, 21 (1st Cir. 1997) (citing *Van Houten v. Harco Constr., Inc.,* 655 A.2d 331, 333-34 (Me.1995)). *See also Global Naps, Inc. v. Massachusetts Dep't of Telecommunications & Energy,* 427 F.3d 34, 44 n.8 (1st Cir. 2005) ("The courts generally 'favor[ ] application of the common-law doctrines of collateral estoppel (as to issues) and res judicata (as to claims) to those determinations of administrative bodies that have attained finality.'") (quoting *Astoria Fed. Sav. & Loan Ass'n v. Solimino,* 501 U.S. 104, 107 (1991)).

For administrative collateral estoppel to apply, an agency's prior finding of fact must have been made in a proceeding that was adjudicative in character, and the proceeding must have satisfied the procedural conditions for preclusion. If those conditions are met, the prior finding of fact may preclude relitigation of the same dispute in a later lawsuit. As explained below, the PUC acted in an adjudicative capacity; the parties actually litigated the safety of RF emissions from CMP smart meters; the PUC conclusively resolved the parties' dispute in a final judgment that was affirmed by the Maine Supreme Judicial Court; and a factual determination which was essential to the outcome of the PUC proceeding now precludes Mr. Friedman from relitigating his contention that CMP's smart meters put him at risk of physical harm.

> a. *The PUC proceeding was adjudicative in character.*

The "essential elements of adjudication" are spelled out in Section 83 of the Restatement (Second) of Judgments, which has been adopted by both the First Circuit[4] and the Maine Supreme Judicial Court.[5] They include:

---

[4] *Aunyx Corp. v. Canon U.S.A., Inc.,* 978 F.2d 3, 7 (1st Cir. 1992).

[5] *Beal v. Allstate Ins. Co.,* 2010 ME 20, ¶ 13, 989 A.2d 733, 738.

(a)  Adequate notice to persons who are to be bound by the adjudication . . .;

(b) The right on behalf of a party to present evidence and legal argument in support of the party's contentions and fair opportunity to rebut evidence and argument by opposing parties;

(c) A formulation of issues of law and fact in terms of the application of rules with respect to specified parties concerning a specific transaction, situation, or status, or a specific series thereof;

(d) A rule of finality, specifying a point in the proceeding when presentations are terminated and a final decision is rendered; and

(e) Such other procedural elements as may be necessary to constitute the proceeding a sufficient means of conclusively determining the matter in question, having regard for the magnitude and complexity of the matter in question, the urgency with which the matter must be resolved, and the opportunity of the parties to obtain evidence and formulate legal contentions.

The PUC proceeding brought by Mr. Friedman met these criteria.  Because Mr. Friedman commenced the action, *December 19, 2014 Order at 6*, he plainly had notice of it.  It is undisputed, moreover, that Mr. Friedman presented evidence, including expert testimony, as well as post-hearing briefs (including a reply brief, in which he was able to respond to arguments advanced by CMP) and other written submissions.  *Id. at 10-11*.  And, as noted above, he had two opportunities to present his legal arguments to the Maine Supreme Judicial Court.  It is clear, in short, that when the PUC received evidence and made factual findings with respect to the health risks of smart meters, it acted in a "judicial" or "adjudicative" capacity.

> b. *The adjudication satisfies the conditions for preclusion.*

Once it is established that a factual finding was made in an adjudicative setting, the next step is to determine whether preclusion applies in the "specific instance."  To do that, the Court must look to four factors: (1) whether "both the prior and subsequent proceedings involved 'the *same issue* of law or fact'"; (2) whether "'the parties *actually litigated*' the issue in the prior proceeding"; (3) whether "the prior proceeding '*actually resolved* the issue in a final and

binding judgment'"; and (4) whether the PUC's "'resolution of that issue of law or fact was *essential* to its judgment**.'"** *Rios-Pineiro v. United States,* 713 F.3d 688, 692 (1st Cir. 2013) (quoting *Monarch Life Ins. Co. v. Ropes & Gray*, 65 F.3d 973, 978 (1st Cir. 1995)).

Here, the specific, legally-dispositive fact which CMP says has been conclusively established is simply this: "AMI, including the use of smart meters, as implemented and operated by CMP, does not present a credible threat of harm to the health and safety of CMP's customers and . . . is, therefore, safe." CMP does not contend – and, in order to prevail on its *res judicata* defense, it need not establish – that the Commission made a finding with respect to the reasonableness of charging an opt-out fee to customers who objected to having smart meters because of concern that RF emissions might jeopardize their health.[6] The two participating Commissioners very clearly did, however, make a finding with respect to a factual issue that is essential to the viability of those claims. In the first sentence of the Decision, they found without reservation that there was insufficient evidence to establish that RF emissions, in the doses emitted by CMP's smart meters, posed a credible risk of harm.[7] As the Decision unequivocally says, their "difference in approach [did] not vitiate their concurrence regarding the safety of the AMI meters and network in use in Maine." In summary, "the safety of the AMI meters and network in use in

---

[6] The Decision of the PUC, quoted above, was followed by two separate opinions, authored by the two Commissioners who participated in the proceeding. Commissioner Littell expressed his view that it would be appropriate for CMP to switch smart meters to "non-transmitting" mode — but not replace the meters with analog devices — at no charge. *Dec. 19, 2014 Order at 47 & 55-61.* Commissioner Vannoy took the position that the fee issue was not before the PUC, and he therefore declined to address it. *Id. at 68-69.* Thus, there was no consensus on the ultimate issue presented here: whether CMP customers who choose to opt out of the AMI program should be required to pay a fee to do so.

[7] In explaining why he suggested that there be a no-cost option for refusing a smart meter, Commissioner Littell explicitly said that he made "no finding" regarding the validity of consumer complaints of adverse health effects, and he did not believe the Commission needed to do so. In his view, it was enough say that there was "a reasonable supposition that there may be symptoms for some people related to the installation of smart meters," and that some consumers had expressed concerns, "even if not capable of satisfying a more-probable-than-not burden of proof that smart meters caused their health effects." *PUC Dec. 19, 2014 Order* at 58.

Maine" was actually litigated and resolved, and it was essential to the PUC's judgment.  The Commission's factual determination is therefore preclusive in this action.

> c.  *The facts established in the PUC proceeding bar the plaintiff's claims, all of which require him to prove that it is medically "necessary" for him to opt out of AMI.*

As explained above, under each of the statutory schemes cited in the Complaint – governing the operations of places of public accommodation (ADA Title III), public entities (ADA Title II), federally-funded "programs" or "services" (the Rehabilitation Act), or "services" or "facilities" in connection with a "dwelling" (the FHAA) – the duty to make "reasonable modifications" to  one's policies or standard practices arises only when those modifications are "necessary" to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities.

Simply put, in the face of the PUC determination – by which the Plaintiff is bound – that "the AMI meters and network do not present a credible threat to the health and safety of CMP's customers," he is precluded from alleging in this action that it is medically "necessary" for him to opt out of the AMI program at all.  CMP does not doubt that Mr. Friedman subjectively, and in good faith, feels ill at ease being in proximity to any device that emits radio-frequency radiation, no matter how low the dose emitted.[8] He may genuinely prefer to remain isolated from all such

---

[8] The Law Court highlighted just how low the RF emissions from CMP's smart meters actually are:

> The evidence supporting the Commission's finding includes data that smart meters comply with RF exposure regulations promulgated by the FCC. Trilliant, the manufacturer of CMP's smart meters, had the meters tested pursuant to FCC standards, and this testing showed that the smart meters complied with FCC exposure limits even at the unrealistically close distance of twenty centimeters from the meter. At average exposure three feet away from a smart meter, the exposure levels are "five orders of magnitude (roughly 100,000 times) lower than" the standards set forth by the FCC and the International Commission on Non–Ionizing Radiation Protection.

*Friedman v. PUC II*, ¶12, 132 A.3d at 187.

devices, even in the absence of scientific evidence that they pose a credible risk to his health.  A personal preference is not, however, a "necessity."  Because we know – from evidence developed and scrutinized in litigation in which Mr. Friedman was an active participant, and from the decision which that evidence produced – that the opt-out (with or without a fee) is not "necessary" to protect his health, he cannot, as a matter of law, demonstrate that he is being charged a fee for a modification of CMP policy or standard practice that is "required" by law.  Therefore, each and every one of his claims must be dismissed.

**2.   Whether or not the Plaintiff's claims are barred by collateral estoppel, he does not plausibly allege a nexus between his disability and the modification for which CMP is charging him a fee.**

Even if the Plaintiff were writing on a blank slate in this action – that is, if he were not constrained by the PUC's conclusive finding that smart meters' RF emissions are safe – in order to state a viable claim for relief he would have to plausibly allege each element of a claim under the ADA, the Rehabilitation Act, or the FHAA.  He has not met that burden.  Because the Complaint asserts only that the RF emissions from a smart meter "may" cause him harm, Mr. Friedman fails to plausibly allege that his disability makes it "necessary" for him to have a non-standard meter.  Thus, the Complaint is also insufficient to allege that CMP, by requiring him to pay for a non-standard meter, is saddling him with an unlawful, discriminatory surcharge.

As a threshold matter, the fact that Mr. Friedman carries a cancer diagnosis, by itself, says nothing about whether he is entitled to an accommodation of any kind.  Entities subject to the ADA are required by law to "accommodate limitations, not disabilities." *Taylor v. Principal Financial Group, Inc*., 93 F.3d 155, 164 (5th Cir. 1996).  "'The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual.'" *Id.* (quoting 29 C.F.R.

1630.2(j), App. (1995)).  *See* 42 U.S.C. § 12112(a)(5)(A) ("[T]he term 'discriminate' includes . . . not making reasonable accommodations to the known physical or mental *limitations* of an otherwise qualified individual with a disability. . . .") (emphasis added); 29 C.F.R. 1630.9, App. (1995) ("Employers are obligated to make reasonable accommodations only to the physical or mental *limitations* resulting from the disability that is known to the employer.") (emphasis added).

    Thus, under both the ADA and the Rehabilitation Act, "[i]n order to be a reasonable accommodation, any modifications requested in a program must be related to the disability."  *Stern v. Univ. of Osteopathic Med. & Health Sciences.,* 220 F.3d 906, 908 (8th Cir. 2000) (Rehabilitation Act claim) (citing *Amir v. St. Louis University,* 184 F.3d 1017, 1029 (8th Cir.1999) (ADA claim)).  Neither statute gives a person with a disability the right to insist that a program or service be modified in whatever way he wishes.  The disability must cause an impairment that can be ameliorated by the requested accommodation.  *See Youngman v. Peoria County,* 947 F.3d 1037, 1043 (7th Cir. 2020) (summary judgment in favor of employer was affirmed;  assuming plaintiff's acromegaly, hypothyroidism, or hypocalcemia were disabilities, "he failed to offer evidence indicating a causal nexus between that disability and the particular limitation (motion sickness) for which he sought an accommodation").

    The same requirement applies in cases brought under the Fair Housing Amendments Act. As one court recently summarized the law:

> In *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1226 (11th Cir. 2008), the Eleventh Circuit held that "'equal opportunity'" can only mean that handicapped people must be afforded the same (or 'equal') opportunity to use and enjoy a dwelling as non-handicapped people, *which occurs when accommodations address the needs created by the handicaps.*" (Emphasis added). The Court went on to state, "If accommodations go beyond addressing these needs and start addressing problems not caused by a person's handicap, then the handicapped person would receive not an "equal," but rather a better opportunity to use and enjoy a dwelling, a preference that the plain language of this statute cannot support." (Citing *Wisconsin Cmty.*

> *Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 749 (7th Cir. 2006) (en banc)
> ("[T]he statute requires only accommodations necessary to ameliorate the
> effect of the plaintiff's disability so that she may compete equally with the
> non-disabled in the housing market."); *Lapid–Laurel, L.L.C. v. Zoning Bd. of
> Adjustment of Twp. of Scotch Plains*, 284 F.3d 442, 460 (3d Cir. 2002) ("[I]f
> the proposed accommodation provides no direct amelioration of a disability's
> effect, it cannot be said to be necessary.") (quotation marks omitted); *Bryant
> Woods Inn*, 124 F.3d at 604 ("The FHA does not require accommodations
> that increase a benefit to a handicapped person above that provided to a
> nonhandicapped person with respect to matters unrelated to the
> handicap."); *Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d
> 144, 152 (2d Cir. 1999) (explaining that the relevant inquiry is whether "the
> non-complying features of the proposed residence are 'necessary' in light of
> the disabilities of proposed residents")).

*Gleason v. Woods Condo. Ass'n,* 2019 WL 2218809, at *9 (E.D. Mich. Mar. 3, 2019) (footnote

omitted), *report and recommendation adopted in part,* 2019 WL 1349611 (E.D. Mich. Mar. 26,

2019).

The Complaint in this case does not explicitly allege that the Plaintiff, *because of his

lymphoplasmacytic lymphoma*, is actually more susceptible than a person without that disease to

becoming ill or injured if he is exposed to RF emissions.  The Complaint alleges *only* that Mr.

Friedman's oncologist and hematologist, Dr. David Benton, has written that he is "concerned that

low-level non-ionizing radiation exposure of the type and level emitted by Electromagnetic

Frequency (EMF) invoicing tools *may* exacerbate problems [Mr. Friedman has] already experienced

. . . including fatigue, cognitive difficulties, memory issues and multiple cancer types"; and that,

because of Dr. Benton's concern, "[i]t is [his] recommendation Mr. Friedman's request for

reasonable accommodation without penalty be granted *to minimize his risk* of disease progression

symptoms exacerbation."  Complaint ¶40 (sic) (emphasis added).

These allegations, even if true, do not "raise a right to relief above the speculative level."

Dr. Benton's statement is, to be sure, "consistent with" the possibility that Mr. Friedman *might* be

unusually sensitive to RF emissions.  However, it "'stops short of the line between possibility and

plausibility of "entitlement to relief."'" *Ashcroft v. Iqbal,* 556 U.S. at 557. Based on what is alleged in the Complaint, it is simply impossible to discern whether there is any evidence whatsoever that sets Mr. Friedman's risk of injury apart from the risk to the population at large – a risk the PUC has unequivocally said is not "credible." In the absence of positive allegations which, if proved, would establish that Mr. Friedman (unlike the rest of the world) would actually be threatened by the operation of a smart meter in his home, his Complaint does not state a claim upon which relief can be granted.

### C. BECAUSE THE OPT-OUT FEE IS CHARGED TO THE DISABLED AND NON-DISABLED ALIKE, IT IS NOT A DISCRIMINATORY, UNAWFUL SURCHARGE.

Even if the Plaintiff were not collaterally estopped from establishing that a non-standard meter is "required" so that he can enjoy equal access to the service provided by CMP, and even if he sufficiently alleged facts to support such a claim, his surcharge claims would fail because he has not alleged that the opt-out fee "constitutes a charge that nondisabled people would not incur." *Dare v. California*, 191 F.3d at 1171. Regardless of whether a modification of policy or standard practice is "required" by the ADA, "[i]f nondisabled people pay the same fee for an equivalent service, the charge to disabled people [does] not constitute a surcharge on a 'required' measure," and it does not run afoul of the law. *Id. See Robishaw v. The Providence Prob. Court,* 206 F. Supp. 3d at 730 (quoting *Dare*).

Here, the Complaint affirmatively alleges that "CMP charges the smart meter opt-out fee to everyone." Complaint ¶64. As we know, moreover, that equal treatment is mandated by the PUC. *See PUC Opt-Out Order Part II*, at 14. Because "nondisabled people pay the same fee for an equivalent service," the fee borne by Mr. Friedman is not an impermissible surcharge.

28

**D. BECAUSE THE PUC REQUIRES THAT CMP CHARGE THE PLAINTIFF A FEE FOR A NON-STANDARD METER, HIS DISPARATE IMPACT CLAIM UNDER THE FHAA FAILS AS A MATTER OF LAW.**

Finally, the Plaintiff alleges that CMP can be held liable under the FHAA on a "disparate impact" theory. Complaint ¶ 70. He contends that this is so because "CMP's opt-out fee results in a disproportionate burden on persons with disabilities," like him. Complaint ¶ 74.

However, while "[d]isparate-impact liability mandates the 'removal of artificial, arbitrary, and unnecessary barriers,'" it does not command "the displacement of valid governmental policies*." Texas Dep't of Housing & Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 540 (2015) (quoting *Griggs v. Duke Power Co*., 401 U.S. 424, 431 (1971)). Thus, where a private entity's discretion to act is limited by legal considerations beyond its control, liability will not lie under a disparate impact theory for the decision to act as the law requires. *Id*. at 543 ("[I]f the ICP cannot show a causal connection between the Department's policy [governing the distribution of tax credits] and a disparate impact – for  instance, because federal law substantially limits the Department's discretion – that should result in dismissal of this case."). *See also Abril-Rivera v. Johnson*, 806 F.3d 599, 611 (1st Cir. 2015) ("'[G]overnmental entities . . . must not be prevented from achieving legitimate objectives,'" at the risk of incurring disparate-impact liability) (quoting  *Texas Dep't of Housing & Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. at 544).

Here, we know that the PUC Opt-Out Order constrains CMP's discretion to relieve Mr. Friedman – or any other customer who elects not to have AMI technology installed in his or her home – of the obligation to pay a fee to exercise that option. As described at length above, the Maine Public Utilities Commission carefully considered whether ratepayers as a group should be

made to absorb the added costs attributable to those who opt out of AMI.  The Commission found no reason to deviate from the "general ratemaking principle [that] customers that request non-standard services should pay the incremental costs of those services," and expressed the view that it would be "basically inequitable for CMP to recover the costs caused by an individual customer's decision to opt out of receiving a standard wireless meter from its general body of ratepayers." *PUC Opt-Out Order Part II, at 14.*  The PUC's preference for across-the-board equity in ratemaking is precisely the sort of "valid governmental policy" that should not be "displaced" by a paradigm which imposes disparate-impact liability on an entity, such as CMP, which does nothing more than carry out the policy.  Accordingly, insofar as the Plaintiff's claim under the FHAA is premised on a disparate-impact theory, CMP respectfully submits that it should be dismissed.

## CONCLUSION

For the reasons set forth above, CMP respectfully requests that the Court dismiss this action pursuant to Fed. R. Civ. P. 12(b)(6).

Dated at Portland, Maine this 5th day of October, 2020.

/s/ Christopher C. Taintor

Christopher C. Taintor, Esq.
Russell B. Pierce, Esq.
Attorneys for Defendant

NORMAN, HANSON & DeTROY
Two Canal Plaza, P.O. Box 4600
Portland, Maine  04112-4600
(207) 774-7000

## <u>CERTIFICATE OF SERVICE</u>

I, Christopher C. Taintor, attorney for Defendant, hereby certify that on October 5, 2020,

I electronically filed a Motion to Dismiss with incorporated Memorandum of Law with

supporting Exhibits 1 through 5 using the CM/ECF system, which will send notification of such

filing to all persons registered for ECF in this matter.


                                        /s/ Christopher C. Taintor
                                        Christopher C. Taintor, Esquire
                                        Attorney for Defendant Central Maine Power Co.


Norman Hanson & DeTroy, LLC
Two Canal Plaza
P.O. Box 4600
Portland, ME   04112-4600
207.774.7000
ctaintor@nhdlaw.com

31