UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| ED FRIEDMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 2:20-cv-00237-JDL |
| v. | ) | |
| | ) | |
| CENTRAL MAINE POWER COMPANY, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S *DAUBERT* MOTION IN LIMINE TO EXCLUDE AND/OR LIMIT TESTIMONY OF DR. ROBERT GALE**

Defendant Central Maine Power Company ("CMP"), through its undersigned counsel, hereby opposes Plaintiff's *Daubert* Motion in Limine to Exclude and/or Limit Testimony of Dr. Robert Gale (ECF 91).

As a threshold matter, considerations of judicial economy support deferring consideration of this motion until after the Court has ruled on CMP's *Daubert* and summary judgment motions. The grounds for those motions are set forth in *Defendant's Local Rule 56(h) Pre-Filing Conference Memorandum* (ECF 92). Because Plaintiff has the burden of proof, if CMP's pretrial motions are granted there will be no need for the Court to reach this motion, the sole purpose of which is to limit the evidence to be admitted at trial.

The motion, moreover, is groundless. In stark contrast to the Plaintiff's "medical" experts – only one of whom is even a physician (and an unlicensed one at that) – Dr. Gale's expertise is in oncology and hematology, with a focus on blood disorders, the category of disease which includes Waldenström macroglobulinemia, the illness that afflicts Plaintiff.[1] In Dr. Gale's 41-page expert

---

[1] Plaintiff's Motion refers to the Gale Report and the Gale deposition transcript as Exhibits 1 and 2, respectively, but Plaintiff did not attach them to his motion. Therefore, we have submitted as Exhibit 1 the Gale deposition transcript, to which his Report is appended as "Exhibit A." Dr. Gale's CV is attached

report in this case, he conclusively opines that there is "**no credible evidence** exposure to [RF] fields such as those emitted from a smart meter of the type proposed to be installed by [CMP] at the residence of Mr. Edward Friedman would worse[n] signs, symptoms or prognosis in someone with lymphoplasmacytic lymphoma/Waldenström macroglobulinemia." Gale Report at 18 (bold emphasis added). Faced with this definitive, clear, and reliable opinion from a highly-qualified expert, Plaintiff moves in limine to exclude Dr. Gale by inaccurately presenting Dr. Gale's analysis and opinions and by cherry-picking isolated statements from his 41-page Expert Report and a few excerpts from Plaintiff's counsel's remarkably incomplete, less-than-one-hour deposition of Dr. Gale. Plaintiff's motion is not the product of a serious effort by Plaintiff's counsel to fully analyze the substance of Dr. Gale's anticipated testimony, or fairly and accurately present his full opinions to this Court.

## LEGAL ARGUMENT

**1. Summary of Grounds to Deny the Motion**

To begin, the Court should understand that as Plaintiff's counsel acknowledged in the May 17 Pre-Filing Conference, there is no challenge here to Dr. Gale's qualifications. Nonetheless, those qualifications, which are spelled out at pages 1 - 4 of his Expert Report and in his curriculum vitae, are worth noting. As is evident from his CV, he is a world-renowned expert in blood disorders, a category of disease which includes Waldenström macroglobulinemia, the rare illness that afflicts Plaintiff. In that respect, Dr. Gale stands in sharp contrast to the expert witnesses

---

hereto as <u>Exhibit 2</u>. In addition, to the extent succinct excerpts from the transcripts of the depositions of the Plaintiff's proffered experts (Dr. David Carpenter, Paul Heroux, and Kent Chamberlin) are cited in this Opposition Memorandum, they are attached as <u>Exhibits 3, 4, and 5</u> respectively.

2

designated by the Plaintiff, none of whom are oncologists and none of whom have ever treated a patient.[2]

Furthermore, as explained below (at pages 5-6), the motion must be denied because Plaintiff has failed to meet his burden relative to Dr. Gale to "demonstrate a 'threshold level of unreliability to "trigger" the [Court's *Daubert*] gatekeeping obligation.'" *Gottstein v. Flying J, Inc.*, 2001 WL 36102297, *1 (N.D. Ala., Aug. 22, 2001) (quoting Goodwin, *The Hidden Significance of Kumho Tire Co. v. Carmichael: A Compass for Problems of Definition and Procedure Created by Merrell Dow Pharmaceuticals, Inc.*, 52 Baylor L. Rev. 603, 626 (2000)).

Dr. Gale's analysis, moreover, adheres to a well-accepted, scientifically-reliable approach to analyzing claims such as the one presented here – that an agent is capable of causing or exacerbating disease. As explained below (at pages 7-10), the "weight of evidence" analysis he employs is endorsed by scientists, regulatory agencies, and the federal judiciary, and the Plaintiff has made no serious effort to demonstrate that it is unreliable.

Instead of confronting Dr. Gale's testimony in full, Plaintiff simply claims that his analysis is flawed because Dr. Gale does not have information about the dose of RF energy the Plaintiff would be exposed to if a smart meter were installed on his property, and because he did not take into account evidence that the RF signal produced by smart meters "spikes." As explained below (at pages 10-12), however, neither the dose of RF produced by a smart meter nor the "spiking"

---

[2] Dr. David Carpenter is a medical school graduate, but he has never treated a patient and is not licensed to practice medicine in any jurisdiction. Carpenter Depo. at 12:22-13:5. Paul Heroux is not a physician of any kind. He was trained in physics, has taken some post-graduate courses in biomedical sciences, and he teaches college-level courses in toxicology. Heroux Depo. a 16:21-17:5 & Heroux Deposition Exhibit 10 at 3-4. Kent Chamberlin did not attend medical school, is not a healthcare practitioner of any kind, and is not formally trained in epidemiology, Chamberlin Depo. at 8:11-24. A fourth expert, Erik Anderson, is an electrical engineer who is familiar with smart meters, but claims no expertise concerning the health effects of RF fields.

phenomenon described by Plaintiff's expert is relevant to Dr. Gale's analysis. Therefore, the fact that he did not consider either does nothing to undercut his opinions, let alone provide a basis for excluding them from trial. All in all, the Motion reflects an unserious, superficial effort at confronting the full substance of Dr. Gale's anticipated testimony.

Not only are Dr. Gale's opinions and his Expert Report reliable and scientifically valid, they also satisfy the *Daubert* standard because they are relevant to the issues in dispute and would assist the trier of fact in evaluating the technical and scientific issues underlying Plaintiff's claims. Moreover, Dr. Gale's testimony supports Defendant's argument that Plaintiff lacks Article III standing to pursue his claim, because the "risk" of future injury Plaintiff alleges in this case remains legally speculative and without competent evidentiary support required for Plaintiff's case-in-chief.[3]

### 2. The *Daubert* Standard

On a motion to exclude evidence under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), the court assesses "whether the reasoning or methodology underlying [expert scientific] testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93.

---

[3] At the very outset, the motion is misleading because it asserts that Mr. Friedman's oncologist recommended that he lessen the amount of radiation exposure in his home out of concern that it "may exacerbate the progression of his disease and exacerbate the symptoms of it." ECF 91 at 1. The Court will note that there is no citation to any evidence supporting this purported "fact." That is because the Plaintiff, for reasons that will become clear in CMP's motion for summary judgment, has not designated his oncologist, Dr. David Benton, as an expert witness. The evidence will demonstrate that when Dr. Benton supplied the letter referred to in Paragraph 40 of the Complaint, which letter was drafted in part by Mr. Friedman himself, Dr. Benton had never advised anyone, including Mr. Friedman, to avoid exposure to a smart meter; he had performed no research to support the proposition that exposure to electromagnetic fields may exacerbate Mr. Friedman's medical problems; and he had not formed the opinion that RF exposure was harmful to the health of any human being. Benton Depo. at 11:14-15:16 & Benton Depo. Exhibit 2.

In evaluating whether evidence is scientifically valid, and therefore reliable, a court may consider, among other factors, whether a theory or method of analysis "can be (and has been) tested," whether it has been subjected to peer review or publication, whether there is a known or potential rate of error, and its "degree of acceptance" within the relevant scientific community. *Id.* at 593-94.

Expert testimony is relevant if it would "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert,* 509 U.S. at 591 (quoting Fed. R. Evid. 702). The "'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 591-92.

As noted above, the initial "burden is on the moving party to demonstrate a 'threshold level of unreliability to "trigger" the [Court's *Daubert*] gatekeeping obligation.'" *Gottstein v. Flying J, Inc.*, *supra*, *1 (citation omitted); *see Salvani v. Corizon Health, Inc.,* 2019 WL 4038517, *3 (S.D. Fla., Aug. 27, 2019) (same). If, and only if, that threshold burden is satisfied, the proponent of expert testimony bears the burden of establishing its admissibility. Once the burden is triggered, "*Daubert* does not require that a party who proffers expert testimony . . . prov[e] to the judge that the expert's assessment of the situation is correct." *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.,* 161 F.3d 77, 85 (1st Cir. 1998). Rather, the burden on the proponent is to demonstrate that the expert's testimony "rests upon 'good grounds, based on what is known.'" *Id.* (quoting *Daubert*, 509 U.S. at 590).

These standards clearly warrant denial of Plaintiff's motion here, as argued further below.

### 3. The Plaintiff Has Not Met His Initial Burden of Demonstrating a "Threshold Level of Unreliability"

The Plaintiff's Motion *in Limine* does not even satisfy his threshold burden of suggesting a basis upon which this Court could find Dr. Gale's analysis scientifically unsound.

To begin, it inaccurately describes Dr. Gale's analysis and opinions. According to the Plaintiff, "Dr. Gale's methodology was to first determine whether a smart meter 'is more likely than not' to worsen cancer symptoms and progression in a laboratory setting and then, only if he determined that to be the case, to assess whether Plaintiff's cancer might be worsened." ECF 91 at 4. That is not, however, what the Gale Report says. Nor is it what Dr. Gale did. The Report contains no suggestion that Dr. Gale performed any laboratory research as part of his work in the case. As explained in more detail below, what he actually did was assemble and review *all* the relevant, published scientific evidence which bears on the question of whether there is a causal connection between exposure to radiofrequency fields and cancer, including Waldenstrom macroglobulinemia – whether the evidence was developed from research involving "laboratory models, animal models and/or humans." He then weighed each item of evidence by assessing its relative quality and probative force.

The Motion is also extraordinarily selective. It is premised largely on a single sentence from a 41-page Expert Report, and a few excerpts from a short deposition, ECF 91 at 1-2, in which Plaintiff's counsel studiously avoided asking questions that would have revealed the breadth of Dr. Gale's opinions, as those opinions were fully and timely disclosed in Dr. Gale's expert report pursuant to Fed. R. Civ. P. 26(b)(4) well in advance of the deposition. Because the Plaintiff has not bothered to grapple with the full weight and substance of Dr. Gale's scientific analysis, as required to satisfy his initial burden, but instead has cherry-picked isolated sentences from the Gale Report and deposition as the bases for his motion to exclude, this Court ought not be put to the task of engaging in a full-blown *Daubert* analysis and the Motion should be dismissed. However, should the Court find that Plaintiff met the threshold burden, the Motion should still be denied, as

6

set forth below, because Dr. Gale's analysis of the evidence is reliable and his opinion testimony is relevant, thus satisfying the *Daubert* standard.

    **4.    Dr. Gale's Analysis of the Evidence Is Reliable**

        a.  <u>There Is Nothing Unreliable About Dr. Gale's "Weight of Evidence" Analysis.</u>

Dr. Gale's testimony satisfies the *Daubert* standard because his approach to the case adheres to a methodology – a "weight of evidence" analysis – that has been widely published, subjected to peer review, and accepted within the relevant scientific community. Most notably, this approach to analyzing causal connections between allegedly toxic agents and disease has been adopted by federal regulators[4] and expressly sanctioned by the First Circuit Court of Appeals as a methodology that is consistent with *Daubert*.[5]

Generally speaking, a weight of evidence analysis is "a structured synthesis of lines of evidence, possibly of varying quality, to determine the degree of support for hypotheses." It consists of "several stages," which include:

> (1) determining the appropriate focus, based on the objectives and preliminary consideration of available data, formulating the question(s) to be assessed and developing a protocol; (2) establishing lines of evidence including identifying and selecting studies, assessing the quality of the studies and analyzing a set of studies of similar type; (3) integrating data from available lines of evidence to determine the degree of support for hypotheses or to estimate quantities of interest; and (4) an explicit presentation of the weight-of-evidence in a form that maximally supports a scientific and/or medical conclusion.

Gale Report at 6.

---

[4] As noted in the Federal Judicial Center's *Reference Manual on Scientific Evidence* at 655 (3rd ed. 2011): "The World Health Organization's (WHO's) IARC and the U.S. National Toxicology Program (NTP) have formal processes to evaluate the weight of evidence that a chemical causes cancer." *See also Waite v. AII Acquisition Corp.*, 194 F. Supp. 3d 1298, 1313 (S.D. Fla. 2016) (the "weight-of-the-evidence methodology [is] used by the International Agency for Research on Cancer ("IARC"), the World Health Organization ("WHO"), and the United States Agency for Toxic Substances and Disease Registry ("ATSDR")").

[5] *See Milward v. Acuity Specialty Prod. Grp., Inc.,* 639 F.3d 11 (1st Cir. 2011), discussed at p. 10, below..

In this particular case Dr. Gale divided his analysis into two parts. He first examined the evidence bearing on the existence of a causal link between exposure to RF fields and the worsening of "signs, symptoms and/or progression of *cancer*" generally. Gale Report at 10-17. He found no evidence to support the existence of such a connection.

Next, although it was not strictly necessary, he analyzed for the sake of "completeness" the same categories of evidence with reference to Plaintiff's particular cancer, Waldenström macroglobulinemia. Gale Report at 17-18. After reviewing the biomedical literature on this narrower issue, Dr. Gale concluded that there is "**no credible evidence** [that] exposure to [RF] fields such as those emitted from a smart meter of the type proposed to be installed by [CMP] at the residence of Mr. Edward Friedman would worsen signs, symptoms or prognosis in someone with lymphoplasmacytic lymphoma/Waldenström macroglobulinemia." Gale Report at 18 (emphasis added). As the Plaintiff acknowledges, Dr. Gale also reviewed all the records of Plaintiff's cancer diagnosis, the treatment he has received for his disease, and the evaluations of his medical condition as it has evolved over time. This, too, distinguishes Dr. Gale from the Plaintiff's expert witnesses, none of whom have reviewed *any* of Mr. Friedman's medical records.

In analyzing whether there is a causal connection between exposure to RF fields and the progression or symptoms of cancer generally, or the Plaintiff's specific cancer, Dr. Gale considered:

> (1) molecular events underlying cancer progression; (2) biological relationship between an exposure and cancer progression; (3) effect(s) of such exposures on animal and human cells; (4) association between such exposures and cancer progression in animals and, when available, humans; and (5) mechanism(s) of action of radiofrequency electromagnetic fields.

Gale Report at 7. To accomplish this goal, he approached his analysis from several perspectives.

First, Dr. Gale conducted his own exhaustive search of the relevant medical literature. He interrogated PUBMED, of the US National Library of Medicine, for the years 1966 to January

2022, using the Boolean search terms *radiofrequency* AND/OR *electromagnetic field* AND *cancer* AND *progression* NOT *causation* NOT promotion. After analyzing the abstracts of the 49 articles yielded by this search, Dr. Gale narrowed the results to 10 that he deemed "potentially relevant to whether exposure to radiofrequency electromagnetic fields is, more likely than not, to worsen sign, symptoms or prognosis of cancer in laboratory models, animal models and/or humans." Gale Report at 10. He determined that "[n]one of these studies report worsening of signs, symptoms or progressions of cancer in experimental animals or persons exposed to radiofrequency electromagnetic fields like those emitted from a smart meter." Gale Report at 11.

Second, in addition to conducting and analyzing the result of his own PUBMED search, Dr. Gale analyzed two articles that had not been produced by that search, but which the Plaintiff's only medically-trained expert, Dr. David Carpenter, has cited in support of his claim that exposure to RF fields *could* worsen the signs, symptoms, or prognosis of Ed Friedman's cancer. Dr. Gale concluded that both articles were flawed. Gale Report at 12-15. He determined that one, authored by Foliart et al., was unreliable due in part to selection biases, that the authors themselves had found "no consistent or statistically significant trend . . . between increasing exposure to [magnetic fields] and event-free survival or risk of death," and that they had described the results of their study as "only . . . hypothesis generating." Gale Report at 13. Dr. Gale found that the other article, authored by Svendsen et al., likewise failed to support Dr. Carpenter's theory, observing that it "reported Hazard Ratios which were not statistically significant," that it failed to replicate the results reported in the Foliart article, and that the authors were unable to identify a biological mechanism that would explain their findings. Gale Report at 14-15.

Third, Dr. Gale reviewed more recent, larger, and higher-quality studies of event-free survival and survival in children with acute lymphoblastic leukemia (the same condition studied

9

by Foliart et al. and Svenden et al.), which found that exposure to extremely low frequency magnetic fields had no impact on survival probability or risk of relapse. Gale Report at 15.

The Plaintiff's only attack on the reliability of this analysis rests on the fact that in a different case, in another court in a different circuit, Dr. Gale's opinions, which were the product of a weight of evidence analysis, were excluded because he did not provide a sufficiently "'rigorous explanation'" of "'how he weighed the evidence he considered, what weight he gave to them, why he gave them that weight, and how he balanced the weight of certain evidence against others [sic] evidence.'" ECF 91 at 6 (quoting *In re Incretin-Based Therapies Products Liability*, 524 F. Supp. 3d 1007, 1043 (S.D. Cal. 2021)). The Plaintiff then says: "No such explanation appears in his report in this case, either." ECF 91 at 6. It is evident, however, that Plaintiff did not actually review Dr. Gale's report, which in this case clearly spells out Dr. Gale's methodology and findings as summarized above.

In *Milward v. Acuity Specialty Prod. Grp., Inc.,* 639 F.3d 11 (1st Cir. 2011), the First Circuit observed that "[n]o serious argument can be made that the weight of the evidence approach is inherently unreliable." *Id.* at 18-19. "Rather, admissibility must turn on *the particular facts of the case*." *Id.* at 19 (emphasis added). Thus, the fact that in another case, involving a different allegedly toxic agent and a different disease, a different judge in a different circuit found Dr. Gale's description of his analysis incomplete, says literally nothing about whether his fully-explained analysis *here* – in particular, the adequacy of his explanation of "how he balanced the weight of certain evidence against other evidence" relevant to the health effects of exposure to RF fields – satisfies *Daubert*. CMP submits that Dr. Gale's analysis of the scientific evidence relevant to *this* case, and the explanation of it in his Expert Report, is both thorough and meticulous. The Plaintiff's superficial assertion that the report contains "no . . . explanation" of how Dr. Gale

10

weighed the evidence – an assertion he does not bother to support with even a modicum of argument – is flat wrong.

> b. <u>Dr. Gale Was Not Required to Consider Either "The Specific Smart Meter at Issue" or the "Spiking" of Radiofrequency Fields Due to its Operation.</u>

Moving beyond the clear reliability of Dr. Gale's "weight of evidence" analysis, Plaintiff next argues that Dr. Gale's testimony should be excluded because (1) he "did not review any materials regarding the specific smart meter at issue in this case or the frequency of the radiation it may emit," and (2) he "has not expressed any opinion regarding 'spiking' in radiofrequency radiation" – a phenomenon which, according to the Plaintiff (and void of any supporting expert opinion), is "a cause of worsening cancer symptoms." ECF 91 at 5.

The first assertion – that medical testimony is inadmissible unless it is based on information about "the specific smart meter at issue" – is perplexing because the Plaintiff, who bears the burden of proof, has himself not designated an expert who has "review[ed] any materials regarding the specific smart meter at issue in this case or the frequency of the radiation it may emit," and is prepared to opine that the specific dose of RF energy produced by such a meter might cause him harm.[6] Therefore, if Plaintiff is correct in saying that a medical expert's testimony cannot be

---

[6] Plaintiff's expert Dr. Carpenter acknowledges that he has not reviewed either of the field studies that have been conducted to analyze the RF exposure from CMP smart meters. Carpenter Depo. at 68:20-69:1.

Plaintiff's expert Heroux was asked to compare the intensity of a cellphone signal to the intensity of exposure one would have from a smart meter. He responded: "I don't have that much information about the smart meters that you're talking about." Heroux Depo. at 48:22-49:2.

Plaintiff's expert Chamberlin was asked whether he is aware of any evidence in the medical literature, apart from anecdotal self-reports, that any human being has ever suffered adverse health effects as a result of having a smart meter at their home. He answered: "So you're asking me specifically about smart meters, and I can understand why. But because *I haven't specifically searched [sic] smart meters* and their effects, I would not be aware of such studies. . . . I'm not aware of them because I haven't studied them." Chamberlin Depo. at 92:16-93:11 (emphasis added).

admitted unless it is informed by data about the RF fields produced by "the specific smart meter at issue," then Plaintiff concedes he has no admissible medical testimony to support his claim, and his action fails for that reason.

More fundamentally, though, an expert witness like Dr. Gale, who categorically *refutes* the existence of any causal relationship between exposure to a particular agent and a particular adverse health effect – unlike one who seeks to *prove* the existence of such a relationship – is not required to frame his opinion in dose-specific terms. That distinction is a natural consequence of the allocation of the burden of proof. Because "[o]ne of the central tenets of toxicology is that 'the dose makes the poison,'" *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig. (No II) MDL 2502*, 892 F.3d 624, 639 (4th Cir. 2018), an expert who affirmatively asserts that Agent X can cause Disease Y must identify the dose at which Agent X is, or can be, toxic. *Adkisson v. Jacobs Eng'g Grp., Inc.,* 342 F. Supp. 3d 791, 800 (E.D. Tenn. 2018) (to prove general causation, plaintiffs had to "show that the amount of toxic constituents generally present in [an industrial by-product] was capable of causing the complained-of diseases"). In contrast, when an expert says "there is no credible evidence that Agent X can *ever* cause Disease Y," implicit in that statement is that the dose does not matter. Here, Dr. Gale has expressed the opinion that "there is *no evidence* in the biomedical literature that *any degree of exposure* to radiofrequency electromagnetic radiations would be more likely than not to increase signs, symptoms or prognosis of a person with Mr. Friedman's cancer." Gale Depo. at 14:21-15:1 (emphasis added). Assuming Dr. Gale is right about that – and for purposes of this motion, the Court must assume he is – the "degree of [Mr. Friedman's] exposure" to RF is wholly irrelevant. Dr. Gale need not identify the dose of RF energy to which Mr. Friedman would be exposed if a smart meter were installed at his home, because the dose makes no difference.

The second assertion – that "spiking" of RF fields is "a cause of worsening cancer symptoms" – is completely unsubstantiated, and the Plaintiff does not include in his motion any evidence to support it. The omission is not surprising. Even Mr. Friedman's medical expert, Dr. Carpenter, admits that a theory involving some relationship on "spiking" has never been proven, he doesn't know how it *could* be proven, and he does not know of a "good explanation" for *why* such a relationship might exist. Carpenter Depo. at 87:17-88:11 & 89:22-90:2. Neither *Daubert* nor any other legal rule or principle makes the admissibility of Dr. Gale's testimony depend on whether he responds to the Plaintiff's unsubstantiated, unexplained, and scientifically-unreliable theory that the "spiking" of RF fields is "a cause of worsening cancer symptoms."

**5. Dr. Gale's Opinion Testimony Is Relevant**

Plaintiff also argues that Dr. Gale's testimony is somehow irrelevant, because in his report he expressed the opinion that "it is *less likely than not* exposure to [RF] fields from a smart meter of the type proposed to be installed by [CMP] . . . would worsen signs, symptoms and/or prognosis" of his disease. ECF 91 at 4 (quoting Gale Report at 5). Plaintiff argues, illogically, that this testimony should be excluded because the operative legal standard requires him to prove only that "'having a smart meter at his home actually risks worsening his lymphoma's progression or symptoms,'" ECF 91 at 2 (quoting ECF 26 at 9), and Dr. Gale's opinion "will not assist the trier of fact in determining what actual risk the smart meters pose to Plaintiff." But the Plaintiff's argument ignores Dr. Gale's report and testimony – Dr. Gale will assist the trier of fact in understanding that the only reliable scientific conclusion in this case is that there is "no credible evidence" that smart meters pose any risk to Plaintiff.

Furthermore, this Court has never suggested that the Plaintiff could prevail if he established the existence of *any* risk of harm to his health, no matter how trivial or speculative that risk is.

13

What this Court determined was that it was "sufficient" for Friedman to allege, at the Rule 12(b)(6) stage, "that using a smart meter would cause a risk that is *significant enough* to deprive him of 'full and equal access' to CMP's services." ECF 26 at 7-8 (emphasis added). While that standard is less than precise, there is no doubt that it requires the Plaintiff to prove that the risk he would face, if a smart meter were installed on his property, is real and substantial. Now, at the close of discovery, CMP intends to demonstrate that having a smart meter would pose *no* risk of worsening the symptoms of Plaintiff's cancer, or his prognosis, and that CMP should prevail as a matter of law without trial for that reason. Dr. Gale's testimony, which will be offered to support that proposition, possesses the "valid scientific connection to the pertinent inquiry" that is "a precondition to admissibility" under Rule 702. *Daubert,* 509 U.S. at 591-92.

Moreover, as set forth in CMP's Pre-Filing Conference Memorandum (ECF 92), Plaintiff cannot satisfy Article III's standing requirement to assert his claims. Plaintiff claims that the required monthly payment charged to customers who choose not to use a smart meter violates his rights under various laws; therefore, in order to assert those claims Plaintiff must demonstrate that the use of a smart meter at his home would place him at an increased risk of harm. A plaintiff who claims he is harmed because another's conduct creates an "increased risk of harm" can satisfy Article III's standing requirement only if he demonstrates "*both* (i) a *substantially* increased risk of harm and (ii) a *substantial* probability of harm with that increase taken into account." *Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.,* 489 F.3d 1279, 1295 (D.C. Cir. 2007) (emphasis in original); *Kerin v. Titeflex Corp.,* 770 F.3d 978, 983 (1st Cir. 2014) (in an increased risk of harm case, a plaintiff who does not "allege facts sufficient to even calculate or estimate the risk" fails to meet his burden of establishing the "concreteness" required by Article III). Plaintiff's case fails to meet these threshold standards.

Dr. Gale's testimony is also, therefore, directly relevant to the standing issue, and to the proper disposition of this case. Dr. Gale has never limited himself to expressing the opinion that exposure to RF fields from a smart meter is "less likely than not" to cause Mr. Friedman harm. Nothing in the Gale Report even suggests that the scientific evidence presents a "close call" on that – to the contrary, Dr. Gale says *twice* (including once in the sentence *immediately following* the one cited by Plaintiff) that there is "**no credible evidence**" to support the notion that there is a causal connection between exposure to RF and the worsening of "signs, symptoms or prognosis in someone with lymphoplasmacytic lymphoma/Waldenstrom macroglobulinemia." Gale Report at 5 & 18 (bold emphasis added). To say that there is "no credible evidence" of a causal connection between A and B is, as a practical matter, precisely the same as saying there is "no risk" that A causes B.

What is more, Dr. Gale explained as much in his deposition:

- He was asked: "When you say in this report less likely than not, you are referring to less than 50-percent probability, correct?" As the Plaintiff observes, he answered "Yes." Gale Depo. at 12:14-17. What the Plaintiff omits, though, is the rest of Dr. Gale's answer, where he explained that he is "**prepared to testify to other standards, if asked to do so.**" Gale Depo. at 13:4-5 (bold emphasis added).

- The dialogue then continued. Plaintiff's counsel asked: "So in this report, you did not render an opinion about whether there was any *actual risk* to Mr. Friedman from this exposure. What you were opining about was whether that risk was more or less than 50 percent, correct?" Dr. Gale again answered that that was true, but clarified that he was "**prepared to answer that question at**

15

> **different levels of certainty**, if asked to do so." Gale Depo. at 13:7-18 (bold emphasis added); *see also* Gale Depo. at 39:24-40:1 ("No, no. I don't mean by the more likely than not standard. **I mean there is no credible evidence, period.**") (bold emphasis added).

Plaintiff's counsel, having read the statement in the Gale Report that there is "no credible evidence" to support Mr. Friedman's professed fear that exposure to RF might make his illness worse, chose not to ask the next logical question – i.e., "with what level of certainty are you prepared to opine that there is no actual risk?" The Plaintiff does not benefit from his lawyer's tactical decision to avoid asking the central question clearly invited *both* by Dr. Gale's Expert Report *and* by his deposition testimony.

Finally, Dr. Gale's testimony is admissible to debunk the unscientific, unqualified analyses offered by the Plaintiff's designated opinion witnesses. In addition to conducting his own independent analysis of the medical evidence, Dr. Gale has scrutinized the basis for the testimony proffered by Dr. David Carpenter, the unlicensed specialist in "environmental medicine" whom the Plaintiff has designated to opine on the connection between exposure to RF fields and Waldenstroms macroglobulanemia, and Kent Chamberlin, the non-physician witness who purports to be an expert in epidemiology. Dr. Gale thoroughly debunks the testimony of both Carpenter and Chamberlin. By way of illustration, Dr. Gale will testify that:

- Dr. Carpenter, never having treated any patient – let alone one with Ed Friedman's cancer – is not competent to predict the course of Mr. Friedman's disease, or to express an opinion as to what exposures might or might not affect his cancer. Gale Report at 19.

- Dr. Carpenter does not describe the method he used to form his opinions. Gale Report at 19.

- Dr. Carpenter cites a report issued by the International Agency for Cancer Research (IARC) as support for his opinion, but omits reference to a more recent IARC study which found no evidence of adverse health effects from low level, long-terms exposure to RF fields. Gale Report at 20.

- There is no evidence Dr. Carpenter sought out evidence contrary to his opinions. Gale Report at 21.

- Dr. Carpenter relies for his opinions on studies (by Foliart et al. and Svenden et al.) which even their authors acknowledge do not support his conclusions. Gale Report at 21-25.

- Dr. Carpenter ignores more recent, larger, and higher-quality studies that contradict the conclusions he draws from the Foliart and Svenden articles. Gale Report at 25.

- Dr. Carpenter says there is a condition known as electro-hypersensitivity (EHS), and implies that it is relevant to this case, although (1) systematic reviews have produced no reliable evidence that such a condition even exists, and (2) in any event, assuming EHS exists, neither Mr. Friedman nor any doctor claims that he suffers from it. Gale Report at 26-28.

The Plaintiff has not made any effort to argue that Dr. Gale should be precluded from offering these critiques (which he will do both in connection with CMP's *Daubert* motions and, if necessary, at trial), and any such argument would be futile. Under well-established principles of federal law, Dr. Gale's testimony is admissible to expose the flaws in the Plaintiff's experts' analyses and opinions. *See Nature's Plus Nordic A/S v. Nat. Organics, Inc.,* 982 F. Supp. 2d 237, 239 (E.D.N.Y. 2013) ("expert opinions . . . which assess or critique another expert's substantive testimony are relevant"); *Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.,* 829 F. Supp. 2d 802, 835 (D. Minn. 2011) ("It is the proper role of rebuttal experts to critique plaintiffs' expert's

methodologies and point out potential flaws in the plaintiff's experts' reports."); *In re Cessna 208 Series Aircraft Prod. Liab. Litig.*, 2009 WL 1649773, at *1 (D. Kan. June 9, 2009) ("In general, expert opinions which assess or critique another expert's substantive testimony are relevant . . . . Such evidence, which attacks the opposing expert's substantive testimony, is proper rebuttal.").

## CONCLUSION

For the reasons set forth above, Plaintiff's *Daubert* Motion in Limine to Exclude and/or Limit the Testimony of Dr. Robert Gale must be denied.

Dated at Portland, Maine this 18th day of May, 2023.

                NORMAN, HANSON & DETROY, LLC

                /s/ Christopher C. Taintor, Esq.
                 Russell B. Pierce, Esq.
                 Attorneys for Defendant Central Maine Power

                Norman, Hanson & DeTroy, LLC
                Two Canal Plaza, P.O. Box 4600
                Portland, ME  04112-4600
                (207) 774-7000

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

**Certificate of Service**

I hereby certify that on May 18, 2023, I electronically filed the Defendant's Objection to the Plaintiff's Motion to Exclude the Testimony of Robert Gale with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ Christopher C. Taintor, Esq.
Attorney for Defendant Central Maine Power

Norman, Hanson & DeTroy, LLC
Two Canal Plaza, P.O. Box 4600
Portland, ME  04112-4600
(207) 774-7000