EXHIBIT 1

1

UNITED STATES DISTRICT COURT

DISTRICT OF MAINE


ED FRIEDMAN,                              CIVIL ACTION NO.

      Plaintiff,                          20-cv-00237-JDL


VERSUS


CENTRAL MAINE POWER COMPANY,

      Defendant.


      DEPOSITION OF ROBERT PETER GALE, M.D., Ph.D.,
DSc(hc) FACP, FRCP, FRCPI(hon) MRSM, given in the
above-entitled cause, via Zoom videoconference,
pursuant to the following stipulation, before
Sandra P. DiFebbo, Certified Shorthand Reporter, in
and for the State of Louisiana, on the 23rd day of
March, 2023, commencing at 12:00 PM, CST.

2

```
 1    APPEARANCES (Via Zoom):

 2

 3                 MOST & ASSOCIATES
                   BY: WILLIAM MOST,
 4               ATTORNEY AT LAW
                   201 St. Charles Avenue
 5               Suite 114, #101
                   New Orleans, Louisiana  70170
 6               Representing the Plaintiff
                   (williammost@gmail.com)
 7

 8

 9                 NORMAN,HANSON & DeTROY
                   BY:  CHRISTOPHER C. TAINTOR,
10               ATTORNEY AT LAW -and-
                   ISOBEL GOLDEN, ATTORNEY AT LAW
11               Two Canal Plaza
                   P.O. Box 4600
12               Portland, Maine  04112-4600
                   Representing the Defendant
13               (ctaintor@ndhlaw.com)

14

15    Also Present (Via Zoom):

16

17                 Tim Connolly, Esq.
                   Ed Friedman
18

19

20    Reported By:

21

22                 Sandra P. DiFebbo
                   Certified Shorthand Reporter
23               State of Louisiana

24

25
```

```
1      E X A M I N A T I O N        I N D E X

2

3                                       Page

4   BY MR. MOST:                        5, 39

5   BY MR. TAINTOR:                     37

6

7

8

9      E X H I B I T                   I N D E X

10

11                      Page

12

13  Exhibit A                          10

14  Exhibit K                          23

15

16

17

18

19

20

21

22

23

24

25
```

1              S T I P U L A T I O N

2

3              It is stipulated and agreed by and

4    between Counsel for the parties hereto that the

5    deposition of ROBERT PETER GALE, M.D., Ph.D.,

6    DSc(hc) FACP, FRCP, FRCPI(hon) MRSM, is hereby

7    being taken pursuant to the Federal Rules of Civil

8    Procedure for all purposes in accordance with law;

9              That the formalities of reading and

10   signing are specifically reserved;

11             That the formalities of sealing,

12   certification, and filing are hereby specifically

13   waived.

14             That all objections, save those as to

15   the form of the question and responsiveness of the

16   answer are hereby reserved until such time as this

17   deposition or any part thereof is used or sought to

18   be used in evidence.

19                  *  *  *  *  *

20             Sandra P. DiFebbo, Certified Shorthand

21   Reporter, in and for the State of Louisiana,

22   officiated in administering the oath to the witness

23   remotely.

24

25

```
 1              ROBERT PETER GALE, M.D., Ph.D., DSc(hc)
 2   FACP, FRCP, FRCPI(hon) MRSM, 11693 San Vicente
 3   Boulevard, Suite 335, Los Angeles, California,
 4   90049-5105, having been first duly sworn, was
 5   examined and testified on his oath as follows:
 6              MR. MOST:
 7                   Chris, can we stipulate that this
 8                   deposition was properly noticed, and
 9                   the court reporter is duly qualified?
10              MR. TAINTOR:
11                   Sure.
12   EXAMINATION BY MR. MOST:
13        Q.   Good morning, Dr. Gale.  My name is
14   William Most.  I am one of the lawyers for the
15   plaintiff in this case, Ed Friedman.  How are you
16   today?
17        A.   Good.  Thank you.
18        Q.   And, Dr. Gale, I assume you have given a
19   number of depositions in the past?
20        A.   More than one, yes.
21        Q.   So you understand that you are under oath
22   here today?
23        A.   Yes.
24        Q.   You understand that your answers here
25   today have the same force as if we were in a
```

 1    courtroom with a judge and jury?

 2         A.    Yes.

 3         Q.    Is there anything today, whether it is

 4    fatigue, illness, medication, substances, or

 5    anything else that will impair your ability to

 6    understand my questions and provide truthful and

 7    complete answers?

 8         A.    No.

 9         Q.    As you know from past depositions, we can

10    take a break.  I don't expect this is going to be a

11    very long deposition.  If we need to take a break,

12    just tell me or Mr. Taintor, and we'll take a

13    break.  All right?

14         A.    Yes.

15         Q.    I will tell you, though, in advance that

16    if we do take a break, I may ask you after the

17    break if you talked to anyone or looked at any

18    documents, and even if you -- I may even ask you if

19    you spoke to an attorney, so I'm just giving you

20    that as a heads-up.  All right?

21         A.    Yes.

22         Q.    Doctor, if I ask a question that is

23    unclear or you don't understand the question, will

24    you agree now to tell me that that is the case

25    rather than just trying to answer the question

1    anyway?

2         A.    Yes.

3         Q.    Doctor, do you know what case you are

4    here for today?

5         A.    Yes.

6         Q.    What is your broad understanding of that

7    case?

8         A.    My broad understanding is that it is

9    litigation between Mr. Friedman and Maine Central

10   Power.

11        Q.    And what do you understand is the subject

12   of that case?

13        A.    My understanding is that it is

14   Mr. Friedman being unhappy with the idea of having

15   a smart meter installed in his home to monitor his

16   electrical consumption.

17        Q.    Doctor, what did you do to prepare for

18   this deposition?

19        A.    I received some materials from

20   Mr. Taintor, medical records regarding

21   Mr. Friedman.  I read the declarations of David

22   Carpenter, Dr. David Carpenter, and Mr. Kent

23   Chamberlin.  I read the deposition of Dr.

24   Carpenter.  I reviewed the biomedical literature.

25   I think that's broadly my effort so far.

1      Q.   So those were the things you did in the
2  process of generating your report, correct?
3      A.   I think it's a declaration rather than a
4  report.
5      Q.   Okay.  So those were the things you did
6  in the process of preparing your declaration,
7  correct?
8      A.   Yes.
9      Q.   Did you do anything particularly to
10  prepare for this deposition today?
11      A.   I reviewed all of the materials that I
12  just mentioned.
13      Q.   Aside from Mr. Taintor, did you speak to
14  anyone to prepare for this deposition?
15      A.   No.
16      Q.   Did you take any notes to prepare for
17  this deposition other than what's in your
18  declaration?
19      A.   No.
20      Q.   Doctor, could you just give us your full
21  name for the record.
22      A.   Robert Peter Gale, G-A-L-E.
23      Q.   And what is your current job title?
24      A.   Well, I have several job titles.  I am a
25  visiting professor of hematology at the Imperial

```
 1   College of Science, Technology and Medicine in
 2   London.  I am a visiting professor of hematology at
 3   Sun Yat-sen Cancer Center in Quangzhou, China.  I
 4   am editor in chief of a medical journal called
 5   Leukemia.  I am executive editor of another
 6   biomedical journal called Bone Marrow
 7   Transplantation.  I am on the advisory board of a
 8   number of biotechnology companies and charities and
 9   other organizations.  That's most of the ones that
10   I recall, but all of these are listed in my
11   curriculum vitae, which I believe was produced to
12   you.
13        Q.   Okay.
14             MR. TAINTOR:
15                  Just for the record, you might need
16             to -- maybe Sandy might have the CV.
17             That would have the spelling of the
18             Chinese institution, which I couldn't
19             begin to spell.
20             THE WITNESS:
21                  It is Sun, S-U-N, new word Y-A-T
22             hyphen S-E-N.
23   BY MR. MOST:
24        Q.   And, Doctor, this is a question I ask of
25   all witnesses.  It's not particular to you, but
```

1    have you ever been arrested?

2        A.    No.

3        Q.    So I'm going to pull up what we've

4    circulated as Exhibit A.  Does this pop up on your

5    screen, Dr. Gale?

6        A.    Yes.

7        Q.    And is this what you described as your

8    declaration?

9        A.    Yes.

10       Q.    I may also refer to this as -- I may

11   refer to this as your report or your expert report.

12   Will you understand me, if I do so?

13       A.    Yes.

14       Q.    So on Page 1 it talks about the Remit,

15   which is this is the task that was set out to you

16   as an expert witness, correct?

17       A.    That's my understanding of the task.

18       Q.    You wrote this document, correct?

19       A.    Yes.

20       Q.    So what you were asked to do was to opine

21   about whether or not exposure to radiofrequency

22   electromagnetic fields from a residential smart

23   meter, of the type proposed to be installed by

24   Central Maine Power Company in the residence of

25   Mr. Edward Friedman, to a reasonable degree of

1    medical probability would worsen signs, symptoms,

2    and/or prognosis of his cancer, correct?

3         A.   Yes, but, also, to comment on the

4    declarations of plaintiff experts, Dr. David

5    Carpenter, Mr. Kent Chamberlin, and the deposition

6    of Dr. David Carpenter.

7         Q.   Right.  If we move to Page 4, at the

8    bottom there is the section that is headed Opinion.

9    Do you see that?

10        A.   Yes.

11        Q.   You provide your opinion to a reasonable

12   degree of medical probability about that it is less

13   likely than not that exposure to the smart meter

14   would worsen the signs, symptoms, or prognosis of

15   Mr. Friedman's cancer, correct?

16        A.   Yes, or words to that effect.

17        Q.   When you talk about -- so when we see in

18   this report what you are opining about is -- your

19   opinion that you present in this report is about

20   whether it is more or less likely than not that

21   this exposure would worsen Mr. Friedman's signs,

22   symptoms or prognosis of his cancer, correct?

23             MR. TAINTOR:

24                  Object to the form of the question.

25             THE WITNESS:

```
 1                    Yes.
 2   BY MR. MOST:
 3        Q.   When we talk about more or less likely
 4   than not, we're talking about greater or less than
 5   50-percent probability, correct?
 6             MR. TAINTOR:
 7                  Same objection. You can answer.
 8             THE WITNESS:
 9                  When you say we, I don't know who
10          you are referring to.
11   BY MR. MOST:
12        Q.   Fair enough.
13        A.   In your question.
14        Q.   When you say in this report less likely
15   than not, you are referring to less than 50-percent
16   probability, correct?
17        A.   Yes.
18             MR. TAINTOR:
19                  Same objection.
20             THE WITNESS:
21                  I'm sorry, Mr. Taintor.  I'm jumping
22          in too quickly.  I'll wait until you
23          finish with your objection.
24             MR. TAINTOR:
25                  I just need to object to some of the
```

1              questions for the record but I think
2              Sandy got them.
3         THE WITNESS:
4              But I'm prepared to testify to other
5              standards, if asked to do so.
6    BY MR. MOST:
7         Q.  So in this report, you did not render an
8    opinion about whether there was any actual risk to
9    Mr. Friedman from this exposure.  What you were
10   opining about was whether that risk was more or
11   less than 50 percent, correct?
12        MR. TAINTOR:
13             Same objection.
14        THE WITNESS:
15             As I said -- yes, that is correct,
16             but I'm prepared to answer that
17             question at different levels of
18             certainty, if asked to do so.
19   BY MR. MOST:
20        Q.  But you have not been asked to do so, so
21   far in this case, agreed?
22        A.  Yes.
23        MR. TAINTOR:
24             Again, object to the form of the
25             question.  You can answer.

1            THE WITNESS:

2                  Yes.

3    BY MR. MOST:

4        Q.   Moving on to Page 39 of this document.

5    You critique Dr. Carpenter's declaration for its

6    failure to assess the exposure that the plaintiff

7    might receive from a smart meter, correct?

8        A.   Yes.

9        Q.   Did you assess the exposure that

10   Mr. Friedman might receive from a smart meter?

11       A.   I read a number of documents related to

12   this issue on smart meters and exposure, but I did

13   not specifically try to calculate what

14   Mr. Friedman's exposure might be, because it is not

15   germane to my opinion, and because such a

16   calculation is outside of my area of designated

17   expertise and outside of my area of expertise.

18       Q.   So why is it a problem for Dr. Carpenter

19   to not assess Mr. Friedman's exposure, but it is

20   not a problem for you to not assess that?

21       A.   Because there is no evidence in the

22   biomedical literature that any degree of exposure

23   to radiofrequency electromagnetic radiations would

24   be more likely than not to increase signs, symptoms

25   or prognosis of a person with Mr. Friedman's

15

1   cancer.

2       Q.   Okay.  So did you review the

3   specifications of the proposed smart meter?

4       A.   No.  That is outside of my area of

5   designated expertise and outside of my area of

6   expertise.

7       Q.   Did you read anything about the frequency

8   at which they emit electromagnetic radiation?

9       A.   Would you specify what you mean by they?

10      Q.   Sure.  Did you review anything that in

11  the course of preparing your declaration that

12  indicated the frequency of the radiation emitted by

13  a smart meter?

14      A.   So you are talking about a generic smart

15  meter and not the smart meter in the instance of

16  Mr. Friedman's proposed smart meter?

17      Q.   Either one.

18      A.   Well, that's a compound question.  Maybe

19  you could give me it in two bites.

20      Q.   Okay.  Did you review anything that

21  indicated the frequency of the radiation that might

22  be emitted from a generic smart meter?

23      A.   I'm sorry.  You mean a generic or -- you

24  said genetic.

25      Q.   Okay.  Generic.

1       A.    Yes.

2       Q.    Did you review anything that indicated

3   the frequency of the radiation that might be

4   emitted from the smart meter proposed for

5   Mr. Friedman's residence?

6       A.    No.  That is outside of my area of

7   designated expertise and outside of my area of

8   expertise.

9       Q.    Okay.

10      A.    I assumed that it would be -- fall within

11  the range of generic smart meters used by companies

12  like Maine Central Power that fall within the range

13  of generic smart meters.

14      Q.    Did you review anything about the

15  specifications of the particular smart meter

16  proposed for Mr. Friedman's residence?

17      A.    No.  That is outside of my area of

18  designated expertise and outside of my area of

19  expertise.

20      Q.    Did you review anything about how often a

21  generic smart meter transmits radiation?

22      A.    Yes.

23      Q.    Did you review anything about for what

24  lengths of time a generic smart meter emits

25  radiation?

1      A.   Yes.

2      Q.   You didn't conduct any tests of any kind

3  yourself in preparation for your declaration,

4  correct?

5      A.   You will have to specify what you mean by

6  tests.

7      Q.   Sure.  What you did in the development of

8  your declaration was essentially a literature

9  review, agreed?

10      A.   No.  I mentioned that I reviewed the

11  declarations of two plaintiff experts, and I

12  reviewed the deposition of one of plaintiff's

13  experts, so it goes beyond what you just described.

14      Q.   So what you did for your declaration was

15  a literature review plus review of declarations and

16  depositions, correct?

17      A.   Yes, and I also relied on my extensive

18  knowledge of the effects of radiation on biological

19  systems.

20      Q.   Did you draft the entirety of this

21  declaration?

22      A.   Yes.

23      Q.   Did anyone assist you with it?

24      A.   No.

25      Q.   Did you copy and paste sections of this

```
 1    from prior declarations that you've written?

 2         A.   I would say yes, because the methodology

 3    I used is a methodology that I've used in prior

 4    declarations and is the methodology recommended by

 5    most scientific bodies.

 6         Q.   So I want to look at your methodology.

 7    So I'm looking at Page 7.  You see the paragraph

 8    here that says, "I used several strategies?"

 9         A.   Yes.

10         Q.   So to produce your opinions here, you did

11    three things in addition to reviewing declarations

12    and depositions.  You ran a search in PubMed and

13    reviewed responsive articles.  You read or reread

14    several textbooks, and you reviewed Ed Friedman's

15    medical records.  Is that correct?

16         A.   Yes.

17         Q.   Did you do anything else?

18         A.   Well, I've looked -- I have reviewed but

19    not relied on a number of articles in the public

20    literature and the biomedical literature which are

21    not included, necessarily, in my declaration or

22    expert report since I didn't rely on them.

23         Q.   Were those found through your PubMed

24    search?

25         A.   They were found through PubMed searches,
```

```
 1    but, also, through searches of Google or Google
 2    Scholar, statements from organizations that I'm a
 3    member of, such as the Health Physics Society, the
 4    American Cancer Society.
 5         Q.   Did you see on Page 10 where you talk
 6    about your Boolean search terms?
 7         A.   Yes.
 8         Q.   These were -- this is the search string
 9    that you used for your PubMed search, correct?
10         A.   As best I recall, yes.
11         Q.   Is this the same search string you used
12    for searching of other databases, like Google
13    Scholar?
14         A.   No, because I'm not -- I don't use
15    Boolean operators when I'm searching Google or
16    Google Scholar, so there would not be these Boolean
17    operators.
18         Q.   And part of your search string for the
19    PubMed was not causation, correct?
20         A.   Yes.
21         Q.   So that would -- that portion of the
22    search string would exclude all articles with the
23    term "causation," correct?
24         A.   Yes, because the issue in this litigation
25    was not causation.  The issue was whether
```

1    Mr. Friedman's exposures were more likely than not

2    to worsen signs, symptoms or prognosis of his

3    cancer, not whether his exposures caused his

4    cancer, which, as far as I know, is not plaintiff's

5    claim.

6         Q.   So this search string would exclude an

7    article that said something to the effect of, "We

8    have found that radiofrequency radiation is the

9    causation of this particular kind of cancer symptom

10   or progression," agreed?

11        A.   No.  I don't agree.  This is a

12   hypothetical that's incomplete.  You said an

13   article that included the word "progression."

14   Several of the articles that I cite in my

15   report/declaration make claims in acute

16   lymphoblastic leukemia to affect the outcome of the

17   disease, so they were not excluded.  They were

18   picked up by my search.

19        Q.   But an article that had the word

20   "causation" in it would be excluded from your

21   search, agreed?

22        A.   I can't agree with that.  This is, again,

23   a hypothetical.  Since several of the articles deal

24   with -- I'm sorry.  Did you say causation?

25        Q.   I did.

```
 1        A.   No.  Many of the articles deal with

 2   causation, even though I excluded it from my

 3   Boolean search terms.

 4        Q.   How were they not excluded if you

 5   excluded it with your search terms?

 6        A.   I mean, search engines are imperfect, and

 7   I think I listed something like 49 citations.  It's

 8   on the screen in front of us.  A number of those

 9   mention causation.

10        Q.   But any article that mentioned causation

11   would be excluded from the PubMed portion of your

12   searching for articles, agreed?

13        A.   No.  It was not. They were not, as

14   indicated by my -- what I just -- my testimony that

15   I just gave.

16        Q.   Okay.  Well, you put this search string

17   into PubMed, right?

18        A.   Yes.

19        Q.   That search of PubMed, using this search

20   string, would not respond with articles that

21   contained the term "causation," agreed?

22        A.   That is a theoretical, because as I've

23   indicated, a number of the articles dealt with

24   causation.  I would say, in fact, the majority of

25   the articles dealt with causation, so as far as I'm
```

```
 1   aware, although this is outside of my area of
 2   expertise and outside of my area of designated
 3   expertise, the PubMed searching engine depends upon
 4   key words which are listed by the author.  I
 5   published more than a thousand articles in PubMed,
 6   and I'm asked to identify key words, and those are
 7   the words that the extractors use.  Now, if I use
 8   the word "causation" in my article, but I did not
 9   list it as a key word, it is very likely that it
10   would come up in a PubMed search, and that is, in
11   fact, the case.
12       Q.   I see.  So your use of this search string
13   excluded all articles with the key word of
14   causation whether or not that word actually
15   appeared in the text of the article; is that
16   correct?
17       A.   Well, that is my understanding of how the
18   search engine works, but detailed knowledge of how
19   the search engine works is outside of my area of
20   designated expertise and outside of my area of
21   expertise.
22       Q.   Okay.  So I want to talk about -- I want
23   to talk briefly about radiofrequency radiation
24   generally.  Radiofrequency radiation is a subset of
25   electromagnetic radiation, correct?
```

1        A.    Yes.

2        Q.    Radiofrequency radiation is a band on the

3   electromagnetic spectrum that includes the

4   emissions that work for radios, TV, microwave

5   ovens, things like that, correct?

6        A.    More or less, correct.  I mean, we could

7   discuss whether microwave ovens are just spanning

8   the boundary of radiofrequency radiations.

9        Q.    I'm pulling up Exhibit K.  I find this to

10  be a sort of helpful diagram of the electromagnetic

11  spectrum.  Does this look -- is this consistent

12  with your understanding of the electromagnetic

13  spectrum?

14       A.    Yes.

15       Q.    This has smart meters ranging from .9 to

16  2.45 gigahertz; is that correct?

17       A.    Yes.

18       Q.    Is that consistent with your

19  understanding?

20       A.    Yes.

21       Q.    There are a number of mechanisms by which

22  radiofrequency radiation can affect the human body,

23  correct?

24       A.    Yes.

25       Q.    Setting aside, for the moment, whether

1    these are significant or harmful, positive or

2    negative effects, I just want to understand the

3    range of mechanisms that could have effects.  Okay.

4    So radiofrequency radiation can cause heating of

5    human tissue, correct?

6         A.   Yes.

7         Q.   That's what we call the thermal effects

8    of radiofrequency radiation?

9         A.   Well, you have to specify who we is.

10        Q.   That's what the scientific community

11   describes as thermal effects, correct?

12        A.   Again, that's vague and ambiguous.  If

13   you want to ask me -- let me try to help you.  If

14   you want to know whether I would accept the fact

15   that radiofrequency radiations that cause heating

16   could be called thermal effects, I can answer that

17   question.

18        Q.   What is the answer to that question?

19        A.   Yes.

20        Q.   Radiofrequency radiation can induce

21   electrical activity in the human body, correct?

22        A.   Yes.

23        Q.   Radiofrequency radiation can cause

24   oxidative stress in the human body, correct?

25        A.   I would say that that is reported, but I

1    would not say there is necessarily unlimited

2    consensus on that point. And we would also have to

3    specify something to do with dose.  I mean, I'm not

4    sure that my mobile phone is causing oxidative

5    stress in my body, so without specifying the dose

6    and frequency and route, I'm not sure that I can

7    agree with your statement.

8        Q.   Is it your opinion that at some doses and

9    at some frequencies radiofrequency radiation can

10   cause oxidative stress in the human body?

11       A.   I think that has been asked and answered.

12   I think that I've testified that that is reported.

13   There are some data to support that notion, but it

14   is not uniformly accepted.

15       Q.   What is your opinion?

16       A.   I think at perhaps the highest exposures

17   it is quite possible, but I would say it remains

18   unproved.

19       Q.   At some doses and at some frequencies,

20   radiofrequency radiation can affect insulin

21   secretion by impacting the human body's calcium

22   channels.  Would you agree?

23       A.   Let me go back and correct my prior

24   answer first, if I may.

25       Q.   Uh-huh.

1      A.   You said in the human body.  I'm not sure
2  that there are evidence to support that claim.
3  These data are based mostly on experiments using
4  cells in a laboratory.  It would be very hard to --
5  somewhere between very hard and impossible in an
6  intact human being to demonstrate an effect of
7  oxidative stress in a human exposed to some
8  unspecified dose of radiofrequency radiations.
9  These are done on cells, or cells in culture, and
10 things of that nature, where such an effect can be
11 quantified.  Whether they represent what actually
12 happens in the human body, as far as I know, is
13 unproved.
14     Q.   In some doses and at some frequencies,
15 radiofrequency radiation can affect insulin
16 secretion by impacting calcium channels in cells.
17 Would you agree?
18     A.   Well, again, these are experiments in
19 laboratory models.  They're not done on intact
20 human beings exposed to the -- with exposures to
21 radiofrequencies that we're discussing.
22     Q.   With that caveat, is the answer yes?
23     A.   Yes, with that caveat.
24     Q.   With that same caveat, at some doses and
25 at some frequencies, radiofrequency radiation can

1    affect brain activity, correct?

2        A.   Yes.  I think that that is correct.

3        Q.   With that same caveat, at some doses and

4    some frequencies, radiofrequency radiation can

5    affect myelin deterioration, correct?

6        A.   Well, I think that that question is

7    outside of my area of expertise and outside of my

8    area of designated expertise.  I think I have

9    encountered, in my search for the bioliterature,

10   one or more articles making this claim, but whether

11   it is generally accepted in the scientific

12   community, I'm not aware that it is.

13       Q.   In your literature review, in preparation

14   of your declaration, did you do any review

15   particularly on the topic of oxidative stress?

16       A.   Well, I read several articles that

17   discussed, again, in experimental systems

18   degeneration of reactive oxygen species.  If that's

19   what you mean by oxidative stress, my answer is

20   yes.

21       Q.   Do you know what the term "dirty

22   electricity" means?

23       A.   I've only seen it once or twice in the

24   lay literature, so it is not something that I'm

25   especially familiar with.  It's outside of my area

1    of designated expertise, and it is outside of my

2    area of expertise.

3         Q.   So you did not do any -- you don't have

4    any opinions about the impact of dirty electricity

5    as it relates to Ed Friedman, agreed?

6         A.   Well, as I testified, I'm only aware of

7    it from one or two articles in the lay press, so

8    you would have to define it for me before I can

9    answer your question.

10        Q.   Sure. Dirty electricity defined here

11   means radiofrequency radiation that deviates from a

12   clean sign wave, i.e., it has spiking.  Does that

13   define it for you?

14        A.   I'm not sure.

15        Q.   But if that is the definition, you have

16   not expressed any opinions in your declaration as

17   it relates to something like that, agreed?

18        A.   Yes.

19        Q.   Did you review anything in your review in

20   preparation for your declaration that indicated the

21   extent to which a smart meter, when attached to a

22   residence, can induce radiofrequency transmission

23   from other wires in the house that aren't part of

24   the smart meter?

25        A.   No.

1      Q.   Your expert report refers to the FCC's
2   conclusions.  Do you recall that?
3      A.   Do you mind putting it up?
4      Q.   Sure.
5      A.   And I'll look at it.
6      Q.   Do you see that Paragraph 30 here on Page
7   36 you refer to a statement by the FCC?
8      A.   You are talking about Item 39?
9      Q.   Yes.
10      A.   Is this -- I don't know where I am in the
11   document.  Are we -- is that my Item 39?
12      Q.   Do you see that it's underneath the
13   rebuttal of testimony of Mr. Kent Chamberlin?
14      A.   Yeah.  So if you'll scroll down, I can
15   verify that.  Yes, I see that.
16      Q.   So in Paragraph 39 here on Page 36, you
17   are referring to a FCC statement as part of your
18   rebuttal here, correct?
19      A.   Yes.
20      Q.   Are you aware that in 2021 the DC Circuit
21   Court of Appeals rejected some FCC standards
22   related to radiofrequency radiation?
23           MR. TAINTOR:
24                I object to the form of the question
25            as overly vague and not applicable to

```
 1              cancer.  You can answer.
 2              THE WITNESS:
 3                   Could you or the court reporter read
 4              back the question, please?
 5    BY MR. MOST:
 6         Q.   Sure.  I'll just resummarize it subject
 7    to the same objection.  Are you aware that in 2021
 8    the DC Circuit Court of Appeals rejected some FCC
 9    standards related to radiofrequency radiation?
10         A.   I have a vague recollection, but are you
11    implying that it has something to do with the issue
12    of a causal link between a wireless device use and
13    cancer or other illnesses, or you are just speaking
14    in a very general sense?
15         Q.   No.  I'm just asking if you have any
16    awareness of that 2021 decision?
17         A.   I had some awareness of it, but I don't
18    know the details.
19         Q.   Okay.  Do you know what Mr. Friedman's
20    symptoms are of his lymphoma?
21         A.   Well, I only know the symptoms that are
22    reported in the medical records that I reviewed,
23    and I think that I listed them.  If we go to the
24    medical section of my report, they may have been
25    listed there.
```

1      Q.   Is this the portion you are talking about

2  that begins on Page 7, the medical history?

3      A.   Right.

4      Q.   I'm not seeing where you -- and I can

5  scroll through this slowly, if helpful.  I'm not

6  seeing where you list his symptoms of lymphoma.  Am

7  I missing it?

8      A.   Well, firstly, he doesn't have a

9  lymphoma.  He has Waldenstrom macroglobulinemia,

10  but since this covers several pages, if you just

11  keep it up, I will read it line by line.

12      Q.   Sure.  Let me just -- before I do that,

13  you say here that he has lymphoplasmacytic

14  lymphoma?

15      A.   Right.

16      Q.   But you're saying he doesn't have

17  lymphoma?

18      A.   Well, we don't really consider -- let me

19  say that most hematologists and oncologists

20  consider Waldenstrom macroglobulinemia quite

21  distinct from a lymphoma.  So, you know, when you

22  look at the listing of lymphomas in any textbooks

23  or things, it would be in a different section,

24  though, lymphoplasmacytic lymphoma is sort of a

25  technical medical term, but, I mean, he is more

```
 1    properly referred to as Waldenstrom
 2    macroglobulinemia.  I'm just reading.  I'm sorry.
 3    You are going too fast for me.  So scroll back up,
 4    please.  Okay.  I note -- scroll back up.  On that
 5    first page, I note that he had severe anemia, which
 6    is typically, you know, characterized by fatigue,
 7    weakness and fatigue.  That's on the third from the
 8    bottom line.
 9        Q.   Yep.
10        A.   And then I mention on the next -- I'm
11    sorry.  Scroll down a bit.  I mentioned cold
12    urticaria.  You can go to the next page.  Okay.
13    That's fine.
14        Q.   So it looks to me like the only symptoms
15    of Mr. Friedman's Waldenstrom macroglobulinemia
16    that you assessed were his anemia and his cold
17    urticaria.  Is that correct?
18        A.   That misstates my testimony.  When you
19    say assessed, that includes all of the documents
20    that I read and reviewed and relied on.  So in
21    reviewing his medical records, there was a -- there
22    were many descriptions of his symptoms.  That's
23    different from what I listed in my expert report/
24    declaration.  I'm well aware of what his signs and
25    symptoms were from my review of his medical
```

1    records.

2         Q.   What are his signs and symptoms?

3         A.   Well, he complained of, on various

4    occasions, of fatigue, weakness.  I would say lack

5    of energy.  You know, since we have -- I assume you

6    have -- it's been produced to you, his medical

7    records, which I reviewed and relied on.  We can go

8    through them page by page, and I can tell you

9    exactly what symptoms he complained to his

10   physicians.  Now, Mr. Friedman has been receiving

11   anti-cancer drugs to treat his Waldenstrom

12   macroglobulinemia, so in the context of receiving

13   anti-cancer drugs, it is somewhere between

14   difficult and impossible, for example, to

15   distinguish signs and symptoms, which would be

16   caused by that treatment, from signs and symptoms

17   caused by the disease, and, in fact, both may

18   exist.

19        Q.   Besides the ones that you've mentioned

20   and the ones listed here in your declaration, do

21   you recall assessing any other symptoms other than

22   the ones you've described here?

23        A.   When you say described here, are you

24   referring to my oral testimony now?

25        Q.   Yes.

```
 1        A.    Where I discussed the medical records, or
 2   are you referring to my expert report?
 3        Q.    Both.
 4        A.    Yes.
 5        Q.    What other ones do you recall?
 6        A.    I'm sorry.  No.  There is nothing beyond
 7   what's in the medical records and what is in my
 8   expert report that I am aware of.
 9        Q.    Other than the symptoms that are here in
10   your declaration and the ones you have orally
11   described to us just now, are there any others that
12   you recall assessing in the course of producing
13   your opinions?
14        A.    You mean in the context of his
15   Waldenstrom macroglobulinemia?
16        Q.    Yes.
17        A.    No.
18        Q.    Dr. Gale, have you ever had a court
19   exclude your testimony, to your knowledge, as an
20   expert?
21        A.    I'm aware of a few instances.  Perhaps
22   three that I'm aware of, where my testimony has
23   been excluded either because I relied on other --
24   the testimony of other experts who were excluded in
25   one instance that I recall, or in another instance
```

1    when I felt that I could not use the language that

2    a court asked me -- that a judge asked me to use in

3    formulating my opinion.  I'm aware of a third case

4    that is up under appeal presently.  I think those

5    are the three instances over a career of 50 years

6    that I'm aware of, and I know of no court that's

7    excluded me based on the quality of my scientific

8    testimony, but I could be wrong.  That's all I

9    know.

10        Q.   What is the case that's currently on

11   appeal?

12        A.   It has to do with an occupational

13   exposure to diesel engine exhaust and someone who

14   subsequently developed a lymphoma.

15        Q.   Do you know the name of the plaintiff or

16   the defendant in that case?

17        A.   Well, I would be guessing.

18        Q.   You were designated as an expert in that

19   case?

20        A.   Yes.

21        Q.   Do you know the name of any party to that

22   case?

23        A.   Well, I don't remember the name of the

24   plaintiff, and I don't remember the name, but I

25   have records, so I can produce that answer, if

```
 1    you'd like.
 2         Q.   Do you recall the name of the defendant?
 3         A.   Sitting here today, I would have to guess
 4    the name of the defendant.  If you want me to try
 5    to do that, I can.
 6         Q.   Sure.  What is your guess?
 7         A.   Well, I've been admonished not to guess,
 8    so you did not include that in your instructions to
 9    me.
10         Q.   That's all right.
11         A.   But on previous occasions I was
12    admonished not to guess, so if you want to say that
13    I should guess --
14              MR. TAINTOR:
15                   Maybe we can cut to the chase.  Is
16                   it in that list of testimony in the
17                   last four years that Sabino would have
18                   sent to me you think?  You think it was
19                   testimony in the last four years?  We
20                   could look at the list and figure it
21                   out, perhaps.  I think that's one of
22                   your exhibits.
23              MR. MOST:
24                   It's okay.  We'll figure it out.
25    BY MR. MOST:
```

1    Q.   Dr. Gale, have any of your answers today

2    been guesses except where you've indicated that

3    they've been guesses?

4    A.   No.  If you put up the list of my

5    testimony in the last four years, which was

6    produced to you, it's possible that I can identify

7    the case that is up for appeal that I am referring

8    to.

9    Q.   That's okay.  We'll figure it out.  It's

10   all right.  I'm just looking over my notes here.

11        MR. MOST:

12             Chris, are you going to have any

13          questions for Dr. Gale?

14        MR. TAINTOR:

15             I might just have a couple just to

16          clear something up, yep.  A couple, not

17          too many.

18        MR. MOST:

19             Yeah, go ahead.

20   EXAMINATION BY MR. TAINTOR:

21   Q.   Okay.  So, Doctor, early on in the

22   deposition, Attorney Most asked you about the focus

23   of your analysis and whether it was on the question

24   of whether it was more likely than not that

25   exposure to radiofrequency energies from a smart

1   meter would worsen Mr. Friedman's cancer, and I
2   think you said that was initially the focus of your
3   analysis, correct?
4       A.   Yes.   That was the focus of my analysis,
5   but in the course of my analysis, the first issue
6   that I tackled was the issue of general causation,
7   and in my review of general causation, I've opined
8   that exposure to radiofrequency radiations have no
9   effect on the course of a cancer.   So given that
10  conclusion regarding general causation, while I
11  answered a question regarding more likely than not,
12  my answer would be the same since I don't believe,
13  or it's my opinion that such exposures cannot
14  worsen the course of a cancer.   It goes far beyond
15  the more likely than not standard.
16      Q.   Right.   And after the paragraph of your
17  opinion that Mr. Most read is another paragraph
18  that you didn't read, which says, "Put otherwise,
19  after an extensive review of the biomedical
20  literature and reports from scientific bodies,
21  medical authorities, and regulatory agencies I
22  found no credible evidence exposure to
23  radiofrequency magnetic fields, such as those
24  emitted from a smart meter of the type proposed to
25  be installed by Central Maine Power at the

```
1    residence of Mr. Edward Friedman would worse" --
2    worsen -- "signs, symptoms, or prognosis in someone
3    with lymphoplasmatic lymphoma -- lymphoplasmacytic
4    lymphoma/Waldenstrom's macroglobulinemia, including
5    Mr. Friedman." So when you said that there was no
6    credible evidence that exposure would worsen
7    Mr. Friedman's condition, what was it that you were
8    trying to convey in that report?
9         A.   Well, what I tried to convey is that -- I
10   don't know how to put it other than what I've
11   stated in my declaration, namely, there is no
12   credible evidence that such an exposure has any
13   convincing impact on any type of cancer, including
14   but not limited to, Mr. Friedman's Waldenstrom
15   macroglobulinemia.  So it fails the test of general
16   causation.
17             MR. TAINTOR:
18                  Gotcha.  Okay.  I think that's all I
19             wanted to ask.  I'm good.  Thank you.
20   BY MR. MOST:
21        Q.   And, Dr. Gale, by the test of general
22   causation, you mean causation by the more likely
23   than not standard, correct?
24        A.   No, no.  I don't mean by the more likely
25   than not standard.  I mean there is no credible
```

1    evidence, period.  The weight of evidence approach

2    that I used does not rely on more likely than not.

3    It relies on an assessment of the biological

4    plausibility experimental data, epidemiological

5    data, and expert opinion.  It is not a more likely

6    than not standard.  It is a binary.  Does the

7    weight of evidence result in the conclusion that

8    exposure to radiofrequency radiations affect the

9    prognosis of someone with an established cancer.

10        Q.   Okay.  So that's your opinion as it

11    pertains to causation of the cancer or progression

12    of the cancer, agreed?

13        A.   That's not what I just testified.  I said

14    to the progression of a cancer.  I wasn't asked to

15    opine about causation, because reading the

16    documents available to me and reading the testimony

17    of plaintiff's expert witnesses, there is no

18    allegation that Mr. Friedman's cancer was caused by

19    his exposure to ionizing -- to radiofrequency

20    radiations, and there is a substantial body of

21    evidence that I cite in my expert report/

22    declaration, that he has a hereditary form of

23    Waldenstrom macroglobulinemia.

24        Q.   Okay.  So the binary that you were

25    talking about earlier, that is your opinion as it

1    regards the progression of cancer, correct?

2         A.   Yes.  Prognosis is the term that I used.

3         Q.   Okay.  By prognosis, you mean something

4    equivalent to progression?

5         A.   Well, it could -- not necessarily. Those

6    are not synonymous.  I mean, prognosis could be

7    larger than progression.  For example, prognosis

8    could include survival.  A person might progress

9    but not die.  So prognosis is an umbrella term that

10   has within it progression, but, obviously, includes

11   other potential outcomes.

12             MR. MOST:

13                  Okay.  Dr. Gale, I thank you very

14                much for your time here.

15             THE WITNESS:

16                  Thank you for your questions.

17                  [End of deposition, 12:57]

18

19

20

21

22

23

24

25

WITNESS CERTIFICATE

I, ROBERT PETER DALE, M.D., have read or have had the foregoing testimony read to me pursuant to Rule 30(e) of the Federal Rules of Civil Procedure and do hereby certify that to the best of my ability and understanding, it is a true and correct transcription of my testimony.

Please check one:

_____Without corrections

_____With corrections (see errata sheet)

_____        _____
ROBERT P. GALE, M.D.                        Date

```
 1              C E R T I F I C A T E

 2

 3              This certification is valid only for
    a transcript accompanied by my original signature
 4  and original required seal on this page.

 5              I, SANDRA P. DIFEBBO, Certified
    Court Reporter, in and for the State of Louisiana,
 6  as the officer before whom this testimony was
    taken, do hereby certify that ROBERT PETER GALE,
 7  M.D., after having been duly sworn by me upon
    authority of R.S. 37:2554, did testify as
 8  hereinbefore set forth in the foregoing 42 pages;

 9              That the testimony was reported by
    me in stenotype, was prepared and transcribed by me
10  or under my personal direction and supervision, and
    is a true and correct transcript to the best of my
11  ability and understanding;

12              That the transcript has been
    prepared in compliance with transcript format
13  guidelines required by statute or by rules of the
    board, that I have acted in compliance with the
14  prohibition on contractual relationships as defined
    by Louisiana Code of Civil Procedure Article 1434
15  and in rules and advisory opinions of the board;

16              That I am not related to Counsel or
    to the parties herein, nor am I otherwise
17  interested in the outcome of this matter.

18

19

20

21  _____
    Sandra P. DiFebbo,
22  Certified Shorthand Reporter

23  Date:  4-4-23

24

25
```

Page 41

1  regards the progression of cancer, correct?
2      A. Yes. Prognosis is the term that I used.
3      Q. Okay. By prognosis, you mean something
4  equivalent to progression?
5      A. Well, it could -- not necessarily. Those
6  are not synonymous. I mean, prognosis could be
7  larger than progression. For example, prognosis
8  could include survival. A person might progress
9  but not die. So prognosis is an umbrella term that
10 has within it progression, but, obviously, includes
11 other potential outcomes.
12     MR. MOST:
13         Okay. Dr. Gale, I thank you very
14     much for your time here.
15     THE WITNESS:
16         Thank you for your questions.
17         [End of deposition, 12:57]
18
19
20
21
22
23
24
25

Page 42

1      WITNESS CERTIFICATE
2
3
4
5      I, ROBERT PETER DALE, M.D., have
6  read or have had the foregoing testimony read to me
7  pursuant to Rule 30(e) of the Federal Rules of
8  Civil Procedure and do hereby certify that to the
9  best of my ability and understanding, it is a true
10 and correct transcription of my testimony.
11
12
13 Please check one:
14
   ✓  Without corrections
15
16
   ____ With corrections (see errata sheet)
17
18
19
20 *Robert Peter Gale*   4-6-2023
   ROBERT P. GALE, M.D.        Date
21
22
23
24
25

Page 43

1      C E R T I F I C A T E
2
3      This certification is valid only for
a transcript accompanied by my original signature
and original required seal on this page.
4
5      I, SANDRA P. DIFEBBO, Certified
Court Reporter, in and for the State of Louisiana,
6  as the officer before whom this testimony was
taken, do hereby certify that ROBERT PETER GALE,
7  M.D., after having been duly sworn by me upon
authority of R.S. 37:2554, did testify as
8  hereinbefore set forth in the foregoing 42 pages;
9      That the testimony was reported by
me in stenotype, was prepared and transcribed by me
10 or under my personal direction and supervision, and
is a true and correct transcript to the best of my
11 ability and understanding;
12     That the transcript has been
prepared in compliance with transcript format
13 guidelines required by statute or by rules of the
board, that I have acted in compliance with the
14 prohibition on contractual relationships as defined
by Louisiana Code of Civil Procedure Article 1434
15 and in rules and advisory opinions of the board;
16     That I am not related to Counsel or
to the parties herein, nor am I otherwise
17 interested in the outcome of this matter.
18
19
20
21 *Sandra P. DiFebbo*
Sandra P. DiFebbo,
22 Certified Shorthand Reporter
23 Date: 4-4-23
24
25

11  (Pages 41 to 43)

**Expert Report  Edward Friedman**

Robert Peter Gale, MD, PhD, DSc(hc), FACP, FRCP, FRCPI (hon), MRSM

**Remit**  I am asked by Mr. Christopher C. Taintor of Norman, Hansen & De Troy LLC to opine whether or not exposure to radiofrequency electromagnetic fields from a residential smart meter of the type proposed to be installed by Central Maine Power in the residence of Mr. Edward Friedman, to a reasonable degree of medical probability, worsen signs, symptoms and/or prognosis of Mr. Friedman's lymphoplasmacytic lymphoma/Waldenström macroglobulinemia.  I am also asked to comment on the Declarations of plaintiff's experts Dr. David Carpenter and Mr. Kent Chamberlin and Deposition of Dr. David Carpenter.

**Qualifications**  I received my AB degree with high honors in biology and chemistry from Hobart College in 1966 and my MD degree from the State University of New York at Buffalo in 1970.  My postgraduate medical training (internal medicine, hematology and oncology) 1970-1973 was at the University of California, Los Angeles (UCLA) from 1972-1976.  In 1976 I received a PhD in microbiology and immunology from UCLA following doctoral work focusing on cancer immunology.  My studies at UCLA were funded by the U.S. National Institutes of Health (NIH) and the Leukemia Society of America where I was the Bogart Fellow and Scholar. From 1973-1983, I was on the faculty of the UCLA School of Medicine in the Department of Medicine, Division of Hematology & Oncology from 1972-1993.. I have published over 1300 scientific articles and more than 20 books, mostly on hematology, leukemia (biology and treatment), transplantation (biology, immunology and treatment), cancer biology and immunology and radiation biology. I have written on medical topics, nuclear energy, weapons and terrorism and politics of US-Soviet relations in articles for The New York Times, Los Angeles Times, Washington Post, USA Today and Wall Street Journal.

From 1980-1997, I was Chairman of the Scientific Advisory Committee of the International Bone Marrow Transplant Registry (IBMTR), an organization of more



**EXHIBIT**

**Exhibit A**

1

than 400 transplant centers in over 60 countries working together to analyze and advance knowledge about blood cell and bone marrow transplants.  Since 1989, I was a member of the Scientific Advisory Board of the Autologous Blood and Marrow Transplant Registry (ABMTR).  In 1989-2003 I chaired the Scientific Advisory Board of the Center for Advanced Studies in Leukemia.  From 1986-1993, I was president of the Armand Hammer Center for Advanced Studies in Nuclear Energy and Health, a foundation supporting research on medical aspects of nuclear issues. From 1993-1999, I was Senior Physician and Corporate Director at Salick Health Care (SHC), Inc. in Los Angeles (now Aptium Oncology), a subsidiary of AstraZeneca Corp.  From 2000-2004 I was Senior Vice-President for Medical Affairs at Antigenics, Inc. I was also a Senior Medical Consultant to Oxford Health Plans in areas of advanced medical technologies.  From 2004 to 2007, I was Senior Vice-President of Research for ZIOPHARM Oncology, Inc. In 2007, I joined Celgene Corp., where I was Executive Director of Clinical Research, Hematology and Oncology.  Celgene Corp. was acquired by Bristol-Myers Squibb Corp and I was employed there until 1 January, 2020.  I am currently a consultant to several biotechnology companies with a focus on cancer.

At the Weizmann Institute of Science, my colleagues and I identified the molecular basis of chronic myelogenous leukemia (CML).  Whilst at the Rockefeller University, I helped unraveled genetic aspects of leukaemia-risk in Fanconi anemia.

I have contributed substantially to basic science and clinical research in how cancers, especially leukemias, develop.  Increasingly, I have focused on issues of clinical trials design, implementation and analyses and in the use of observational databases, expert consensus and clinical practice guidelines to determine safe and effective cancer therapies. I have been able to translate my knowledge and expertise in the molecular biology of blood cancers to other cancers.

I am Visiting Professor of Haematology, Centre for Haematology Research, Department of Immunology and Inflammation, Imperial College London, UK.  I have been a visiting professor, scholar or lecturer at many universities including Weizmann Institute of

2

Science (Meyerhoff Visiting Scientist 1983-84), Academy of Medical Sciences-USSR, All-Union Cancer Center-USSR, Universities of Cape Town, Bologna, Michigan and Rome, Cornell Univ., Tokyo Univ., Tufts Univ., Uppsala Univ., Roswell Park Cancer Center, Cleveland Clinic, Swedish National Radiation Protection Board, UK Royal College of Physicians and The UK Royal Society of Pathology.

I am a Fellow of the American College of Physicians, the Royal College of Physicians, The Royal College of Physicians of Ireland (hon) and a Member of the Royal Society of Medicine.  I am an honorary member of the Russian Academy of Science, Chinese Academy of Medical Science and a Diplomat of the American Boards of Internal Medicine and Oncology and eligible in the American Board of Hematology.

I am a member of several learned societies including The American Association for the Advancement of Science, American Association of Immunologists and American Federation for Cancer Research, American Federation for Clinical Research, American Society for Clinical Oncology, American Society of Hematology, International Society of Hematology, International Society of Experimental Hematology and others.

I am Editor-in-Chief of *Leukemia*, Executive Editor of *Bone Marrow Transplantation*, Associate Editor of *Clinical Transplantation* and on the editorial boards of scientific journals including *Acta Haematologica, Advances in Cell and Gene Therapy, Blood Reviews, Case Reports in Medicine, Cell Transplantation, HemOnc Today* (Section Editor), *Leukemia Research, Leukemia Research Reports, Transplantation* and others and review typescripts for the *New England Journal of Medicine, Lancet, Annals of Internal Medicine, JAMA, Journal of Clinical Oncology* and others.

I received many awards for my scientific achievements and contributions including the President's Award, New York Academy of Science, Scientist of Distinction Award Weizmann Institute of Science, Distinguished Alumni Award from Hobart College and Intra-Science Research Foundation Award. I hold honorary degrees including DSc from Albany Medical College and the University of Buffalo, LHD from Hobart College and DPS from MacMurray College.

3

I am widely recognized for my humanitarian activities.  In 1986, I was asked by the government of the Soviet Union to coordinate medical efforts for victims of the Chernobyl nuclear power station accident. In 1987, I was asked by the government of Brazil to coordinate medical efforts for victims of a radiation accident in Goiania. In 1988, I was part of the US medical emergency team sent in the aftermath of an earthquake in Armenia.  In 1999 I was asked by the government of Japan to treat victims of the nuclear criticality accident near Tokyo. In 2011, I was called to Japan to deal with medical consequences of the Fukushima nuclear power station accident have also been a neutral war observer for the governments of Croatia and Armenia and a medical consultant to the government of Tartarstan. I have received several awards  for  my   humanitarian activities including the Olender Peace Prize, City of Los Angeles Humanitarian Award, Myasthenia Gravis Foundation Humanitarian Award and an Honorary Medals from the Russian and the Ukraine Academies of Medical Sciences. My public service includes giving expert testimony to several US Congressional Committees on health policy issues, consultation for US Public Health Service, Office of Technology Assessment (OTA), Agency for Health Care Policy and Research AHPCR), the Task Force on Neurosciences of the US Office of Technology Assessment, California Senate Task Force on Emergency Medical Response for Nuclear Accidents. In addition to my academic publications, I have written popular books on Chernobyl, US nuclear energy policy and radiation. Copies of my *curriculum vitae* and list of more than 1200 publications are attached.

**Opinion**

**Based on data I reviewed and considered I opine, to a reasonable degree of medical probability, it is less likely than not exposure to radiofrequency electromagnetic fields from a smart meter of the type proposed to be installed by Central Maine Power in the residence of Mr. Edward Friedman, would worsen signs, symptoms and/or prognosis of Mr. Friedman's lymphoplasmacytic lymphoma/Waldenström macroglobulinemia.**

**Put otherwise, after an extensive review of the biomedical literature and reports from scientific bodies, medical authorities and regulatory agencies I found no credible evidence exposure to radiofrequency magnetic fields such as those emitted from a smart meter of the type proposed to be installed by Central Maine Power at the residence of Mr. Edward Friedman would worse signs, symptoms or prognosis in someone with lymphoplasmacytic lymphoma/Waldenström macroglobulinemia including Mr. Friedman.**

**Method**

The method I used to address the question of whether, to a reasonable degree of medical probability, *the weight-of-evidence* indicates exposure to radiofrequency electromagnetic fields from a smart meter of the type proposed to be installed in the residence of Mr. Edward Friedman, is likely to worsen signs, symptoms or prognosis of Mr. Friedman's cancer follows methods and guidelines from several sources including, but not limited to, the: (1) Reference Manual on Scientific Evidence (2nd Ed.; Federal Judicial Center; 2000; (2) Guidelines for Cancer Risk Assessment (US Environmental Protection Agency; 2005); (3) Risk Assessment in the Federal Government: Managing the Process (National Research Council; National Academy of Science; 1983); (4) Science and Judgment in Risk Assessment (National Research Council; National Academy of Science; 1994); (5) 15th Report on Carcinogens (National Toxicology Program [NTP]; 2016; US Department of Health and Human Services; 2014); (6) International Agency for Research in Cancer (IARC) of the World Health Organization (WHO) and United Nations (UN). (7) Monograph 75s on the Evaluation of Carcinogenic Risks to Humans, Supplement 7, Overall Evaluations of Carcinogenicity 1987).

This *weight-of-evidence* methodology is built on to the *Hill viewpoints* but adds elements which increase scientific validity and is summarized in the US EPA Guidelines for Carcinogen Risk Assessment (2005. P. 1-11):

*The cancer guidelines emphasize the importance of weighing all of the evidence in*

5

*reaching conclusions about the human carcinogenic potential of agents. This is accomplished in a single integrative step after assessing all of the individual lines of evidence… Evidence considered includes tumor findings, or lack thereof, in humans and laboratory animals; an agent's chemical and physical properties; its structure-activity relationships (SARs) as compared with other carcinogenic agents; and studies addressing potential carcinogenic processes and mode(s) of action, either in vivo or in vitro.*

This approach is also echoed in the NTP guidelines for carcinogen risk assessment:

*Conclusions regarding carcinogenicity in humans or experimental animals are based on scientific judgment, with consideration given to all relevant information.  Relevant information includes, but is not limited to, dose response, route of exposure, chemical structure, metabolism, pharmacokinetics, sensitive sub-populations, genetic effects, or other data relating to mechanism of action or factors that may be unique to a given substance.*

Briefly, a *weight-of-evidence* analysis is a structured synthesis of lines of evidence, possibly of varying quality, to determine the degree of support for hypotheses.  There a several stages to a weight-of-evidence analysis: (1) determining the appropriate focus, based on the objectives and preliminary consideration of available data, formulating the question(s) to be assessed and developing a protocol; (2) establishing lines of evidence including identifying and selecting studies, assessing the quality of the studies and analyzing a set of studies of similar type; (3) integrating data from available lines of evidence to determine the degree of support for hypotheses or to estimate quantities of interest; and (4) an explicit presentation of the weight-of-evidence in a form that maximally supports a scientific and/or medical conclusion.

It follows that to reach an unbiased scientific opinion it is necessary to review publications and data in the scientific and biomedical literature.  Typically this is done by  performing searches for publications on relevant topics such as effects of smart meters or devices emitting similar radiofrequency magnetic waves on signs, symptoms and/or prognosis of cancer, especially in persons with cancers like this of

6

plaintiff.  Often this is done using the PUBMED search engine of the US National Library of Medicine and Google Scholar.

In forming my opinion I considered the following concepts, issues and data: (1) molecular events underlying cancer progression; (2) biological relationship between an exposure and cancer progression; (3) effect(s) of such exposures on animal and human cells; (4) association between such exposures and cancer progression in animals and, when available, humans; and (5) mechanism(s) of action of radiofrequency electromagnetic fields.

I used several strategies to review publications and data in scientific and medical literature in forming my opinion.  I performed searches for scientific and biomedical publications using the PUBMED search engine of the US National Library of Medicine and Google Scholar.  I sought publications representing a range of opinions including those supporting and contrary to my opinion as stated in this report.  I read and/or re-read all or parts of several relevant textbooks covering diverse disciplines including medicine, cell biology, cancer biology, carcinogenesis, epidemiology and physics.  I also reviewed medical records of Mr. Edward Friedman provided by Mr. Taintor.

**Estimated Exposure from a Residential Smart Meter to Plaintiff**

**Medical History**

Mr. Edward Friedman is a 67 year old male with lymphoplasmacytic lymphoma/Waldenström macroglobulinemia.  When In 2001 he learned his mother had an immunoglobulin M (IgM) monoclonal gammopathy he asked his physician to test him for a similar abnormality.  A workup showed a IgM  monoclonal gammopathy with a IgM-kappa of 835 mg/dL.   No therapy was given and his IgM concentrations were followed. His IgM concentration in 2003 was 915 mg/dL and in 2010, 1210 mg/dL.  In 2013 he was noted to have severe anaemia with an IgM concentration of 2585 mg/dL.  A bone marrow biopsy show abnormalities consistent with lymphoplasmacytic lymphoma/Waldenström macroglobulinemia.   His initial therapy was with with

7

bendamustine and rituximab to which he responded.  In 2016 there was disease progression and he was begun on ibrutinib to which he again responded.  The most recent IgM concentration available to me was 295 mg/dL in April, 2021.  At this time his physician wrote to the US Federal Aviation Administration commenting:  *there are no restrictions placed on further activity*.

Mr. Friedman has a history of cold urticaria as a child, a condition sometimes associated with lymphoplasmacytic lymphoma/Waldenström macroglobulinemia.  Also, because his mother has an IgM monoclonal gammopathy there is a substantial likelihood Mr. Friedman has had an abnormality of IgM-producing B-lymphocytes since birth and which has progressed over his lifetime eventuating in lymphoplasmacytic lymphoma/Waldenström macroglobulinemia. Indicate  Mr. Friedman is participating in a study of familial Waldenström macroglobulinemia at the US National Institutes of Health, Division of Cancer Epidemiology and Genetics, Genetic Epidemiology Branch to which he has provided medical data and blood samples.  There is also said to be a family history of chronic lymphocytic leukaemia (CLL), a cancer closely related to lymphoplasmacytic lymphoma/Waldenström macroglobulinemia.  These data indicate it is highly likely Mr. Friedman has an inherited form of lymphoplasmacytic lymphoma/Waldenström macroglobulinemia present at birth and slowly progressive.  About 20 percent of people with lymphoplasmacytic lymphoma/Waldenström macroglobulinemia have a family member with this or a related B-lymphocyte abnormality including a related cancer.  Most people with lymphoplasmacytic lymphoma/Waldenström macroglobulinemia have a mutation in the *MYD88* gene.  Other genetic abnormalities include mutation in the *CXCR4* gene, deletions of chromosomes 6q and 13q14 and trisomy of chromosome 4.  These were likely tested for at the NIH but there is no relevant report in the medical records I reviewed.

Mr. Friedman has several other medical conditions including benign prostatic hypertrophy, hypertension, osteoporosis and arterio-sclerotic cardio-vascular disease. He has surgical resection of a meningioma in 1995 and knee surgeries in 1990 and 1993.  The only drugs indicated in the medical records available to me are ibrutinib and rosuvastatin but it is likely there are others.  He is not a smoker and has only modest

8

alcohol exposure.

Lymphoplasmacytic lymphoma/Waldenström macroglobulinemia is more common in males and persons of European descent and risk increases with age.  Mr. Friedman does not have hepatitis C nor any autoimmune disorder associated with lymphoplasmacytic lymphoma/Waldenström macroglobulinemia.

**Approach**

The approach I followed was 1st determine general causation, namely whether to a reasonable degree of medical probability the *weight-of-evidence* indicates exposure to radiofrequency electromagnetic fields from a residential smart meter of the type proposed to be installed by Central Maine Power at the residence of Mr. Edward Friedman is more likely than not to worsen sign, symptoms and/or progression of cancer in laboratory models, animal models and/or humans.  Were I to conclude so my strategy was to next consider specific causation, namely, whether, to a reasonable degree of medical probability the *weight-of-evidence* indicates exposure to radiofrequency electromagnetic fields from a residential smart meter of the type proposed to be installed by Central Maine Power at the residence of Mr. Edward Friedman is more likely than not to worsen signs, symptoms and/or progression of lymphoplasmacytic lymphoma/Waldenström macroglobulinemia in Mr. Friedman.

**It is important to emphasize the issue I considered is whether exposure to radiofrequency electromagnetic fields such as those emitted from a smart meter the type proposed to be installed by Central Maine Power in the residence of Mr. Edward Friedman is more likely than not to worsen sign, symptoms and/or progression of cancer in laboratory models, animal models and/or humans, NOT whether such exposures cause cancer and/or *promote* cancer development in laboratory models, animal models or humans.** (*Promotion* has a precise scientific meaning in the context of cancer development which differs from other non-scientific use of the term *promotion*.)

9

In performing my research and reaching my opinions I considered a wide range of data derived from diverse sources such as reports from scientific bodies, regulatory agencies, heath authorities, textbooks and citations identified by searches in PUBMED of the National Library of Medicine, Google Scholar and others.  I also reviewed publications cited in critical reviews such as IARC monographs and EPA documents.  In forming my opinion I considered data and citations supporting and not supporting my *weight-of-evidence* approach discussed herein.  As such, my analyses was comprehensive and unbiased.

**General causation**

The issue I considered is whether, to a reasonable degree of medical probability, the *weight-of-evidence* indicates exposure to radiofrequency electromagnetic fields such as those emitted from a smart meter proposed to be installed by Central Maine Power at the residence of Mr. Edward Friedman is, more likely than not, to worsen sign, symptoms or prognosis of cancer in laboratory models, animal models and/or humans.

To explore this issue I interrogated PUBMED of the US National Library of Medicine for English-language citations 1966 to January, 2022 using the Boolean search terms *radiofrequenc*y AND/OR *electromagnetic field* AND *cancer* AND *progression* NOT *causation* NOT promotion.   I retrieved 49 citations which met these criteria (**Appendix 1**).  My review of abstracts of these citations identified 10 potentially relevant to whether exposure to radiofrequency electromagnetic fields is, more likely than not, to worsen sign, symptoms or prognosis of cancer in laboratory models, animal models and/or humans (Appendix 2).  Next, I reviewed each publication assigning a qualitative score to the *quality of evidence* from weak to moderate to strong.

References 1 and 3 deal with exposure of human cells in the laboratory to radiofrequency electromagnetic fields.  Both report **increased** killing of cancer cells

10

simultaneously treated with an anti-cancer drug (temozolomide) and radiofrequency electromagnetic fields consistent with an anti-cancer benefit rather than a detriment. Reference 2 reports no adverse effects of exposure to radiofrequency electromagnetic fields in persons with brain cancer.  Reference 4 deals with effects on a surrogate endpoint (natural-killer cells) of unknown biological importance in **occupationally exposed** workers.  Reference 5 is a laboratory study of brain cancer cells of unknown relevance to cancer prognosis.   Reference 6 is a laboratory experiment using a human cancer cell line but where the cells were simultaneously exposed to high doses of ionizing radiations.  The authours conclude: *We concede, however, that we have not demonstrated that ELF increases the incidence of cellular transformation*.   Reference 7 looks at the effect of electromagnetic fields in rats injected with leukaemia cells and is perhaps most relevant to the issue in this litigation.  The authours conclude: … ***there were no overall effects of magnetic fields on splenomegaly or survival in exposed animals***.  *In addition, no significant and/or consistent differences were detected in hematological parameters between the magnetic field exposed and the ambient control groups*.   (Bolding mine.) Reference 8 is a review focused on cancer causation which does not indicate exposure to radiofrequency electromagnetic radiations of the type emitted from a smart meter worsen signs, symptoms or prognosis of cancer.  Reference 9 is another study of injecting mice with leukaemia cells and exposing them to magnetic fields. The authours conclude:  *No statistically significant differences … in survival, spleen weight, or body weight resulted between P388-treated or nontreated mice from exposure to the magnetic field.  **No effect on the incidence or progression of P388 leukemia was apparent***.  (Bolding mine.)  This reference is also that most relevant to this litigation.  Reference 10 is a review which make no comment on adverse effects of radiofrequency electromagnetic fields on cancer progression.

Most studies I reviewed were of weak or moderate quality.  The 3 most relevant studies to the issue in this litigation are references 2, 7 and 9 which look at survival of humans, rats and mice with a brain cancer (reference 2) or leukaemia (references 7 and 9).  None of these studies report worsening of signs, symptoms or progressions of cancer in experimental animals or persons exposed to radiofrequency electromagnetic fields like those emitted from a  smart meter.

11

I also reviewed 2 publications cited by plaintiff's expert witness Dr. David Carpenter which he claims prove exposure to radiofrequency electromagnetic fields such as those emitted by a smart meter will worsen signs, symptoms and/or prognosis of plaintiff's cancer and which did not appear in my PUBMED search:  (1) Foliart DE, Pollock BH, Mezei G et al.. 2006.  Magnetic field exposure and long-term survival among children with leukaemia.  Br J Cancer 94:161-4; and (2) Svendsen AL, Weihkoph T, Kaaatsch P *et al.*  2007.  Exposure to magnetic fields and survival after diagnosis of childhood leukemia: A German cohort study. Cancer Epidemiol Biomark Prev 16:1167-71.

Both studies are in children with acute lymphoblastic leukaemia, not lymphoplasmacytic lymphoma/Waldenström macroglobulinemia, entirely different diseases.  Acute lymphoblastic leukaemia is a type of leukaemia common in children whereas lymphoplasmacytic lymphoma/Waldenström macroglobulinemia is a type of lymphoma common in adults with different codes in the International Classification of Diseases (ICD).  Acute lymphoblastic leukaemia in the study cited occurs in children whereas lymphoplasmacytic lymphoma/Waldenström macroglobulinemia occurs predominately in adults.  Therapy of these cancers is entirely different as is their prognoses.

The study by Foliart *et al*. is flawed for several reasons.  First, it was funded by Electric Power Research Institute (EPRI) and Electricite' de France.  Both organizations have potential vested interests in the study outcome.  Second, there is no indication of potential conflict(s) of interest of the authours.  This is considered mandatory in scientific articles.  Third, there is no indication the data are available to other scientists to test reproducibility of the authours' conclusions.  This is considered mandatory in most scientific journals.  Fourth, interviews for exposure and data collection where done by the Public Health Institute whose source(s) of funding is not disclosed in the article.  Fifth, there are substantial and important subject selection biases.  For example, only 29 percent of potential study subjects agreed to participate, 5 percent never returned the meter designed to quantity magnetic field exposure and data from only 79 percent of potential subjects were analyzed.  These selection biases make the study conclusions unreliable.  These limitations are mentioned by the authours in the

12

Discussion section of the article   They state:   *Three limitations of our study are noteworthy.  …  only 5% of the cohort (19 children) had a TWA* (time weighted average) *above 0.3 mT.   Thus, we had limited ability to evaluate outcome among children exposed to more than 0.3 mT and could perform no meaningful analyses above 0.4 mT. Secondly, less than one-third of potentially eligible children enrolled into our study…. Finally, our survival analyses were based on first-year MF exposure assessments. However, a single measurement was less useful among children who changed residences. Twelve percent of children with first-year measurements moved during the exposure assessment protocol.  The total number of children who changed residences during the entire course of follow-up is unknown.* **The single assessment of MF exposure in residentially mobile children may not be an adequate surrogate of MF exposure over the study's extended follow-up period**.  (Bolding mine.)  In my *weight-of-evidence* analysis I rated the quality of this study weak.

Importantly, the authours state:  **No consistent or statistically significant trend was noted between increasing exposure to MF [**magnet field] **and event-free survival or risk of death**. *Although we report poorer survival among children with the highest MF exposure category,* **clinical inferences are limited, with results possibly attributable to chance alone**. *Independent confirmation is needed, as our study is the first to look at relapse and survival and thus* **our findings can be viewed only as hypothesis generating**.  (Bolding mine.)

The figure below from the article by Foliart *et al*. shows no significant difference in event-free survival of children with acute lymphoblastic leukaemia exposed to different strengths of magnetic fields.



The second study cited by Dr. Carpenter as supporting his opinion is Svendsen *et al*. 2007  (Svendsen AL, Weihkoph T, Kaaatsch *et al*.  2007.  Exposure to magnetic fields and survival after diagnosis of childhood leukemia: A German cohort study. Cancer Epidemiol Biomark Prev 16:1167-1171)  The authours also studied children with acute lymphoblastic leukaemia rather than adults with lymphoplasmacytic lymphoma/Waldenström macroglobulinemia.  The endpoint Svendsen *et al*. studied was survival not event-free survival differing importantly from the endpoint in the study by Foliart *et al*.  Also, Svendsen *et al*. measured 24 hour magnetic field exposure in contrast to Foliart *et al*. who studied a time weighted average.  The follow-up interval of the studies also differed, 5 *versus* almost 10 years.

When Svendsen *et al*. tried to replicate the event-free survival reported by Foliart *et al*. they reported Hazard Ratios which were not statistically significant.  These data indicate conclusions of the Foliart *et al*. study are not supported by results of the study of Svendsen *et al*.  Table 3 of the study by Svendsen *et al*.. indicates a non-significant increase in deaths in children in the highest magnetic field exposure cohort.  Moreover, Foliart *et al*. reported worse event-free survival only in children exposed to magnetic fields greater than 0.3 µT which was not found in the study by Svendsen *et al*.  The article by Svendsen *et al*. does not indicate funding source, potential conflicts of interest nor data availability.  These elements are considered essential requirements in scientific

articles.  The authours of the study by Svendsen *et al*. conclude:  ***In all, the evidence is still based on small numbers, and a biological mechanism to explain the findings is not known***.  (Bolding mine.)  Reproducibility is a key element of scientific research.  Results which are not replicable or reproducible should be down-graded. In my *weight-of-evidence* analysis I rated the quality of this study weak.

There have been several larger studies of event-free survival and survival in children with acute lymphoblastic leukaemia after the publications by Foliart *et al*. and Svendsen *et al*.  These studies are much larger and of higher quality.   For example, Schuz *et al*. 2012 studied the relationship between exposure to extremely low frequency magnetic fields (ELF-MF) in more than 3,000 children from 6 countries (Schüz J, Grell K, Kinsey S.  2012. Extremely low-frequency magnetic fields and survival from childhood acute lymphoblastic leukemia: An international follow-up study. Blood Cancer J. 21;2(12):e98. doi: 10.1038/bcj.2012.43. PMID: 23262804; PMCID: PMC3542478).  These authours reported no impact on event-free survival or survival in children exposed to  extremely low frequency magnetic fields in the ranges studied by Foliart *et al*. and Svendsen *et al*. The authours concluded:   ***ELF–MF exposure has no impact on the survival probability or risk of relapse in children with ALL***. (Bolding mine.)

Lastly, I reviewed but did not rely on reports from scientific bodies, medical authorities and regulatory agencies not indexed in PUBMED.  For example, IARC Monograph 102; Non-Ionizing Radiation, Part 2: Radiofrequency Electromagnetic Fields. 2013.  Sections 2.2 (pages 158-187) reviews data on cancer in humans from environmental exposure from fixed-site transmitters.   There is extensive discussion of radiofrequency electromagnetic fields and cancer causation with > 200 references but no data indicating exposure to radiofrequency electromagnetic fields worsens signs, symptoms and/or progression of cancer in humans.  Although the IARC Committee concluded there is *limited evidence* for carcinogenicity of radiofrequency radiation there is no conclusion exposure to radiofrequency electromagnetic fields worsened signs, symptoms and/or progression of cancer in animals or humans.   Moreover, the IARC designation of RFR [radiofrequency radiation] as a group 2B agent (a *possible* carcinogen) is frequently misunderstood.  The most recent IARC communication states:

… *despite considerable research efforts, no mechanism relevant for carcinogenesis has been consistently identified to date*.   (Bolding mine.) Importantly, cancer causation is not at issue in this litigation.

Another reference I reviewed but did not rely on is the WHO IARC World Cancer Report (2020; Section 2.5 pages 84-91) whose authours state: *Most of the epidemiological research does not support an association between mobile phone use and tumours occurring in the head, which is the body part with the highest exposure to radiofrequency electromagnetic fields*.  And: *Despite considerable research efforts, no mechanism relevant for carcinogenesis of radiofrequency electromagnetic fields has been consistently identified to date*. Also, *most of the epidemiological research does not indicate carcinogenicity of radiofrequency electromagnetic fields*. (Bolding mine.)

I also reviewed but did not rely on the US FDA Review of Published Literature between 2008 and 2018 of Relevance to Radiofrequency Radiation and Cancer (2020) which considered 125 articles relevant to effects of RFR [radiofrequency radiations] on animals.  The authours concluded: … *none of these [studies} have adequately demonstrated that localized exposure to RFR at any level  … can lead to adverse effects*.  The authours also discuss 70 relevant epidemiological studies published as peer-reviewed scientific evidence.  They conclude: *Based on the studies that are described in detail in this report, there is insufficient evidence to support a causal association between RFR exposure and tumorigenesis. There is a lack of clear dose response relationship, a lack of consistent findings or specificity, and a lack of biological mechanistic plausibility*.  (Bolding mine.)  Again, comments regarding cancer causation are not the issue in this litigation.

I also reviewed but did not rely on a report from the National Institute of Environmental Health and Safety (NIEHS) of the US National Institutes of Health (1992).   After reviewing available data the expert panel concluded:  *It is our opinion that based on evidence to date, ELF-EMF exposure would not be listed in the "Report on Carcinogens" as an agent "reasonably anticipated to be a human carcinogen."*

16

*This is based on the limited epidemiological evidence and the findings from the EMF-RAPID Program that did not indicate an effect of ELF-EMF exposure in experimental animals or a mechanistic basis for carcinogenicity*.  (Bolding mine.)
.

**Based on my *weight-of-evidence* review of these data I opine to a reasonable degree of medical certainty exposure to radiofrequency electromagnetic fields like those emitted from a smart meter is less likely than not to worsen signs, symptoms and/or progression of cancer in laboratory models, animal models or humans.**

**Specific Causation**

Having determined to a reasonable degree of medical certainty exposure to radiofrequency electromagnetic fields is less likely than not to worsen signs, symptoms and/or prognosis of cancer in laboratory models, animal models or humans there was no need to consider whether the *weight-of-evidence* supports the notion exposure to radiofrequency electromagnetic fields are less likely than not to worsen signs, symptoms and/or prognosis of lymphoplasmacytic lymphoma/Waldenström macroglobulinemia.  However, for completeness I repeated my PUBMED searches adding the search term *lymphoplasmacytic lymphoma/Waldenström macroglobulinemia*.  No citations were identified.  I also repeated my PUBMED search using the search terms *radiofrequency* AND/OR *electromagnetic field* AND *lymphoplasmacytic lymphoma/Waldenström macroglobulinemia*.  The search identified 1 additional citation: Huss *et al*.  2018 (Huss A, Spoerri A, Egger M *et al*.  2018. Occupational extremely low frequency magnetic fields (ELF-MF) exposure and hematolymphopoietic cancers - Swiss National Cohort analysis and updated meta-analysis. Environ Res. 164:467-74). This study was in persons **occupationally** exposed rather than exposed from a residential smart meter.  It included persons with Waldenström macroglobulinemia. The authours concluded:  *Our analysis provided no convincing evidence for an increased risk of death from a range of hematolymphopoietic cancers in workers exposed to high or medium levels of ELF magnetic fields*.  (Bolding

17

mine.)   Moreover, because the study considered risk of death it is not relevant to the issue of worsening of signs, symptoms and/or prognosis of someone with lymphoplasmacytic lymphoma/Waldenström macroglobulinemia.  I rated this study high quality but not relevant to the issue or exposure to radiofrequency electromagnetic fields worsening signs, symptoms and/or prognosis of someone with lymphoplasmacytic lymphoma/Waldenström macroglobulinemia.

A second cross-referenced study (Koeman T, van den Brandt PA, Slottje P *et al*. 2014).  Occupational extremely low-frequency magnetic field exposure and selected cancer outcomes in a prospective Dutch cohort. Cancer Causes Control. 25: 203-14) dealt with cancer causation and in **occupationally** exposed persons.   I rated this study high quality but not relevant to the issue of exposure to radiofrequency electromagnetic radiations such as those emitted from a smart meter worsening signs, symptoms and/or prognosis of someone with lymphoplasmacytic lymphoma/Waldenström macroglobulinemia.

In summary, in my extensive review of the biomedical literature and reports from scientific bodies and regulatory agencies I found no credible evidence exposure to radiofrequency magnetic field such as those emitted from a smart meter of the type proposed to be installed by Central Maine Power at the residence of Mr. Edward Friedman would worsen signs, symptoms or prognosis in someone with lymphoplasmacytic lymphoma/Waldenström macroglobulinemia like Mr. Friedman.

**Rebuttal to Testimony of Dr. David Carpenter**

1.  There are several important errors and limitations which compromise the testimony of Dr. Carpenter which I detail below.

2.  After attending medical school Dr. Carpenter has no further medical training or practice. He has not diagnosed nor cared for anyone with a medical illness. He has not diagnosed nor treated anyone with plaintiff's cancer (Waldenström macroglobulinemia).  He has no medical basis on which to predict the course of plaintiff's cancer to have an informed

18

opinion on what exposures might or might not affect plaintiff's cancer including whether exposure to radiofrequency electromagnet fields including those emitted from a smart meter could affect plaintiff's signs or symptom or prognosis.

3.  Dr. Carpenter does not describe the method he used to reach his opinions.  He does not indicate he followed recommendations for judging scientific evidence from any scientific body or regulatory agency such as: (1) Reference Manual on Scientific Evidence; (2) US Environmental Protection Agency; (3) US National Research Council; (4) US National Academy of Science; (5) US National Toxicology Program [NTP]; (7) US Department of Health and Human Services [US DHHS]; (8) International Agency for Research in Cancer (IARC); (9) World Health Organization (WHO) and others.

4.  There is no indication Dr. Carpenter used a *weight-of-evidence* methodology or any other established and reproducible methodology to evaluate risk from exposure to radiofrequency electro-magnetic  fields as recommended by these scientific organizations and regulatory agencies and which is considered best practice in evaluating a scientific or medical question.   A *weight-of-evidence* methodology approach is built on to the Hill *viewpoints* but adds elements which increase scientific validity.

5.   I discuss the *weight-of-evidence* approach to answering scientific questions in detail above.  Briefly put, a weight-of-evidence analysis is a structured synthesis of lines of evidence, possibly of varying quality, to determine the degree of support for hypotheses.

6.   There a several stages to a weight-of-evidence analysis: (1) Determining the appropriate focus, based on the objectives and preliminary consideration of available data, formulating the question(s) to be assessed and developing a protocol; (2) Establishing lines of evidence including identifying and selecting studies, assessing the quality of the studies and analyzing a set of studies of similar type; (3) Integrating data from available lines of evidence to determine the degree of support for hypotheses or to estimate quantities of interest; and (4) An explicit presentation of the weight-of-evidence in a form that maximally supports a scientific and/or medical conclusion.

7.  It follows that to reach an unbiased scientific opinion it is necessary to review publications and data in the scientific and medical literature.  Typically this is done by performing searches for scientific and biomedical publications on relevant topics such as effects of smart meters or similar radiofrequency waves on prognosis and signs and symptoms of cancer, especially in persons with cancers like this of plaintiff.  Typically this is done using the PUBMED search engine of the US National Library of Medicine and Google Scholar.

8.  In forming a scientific or medical opinion it is necessary to consider publications representing a range of opinions including those supporting and contrary to an experts opinion as stated in this report.  There is no indication this was done by Dr. Carpenter who cites only references supporting his opinion ignoring a large body of scientific and medical publications with conclusions contrary to his.

9.   For example, Dr. Carpenter cites a report from the International Agency for Cancer Research (IARC), a WHO agency dealing with cancer causation which is not at issue in this litigation but fails to cite or consider a recent report from the WHO stating: *To date, no adverse health effects from low level, long-term exposure to radiofrequency or power frequency fields have been confirmed*.

10.  And:  Experiments with healthy volunteers indicate that short-term exposure at the levels present in the environment or in the home do not cause any apparent detrimental effects.  Despite extensive research, to date there is no evidence to conclude that exposure to low level electromagnetic fields is harmful to human health.

11.  And:  In the area of biological effects and medical applications of non-ionizing radiation approximately 25,000 articles have been published over the past 30 years.  Based on a recent in-depth review of the scientific literature, the WHO concluded that current evidence does not confirm the existence of any health consequences from exposure to low level electromagnetic fields.

12.  Simply put, Dr. Carpenter's method for reaching his opinions is a *black box*.  There is no way to judge accuracy, validity or reproducibility of his opinions and it is impossible to know whether other experts would reach similar opinions without knowing the evidence Dr. Carpenter reviewed and considered and how he weighed this evidence in reaching his opinions.

13.  Moreover, there is no indication Dr. Carpenter reviewed the biomedical literature relevant to the question at hand nor that he sought out publications and/or reports with conclusions contrary to his opinion(s).

14. There is no indication Dr. Carpenter reviewed plaintiff's medical records.  Moreover, as discussed in my item 1, Dr. Carpenter is unqualified to comment accurately on plaintiff's medical condition and especially on plaintiff's prognosis.

15.  Much of Dr. Carpenter's testimony focuses on whether exposure to radiofrequency electromagnetic fields cause cancer.  This is not at issue in this litigation.  Plaintiff makes no claim his cancer was caused by exposure to radiofrequency electromagnetic fields emitted by a smart meter.

16.  Moreover, as Dr. Carpenter states: *There is not strong evidence that Waldenström macroglobulinemia is caused by exposure to RF-EMFs*…

17.  Further, there are convincing data plaintiff has a hereditary form of Waldenström macroglobulinemia and plaintiff is participating in a study of this cancer at the US National Institutes of Health (NIH).  His participation in the study indicates expert physicians at the NIH and plaintiff agree he has a hereditary form of Waldenström macroglobulinemia.  There are no data in the biomedical literature of any association between hereditary Waldenström macroglobulinemia and radiofrequency electromagnetic fields including those emitted from a smart meter.

18.  To support his opinion exposure to radiofrequency electromagnetic fields from a smart meter *would increase the risk his cancer could worsen* Dr. Carpenter cites 2 studies: (1) Foliart DE, Pollock BH, Mezei G, Iriye R, Silva JM, Ebi KL, Kheifets L, Link M, and Kavet R (2006)  Magnetic field exposure and long-term survival among children with

21

leukaemia.  Br J Cancer 94; 161-164; and (2) Svendsen AL, Weihkoph T, Kaaatsch P, Schuz J (2007) Exposure to magnetic fields and survival after diagnosis of childhood leukemia: A German cohort study. Cancer Epidemiol Biomark Prev 16: 1167-1171.

19.  For example, both studies are in children with acute lymphoblastic leukaemia, not Waldenström macroglobulinemia.  These are entirely different diseases.  Acute lymphoblastic leukaemia is a type of leukaemia whereas Waldenström macroglobulinemia is a type of lymphoma.  These cancers have different codes in the International Classification of Diseases (ICD).  Acute lymphoblastic leukaemia in the study cited occurs in children whereas Waldenström macroglobulinemia occurs in adults.  Therapy of these cancers is entirely different as is their prognoses.

20.  The study by Foliart *et al*. is flawed for several reasons.  First, it was funded by Electric Power Research Institute (EPRI) and Electricite' de France.  Both organizations have potential vested interests in the study outcome.

21.  Second, there is no indication in the article of potential conflict(s) of interest of the authours.  This is considered mandatory in scientific articles.

22.  Third, there is no indication that the data are available to other scientists to test reproducibility of the authours' conclusions.  This is considered mandatory in scientific articles.

23.  Fourth, interviews for exposure and data collection where done by the Public Health Institute whose source(s) of funding are not disclosed.

24.  Fifth, there are substantial and important subject selection biases.  For example, only 29 percent of potential study subjects agreed to participate, 5 percent never returned the meter designed to quantity magnetic field exposure and data from only 79 percent of potential subjects were analyzed.  These selection biases make the study conclusions unreliable.

25.  These limitations are mentioned by the authours in the article Discussion.  They state: *Three limitations of our study are noteworthy.  …  only 5% of the cohort (19 children)*

22

*had a TWA* (time weighted average) *above 0.3 mT.   Thus, we had limited ability to evaluate outcome among children exposed to more than 0.3 mT and could perform no meaningful analyses above 0.4 mT.  Secondly, less than one-third of potentially eligible children enrolled into our study….   Finally, our survival analyses were based on first-year MF exposure assessments.   However, a single measurement was less useful among children who changed residences. Twelve percent of children with first-year measurements moved during the exposure assessment protocol.  The total number of children who changed residences during the entire course of follow-up is unknown. The single assessment of MF exposure in residentially mobile children may not be an adequate surrogate of MF exposure over the study's extended follow-up period*.

26.   Importantly, Dr. Carpenter mis-represents the study conclusion.  The study authours state:   ***No consistent or statistically significant trend was noted between increasing exposure to MF*** (magnet field) ***and event-free survival or risk of death****. Although we report poorer survival among children with the highest MF exposure category,* **clinical inferences are limited, with results possibly attributable to chance alone***. Independent confirmation is needed, as our study is the first to look at relapse and survival and thus* **our findings can be viewed only as hypothesis generating***.  (Bolding mine.)

27.   The figure below from the article by Foliart *et al*. shows no significant difference in event-free survival of children with acute lymphoblastic leukaemia exposed to different strengths of magnetic fields.



28.  The conclusion is this study of the potential impact of magnetic fields on event-free survival and survival of children with acute lymphoblastic leukaemia does not support Dr. Carpenter' opinion …*if a smart meter were placed on Mr. Friedman's house, the elevated exposure coming from it would increase the risk his cancer could worsen* … on several counts including different diseases and his mis- understanding and/or representation of the authours' conclusions.

29.  The second article Dr. Carpenter relies on in forming is opinion *if a smart meter were placed on Mr. Friedman's house, the elevated exposure coming from it would increase the risk his cancer could worsen* … is by Svendsen *et al*.  These authours also studied children with acute lymphoblastic leukaemia rather than adults with Waldenström macroglobulinemia.  The endpoint Svendsen *et al*. studied was survival not event-free survival, the endpoint in the study by Foliart *et al*.  Also, Svendsen *et al*. measured 24 hour magnetic field exposure in contrast to Foliart *et al*. who studied a time weighted average. The follow-up interval of the studies also differed: 5 years *versus* almost 10 years.

30.  When Svendsen *et al* tried to replicate the event-free survival reported by Foliart *et al*. they reported Hazard Ratios which were not statistically significant.  These data indicate conclusions of the Foliart *et al*. study are not supported by results of the study of

Svendsen *et al*.  Dr. Carpenter offers no explanation nor does he attempt to reconcile these discordant results.

31.  Table 3 of the study by Svendsen *et al*. indicates a non-significant increase in deaths in children in the highest magnetic field exposure cohort.  Moreover, the Foliart *et al*. reported worse event-free survival only in children exposed to magnetic fields  greater than 0.3 µT which was not found in the study by Svendsen *et al*.  These discordances are not discussed by Dr. Carpenter.

32.  The article by Svendsen *et al*. does not indicate funding source, potential conflicts of interest nor data availability.  These elements are considered essential requirements in scientific articles.

33.  Authours of the study by Svendsen *et al*. conclude:  *In all, the evidence is still based on small numbers, and a biological mechanism to explain the findings is not known*.

34.  There have been several larger studies of event-free survival and survival in children with acute lymphoblastic leukaemia after the publications by Foliart *et al*. and Svendsen *et al*.  These studies are much larger and of higher quality.

35.  For example, Schuz *et al*. (2012) studied the relationship between exposure to extremely low frequency magnetic fields (ELF-MF) in more than 3,000 children from 6 countries (Schüz J, Grell K, Kinsey S, et al. 2012. Extremely low-frequency magnetic fields and survival from childhood acute lymphoblastic leukemia: an international follow-up study. Blood Cancer J. 2012; 2:e98).  These authours reported no impact on event-free survival or survival in children exposed to  extremely low frequency magnetic fields in the ranges studied by Foliart *et al*. and Svendsen *et al*.  The authours concluded: *ELF–MF exposure has no impact on the survival probability or risk of relapse in children with ALL.*

36.  Replicability and reproducibility are required to reach an accurate and precise scientific conclusion.  Results of the studies by Foliart *et al*. and Svendsen *et al*.  fail to meet this requirement and cannot be relied on in forming a supportable opinion.

37.  Consequently, Dr. Carpenter's opinion: … *there is **clear evidence** that elevated exposure to electromagnetic fields shortens survival of children diagnosed with leukemia* ... is not supported by a careful and critical review of the biomedical literature. (Bolding mine.)

38.  In forming an opinion it is important to consider and weigh all relevant evidence.  There is no indication Dr. Carpenter has done so in reaching his opinion.  For example, there are substantial data in animals with cancer on the relationship between exposure to magnetic fields and survival.  The most relevant to plaintiff's cancer is a study of lymphoma development in mice exposed to high dose magnetic fields.  (Waldenström macroglobulinemia is more closely related to lymphomas compared with acute lymphoblastic leukaemia.)

39.  For example, a study by Sommer and Lerchi (2006) reported no increased risk of lymphoma development in mice exposed to very high dose magnetic fields (Sommer, A. M., Lerchl, A.  2006. 50 Hz Magnetic Fields of 1 mT Do Not Promote Lymphoma Development in AKR/J Mice. *Radiation Research*, *165:*343–9).

40.  Additionally, Dr. Carpenter implies there is a medical condition he terms *electro-hypersensitivity (EHS)* otherwise referred to as electro-magnetic hypersensitivity and idiopathic environmental intolerance to electromagnetic fields.  Notably, he does not opine nor present evidence plaintiff has this or any related condition.

41.  The weight-of-evidence indicates there is no such condition in humans.  For example, Rubin *et al*. (2010) reviewed data from 46 blinded or double-blinded provocation studies in 1175 persons claiming to have idiopathic environmental intolerance to electro-magnetic fields (Rubin GJ, Nieto-Hernandez R, Wessely S. 2010.  Idiopathic environmental intolerance attributed to electromagnetic fields (formerly 'electromagnetic hypersensitivity'):  An updated systematic review of provocation studies. Bioelectromagnetics. 31:1-11).

26

42.   The authours reported: *No robust evidence could be found to support this theory.* And: *Despite the conviction of IEI-EMF* (idiopathic environmental intolerance to electromagnetic fields) *sufferers that their symptoms are triggered by exposure to electromagnetic fields,* **repeated experiments have been unable to replicate this phenomenon under controlled conditions**. (Bolding mine.)

43.   Another systematic review consider types of symptoms reported by persons claiming to have idiopathic environmental intolerance to electromagnetic fields (Rubin GJ, Hillert L, Nieto-Hernandez R, *et al*. Do people with idiopathic environmental intolerance attributed to electromagnetic fields display physiological effects when exposed to electromagnetic fields? 2011. A systematic review of provocation studies. Bioelectromagnetics. 32:593-609).

44.   The authours identified 29 single- or double-blind experiments in which participants claiming to have idiopathic environmental intolerance to electromagnetic fields were exposed to different EMF (electro-magnetic field) levels and in which objectively measured outcomes were assessed.  Only 5 studies identified significant effects of exposure including reduced heart rate and blood pressure, altered pupillary light reflex, reduced visual attention and perception, improved spatial memory, movement away from an EMF source during sleep and altered EEG during sleep.  These effects were not confirmed in the other 24 studies.

45.   Importantly, none of the effects noted in item 38 are those cited by Dr. Carpenter as potentially affecting plaintiff (fatigue, headache, brain fog, tinnitus).

46.   A report from the WHO concluded:  *Despite extensive research, to date there is no evidence to conclude that exposure to low level electromagnetic fields is harmful to human health.*

47.   Moreover, as indicated, Dr. Carpenter makes no claim plaintiff suffers from what he terms *electro-hypersensitivity*.   Instead Dr. Carpenter opines plaintiff's exposure to radiofrequency electromagnet fields emitted from a smart meter *would increase the risk*

*his cancer could worsen which in turn logically may exacerbate his symptoms affecting his quality of life and likely shortening it*.

48.  Consequently, Dr. Carpenter does not opine plaintiff has what he terms *electro-hypersensitivity* but rather plaintiff's exposure to radiofrequency electromagnet fields emitted from a smart meter would worsen his Waldenström macroglobulinemia which, as a result, may  exacerbate his symptoms affecting his quality of life and likely shortening it.

49.  As I discuss above there are no convincing data including, but not limited to acute lymphocytic leukaemia in children, exposure to radiofrequency electromagnet fields impacts the event-free survival or survival of persons with any cancer including, but not limited to Waldenström macroglobulinemia.

50.  It is unclear how Dr. Carpenter can opine to *a reasonable degree of medical certainty* absent appropriate medical training.

51.  It is my understanding an opinion should be stated as being *more likely than not*. Nowhere in his testimony does Dr. Carpenter opine to a *more likely than not* standard.

52.  In fact, in his testimony he opines plaintiff's potential exposure to radiofrequency electromagnetic fields emitted from a smart meter ***may exacerbate his symptoms.*** (Bolding mine.)  Anything may happen but this falls short of an event which is *more likely than not*.

53.  As such, Dr. Carpenter offers no opinion of the probability, if any, plaintiff would suffer an adverse event such as progression of his cancer or worsening of signs and symptoms as a consequence thereof (the only mechanism he posits).

54.  In summary, I opine Dr. Carpenter's testimony and opinions contained therein are unreliable, indicate no unbiased critical review and evaluation of the relevant biomedical literature or disclose any methodology recommended by scientific bodies and regulatory agencies which could allow other experts to replicate his processes.

55.  Furthermore, I opine Dr. Carpenter is not medically qualified to opine in this litigation to *a reasonable degree of medical certainty*.


**Rebuttal to Testimony of Mr. Kent Chamberlin**

1.  There are several important errors and limitations which compromise the testimony of Mr. Chamberlin which I detail below.

2.  Mr. Chamberlin has no medical training and lacks a scientific basis to opine whether exposure to radiofrequency electromagnet fields including those emitted from a smart meter could affect signs, symptom or prognosis of plaintiff's cancer;

3.  Mr. Chamberlin does not describe the method he used to reach his opinions.  He does not indicate he followed recommendations for judging scientific evidence from any scientific body or regulatory agency such as: (1) Reference Manual on Scientific Evidence; (2) US Environmental Protection Agency; (3) US National Research Council; (4) US National Academy of Science; (5) US National Toxicology Program [NTP]; (7) US Department of Health and Human Services [US DHHS]; (8) International Agency for Research in Cancer (IARC); (9) World Health Organization (WHO) and others;

4.  There is no indication Mr. Chamberlin used a *weight-of-evidence* methodology or any other established and reproducible methodology to evaluate risk from exposure to radiofrequency electro-magnetic fields as recommended by these scientific organizations and regulatory agencies and which is considered best practice in evaluating a scientific or medical question.  A *weight-of-evidence* methodology approach is built on to the Hill *viewpoints* but adds elements which increase scientific validity;

5.   I discuss the *weight-of-evidence* approach to answering scientific questions in detail above.  Briefly put, a weight-of-evidence analysis is a structured synthesis of lines of evidence, possibly of varying quality, to determine the degree of support for hypotheses.

6.   There a several stages to a weight-of-evidence analysis: (1) Determining the appropriate focus, based on the objectives and preliminary consideration of available data, formulating the question(s) to be assessed and developing a protocol; (2) Establishing lines of evidence including identifying and selecting studies, assessing the quality of the studies and analyzing a set of studies of similar type; (3) Integrating data from available lines of evidence to determine the degree of support for hypotheses or to estimate quantities of interest; and (4) An explicit presentation of the weight-of-evidence in a form that maximally supports a scientific and/or medical conclusion;

7.   It follows that to reach an unbiased scientific opinion it is necessary to review publications and data in the scientific and medical literature.  Typically this is done by performing searches for scientific and biomedical publications on relevant topics such as effects of smart meters or similar radiofrequency waves on prognosis and signs and symptoms of cancer, especially in persons with cancers like this of plaintiff.  Typically this is done using the PUBMED search engine of the US National Library of Medicine and Google Scholar;

8.   In forming a scientific or medical opinion it is necessary to consider publications representing a range of opinions including those supporting and contrary to an experts opinion as stated in this report.  There is no indication this was done by Mr. Chamberlin who cites only 2 references which support his opinion regarding plaintiff ignoring a large body of scientific and medical publications with conclusions contrary to his;

9.   For example, Mr. Chamberlin cites a report from the International Agency for Cancer Research (IARC), a WHO agency dealing with cancer causation which is not at issue in this litigation but fails to cite or consider a recent report from the WHO stating: *To date, no adverse health effects from low level, long-term exposure to radiofrequency or power frequency fields have been confirmed*.

10.   And:  *Experiments with healthy volunteers indicate that short-term exposure at the levels present in the environment or in the home do not cause any apparent detrimental*

*effects.  Despite extensive research, to date there is no evidence to conclude that exposure to low level electromagnetic fields is harmful to human health.*

11.   And:  *In the area of biological effects and medical applications of non-ionizing radiation approximately* 25,000 articles have been published over the past 30 years.  Based on a rece*nt in-depth review of the scientific literature, the WHO concluded that current evidence does not confirm the existence of any health consequences from exposure to low level electromagnetic fields.*

12.   Simply put, Mr. Chamberlin's method for reaching his opinions is a *black box*.  There is no way to judge accuracy, validity or reproducibility of his opinions and it is impossible to know whether other experts would reach similar opinions without knowing the evidence Mr. Chamberlin reviewed and considered and how he weighed this evidence in reaching his opinions. Put otherwise, he hold his opinion **because I say so**;

13.   There is no indication Mr. Chamberlin reviewed plaintiff's medical records to understand clinical features, signs, symptoms and prognosis of plaintiff's cancer. Without any medical training Mr. Chamberlin is unqualified to opine what exposures including, but not limited to radiofrequency electromagnet fields including those emitted from a smart meter. might or might not affect clinical features, signs, symptoms and prognosis of plaintiff's cancer;

14.   In fact, Mr. Chamberlin's statement regarding plaintiff's health: *Mr. Ed Friedman suffers from a form of non-Hodgkin's Lymphoma, called Waldenstrom's macroglobulinemia.  This is in general not a curable disease although progression can be delayed with treatment*, is identical to testimony of plaintiff medical expert Dr. David Carpenter;

15.   Much of Mr. Chamberlin's testimony focuses on whether exposure to radiofrequency electromagnetic fields cause cancer.  This is not at issue in this litigation.  Plaintiff makes no claim his cancer was caused by exposure to radiofrequency electromagnetic fields emitted by a smart meter;

31

16. To support his opinion Mr. Chamberlain cites 2 references: Bann, *et al.* Radiofrequency Electromagnetic Fields: evaluation of cancer hazards," on behalf of the WHO International Agency for Research on Cancer Monograph Working Group, https://monographs.iarc.who.int/wp-content/uploads/2018/06/REF_Poster2012.pdf; and (2) M. Wyde M. et al., "Report of Partial findings from the National Toxicology Program Carcinogenesis Studies of Cell Phone Radiofrequency Radiation in Hsd: Sprague Dawley & lt;sup & gt;®</sup> SD rats (Whole Body Exposures)," bioRxiv, p. 55699, Jan. 2018.

17. Mr. Chamberlin's Bann *et al*. reference is to a poster rather and not the complete scientific report (IARC Monograph 102 Non-Ionizing Radiation, Part 2: Radiofrequency Electromagnetic Fields.  IAARC. Lyon, France 2011).  It is unclear if Mr. Chamberlin read the relevant IARC monograph but he does not indicate he did so in his testimony nor does he include it in his references;

18. Importantly, the poster Mr. Chamberlain cites deals with cancer causation NOT with whether exposure to radiofrequency electromagnetic fields can worsen signs, symptoms or prognosis of someone with cancer;

19. Mr. Chamberlain opines: *Mr. Friedman's cancer **may or may not** have been caused by exposure to radiation*.  (Bolding mine).  Clearly, Mr. Chamberlin does not opine it is *more likely than not* plaintiff's cancer was caused by exposure to radiofrequency electromagnetic fields including those emitted from a smart meter;

20. Furthermore, cancer causation as a result of exposure to radiofrequency electromagnetic fields including those emitted from a smart meter is not the matter of this litigation;

21. Further, there are convincing data plaintiff has a hereditary form of Waldenström macroglobulinemia and plaintiff is participating in a study of this cancer at the US National Institutes of Health (NIH).  His participation in the study indicates expert

32

physicians at the NIH and plaintiff agree he has a hereditary form of Waldenström macroglobulinemia.  There are no data in the biomedical literature of any association between hereditary Waldenström macroglobulinemia and radiofrequency electromagnetic fields including those emitted from a smart meter;

22.  To support his opinion *the likelihood of his cancer worsening is increased by having radiating devices, such as a smart meter*, Mr. Chamberlin cites a study from Brazil which he claims shows: *there is a dose-dependent relationship between death rate from cancer and exposure to radiation* (Dode AC, Leão MMC, Tejo FAF *et al.* 2011.  Mortality by neoplasia and cellular telephone base stations in the Belo Horizonte municipality, Minas Gerais state, Brazil.  Sci Total Environ. 409:3649-65);

23.  First, this is an ecologic epidemiologic study which Mr. Chamberlin is unqualified to critically review or critically and accurately judge validity of the authours' conclusions.

24.  Second, the study deals with the incidence of fatal cancers NOT worsening of sign and/or symptoms nor prognosis in someone with cancer which is the subject of this litigation.  The authours make no claim exposure to cell phone base stations worsen signs, symptoms or prognosis of someone with cancer;

25.  Consequently, it is unclear if Mr. Chamberlain mis-understands conclusions of the study, the subject of this litigation or both;

26.  Mr. Chamberlain fails to cite limitations of the study noted by the authours:  *The principal limitations of the present study concern the study design and the use of secondary data. By design, the group results could not be extrapolated to each person in the population. Although the data were well standardized and collected from official personnel in the City Health Department, they are subject to misclassification due to lack of information and errors in the entering of data and diagnosis. Finally, neither the life habits nor the genetic factors of the residents could be taken into account;*

27.  There are several peer-reviewed publications challenging conclusions of the study Mr. Chamberlin cites.   For example, Foster KR, Trottier L. Comments on "Mortality by neoplasia and cellular telephone base stations in the Belo Horizonte municipality, Minas Gerais state, Brazil" by Dode et al. (op. cit.);

28.  Foster and Trottier note:  *The authors do not clearly describe how they obtained the results shown in Table 1 (their Table 5), how they avoided double-counting residents in overlapping 1-km radii surrounding different base stations, or even what is "the base station" to which they refer in the caption to their Table 5, nor do the authors provide a rationale why distance to the "first licensed transmitter" within 1 km of a house should be a useful proxy measure for radiofrequency field exposure to an individual, given the presence of many other sources of radiofrequency energy in the environment (including many base stations erected subsequent to the first transmitter within 1 km of a decedent's residence and not considered in their analysis);*

29.  Also: *But there is an even larger problem. The time period of their cancer data, 1996–2006, coincided with the time of rapid buildout of the cellular telephone system. Dode et al. included in their analysis "only the deaths of those who were exposed since the first license date of the BS" within 1 km of each decedent's residence. They did not adjust their data for the length of time over which the base station had been present. Consequently, the number of "accumulated deaths" around each station would vary for the trivial reason that the stations were installed at different times. In the likely event that the cellular telephone network was initially built out with a denser grid of base stations in the central vs. outlying districts, then more residents of Centro-Sul would have lived close to a base station for longer times than in outlying districts, with more "accumulated deaths" simply because of longer accumulation times — regardless of any true variation in cancer death rate;*

30.  Also*, Dode et al. make claims that are puzzling and, on face value, biologically implausible: (1) residence close to a base station increases risk of death for all forms of cancer whereas exposure to a carcinogen would be expected to increase only specific neoplasms; (2) the effect appears after only brief exposure whereas tumors have*

34

*latencies of many years after initial exposure to a carcinogen; and (3) the "number of deaths by neoplasia" .. falls off dramatically after 1–2 years of exposure;*

31.   *The second fatal weakness is the presentation of data in terms of "cumulative deaths" (deaths per 1000 residents summed over varying time intervals) rather than death rate (deaths per 1000 residents per year). These buildings were among the first in the city to receive antennas on their roofs, and consequently many residents of the area will have lived for relatively long times near (in many cases directly beneath) the cellular antennas. Other areas in the city …were relatively bereft of base stations even as late as 2006;*

32.   Mr. Chamberlain fails to cite the conclusion of the WHO on the topic of cell phone base stations: *Considering the very low exposure levels and research results collected to date, there is no convincing scientific evidence that the weak RF signals from base stations and wireless networks cause adverse health effects*;

33.   Also, in the IARC poster Mr. Chamberlin references (see my item 16) the IARC Working Group states regarding environmental exposures to RF-EMF (radiofrequency-electromagnetic fields): *Ecological and case control studies have been carried out to investigate potential associations of brain cancer with RF emissions from transmission antennas.  These studies are generally limited by reliance on measures of geographic proximity to the antennas as an exposure surrogate.   Substantial exposure misclassification is unavoidable.  For the same reason, no conclusions can be drawn from the limited data that were available on risk for leukaemia, lymphoma or number of other cancers;*

34.   It appears Mr. Chamberlain relied on the Dode reference, an environmental study, to support his opinion whilst also relying on the poster by Bann *et al*. but ignores the conclusion of the IARC Working Group regarding environmental studies of radiofrequency electromagnetic fields and cancer causation in the same reference which concluded: *no solid data*;

35.  Although exposure to radiofrequency electromagnetic fields are judged by IARC as *possibly carcinogen to humans (Group 2B)* this is not the subject of this litigation. Plaintiff makes no claim exposure to radiofrequency electromagnetic fields was a cause of his cancer;

36.  Moreover, Mr. Chamberlain fails to cite conclusion from many other scientific bodies and regulatory agencies which have not classified radiofrequency electromagnetic fields as a human carcinogen.  For example, the International Commission on Non-Ionizing Radiation Protection (ICNIRP) determined the studies do not allow the conclusion radiofrequency electromagnetic fields are a human carcinogen;

37.  The US Food and Drug Administration (FDA) concluded: *Based on the studies that are described in detail in this report, there is insufficient evidence to support a causal association between radiofrequency radiation (RFR) exposure and [tumor formation]*;

38.  The National Toxicology Program (NTP) did not include radiofrequency electromagnetic fields in the 15th Report on Carcinogens (December 21, 2021) which lists substances *known to be a human carcinogens* or *reasonably anticipated to be human carcinogens*;

39.  The US Federal Communication Commission (FCC) states: *[C]urrently no scientific evidence establishes a causal link between wireless device use and cancer or other illnesses;*

40.  There are many other statistical issues with the Dode study which invalidate Mr. Chamberlin's interpretation;

41.  The authours make no claim signs, symptoms and/or prognosis of someone with cancer is affected by exposure to radiofrequency electromagnetic fields from cell phone base towers;

36

42.  Mr. Chamberlain's only other reference is to a study by Wyde *et al*. (Wyde M *et al*. 2011.  Report of Partial findings from the National Toxicology Program Carcinogenesis Studies of Cell Phone Radiofrequency Radiation in Hsd: Sprague Dawley & lt;sup & gt;®&lt;/sup&gt; SD rats (Whole Body Exposures)," *bioRxiv*, p. 55699, Jan. 2018);

43.  This is a study in rats.  The reference he cites appears bioRxiv,  an unrefereed preprint server, NOT a peer-reviewed journal.  The bioRxiv editorial policy states: Articles are not peer-reviewed …   *No endorsement of an article's methods, assumptions, conclusions, or scientific quality by Cold Spring Harbor Laboratory is implied by its appearance in bioRxiv* (https://www.biorxiv.org/about-biorxiv);

44.  A search of PUBMED of the US National Library of Medicine (NLM) on 1 January 2022 identified only a technical report from the NTP.  No peer-reviewed version of the article by Wyde *et al*. Mr. Chamberlain references as supporting his opinion has been published in the biomedical literature;

45.  Importantly, as I discuss in my item 38 above, The National Toxicology Program (NTP) which sponsored the Wyde *et al*. study did not include radiofrequency electromagnetic fields in the 15th Report on Carcinogens (December 21, 2021);

46.  In forming an opinion it is important to consider and weigh all relevant evidence.  There is no indication Mr. Chamberlin did so in reaching his opinion.  For example, A recent WHO report states:  *In the area of biological effects and medical applications of non-ionizing radiation approximately 25,000 articles have been published over the past 30 years.*  In his testimony Mr. Chamberlin cites 2 references or 1 ten-thousandth of the published literature;

47.  It is my understanding an opinion should be stated as being *more likely than not*. Nowhere in his testimony does Mr. Chamberlin opine to a *more likely than not* standard.

48.  Mr. Chamberlin offers no opinion of the exact probability, if any, plaintiff would suffer worsening of signs, symptoms or prognosis of his cancer as a consequence exposure to radiofrequency electromagnetic fields including those emitted from a smart meter.

49.  Rather his opinion confounds several types of radiation.  He states in his conclusion: … based on what is known about the relationship between cancer and **radiation exposure**… and … **radiating devices** … (Bolding mine.)  At issue I this litigation is nor radiation *per se* but specifically radiofrequency electromagnetic fields emitted by a smart meter;

50.  In summary, I opine Mr. Chamberlin's testimony and opinions contained therein are unreliable, present no balanced critical review of the relevant biomedical literature or disclose the methodology he used to reach his conclusions thereby preventing other experts to replicate his analyses.  Moreover, his opinions are contrary to those of most scientific bodies and regulatory agencies.  Put otherwise, the support for his opinion is **because I say so.**

51.  Lastly, Mr. Chamberlin does not suggest the adverse events he speculates could result from exposure to radiofrequency electromagnetic radiations such as those emitted from a smart meter are *more likely than not* to occur nor does he proffer his opinions to a *reasonable degree of expert certainty*.

**Comments on the Deposition of Dr. David Carpenter**

I reviewed the Deposition of Dr. David Carpenter on this matter on 13 January, 2022.  Specific comments with page and line references follow:

1.  Dr. Carpenter testifies 2 articles he cites (Foliart DE, Pollock BH, Mezei G et al.. 2006. Magnetic field exposure and long-term survival among children with leukaemia.  Br J Cancer 94:161-4; and (2) Svendsen AL, Weihkoph T, Kaaatsch P *et al.* 2007.  Exposure to magnetic fields and survival after diagnosis of childhood leukemia: A German cohort study.  Cancer Epidemiol Biomark Prev 16:1167-71) support his opinion.  Above I

discuss in detail several reasons these references are unreliable.  Briefly, conclusions of the 2 studies are contradictory and the Svendsen study could not confirm conclusions reported in the Foliart study.  Second, these data are in children with acute lymphoblastic leukaemia which is different from plaintiff's cancer.  Third, no scientific body, medical authority nor regulatory agency recognizes conclusions of these studies. I know of no cancer-related organization including those specialized in therapy of acute lymphoblastic leukaemia which supports conclusions of these studies nor advises children with acute lymphoblastic leukaemia in remission to avoid exposure to radiofrequency electro-magnetic rations like this emitted by a smart meter (nor of any type (p. 36; 10 and following);

2. Dr. Carpenter testifies he has no idea what exposure plaintiff might receive from a smart meter such as the type proposed to be exposed at plaintiff's residence (p. 63, lines 11-18; 66/14; 98/17; 101/23);

3. Dr. Carpenter testifies he has no idea what exposure to radiofrequency electro-magnetic fields is harmful to humans (Page 58; Line 21; Page 59; Line 17; Page 60; Line 10; Page 64; Line 14; and Page 66; Line 7);

1. Dr. Carpenter discuss an article on pages 81-84 by Belpomme *et al.* (Belpomme D, Hardell L, Belyaev I et al. 2018.  Thermal and non-thermal health effects of low intensity non-ionizing radiation: An international perspective.  Environ Pollut. 242:643-58; Carpenter Deposition Exhibit 8).  First, this is a review article rather than a scientific study.  Second, Dr. Carpenter is a co-authour of the article.  The claim in this article which Dr. Carpenter cites is that exposure to radiofrequency electro-magnetic fields results in the production of reactive oxygen species.  The only citation in the article supporting this claim is to an un-peer-reviewed online website (www.bioiniative.org) which has been highly-criticized for lack of scientific accuracy.  Even if the claim exposure to radiofrequency electro-magnetic fields were true production of reactive oxygen species would be relevant only to cancer causation and not to progression in someone with cancer in general nor in someone with lymphoplasmacytic lymphoma/Waldenström macroglobulinemia like plaintiff.  Moreover, large well-conducted

39

clinical trials designed to prevent cancer or improve cancer prognosis by interventions which decrease production of reactive oxygen species have been uniformly negative. (Pages 81-84).  Lastly, as I discuss in Item 9 below Dr. Carpenter testifies in this Deposition: biological effects don't always translate into a human disease or a hazard to people (Page 61, Line 10; Page 62, Line 7);

2.  Dr. Carpenter testifies his opinion regarding medical consequences of radiofrequency electromagnetic fields such as those emitted by a smart meter is minority opinion (Page 78, Line 5)  and testifies radiofrequency electro-magnetic fields are "toxic" but admits it's unproved (Page 90; Line 1);

3.  Dr. Carpenter testifies he has a conflict-of-interest (Page 70, Line 20; Page 72, Line 15; Page 73, Line 7);

4.  Dr. Carpenter testifies articles he cites have nothing to do with plaintiff (Page 83, Line 22; Page 84, Line 16);

5.  Dr. Carpenter testifies he cannot cite any article where someone has been harmed by exposure to radiofrequency electro-magnetic fields from a smart meter (Page 93, Line 20);

6.  Dr. Carpenter testifies he has no way of knowing what effect exposure to radiofrequency electro-magnetic fields would have on anyone (Page 140, Line 4);

7.   Dr. Carpenter testifies he cannot say to a reasonable degree of medical certainty exposure to radiofrequency electro-magnetic fields would shorten remission of someone  with cancer by any interval more than 5 seconds (Page 102, Line 8);

8.   Dr. Carpenter testifies he authoured a statement about a proposed limit on exposure to radiofrequency electro-magnetic fields he does not believe (Page 56, Line 19);

9.   Dr. Carpenter testifies biological effects don't always translate into a human disease or a hazard to people (Page 61, Line 10; Page 62, Line 7);

10.   On pages 110-111 Dr. Carpenter discusses development of Schwannomas and brain cancers in rodents exposed to radiofrequency electro-magnetic fields.  These studies are in rodents, not humans.   The exposure conditions were set to approximate conditions like those of mobile phone exposures, not exposures from a smart meter. These cancers were detected only in male rats and not in genetically-identical female rats.   These experiments dealt with cancer causation, not cancer progression. Schwannomas and gliomas are cancers of neural tissue and are entirely unrelated to plaintiff's cancer.  Lastly, there is no convincing evidence of an increased incidence of these cancers in human mobile phone users despite extensive study;

11.  Dr.  Carpenter  testifies  the  same  exposure  to  radiofrequency  electro-magnetic exposures might be harmless to one person, mildly harmful to another and seriously harmful to another.  He gives no indication in his Declaration or Deposition which type of persons plaintiff is.  First, there are no convincing scientific data a condition he terms electro-magnetic hypersensitivity exists. (My Item 40 above.)  Specifically, he does not opine nor present evidence plaintiff has this or any related condition (if such conditions exist which is doubtful).  For example, on page 83, line 24 of his Deposition he testifies: *… on which Ed does not have, on electrohypersensitivity, which he* [Plaintiff] *does not have and on the full spectrum of these and the cognitive effects, which also he* [Plaintiff] *does not have.* (Page 83, Line 24 to Page 84, Line 2);


This report is a good faith effort to set forth my opinions and the bases thereof.  I reserve the right to supplement this report to include further opinions based on additional information, clarifying data, testimony or comments by other technical experts or additional discovery.


  Dated:    22February, 2022; Los Angeles, California

*Robert Peter Gale MD, PhD*

Robert Peter Gale, MD, PhD, DSc(hc), FACP, FRCP, FRCPI(hon), MRSM



# Radiofrequency (RF) Radiation

Radiation is the emission (sending out) of energy from any source. X-rays are an example of radiation, but so is the light that comes from the sun and the heat that is constantly coming off our bodies.

When talking about radiation and cancer, many people think of specific kinds of radiation such as x-rays or the radiation made by nuclear reactors. But there are other types of radiation that act differently.

Radiation exists across a spectrum from very low-energy (low-frequency) radiation to very high-energy (high-frequency) radiation. This is sometimes referred to as the **electromagnetic spectrum**.

The electromagnetic spectrum illustration below shows all of the possible frequencies of electromagnetic energy. It ranges from extremely low frequencies (such as those from power lines) to extremely high frequencies (x-rays and gamma rays), and includes both non-ionizing and ionizing radiation.

Examples of high-energy radiation include x-rays and gamma rays. These rays, as well as some higher energy UV radiation, are forms of **ionizing radiation**, which means they have enough energy to remove an electron from (ionize) an atom. This can damage the DNA (genes) inside of cells, which can sometimes result in cancer.



Image credit: National Cancer Institute

EXHIBIT

Exhibit K

# What is radiofrequency (RF) radiation?

Radiofrequency (RF) radiation, which includes radio waves and microwaves, is at the low-energy end of the electromagnetic spectrum. It is a type of **non-ionizing radiation**. Non-ionizing radiation does not have enough energy to remove electrons from an atom. Visible light is another type of non-ionizing radiation. RF radiation has lower energy than some other types of non-ionizing radiation, like visible light and infrared, but it has higher energy than extremely low-frequency (ELF) radiation.

If RF radiation is absorbed by the body in large enough amounts, it can produce heat. This can lead to burns and body tissue damage. Although RF radiation is not thought to cause cancer by damaging the DNA in cells the way ionizing radiation does, there has been concern that in some circumstances, some forms of non-ionizing radiation might still have other effects on cells that might somehow result in cancer.

# How are people exposed to RF radiation?

People can be exposed to RF radiation from both natural and man-made sources.

Natural sources include:

- Outer space and the sun

- The sky – including lightning strikes

- The earth itself – most radiation from the earth is infrared, but a tiny fraction is RF

Man-made RF radiation sources include:

- Broadcasting radio and television signals

- Transmitting signals from cordless telephones, cell phones and cell phone towers, satellite phones, and 2-way radios

- Radar

- WiFi, Bluetooth® devices, and smart meters

- The heating of body tissues to destroy them in medical procedures

- "Welding" pieces of polyvinyl chloride (PVC) using certain machines

- Millimeter wave scanners (a type of full body scanner used for security screening)

Some people can have significant RF exposure as part of their jobs. This includes people who maintain antenna towers that broadcast communication signals and people who use or maintain radar equipment.

Most people are exposed to much lower levels of man-made RF radiation every day due to the presence of RF signals all around us. They come from radio and television broadcasts, WiFi and Bluetooth devices, cell phones (and cell phone towers), and other sources.

# Some common uses of RF radiation

### Microwave ovens

Microwave ovens work by using very high levels of a certain frequency of RF radiation (in the microwave spectrum) to heat foods. When food absorbs microwaves, it causes the water molecules in the food to vibrate, which produces heat. Microwaves do not use x-rays or gamma rays, and they do not make food radioactive.

Microwave ovens are designed so that the microwaves are contained within the oven itself. The oven only makes microwaves when the door is shut and the oven is turned on. When microwave ovens are used according to instructions, there is no evidence that they pose a health risk to people. In the US, federal standards limit the amount of RF radiation that can leak from a microwave oven to a level far below what would harm people. Ovens that are damaged or modified, however, could allow microwaves to leak out, and so could pose a hazard to people nearby by potentially causing burns.

## Full-body security scanners

In many airports in the United States, the Transportation Security Administration (TSA) uses full body scanners to screen passengers. The scanners currently used by the TSA use **millimeter wave imaging**. These scanners send out a small amount of millimeter wave radiation (a type of RF radiation) toward the person in the scanner. The RF radiation passes through clothing and bounces off the person's skin, as well as any objects under the clothes. Receivers sense the radiation and create an image of the outline of the person.

Millimeter wave scanners do not use x-rays (or any other kind of high-energy radiation), and the amount of RF radiation used is very low. According to the US Food and Drug Administration (FDA), these scanners have no known health effects. However, TSA often allows people to be screened in a different way if they object to screening with these scanners.

## Cell phones and cell phone towers

Cell phones and cell phone towers (base stations) use RF radiation to transmit and receive signals. Some concerns have been raised that these signals might increase the risk of cancer, and research in this area continues. For more information, see Cellular Phones and Cell Phone Towers.

# Does RF radiation cause cancer?

Researchers use 2 main types of studies to try to determine if something might cause cancer:

- **Studies done in the lab studies**
- **Studies looking at groups of people**

Often neither type of study provides enough evidence on its own, so researchers usually look at both lab-based and human studies when trying to figure out if something causes cancer.

*The following is a brief  summary of some of the major studies that have looked at this issue to date. However, this is not a comprehensive review of all studies that have been done.*

## Studies done in the lab

RF waves don't have enough energy to damage DNA directly. Because of this, it's not clear how RF radiation might be able to cause cancer. Some studies have found possible increased rates of certain types of tumors in lab animals exposed to RF radiation, but overall, the results of these types of studies have not provided clear answers so far.

A few studies have reported evidence of biological effects that could be linked to cancer, but this is still an area of research.

In large studies published in 2018 by the US National Toxicology Program (NTP) and by the Ramazzini Institute in Italy, researchers exposed groups of lab rats (as well as mice, in the case of the NTP study) to RF waves over their entire bodies for many hours a day, starting before birth and continuing for at least most of their natural lives. Both studies found an increased risk of uncommon heart tumors called malignant schwannomas in male rats, but not in female rats (nor in male or female mice, in the NTP study). The NTP study also reported possible increased risks of certain types of tumors in the brain and in the adrenal glands.

While both of these studies had strengths, they also had limitations that make it hard to know how they might apply to humans being exposed to RF radiation. A 2019 review of these two studies by the International Commission on Non-Ionizing Radiation Protection (ICNIRP) determined that the limitations of the studies didn't allow conclusions to be drawn regarding the ability of RF energy to cause cancer.

Still, the results of these studies do not rule out the possibility that RF radiation might somehow be able to impact human health.

## Studies in people

Studies of people who may have been exposed to RF radiation at their jobs (such as people who work around or with radar equipment, those who service communication antennae, and radio operators) have found no clear increase in cancer risk.

A number of studies have looked for a possible link between cell phones and cancer. Although some studies have shown a possible link, many others have not. For many reasons, it is hard to study if there might be a link between cell phones and cancer, including the relatively short time that cell phones have been in widespread use, changes in the technology over time, and difficulty in estimating each person's exposure. The topic of cell phones and cancer risk is discussed in detail in Cellular (Cell) Phones.

## What do expert agencies say?

**The American Cancer Society (ACS) does not have any official position or statement on whether or not radiofrequency radiation from cell phones, cell phones towers, or other sources is a cause of cancer.** ACS generally looks to other expert organizations to determine if something causes cancer (that is, if it is a carcinogen), including:

- The **International Agency for Research on Cancer (IARC)**, which is part of the World Health Organization (WHO)

- The **US National Toxicology Program (NTP)**, which is formed from parts of several different government agencies, including the National Institutes of Health (NIH), the Centers for Disease Control and Prevention (CDC), and the Food and Drug Administration (FDA)

Other major organizations might also comment on the ability of certain exposures to cause cancer.

Based on a review of studies published up until 2011, the **International Agency for Research on Cancer (IARC)** has classified RF radiation as "possibly carcinogenic to humans," based on limited evidence of a possible increase in risk for brain tumors among cell phone users, and inadequate evidence for other types of cancer. (For more information on the IARC classification system, see Known and Probable Human Carcinogens.)

More recently, the **US Food and Drug Administration (FDA)** issued a technical report based on results of studies published between 2008 and 2018, as well as national trends in cancer rates. The report concluded: "Based on the studies that are described in detail in this report, there is insufficient evidence to support a causal association between radiofrequency radiation (RFR) exposure and [tumor formation]."

So far, the **National Toxicology Program (NTP)** has not included RF radiation in its *Report on Carcinogens*, which lists exposures that are known to be or reasonably anticipated to be human carcinogens. (For more on this report, see Known and Probable Human Carcinogens.)

According to the **US Federal Communications Commission (FCC)**:

"[C]urrently no scientific evidence establishes a causal link between wireless device use and cancer or other illnesses. Those evaluating the potential risks of using wireless devices agree that more and longer-term studies should explore whether there is a better basis for RF safety standards than is currently used."

# How can I avoid exposure to RF radiation?

Because sources of RF radiation are so common in the modern world, there is no way to completely avoid exposure to it. There are some ways you can lower your exposure to RF radiation, such as:

- Avoiding jobs with increased RF exposure

- Limiting the time you spend near appliances, equipment, and other devices (such as WiFi routers) that give off RF radiation

- Limiting the time you spend with a cell (mobile) phone placed against your ear (or close to another part of your body)

Still, it isn't clear that doing these things will be helpful in terms of health risks.

## Additional resources

Along with the American Cancer Society, other sources of information include:

**Centers for Disease Control and Prevention (CDC)**
Toll-free number: 1-800-232-4636 (1-800-CDC-INFO)
Website: www.cdc.gov

**Federal Communications Commission (FCC)**
Wireless Devices and Health Concerns: www.fcc.gov/consumers/guides/wireless-devices-and-health-concerns
RF Safety FAQ: www.fcc.gov/engineering-technology/electromagnetic-compatibility-division/radio-frequency-safety/faq/rf-safety

**National Cancer Institute (NCI)**
Toll-free number: 1-800-422-6237 (1-800-4-CANCER)
Website: www.cancer.gov
Electromagnetic Fields and Cancer: www.cancer.gov/about-cancer/causes-prevention/risk/radiation/electromagnetic-fields-fact-sheet

**National Institute of Environmental Health Sciences (NIEHS)**
Website: www.niehs.nih.gov
Electric and Magnetic Fields: www.niehs.nih.gov/health/topics/agents/emf/index.cfm

*Inclusion on this list does not imply endorsement by the American Cancer Society.*

No matter who you are, we can help. Contact us anytime, day or night, for information and support. Call us at **1-800-227-2345** or visit www.cancer.org.

## References

Castillo M, Quencer RM. Sublethal exposure to microwave radar. *JAMA*. 1988;259(3):355.

Elder JA, Chou CK. Auditory response to pulsed radiofrequency energy. *Bioelectromagnetics*. 2003;Suppl 6:S162-73.

Elder JA. Ocular effects of radiofrequency energy. *Bioelectromagnetics*. 2003;Suppl 6:S148-61.

Falcioni L, Bua L, Tibaldi E, et al. Report of final results regarding brain and heart tumors in Sprague-Dawley rats exposed from prenatal life until natural death to mobile phone radiofrequency field representative of a 1.8 GHz GSM base station environmental emission. *Environ Res*. 2018;165:496-503.

Federal Communications Commission. RF Safety FAQ. 2015. Accessed at https://www.fcc.gov/engineering-technology/electromagnetic-compatibility-division/radio-frequency-safety/faq/rf-safety on March 26, 2020.

Food and Drug Administration. Microwave Ovens. 2019. Accessed at https://www.fda.gov/radiation-emitting-products/home-business-and-entertainment-products/microwave-ovens on March 26, 2020.

Food and Drug Administration. Products for Security Screening of People. 2018. Accessed at https://www.fda.gov/radiation-emitting-products/security-systems/products-security-screening-people on March 26, 2020.

Food & Drug Administration. Review of Published Literature between 2008 and 2018 of Relevance to Radiofrequency Radiation and Cancer. 2020. Accessed at https://www.fda.gov/media/135043/download on March 19, 2020.

International Agency for Research on Cancer. *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans. Volume 102, part 2: Non-Ionizing Radiation, Radiofrequency Electromagnetic Fields*. 2013. Accessed at https://publications.iarc.fr/126 on March 26, 2020.

International Commission on Non-Ionizing Radiation Protection (ICNIRP). ICNIRP Note: Critical Evaluation of Two Radiofrequency Electromagnetic Field Animal Carcinogenicity Studies Published in 2018. *Health Phys*. 2019 Aug 27. [Epub ahead of print]

National Toxicology Program. Cell Phone Radio Frequency Radiation Studies. 2019. Accessed at www.niehs.nih.gov/health/materials/cell_phone_radiofrequency_radiation_studies_508.pdf on March 27, 2020.

Last Revised: June 1, 2020

American Cancer Society medical information is copyrighted material. For reprint requests, please see our Content Usage Policy.