EXHIBIT A
(Anderson Mtn)

1

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

ED FRIEDMAN,                    )
                                )
              Plaintiff         )
                                )
                                )          CIVIL ACTION
    vs.                         )
                                )   Docket No. 2:20-cv-00237-JDL
                                )
CENTRAL MAINE POWER             )
COMPANY,                        )
                                )
              Defendant.        )

**REMOTE DEPOSITION OF ERIK S. ANDERSON, P.E.**

Taken pursuant to notice dated January 13, 2022, on
January 26, 2022, commencing at 11:00 a.m., before
Julie G. Edgecomb, RMR, CRR, a Notary Public in and
for the State of Maine.

APPEARANCES:

For the Plaintiff:      David Lanser, Esquire

For the Defendant:      Christopher C. Taintor, Esquire

ALSO PRESENT:           Ed Friedman
                        Tim Connolly, Esq.

THE REPORTING GROUP
Mason & Lockhart

---

2

INDEX

Deponent:  ERIK S. ANDERSON, P.E.

Examination by:                          Page

    Mr. Taintor                          3, 77

    Mr. Lanser                           73

                    EXHIBITS

Number          Description              Page

1      Notice of Deposition               5
2      Anderson Engineering Report       19
3      Answers to Interrogatories        19
4      Sage Associates Report            33
5      Bathgate Report                    67
6      Arizona Testimony                  6
7      Forbes Article                    67
8      Power Quality                     22
9      Anderson Bio                      --
10     Code of Ethics for Engineers       4
11     Bathgate Article                  67
12     Prior Testimony                    5
13     Invoice                           67

(Exhibits retained by counsel.)

THE REPORTING GROUP
Mason & Lockhart

---

3

1       (The attorneys participating in this deposition
2    acknowledge that I am not physically present in the
3    deposition room and that I will be reporting this
4    deposition remotely.  The parties and their counsel
5    consent to this arrangement and waive any objections
6    to this manner of reporting.)
7                    * * * * * * *
8       (The deponent was administered the oath by the
9    Notary Public.)
10                   * * * * * * *
11   ERIK S. ANDERSON, P.E., having been duly sworn by the
12   Notary Public, was examined and deposed as follows:
13              E X A M I N A T I O N
14   BY MR. TAINTOR:
15   Q    Good morning again, Mr. Anderson.  My name is Chris
16        Taintor, and I represent Central Maine Power in the
17        case brought by Ed Friedman in the United States
18        District Court in Maine.
19            And you understand we're here today to take your
20        deposition as an expert witness in connection with
21        that case?
22   A    Yes, sir, I do.
23   Q    Okay.  And I know you have been through the deposition
24        process many times.  I think I saw in one of your CVs,
25        as of a couple of years ago, you had given at least 85

THE REPORTING GROUP
Mason & Lockhart

---

4

1        depositions; does that sound right?
2   A    Yes, it does.
3   Q    Okay.  So I'm not going to spend a whole lot of time
4        on the rules of the road, but I guess the main thing I
5        want you to know is I don't think we'll be terribly
6        long today, but if you need to take a break, for any
7        reason, at any time, just let me know and we can do
8        that, okay?
9   A    Thank you.  I appreciate that.
10  Q    Yeah.  And most importantly, because I'm not an
11       electrical engineer, or even close to one, I'm bound
12       to ask you questions that don't make sense to you, for
13       any number of reasons, and I would just like to make
14       sure that we have a record in which you're only
15       answering questions you understand.
16           So if you could please let me know if I've asked
17       you a question that doesn't make sense to you or that
18       you don't understand, I would be grateful for that,
19       okay?
20  A    I will do that.
21  Q    Thanks.  And we've marked a number of exhibits, and
22       most of them are things that you have seen before this
23       morning.  I think there may be only one that you've
24       probably seen before but not in connection with this
25       case, and that's Exhibit 10.

THE REPORTING GROUP
Mason & Lockhart

5

```
1       But let me start with Anderson Deposition Exhibit
2   1, which is the notice to take your deposition.  And I
3   understand that you have produced a current CV; is
4   that correct?
5 A Yes, I have.
6 Q Okay.  And the documents I received this morning from
7   Attorney Lanser would include all the documents you
8   reviewed, referred to, or relied on in forming your
9   opinions in the case?
10 A Yes, they are, with the exception of some of the legal
11   documents I -- I believe are listed in my report, but
12   I did not send those to --
13 Q Okay.
14 A -- counsel.
15 Q For example, the complaint and the -- there was an
16   order on a motion to dismiss and that sort of thing?
17 A Yes, sir, that's correct.
18 Q Have you ever written any articles about the issues
19   which are the subject of your report in this case?
20 A No, I have not authored any articles, no, sir.
21 Q Okay.  And then there is a list of cases in which
22   you've testified, and that's been marked as Exhibit
23   12, and I think we know that your testimony in one of
24   these Arizona cases involved issues -- high-voltage --
25   or high-frequency voltage transients, correct?
```

THE REPORTING GROUP
Mason & Lockhart

6

```
1 A Yes, sir, that's correct.
2 Q Other than that case in the -- that was before, I
3   think, the Arizona Public Service Commission --
4   Arizona Corporation Commission, and that is Exhibit 6,
5   have you ever provided testimony under oath on that
6   particular issue in any other case?
7 A No, sir, I don't believe I have.
8 Q Okay.  And with respect to Exhibit 6, which is your
9   testimony on behalf of a gentleman named Warren
10   Woodward in the state of Arizona, you understand that
11   in that case, Mr. Woodward was, among other things,
12   opposing the implementation of a smart meter system in
13   the state of Arizona?
14 A I -- I think that was one of his concerns, yes.
15 Q And did you understand that your testimony was offered
16   in support of that position?
17 A Yes.
18 Q And do you understand that that matter was resolved
19   against Mr. Woodward?
20 A To a certain extent.  I don't know precisely what the
21   outcome of that case was.
22 Q So if we look at Exhibit 12, which you talked about a
23   moment ago, with the exception of the Woodward case in
24   Arizona, which looks like it's one that is sort of
25   just above the midway point on the first page of
```

THE REPORTING GROUP
Mason & Lockhart

7

```
1   Exhibit 12 talking about your testimony before the
2   Arizona Corporation Commission, there's no other
3   testimony here that involves the same issues that are
4   the subject of your testimony in this -- or the
5   subject of your report in this case, correct?
6 A Well, I don't know if that's precisely correct or not.
7   I -- I have testified in many cases regarding
8   transient voltages and, oh, power quality issues,
9   failures of devices in conjunction with that, so I --
10   I don't know that that's absolutely correct.
11 Q Okay.  So when you're talking about voltage transients
12   and cases in which you've testified, is that because
13   in those cases, there has been a malfunction of the
14   device or a failure of the device to operate because
15   of power quality?
16 A That certainly is an issue, yes, and some of those
17   cases do have to do with failures in conjunction with
18   that, absolutely, yes.
19       (Tim Connolly, Esq., joined the Zoom.)
20 BY MR. TAINTOR:
21 Q Okay.  Other than this case and the case before the
22   Arizona Corporation Commission, have you testified in
23   any other case where, to your knowledge, an individual
24   was asserting, in an administrative or judicial
25   proceeding, that power quality was having a negative
```

THE REPORTING GROUP
Mason & Lockhart

8

```
1   impact or could have a negative impact on his or her
2   health?
3 A I don't believe so, no.
4 Q When were you initially contacted to serve as an
5   expert witness?
6 A I think that's listed in my report, like the first
7   paragraph.  I believe it may have been in September or
8   October of last year.
9 Q Okay.  September 26th, 2021, and you were contacted
10   directly by Mr. Friedman?
11 A That's my recollection, yes.
12 Q And did you, from that initial conversation, did you
13   gain an understanding of what it was thought your
14   testimony could offer to assist Mr. Friedman in
15   prosecuting his lawsuit against Central Maine Power
16   Company?
17 A Yes, he conveyed to me why he was contacting me and
18   what he was -- well, what kind of help he was looking
19   for, yes.
20 Q And -- and what was your understanding of your charge,
21   if you will, or your assignment as an expert witness?
22 A I believe he was looking for someone to be able to
23   discuss the -- the effects of the smart meter and its
24   operation on the electrical system of his residence.
25 Q Okay.  And I think this is very clear from your
```

THE REPORTING GROUP
Mason & Lockhart

9

1      report, but I just want to be absolutely certain.  You
2      do not intend to offer any opinions in this case that
3      exposure to radio frequency signal emitted by smart
4      meters has ever caused or ever could cause harm to
5      human beings, correct?
6  A  **I don't believe that that's what I was asked to do,**
7      **and I -- I don't believe I will opine that in this**
8      **case, no.**
9  Q  And that would be far beyond your area of expertise;
10     would you agree?
11  A  **I'm not going to necessarily agree to that, no, but I**
12     **was not asked to do that in this case.**
13  Q  So let me ask you then about Exhibit 10, which is the
14     National Society of Professional Engineers Code of
15     Ethics.
16        You are a member of the National Society of
17     Professional Engineers?
18  A  **Yes, sir, I am a member of the NSPE, absolutely.**
19  Q  And this -- this Code of Ethics is something you're
20     familiar with?
21  A  **Yes, sir, it is.**
22  Q  Have you ever testified in any case anywhere about the
23     effects on human health of high-frequency voltage
24     transients?
25  A  **Not that I'm aware of, no.**

10

1  Q  Do you have any medical training of any kind?
2  A  **Ah, no, I don't think I've had any medical form of**
3     **training, no.**
4  Q  In your -- let me ask you this.  How much of your
5     professional time, say, over the course of the
6     last five years, has involved forensic work?
7  A  **Oh, I would say 50 percent or better.**
8  Q  And what's the rest?  How's that broken up?
9  A  **The rest is broken up with working with the**
10    **manufacturing side of Anderson Engineering with**
11    **Midwest Current Transformer and also dealing with**
12    **manufacturers of industrial equipment and certifying**
13    **their products per the National Fire Protection**
14    **Association 79 and 70, along with UL508.**
15  Q  Can you repeat those acronyms for me?
16  A  **NFPA is the National Fire Protection Association.**
17  Q  Yeah.
18  A  **And they -- they have standards that they've created**
19    **and one of them is NFPA 70, which is the National**
20    **Electrical Code, and another is NFPA 79, which is**
21    **industrial machinery, and then Underwriter**
22    **Laboratories, UL, 508 is industrial cabinets, I**
23    **believe.**
24  Q  So I think what you said is that you spent some --
25     some part of your professional time certifying newly

11

1      manufactured products for compliance with those NFPA
2      and UL standards?
3  A  **Not just newly manufactured, but any industrial**
4     **equipment, whether it's new or used or whatever**
5     **vintage it is.**
6  Q  So what -- if -- if equipment is not new, what
7     certification is required?  Is that something that has
8     to happen periodically?
9  A  **No, it's not, but it's -- it's becoming more and more**
10    **the standard that equipment in industrial applications**
11    **or industrial machinery be certified by either the**
12    **nationally recognized testing laboratory or by a**
13    **professional engineer or whomever the authority having**
14    **jurisdiction will recognize.**
15  Q  Okay.
16  A  **So if you've got a piece of equipment that you've been**
17    **using for decades, more than likely it was not**
18    **certified or may have not been certified.  The**
19    **authority having jurisdiction can tell you that you**
20    **have to have that certified in some way or another.**
21  Q  Gotcha, thank you.  Your forensic work, I take it from
22     your -- your website and your CV, consists primarily
23     of fire and accident investigations?
24  A  **It has to do with fires to a certain degree, yeah.  An**
25    **economic loss is usually what triggers it, and that**

12

1     **can be a flood or a fire or any type of economic loss**
2     **to property.  It also has to do with electrical**
3     **accidents that occur to individuals -- personal**
4     **injury, wrongful death.**
5     **So there -- there have been a number of instances**
6     **where I've testified and discussed effects of**
7     **electricity on the human body and how it can cause --**
8     **it can cause damage to the human body, but in various**
9     **ways, and cause -- also cause death.**
10  Q  Those are primarily electrocution cases?
11  A  **They -- they can be electrocution cases.  They also**
12    **can be damage that has occurred to an individual that**
13    **was in close proximity to an electrical discharge**
14    **where there -- they sustained rather significant**
15    **injuries due to the fields -- magnetic fields, the**
16    **electric fields -- that they're in close proximity to.**
17    **Of course, there are instances where you have arc**
18    **flash considerations and the -- the arc flash plasma,**
19    **basically, is ejected out onto the individual where it**
20    **causes burns and metal impregnation, things like that.**
21  Q  All right.
22  A  **So there's various ways to be injured --**
23  Q  All right.
24  A  **-- by that.**
25  Q  Have you ever taken the position, either in a public

13

1  forum or in consulting with users of -- of electrical
2  power, that they should not have smart meters?
3  A  No, not specifically.
4  Q  Do you have a smart meter at your home?
5  A  I more than likely do.
6  Q  Have you been in contact with any of the other expert
7     witnesses who have been designated by the plaintiff in
8     this case?
9  A  I don't believe so, no.
10 Q  Do you know Dr. David Carpenter?
11 A  I do not.
12 Q  Do you know Kent Chamberlin?
13 A  No, sir.
14 Q  And there's another doctor, Heroux, H-e-r-o-u-x, do
15    you know him?
16 A  No.
17 Q  Other than Mr. Friedman and his attorneys, have you
18    spoken with anyone about your work in this case?
19 A  Yes, sir, I have.
20 Q  And who else have you spoken with?
21 A  I've spoken with Paul Harding --
22 Q  I'm sorry, who?
23 A  -- and -- and Warren Woodward.
24 Q  Who?  What was the first name?
25 A  Paul Harding.

14

1  Q  And who's he?
2  A  Paul Harding is an individual that I met when I was
3     working on that other matter that you discussed, the
4     Arizona Corporation Commission.
5  Q  Okay.
6  A  I have spoken with him, and -- and Warren Woodward
7     similarly, when I was trying to get ahold of
8     Mr. Harding.
9  Q  Okay.  Now, what was Mr. Harding's role in the Arizona
10    case?
11 A  Mr. Harding has equipment used for measuring the smart
12    meter devices that are pertinent to this case.
13 Q  So did you obtain some equipment from him?
14 A  I did not.  I -- I tested -- well, in the Arizona
15    case, he was the one that supplied the equipment for
16    the testing that I witnessed, and in this case, I
17    actually did some further testing with Mr. Harding in
18    regards to this case.
19 Q  You did testing where?
20 A  At Mr. Harding's residence.
21 Q  And where is that?
22 A  It's basically between Phoenix and Tucson in Arizona.
23 Q  So what were you testing at Mr. Harding's residence?
24 A  I had tested a GE I-210+ meter at Mr. Harding's
25    residence.

15

1  Q  And how did you -- how did you perform the testing,
2     and what specific tests did you perform?
3  A  What -- what we did was we connected the meter to his
4     test stand setup and measured the -- measured the --
5     the power -- or, well, measured the voltage waveforms
6     coming off of it.
7  Q  And is that the testing that -- is that testing
8     reflected in your report in this case?
9  A  No, it is not.
10 Q  What did that testing reveal?  If there was anything
11    -- well, let me ask you generally, what did the
12    testing reveal?
13 A  The testing revealed that there was additive
14    transients generated by the smart meter with its power
15    supply.
16 Q  Did you make notes of the testing?
17 A  Yes, sir, I did.
18 Q  Did you produce that material this morning?
19 A  No, I did not.
20 Q  I'm just going back to the notice of deposition, which
21    is Deposition Exhibit 1, Paragraph 3 asked for all
22    documents, including, but not limited to, any reports
23    prepared or created by you in regard to this case.
24       Do you think the results of that testing that you
25    did with Mr. Harding would fall within that

16

1     description?
2  A  I don't know that specifically; it may.
3  Q  Had you seen this deposition notice before today?
4  A  I believe I was supplied with it.  I don't know that I
5     read it, other than I did look through the list and
6     tried to comply with that list, yes.
7  Q  Are there any other documents, besides the notes of
8     the testing you performed at Mr. Harding's residence,
9     that you created concerning this case which, so far as
10    you know, have not been produced to CMP?
11 A  Well, I have notes in my file that I did not produce.
12 Q  Okay.  How many pages of notes do you have?
13 A  I don't know.
14 Q  Are those handwritten or computerized?
15 A  They're handwritten.
16    MR. TAINTOR:  Okay.  Dave, is there a dispute
17    about the discoverability of all these notes?
18    MR. LANSER:  Well, I have not seen these notes
19    either, so I don't anticipate a dispute, but maybe
20    after this, if Mr. Anderson would send them to me and
21    we can review them to see if there's a dispute.  If
22    that's all right with you, Chris?
23    MR. TAINTOR:  Yeah, or maybe during a break.  I
24    mean, I won't be terribly long today, but if he has
25    the ability to send them off to you, you could -- we

17

1 might just -- it might make it easier.
2     THE DEPONENT:  I -- I don't have a scanner.
3     MR. TAINTOR:  Oh, okay, all right.  Well, we'll
4 -- we'll just deal with that, I guess, and I don't
5 know whether this other information will create a
6 reason to reconvene, hopefully not, but, you know, I
7 may want to leave that option open if we get to that
8 point.
9 BY MR. TAINTOR:
10 Q  Okay.  So what relevance, if any, does the testing
11 that you performed with Mr. Harding have to the
12 opinions expressed in your report in this case?
13 A  **I think that they help solidify those opinions.**
14 **I don't -- they don't change the opinions.**
15 Q  And they solidify your opinion that having a smart
16 meter -- well, tell me the -- rather than my try to
17 articulate it, and probably poorly, why don't you have
18 -- why don't you tell me the opinion that you believe
19 the testing you did with Mr. Harding solidifies.
20 A  **Well, I -- I believe that it shows that the powering**
21 **up of the smart meter and the switch mode power supply**
22 **within it creates transients on the system.**
23 Q  Okay.  Are transients created in a -- in a residential
24 electrical system by devices other than smart meters?
25 A  **Yes, I believe they do.**

18

1 Q  And -- and what other devices cause that to occur?
2 A  **Well, certain appliances I would expect do, like**
3 **possibly a refrigerator would be an appliance that**
4 **would create transients.**
5 Q  Any other appliances you can think of?
6 A  **Well, any -- any other -- any other devices that may**
7 **contain the switch mode power supply can have**
8 **transients associated with it.**
9 Q  And do you know which appliances are likely to have or
10 to contain switch mode power supplies?
11 A  **Typically electronics.  I would expect monitors, video**
12 **monitors, computers.**
13 Q  Anything else?
14 A  **Potentially air conditioning, heat pump that may also.**
15 Q  Anything else?
16 A  **Not that comes readily to mind at this time.**
17 Q  Okay, thanks.  You mentioned Warren Woodward and Paul
18 Harding.  Was your -- am I correct in understanding
19 that you spoke with Mr. Woodward only in order to
20 connect with Mr. Harding?
21 A  **That's correct, yes.**
22 Q  Is Mr. Harding a professional engineer?
23 A  **I don't believe so, no.**
24 Q  Do you know what he does for a living?
25 A  **My understanding is that he works with individuals**

19

1 that are trying to clean up their power systems.
2 Q  And what do you mean when you say clean up their power
3 systems?
4 A  **Reduce the transients and harmonics on their wiring,**
5 **their household, residential wiring.**
6 Q  Other than Mr. Wood -- Woodward and Mr. Harding, is
7 there anyone else you have spoken with, again, leaving
8 aside Mr. Friedman and his lawyers, anyone else you've
9 spoken with about the case?
10 A  **I don't believe so, no.**
11 Q  Do you have your report accessible to you there
12 Exhibit 2?
13 A  **Yes, I do.**
14 Q  Looking at Attachment 1, which is referred to in your
15 report as documents that you've reviewed to assist you
16 in formulating your opinions --
17 A  **Yes, sir.**
18 Q  -- let me ask you -- let me ask you first about
19 Central Maine Power Company's answers to
20 interrogatories, which is Exhibit 3, how did your
21 review of those answers to interrogatories assist you
22 with formulating your opinions in the case?
23 A  **That's No. 1, or objections and answers --**
24 Q  Yes.
25 A  **-- to plaintiff's interrog -- yeah.**

20

1 Q  Yeah, it's Exhibit 3.
2 A  **Oh, okay.  Well, I -- I think that was mostly**
3 **background knowledge, as I recall.**
4 Q  Okay.
5 A  **I'd have to pull it up to really give you a full**
6 **detailed account of that, but it was mainly just to**
7 **understand more about what was going on.**
8 Q  Okay.  You know, why don't you go ahead and pull that
9 up, actually, because I want to ask you a couple
10 questions about it.  Just let me --
11     MR. LANSER:  Chris, not to just to jump in here,
12 but, Erik, just to clarify, the -- that ShareFile link
13 that I forwarded to you is -- is where the exhibits
14 are numbered as Chris is referring to them.
15     THE DEPONENT:  I see, okay.
16     MR. LANSER:  So pull that up if you do have it --
17     THE DEPONENT:  I will --
18     MR. LANSER:  -- rather than hunting down each
19 individual document, just go off of that Share --
20 ShareFile.  Then we'll all be on the same page.
21     MR. TAINTOR:  Right, and just let me know when
22 you've found it.
23     MR. LANSER:  I can reforward it to you if you
24 don't have it.
25     THE DEPONENT:  Oh, no, no, I've got it.

21

1      MR. LANSER:  Okay.
2  A   All right.  Where did -- where did you want to go to?
3  BY MR. TAINTOR:
4  Q   So -- so in that Exhibit 3, I -- my -- my guess is
5      that the information that might have been relevant to
6      you is in the answer to Interrogatory No. 9, which
7      starts at the bottom of Page 6.
8          So I'm going to -- I'll refer you there and --
9      and ask you if that answer to interrogatory --
10     interrogatories informed your opinion in any way in
11     the case?
12 A   Not other than the response as given as how the smart
13     meter operates --
14 Q   Okay.
15 A   -- or what -- what some of its parameters are.
16 Q   So the information about the duty cycle of the CMP
17     smart meters was not particularly relevant to you in
18     forming your opinions?
19 A   Well, no, I mean, it's good information to have, it's
20     absolutely very good information to have, but it is --
21     it is part of my --
22 Q   All right.
23 A   -- conclusions, yes, yeah.
24 Q   And then the CMP power quality webpage, now I marked
25     that as -- I -- I marked these exhibits before I got

THE REPORTING GROUP
Mason & Lockhart

22

1      your material from Dave this morning, so I -- the copy
2      of that that I have and I've marked as Exhibit 8 --
3  A   Yes, yes.
4  Q   -- I think that's -- I think that's identical to what
5      you've produced -- well, I think substantively it's
6      identical to what you've produced, but it's just in a
7      slightly different format, and this is from Central
8      Maine Power Company's power quality webpage.
9          What particular information in this document, if
10     any, is relevant to or informed your opinions in this
11     case?
12 A   Again, I think it's background information.  It shows
13     that CMP is aware of, you know, issues involving
14     voltage fluctuation, switching transients -- switching
15     transients, power outages, what can cause them, what
16     to do about them --
17 Q   Okay.
18 A   -- things like that, how to, you know, mitigate that
19     possibly.
20 Q   Okay.  Item No. 3 on Attachment 1 refers to Central
21     Maine Power Company's response to Friedman Data
22     Request No. 1.  What is that document?  Do you -- I
23     don't think I saw that in -- as an attachment to what
24     Dave sent me this morning, but I'll -- I'll check
25     again.

THE REPORTING GROUP
Mason & Lockhart

23

1  A   I probably did not attach that.  Let me see if I can
2      find it.  What was the name of the document again?
3  Q   It's referred to as Central Maine Power Company
4      response to Friedman Data Request No. 1.
5  A   Right.  I've got a document here, Central Maine Power
6      Company response dated September 13, 2012.
7  Q   Okay.
8  A   Response prepared by Barry Brown.
9  Q   Lane -- Laney Brown maybe?
10 A   Or Lane -- sorry, yeah, Laney, that's correct.
11         MR. TAINTOR:  Dave, do you remember -- do you
12     know if you sent me that document this morning?
13         MR. LANSER:  I'm not sure if that's included in
14     there.  I'm trying to pull up --
15 A   I don't -- I don't -- I would not think that that is.
16     That -- that is a document that basically lays out the
17     cut sheets for the various meters.
18 BY MR. TAINTOR:
19 Q   What's -- what's a cut sheet?
20 A   It's basically a description of the meter and its
21     functions -- functionality, performance --
22 Q   Okay.
23 A   -- power, physical, environmental, report events,
24     alarms, things like that, for the -- for the meters
25     and the SecureMesh system.

THE REPORTING GROUP
Mason & Lockhart

24

1  Q   Okay.  Did that document inform your opinions in any
2      way in this case?
3  A   Yes, that document basically gave me information as to
4      what types of meters are in use or --
5  Q   Okay.
6  A   -- expected to be in use, yes, and -- and the mesh
7      system, also, the communication system.
8  Q   Was there any testing you performed, other than the
9      testing that you did with Mr. Harding, that is not
10     described in your report?
11 A   I -- I don't believe so.
12 Q   Was there a particular reason that you didn't mention
13     the testing that you did with Mr. Harding in your
14     report?
15 A   Yeah, I -- I did not have the meter.
16 Q   I'm sorry?
17 A   I didn't have a meter to test.
18 Q   I'm sorry, I must have mis -- misunderstood you or I
19     misspoke.
20         You did -- you did testing with Mr. Harding,
21     right?
22 A   Yes, sir, yes.
23 Q   And you didn't mention that in your report, yeah.
24 A   That's because I wrote the report before I did the
25     testing.

THE REPORTING GROUP
Mason & Lockhart

25

1  Q   I see, okay, gotcha.  I take it that you have not
2      reviewed the field studies of Central Maine Power
3      Company's meters that were performed either by
4      Exponent or on behalf of the Office of the Public
5      Advocate of the State of Maine?
6  A   **Not that I recall, no.**
7  Q   Did you author all of Anderson Deposition Exhibit 2,
8      your report?
9  A   **Yes, I -- I did.  Of course, there was some input from**
10     **counsel and Mr. Friedman as we discussed it, but, yes,**
11     **I did.**
12 Q   Is there any particular language in the report that
13     you believe was supplied to you by other persons?
14 A   **Not specifically, but there -- there was some**
15     **discussion about the language.  I -- I don't profess**
16     **to be the best writer in the world, and I -- I have no**
17     **problem talking to others about different ways to**
18     **phrase things and things like that, but I -- I**
19     **certainly am open to other ways to express things.**
20 Q   Are there any particular passages in your report that
21     you can identify as having been changed by -- by
22     reason of your communicating with either Mr. Friedman
23     or his counsel?
24 A   **Well, there were portions of the report that were**
25     **discuss -- that we discussed about that would seem to**

THE REPORTING GROUP
Mason & Lockhart

26

1      **be better if it was fleshed out a little bit more, and**
2      **then with some of the -- some of the citing of certain**
3      **things and the -- the formatting for that, so some of**
4      **those things were changed.  But for the most part, the**
5      **report are my thoughts.**
6  Q   Okay.  Now, and I understand it's certainly reasonable
7      for a lawyer to say or for a client to say, gee, I,
8      you know, I think it's important for you to emphasize
9      this more than you have.
10         But what I'm trying to get at is whether there is
11     particular language in your report that you believe
12     comes from or came from someone else?
13 A   **Well, I'm sure there are certain instances that there**
14     **may be more from other parties than other -- you know,**
15     **but, again, I -- I am very open to that type of thing,**
16     **and I stand by the report.  I have no issues with any**
17     **of the language in it, and I believe it speaks for**
18     **itself.**
19 Q   Okay, and -- and I get that.  I'm just trying to
20     understand if there -- if there is any passage in the
21     report, or multiple passages in the report, where you
22     believe -- where you can specifically identify that
23     the language itself was actually provided to you by
24     someone else?
25 A   **I don't know that I can specifically do that.  There**

THE REPORTING GROUP
Mason & Lockhart

27

1      **were certainly passages in the report that were**
2      **mentioned or that were thought could be phrased in**
3      **different ways throughout the report, basically.  I**
4      **mean, it started out as a very rough draft when I**
5      **first presented it, and it -- it had been totally**
6      **changed by the time it was finally done.**
7  Q   Let me ask you about Footnote 8 in the report.
8  A   **All right, let me --**
9  Q   Sure.
10 A   **-- pull that up.  Yes, sir.**
11 Q   Have you reviewed the -- the documents cited in that
12     footnote?
13 A   **Only to a limited extent, yes.**
14 Q   To what extent?
15 A   **Well, that basically what their decision was, what was**
16     **ruled there in their decision.**
17 Q   Is the language in Footnote 8 yours?
18 A   **No, sir, it's not.**
19 Q   Do you have any information about what the court
20     decision cited in Footnote 8 said about the connection
21     between exposure to RF signal and cancer?
22 A   **I don't think I specifically know that, no.**
23 Q   So if you stay with your report for a moment, I want
24     to look -- ask you about the analysis and discussion
25     section, which starts at the bottom of Page 3.

THE REPORTING GROUP
Mason & Lockhart

28

1  A   **Yes, sir.**
2  Q   And so this says smart meters create intense exposure
3      to pulsed radio frequencies in a few ways.  RF
4      antennas are embedded within the smart meter to
5      transmit data usage to utility companies and/or
6      communicate with other smart meters or other smart
7      devices like home thermostats.
8          Was it your intention to convey in those two
9      sentences that the transmission of data from a smart
10     meter to the utility company or to other smart meters
11     or other smart devices would create an intense
12     exposure to pulsed radio frequencies in a typical
13     consumer?
14 A   **I was -- I -- my -- my intent there was to convey that**
15     **that is a potential, yes, that they can create intense**
16     **exposure to pulsed radio frequencies.**
17 Q   Not to parse words too much, but the first sentence
18     doesn't say smart meters can create intense exposure,
19     it says smart meters do -- well, it says smart meters
20     create intense exposure --
21 A   **Yes.**
22 Q   -- to pulsed radio frequencies in a few ways, and then
23     it starts giving some examples of how smart meters do
24     that, correct?
25 A   **That's correct, yes, sir.**

THE REPORTING GROUP
Mason & Lockhart

**Page 29**

1  Q  And one of the ways that you cited as an example was
2     by the transmission of data from the smart meter to
3     the utility company or to other smart meters, correct?
4  A  **Yes, sir, I do.**
5  Q  Under what condition -- or what conditions would need
6     to occur for that communication to create intense
7     exposure to pulsed radio frequencies in a human being?
8  A  **Well, I -- I think it has to do with how far away you**
9     **are from the meter and how -- how those frequencies**
10    **interact with your body and how susceptible you are to**
11    **those frequencies.**
12 Q  Would you -- would a -- would an individual have to
13    have his or her face basically pressed against the
14    smart meter in order for that scenario to create an
15    intense exposure to radio frequencies?
16 A  **Well, I would expect that would be one way to do it,**
17    **but I don't believe you have to be quite that close,**
18    **particularly if you're sensitive to it or if you have**
19    **adverse reactions to those RF frequencies.**
20 Q  How close do you think you would have to be to have an
21    intense exposure based on that scenario?
22 A  **I -- I think that would depend on the individual to a**
23    **certain extent. I don't know that I can quantify that**
24    **for you.**
25 Q  Did anyone ever tell you that Mr. Friedman was

THE REPORTING GROUP
Mason & Lockhart

**Page 30**

1     electrosensitive or -- hypersensitive to RF signal?
2  A  **I don't believe so, no.**
3  Q  Then at the top of the next page, Page 4, you said the
4     meters' various radio frequencies emitted by these
5     antennas also conduct through the home electrical
6     wiring and that -- you go on to explain that later on
7     in your report, correct?
8  A  **Yes, sir, I do.**
9  Q  And then you say RF wire conducted frequencies come
10    also from the conversion process from alternating
11    current to direct current handled by the switch mode
12    power supply.
13       So I guess I'm just trying to understand, and
14    this is one of those topics where, because I'm not an
15    electrical engineer, I really come at this from a
16    position of ignorance, is the -- the mechanism
17    described in the last sentence about the conversion
18    process from AC to DC a separate source of exposure,
19    or is that a process that, in your view, heightens the
20    exposure that occurs from other sources?
21 A  **My -- that -- that kind of sounds like two questions.**
22 Q  Okay.
23 A  **The -- the first one, yes, the -- the conversion from**
24    **AC to DC by the switch mode power supply creates**
25    **transients on the system and that those transients are**

THE REPORTING GROUP
Mason & Lockhart

**Page 31**

1     **cumulative on the rest of the system. So I'm not**
2     **exactly sure what the answer to your questions are,**
3     **but I think they would basically both be yes.**
4  Q  Okay. Well, what do you mean when you say that the
5     transients are cumulative?
6  A  **Well, you asked about the other devices on the system,**
7     **and if there are other devices on the system that**
8     **create transients, then the transients that are**
9     **generated by the switch mode power supply would be**
10    **cumulative to that.**
11 Q  I see. Now just flip back to Page 2 of your report.
12 A  **Okay.**
13 Q  At the top of the page, you see there are six numbers?
14 A  **Yes, sir.**
15 Q  Number 3 says the RF electromagnetic fields/waves
16    produced by the electric smart meters used by CMP are
17    not attenuated as they travel throughout the
18    electrical distribution network of the residence the
19    meter is controlling.
20       So, again, just so that I can understand what
21    you're saying, when you say the -- the waves are not
22    attenuated, are you saying that the -- that the
23    transients remain the same throughout the system?
24 A  **Correct, the -- the transients that are generated are**
25    **not reduced throughout the electrical system as they**

THE REPORTING GROUP
Mason & Lockhart

**Page 32**

1     **travel through the electrical conductors, the copper**
2     **conductors. There is very little loss in the copper.**
3        The -- the transmitted energy that is transmitted
4     by the antenna falls off by the square of the radius
5     and the square of the distance away from it, although
6     it can be picked up by the -- by the wiring in the
7     house and then as a passive antenna and follow it
8     along and that -- that RF higher frequency from the
9     transmission of the data can be found in other places
10    in the house that are much -- much reduced intensity.
11       But the transients that are generated by the
12    switch mode power supply are definitely transmitted
13    throughout -- throughout the house and they are not
14    attenuated or they are not reduced or -- because of
15    that --
16 Q  Okay.
17 A  **-- because the -- the electrical wiring that they're**
18    **on is very -- has a very low loss.**
19 Q  Gotcha, thank you. If we go back to Page 4 of your
20    report under the heading RF emissions from the
21    transmitting -- transmitting antennas --
22 A  **Yes, sir.**
23 Q  -- in the middle of that paragraph, you made the
24    statement that emissions from CMP meters can occur
25    often up to 190,000 times a day, and you cite a Sage

THE REPORTING GROUP
Mason & Lockhart

33

1    Associates report in support of that statement.
2       Do you know whether that 190,000 times per day
3    figure actually appears in the Sage Associates report?
4  A  **I don't recall that specifically, no.**
5  Q  I'll tell you, so the Sage Associates report is
6    Exhibit 4, and I ran a search to try to find that
7    figure and couldn't find it, but that may just be my
8    problem.
9       Do you happen to know or did you make any notes
10   about where that figure appears?
11 A  **I don't recall that specifically.**
12 Q  What --
13 A  **I remember read -- I remember reading that somewhere,**
14   **but I -- I don't specifically recall where I saw that.**
15 Q  Do you think that's one of the sentences in your
16   report that might have been provided by someone else?
17 A  **I don't believe that specifically.  I -- I remember**
18   **seeing that figure in a report at some point in time,**
19   **but I don't recall it off the top of my head right**
20   **now.**
21 Q  Okay.
22 A  **And it may have not been cited from that report; it**
23   **may have been a different report.  I -- I'm not**
24   **specifically sure.**
25      I did -- I did look at that Sage report recently,

THE REPORTING GROUP
Mason & Lockhart

34

1    and I -- I agree with you, I don't necessarily recall
2    seeing it in that report.  It may have come from a
3    different report.
4  Q  Are you -- before your involvement in this case, were
5    you familiar with Sage Associates?
6  A  **No, sir, I was not.**
7  Q  How did you come to be familiar with Sage Associates
8    and with this report in particular?
9  A  **I believe the first time I saw that was when I was**
10   **working for the Children's Health Defense.**
11 Q  Where -- and where were you working -- well, let me
12   ask you this.
13      Where and in what regard -- in what connection
14   were you working for Children's Health Defense?
15 A  **I was asked to produce a report or testimony in an**
16   **amicus brief that they were filing.**
17 Q  And was that in connection with the -- the lawsuit
18   that we talked about before, which is cited in
19   Footnote 8 of your report?
20 A  **Yes, sir, it is.**
21 Q  Do you have any information about who actually
22   authored Exhibit 4, the Sage Associates report, what
23   -- what individual or individuals were responsible for
24   its content?
25 A  **Not other than what I saw from their website.  I -- I**

THE REPORTING GROUP
Mason & Lockhart

35

1    **don't know if there's an individual that authored that**
2    **or not.  I don't -- I certainly don't know the**
3    **individual who did, if they did.**
4  Q  Did you rely on the Sage Associates report -- let me
5    -- let me ask you this.  Withdraw that question.
6       I see --
7       THE DEPONENT:  Before you start, Chris, can we
8    take a five-minute break?
9       MR. TAINTOR:  Absolutely.  It's 12:01.  We'll
10   come back in -- yeah, come back in about five or six
11   minutes?
12      THE DEPONENT:  Yeah.
13      MR. TAINTOR:  All right.  Thanks.
14      THE DEPONENT:  Thank you.
15      MR. TAINTOR:  Okay.
16      (A break was taken from 12:03 p.m. to 12:09 p.m.)
17 BY MR. TAINTOR:
18 Q  All right.  Mr. Anderson, are you okay to go?
19 A  **Yes, I am, yes.**
20 Q  Okay.  So I don't remember exactly where we were, but
21   let me go back first to the -- the issue with
22   Mr. Harding.
23      What was it that prompted you, after you had
24   created your report in this case, to connect with
25   Mr. Harding to perform further testing?

THE REPORTING GROUP
Mason & Lockhart

36

1  A  **My understanding that he had the best setup that I was**
2    **aware of to do the testing.**
3  Q  Okay.  And you got that understanding from your prior
4    work in Arizona or from somewhere else?
5  A  **No, from my prior work in Arizona.**
6  Q  So the testing that's described at Page 7 of your
7    report was performed, obviously, before the report was
8    created, but on Landis+Gyr, or Gyr, G-y-r, meter.  And
9    was that the same kind of meter that you used in the
10   testing with the gentleman Paul Harding in Arizona?
11 A  **Yes, the -- the testing that's described there is the**
12   **testing that I had done with Mr. Harding, yes.**
13 Q  I'm sorry, now I'm really confused.  I -- I thought
14   you said -- so the -- oh, I see, okay.  The test --
15   the testing that's described on Page 7 of your report
16   is testing that you had done when you were working on
17   the Arizona case some years before this.
18 A  **That's correct.**
19 Q  And when you went back to Arizona after you generated
20   this report to do the testing over again or slightly
21   differently?
22 A  **I'm actually in Arizona, so I don't have to leave --**
23 Q  Okay.
24 A  **-- if I didn't want to.**
25 Q  I'm sorry, I thought you were in Minnesota.  You're

THE REPORTING GROUP
Mason & Lockhart

37

1  all over the place.
2  A  **Our home office is in Minnesota, that's correct, yes,**
3     **but it's warmer here in Arizona.**
4  Q  Yeah, God bless you, and I see you have the -- the rug
5     behind you, so --
6  A  **Right, right.**
7  Q  Anyway, so -- but -- but leaving that --
8  A  **And God bless you, also.**
9  Q  Listen, I'm cold here, so --
10 A  **Right.**
11 Q  -- I'm -- I'm envious.
12       But the -- regardless of whether you had to
13    travel or not, you had done this testing with
14    Mr. Harding some years ago, and that's the testing
15    that you did that's cited at Page 7 of your report,
16    but after the report was completed, you found
17    Mr. Harding again and performed the same or similar
18    testing?
19 A  **Yes, sir, that's correct.**
20 Q  And so the more recent testing that you've talked
21    about is the testing that you may have notes for or
22    you do have notes for, but you can't scan them today,
23    and we'll get hopefully at some later time.
24       Are there notes or records of the testing you did
25    previously with Mr. Harding that's referred to in your

38

1  report?
2  A  **Yes, sir, there are.**
3  Q  And just to be clear, I know the answer to this, I
4     think, but those haven't been provided either,
5     correct?
6  A  **They have not.**
7  Q  So you -- you told me that you were enlisted to assist
8     with an amicus brief in the Children's Health De --
9     Children's Health Defense case, which was essentially
10    a challenge to an FCC action, correct?
11 A  **You would know more about that than I.**
12 Q  Okay.  And in connection with that -- in connection
13    with the work you did on that case, you were first
14    alerted to the existence of the Sage Associates
15    report, which is Exhibit 4, correct?
16 A  **Yes, sir.**
17 Q  Did you -- did you work with Mr. Friedman on that
18    Children's Health Defense case?
19 A  **No, sir, I was not aware of Mr. Friedman at that time.**
20 Q  Was your first contact with him the September 26th,
21    2021 contact referred to in your report?
22 A  **Yes, sir.**
23 Q  Did you work with Cindy Sage in the Children's Health
24    Defense case?
25 A  **Not that I recall.  That name does not ring a bell.**

39

1       (Dogs barking.)
2  BY MR. TAINTOR:
3  Q  Is that -- is that Mr. Friedman's previously perfectly
4     behaved dog doing that?
5  A  **That's my dogs.**
6  Q  Oh.
7  A  **I -- I apologize.**
8  Q  That's fine, I'm just kidding.
9  A  **That's what happens when you work from home.  Whenever**
10    **somebody walks by the curtain or something like that,**
11    **the dogs go crazy.**
12 Q  It's all good.
13 A  **Thank you, I apologize.**
14 Q  So the -- who -- who brought you into the Children's
15    Health Defense case?
16 A  **I was originally contacted by a woman by the name of**
17    **Dafna.  I don't necessarily recall her last name at**
18    **this point.**
19 Q  Gotcha.  And, I'm sorry, maybe I -- I'm not sure if I
20    asked you this question before we had the
21    interruption, did you work with Cindy Sage in the --
22    in the Children's Health Defense case?
23 A  **I don't -- I don't recall ever speaking with an**
24    **individual by that name.**
25 Q  The Sage Associates report, which is Exhibit 4, is

40

1  cited twice in your report in Footnote 3 and
2  Footnote 7.
3       Footnote 3 is after the sentence that we talked
4  about before, which says that emissions from smart
5  meters are intense and can occur often, up to 190,000
6  times a day, and it's also cited for the proposition
7  that pulsed RF emissions from smart meters exceed the
8  absolute energy output limits stated in the FCC
9  guidelines, if the emissions are not averaged over a
10 30-minute exposure as prescribed by those guidelines.
11      Was it suggested to you by anyone that the Sage
12 Associates report ought to be cited in support of
13 either of those propositions?
14 A  **I don't recall that specifically, but, you know, the**
15    **-- the No. 8, the cite No. 8, that was -- that --**
16    **that came out of the Children's Health Defense, which**
17    **I believe I -- I did read at one point in time, but**
18    **that I believe is where that was generated from.**
19      And, also, some of this information about the
20 190,000 times per day could have been part of that
21 testimony or report or amicus brief that was
22 generated.
23 Q  Okay.  So to go back to my question, I think you said
24    that you don't know whether the references to Sage
25    Associates in Footnotes 3 and 7 were included at the

41

1  suggestion or direction of anyone else; is that
2  correct?
3  A  I think they were part of whatever report was produced
4     with the Children's Health Defense.
5  Q  Okay.  That -- that -- that's a little bit --
6  A  And then that was a -- that was a collaborative
7     effort, clearly, yeah.
8  Q  A collaborative effort with whom?
9  A  With the Children's Health Defense and their attorneys
10    and myself.
11 Q  Okay.  But what I'm trying to get at now is who made
12    the decision that the Sage Associates report ought to
13    be cited at Footnotes 3 and 7 of your report, which is
14    Deposition Exhibit 2?
15 A  Oh, I'm sure I did, or at least I approved it.
16 Q  Okay.
17 A  I mean, there -- there were various iterations of
18    these reports, but, yeah, I -- I proofread it --
19 Q  Okay.  Did --
20 A  -- approved of it, yes.
21 Q  Did someone else actually draft large portions of the
22    report to be proofread by you?
23 A  Not necessarily, no, I -- I started out with a draft
24    and then we discussed it and refined it.
25 Q  Right.  A moment ago, though, you talked about

42

1  proofreading something, and what I want to understand
2  is whether there were large parts, or maybe not even
3  large parts, but substantial parts of Exhibit 2 which
4  were drafted by someone other than yourself to be
5  proofread by you?
6  A  Not necessarily, no.  I -- I did the majority of the
7     drafting, and then there were changes made in the
8     wording and the formatting of it, and then as that
9     occurred, I would go through those and make edits and
10    things like that --
11 Q  Okay.
12 A  -- go from there, until it got to a point where we
13    were all comfortable with it --
14 Q  But --
15 A  -- or I was comfortable with it and they had it in a
16    format that they thought would be acceptable to them.
17    I mean, like these cites, I -- I'm not the best at
18    writing cites, I don't typically cite a lot of
19    documents in my reports, but others do.
20 Q  Hm-hmm.
21 A  You know, I have -- I don't have a problem with that.
22 Q  And I appreciate that, and I'm just really trying to
23    understand how much of this is your work and how much
24    of it is someone else's, and so I'm really trying to
25    understand whether you were, for example, sending

43

1  documents to Mr. Friedman or to his counsel and they
2  were then coming back with new language in them, not
3  just formatting and citations, but actually new
4  substantive language?
5  A  No, I don't think there's any new substantive
6     language, no.
7  Q  Okay.  Did you rely on the Sage Associates report for
8     any propositions other than those for which there are
9     citations in Footnotes 3 and 7?
10 A  I don't know that specifically.  Basically, I got from
11    the Sage report through Sage & Associates was that
12    they found, you know, the RF signal and the -- and
13    where they found it and the magnitude of it and, you
14    know, other various facts, information that they
15    developed during their testing.  I mean, there --
16    there's a number of things in there, but they don't
17    all obviously pertain to my expressed opinions.
18 Q  And did Sage Associates actually perform any testing?
19 A  All I know is what I saw in their report, so I don't
20    know specifically if they performed the testing or
21    not.
22 Q  Well --
23 A  I don't -- I can't tell you who performed the testing
24    unless it's given in the report.
25 Q  Are there any test results reported in the Sage

44

1  Associates report, or is it just a model of what might
2  happen?
3  A  I know there was some modeling in there.  I don't know
4     specifically if they actually did do any testing.  I
5     thought there may have been some testing done within
6     the vicinity, but I -- I don't recall if they were the
7     ones that had described the meters that they used or
8     not.  I'd have to look at it again.
9  Q  Yeah, why don't you do that.  I'm just trying to
10    understand, I -- I think you told me a moment ago that
11    you were aware of some testing results -- or some test
12    results for the Sage Associates report, and I'd just
13    like you to take a look at Exhibit 4 and tell me where
14    those test results appear and how they influenced your
15    report, if at all.
16 A  Well, it does look like this does show that it is
17    computer modeling.
18 Q  So there's no -- there are no test results reflected
19    in Exhibit 4?
20 A  Well, I don't know if there are test results in
21    Exhibit 4, not necessarily.  I mean, there's obviously
22    data given, but there -- they may have done all
23    computer modeling.  That's certainly very possible
24    here.
25 Q  Is the Sage Associates report peer-reviewed?

45

1  A  I don't know that.

2  Q  When you're, as a general proposition, deciding what

3      sort of material it is reasonable for you to rely on

4      in formulating opinions that you're going to testify

5      to under oath in court, do you -- what consideration,

6      if any, do you give to whether or not a resource has

7      been peer-reviewed?

8  A  I don't know that I specifically look towards -- to

9      finding whether it's peer-reviewed or not.

10  Q  So that's not particularly relevant in -- in your

11      mind?

12  A  Well, it certainly has relevancy, sure, but I don't

13      know that I specifically look to a report to find out

14      if it's peer-reviewed or not or that I try to

15      determine whether it's peer-reviewed or not.

16  Q  What's the function of peer-review, as you understand

17      it?

18  A  I suppose it would give others an opportunity to

19      determine whether they agree with it or not.

20  Q  Is it also to, in part, to test the validity and

21      reliability of the conclusions set out in a -- in a

22      study?

23  A  I would expect it is, yes.

24  Q  When you're deciding what weight, if any, to give a

25      resource when you're going to rely on it as any part

THE REPORTING GROUP

Mason & Lockhart

46

1      of the basis for an opinion that you might offer in

2      court, what consideration, if any, do you give to the

3      credentials and qualifications of the person who

4      created the document?

5  A  I don't know that I've specifically looked at that.

6  Q  So just to be clear, the -- as far as the Sage

7      Associates report is concerned, No. 1, you don't know

8      who authored it and what their qualifications are,

9      and, No. 2, you don't know whether it was peer-

10      reviewed, correct?

11  A  I'm not aware of those things, no.

12  Q  Do you know whether that -- that report has been

13      subjected to professional critique in the electric

14      power industry?

15  A  I am not aware of that, no.

16  Q  Have you looked into that at all?

17  A  I have not.

18  Q  Are you familiar with the Electric Power Research

19      Institute?

20  A  I don't recall, no.

21  Q  So when you cited the Sage Associates report for the

22      proposition that pulsed RF emissions exceed the

23      absolute energy output limits as stated in the FCC

24      guidelines if the emissions are not averaged over a

25      30-minute exposure, you were relying, to be clear, you

THE REPORTING GROUP

Mason & Lockhart

47

1      were relying for that statement, at least in part, on

2      the Sage Associates report, correct?

3  A  It's -- it's very possible, yes.  I don't recall that

4      specifically, but I -- I don't know that I rely on

5      that -- solely on that, but I don't recall

6      specifically if there were other instances where I --

7  Q  Well, you cited --

8  A  -- saw that.

9  Q  You cited the Sage Associates report there.  So do you

10      have any understanding of what assumptions the authors

11      of the Sage Associates report made when projecting

12      that pulsed RF emissions would exceed absolute energy

13      output limits stated in the FCC guidelines?

14  A  Not other than what's given in the report.

15  Q  Do you know what assumptions were made regarding the

16      duty cycle of the meters?

17  A  Again, not other than what is given in the report.

18  Q  And what --

19  A  I mean, I --

20  Q  What --

21  A  -- believe there was some cite to that.

22  Q  What -- what --

23  A  There were some data given about that.

24  Q  What -- what were the assumptions made by Sage

25      Associates in the report regarding the duty cycle of

THE REPORTING GROUP

Mason & Lockhart

48

1      the meters?

2  A  Well, I think we'd have to look at that, but I believe

3      there were different duty cycles potentially.

4  Q  Wasn't the assumption a continuous 24-hour duty cycle?

5  A  I believe that may have been one of the assumptions,

6      yes --

7  Q  Were there any other --

8  A  -- as part of the report.  What's that?

9  Q  Nothing, thanks.  Do you know what assumptions were

10      made in the Sage report regarding reflection

11      percentages?

12  A  Not without looking at it, no.  There were some things

13      between 60 percent, a hundred percent, a thousand

14      percent, 2,000 percent, that type of thing I -- I

15      recall.

16  Q  Do you know -- have you ever reviewed the studies

17      cited by Sage as the basis for the 1,000- and 2,000-

18      percent reflection assumptions?

19  A  I have not looked at those studies.

20  Q  At Page 4 of your report, under the heading RF

21      emissions from the transmitting antennas, you wrote

22      from my experience and testing done by others, these

23      meters, meaning smart meters, transmit more times than

24      the electric companies report.

25      What is your experience that you're referring to

THE REPORTING GROUP

Mason & Lockhart

49

1 in that sentence?

2 A **The testing that I did in regards to the Arizona case.**

3 Q So -- and that's the -- the testing described at

4 Page 7 of your report that we don't have the notes

5 for, correct?

6 A **Yes, sir, Page 7.**

7 Q And you're saying that when you did that testing in

8 Arizona, that testing showed that the smart meters you

9 tested transmitted more times than the electric

10 companies report?

11 A **That was my understanding, yes.**

12 Q And would that be reflected in a report that you filed

13 in connection with the Arizona case?

14 A **I don't know that that was specifically brought up in**

15 **that case.**

16 Q Actually, I guess we have that, so why don't we just

17 take a look at it. So I think that's Exhibit 6,

18 Deposition Exhibit 6; do you have that?

19 A **Yes, sir, I do.**

20 Q So does the report that you submitted or the direct

21 testimony you submitted to the Arizona Corporation

22 Commission say anything about the transmission of the

23 smart meters occurring more often than the electric

24 companies report?

25 A **I don't believe it does, no.**

50

1 Q Do you know whether you testified in any form other

2 than Exhibit 6 in the Arizona case?

3 A **What do you mean by that?**

4 Q I'm sorry, did you testify live in person?

5 A **Yes, sir, I did.**

6 Q Did you submit other written testimony besides

7 Exhibit 6 in the Arizona case?

8 A **Not that I'm aware of.**

9 Q And so I just want to understand how it was that your

10 testing in Arizona could have established that the

11 meters in use there transmitted more times than the

12 electric companies reported.

13 Were you actually monitoring or did you actually

14 monitor transmissions from a smart meter that was in

15 use at a residence in connection with the Arizona

16 case?

17 A **Yes, sir, I did.**

18 Q And so your records of that work would show that you

19 determined that the transmissions you measured and

20 observed actually exceeded those that were reported by

21 the electric company in Arizona; am I understanding

22 you correctly?

23 A **The -- the testing that I did showed that the meter**

24 **transmitted regularly. It -- it was cycling on and**

25 **off as we were testing it, so that's -- that's my**

51

1 recollection of it.

2 Q And I want to -- and maybe I'm just not understanding

3 this, and that's my fault, obviously not yours, I want

4 to distinguish between your observation and

5 measurement versus testing.

6 I assume that if you're testing a smart meter,

7 you've got, you know, for example, a -- I think you

8 had it set up for your testing in Exhibit 6, right?

9 A **Yes.**

10 Q And it shows -- it shows you've got the smart meter

11 hooked up in a basement somewhere; is that right?

12 A **Yes, that -- that is an overall view of the test**

13 **setup.**

14 Q Okay. And is that a -- was that an operating smart

15 meter in the sense that it was a meter that had been

16 installed by a power company to measure electricity

17 usage in a home, or was that a -- or was that a device

18 that you and Mr. Harding had that was not actually

19 measuring usage in a home?

20 A **This was the device under test or the unit under test.**

21 **It was not at that time something that was installed**

22 **by the power company.**

23 Q So how could you measure -- how could you determine,

24 based on that test, that that meter was transmitting

25 more times than the electrical company reported that

52

1 it would or should?

2 A **Well, during that testing, the meter cycled regularly,**

3 **and it's my understanding that it wouldn't -- it**

4 **wouldn't cycle that often according to the power**

5 **company.**

6 Q Okay.

7 A **It just showed to me that it cycled repeatedly.**

8 Q Okay. And -- and for my edification, when you say it

9 cycled, what was it doing?

10 A **It was -- it was transmitting --**

11 Q Transmitting --

12 A **-- information.**

13 Q Transmitting to what?

14 A **To whatever it could find or just transmitting.**

15 Q You also said that, in addition to your experience,

16 you were aware of testing done by others which showed

17 that meters transmit more times than the electric

18 companies report.

19 What was that testing done by others? Who -- who

20 were the others who did that testing?

21 A **I believe that was given in some of the reports that I**

22 **had read in regards to this assumption. I don't know**

23 **specifically which one they are right now, but I do**

24 **recall reading it.**

25 Q You -- you recall reading that in connection with the

53

1    Arizona case?
2  A  **I don't know that I did necessarily with the Arizona**
3     **case, but with the Children's Health Defund --**
4     **Defense --**
5  Q  Gotcha.
6  A  **-- Children's Health Defense.**
7  Q  Yeah.  Then you relied or you cited a report created
8     by an organization called Isotrope Wireless?
9  A  **Yes, sir.**
10 Q  And that was a study, I think, of electric meters and
11    water meters in three different homes in New York; is
12    that correct?
13 A  **That sounds correct, yes.**
14 Q  And in that particular environment with those
15    particular meters, Isotrope determined that RF
16    emissions from smart meters' transmitting antennas
17    could be detected in different portions of those
18    homes, correct?
19 A  **I believe so, yes.**
20 Q  When you said in your report that the emissions from
21    the smart meters were well above ambient RF radiation
22    levels, what did you mean by the term ambient?
23 A  **Ambient would be the surrounding areas.**
24 Q  So --
25 A  **Such that you -- if you took a reading, an ambient**

THE REPORTING GROUP
Mason & Lockhart

54

1     **reading would be kind of a baseline reading.**
2  Q  Okay.  So if you're --
3  A  **Go ahead.**
4  Q  Oh, I'm sorry, I didn't mean to interrupt you, go
5     ahead.
6  A  **I'm just trying to give you a -- my interpretation or**
7     **definition of ambient.  Like if you want an ambient**
8     **temperature of something, you would take the**
9     **temperature of the room; that's -- that's the same**
10    **thing as -- or that's what ambient is.**
11 Q  Okay.  Well, in a situation where you're talking about
12    RF emissions being detectable at levels above ambient
13    RF radiation levels, is that -- am I correct in
14    understanding that that is simply saying that there
15    are different levels of RF emissions detectable within
16    a given room in a home?
17 A  **Well, I would expect there could be, yes.**
18 Q  Do you think that's what that's -- I mean, is that
19    what you intended to communicate by that sentence?  So
20    let me ask you the question differently.  I'm -- I'm
21    sure I'm being obtuse here, and I apologize.
22       I'm trying to understand whether, when you talk
23    about ambient RF levels, you're talking about in the
24    environment as a whole, throughout the house, or in
25    the room where the measurements are being conducted.

THE REPORTING GROUP
Mason & Lockhart

55

1     So -- so I can't tell whether, for example, you mean
2     to say that the Isotrope report found that there were
3     some measurable levels in a particular room of a house
4     that were greater than the RF levels outdoors, or
5     whether there were detectable levels in a given room
6     that were -- were different from the levels detected
7     in a different room, or if there were different levels
8     within a room.
9        Do you understand my confusion and what I'm
10    trying to get at?
11 A  **Yeah, I understand what you're trying to ask, yes, and**
12    **I don't know that I can answer that for you.  There**
13    **are -- there are probably different levels of ambient**
14    **to different areas, possibly.**
15       **An ambient measurement is a measurement of what's**
16    **in the environment, and then whatever's above ambient**
17    **is something that's greater than what's in the**
18    **surrounding environment.**
19 Q  And so I guess that -- that -- maybe that puts a finer
20    point on my question.  Is -- in the -- as the Isotrope
21    report used that term, was the environment like the
22    world at large, was the environment the house, or was
23    the environment the room, or is it something else?
24 A  **I don't know that.  I mean, we could look at the**
25    **report and maybe they specify that, or maybe they**

THE REPORTING GROUP
Mason & Lockhart

56

1     don't; I don't know.
2  Q  All right.  We'll do that later.
3        Would you have any basis for disputing the
4     finding made in connection with the Maine Public
5     Utilities Commission case that CMP smart meters
6     produce emissions significantly below the maximum
7     power density exposure levels as outlined by the
8     Federal Communications Commission?
9  A  **I haven't looked into that.  I don't know that I can**
10    **opine on that.**
11 Q  And you understand -- are you familiar with the -- the
12    power density standards established by the FCC?
13 A  **To a certain extent.**
14 Q  Are you aware that they are established for continuous
15    exposure?
16 A  **I would expect they are.**
17 Q  Are you aware that the FCC regulations explicitly
18    permit emissions at levels which exceed 1 milliwatt
19    per square centimeter for shorter exposure times, so
20    long as they do not exceed that level if they're
21    averaged over 30 minutes?
22 A  **I have no reason to doubt that.**
23 Q  Just hold on one second, let me find a document, if I
24    can.
25       Have you ever conducted a study similar to the

THE REPORTING GROUP
Mason & Lockhart

57

1  Isotope study to determine levels of radio frequency
2  signal within different parts of a residence?
3  A  No, I have not.
4  Q  Have you ever reviewed any similar studies?
5  A  Well, I may have.  I don't recall specifically, but I
6     very well could have.
7  Q  You don't remember, though.
8  A  I don't remember off the top of my head, no.
9  Q  Do you know whether the Isotrope study has been
10    replicated?
11 A  I don't know that, no.
12 Q  Do you know whether it can be replicated based on the
13    data contained in the report?
14 A  I have not tried to replicate it, and I don't know of
15    anybody who has.
16 Q  Do you know whether it can be replicated?
17 A  I would expect you can do that testing, yes.  I'm sure
18    you can replicate the testing.  I don't know if you
19    can replicate the data, but you can replicate the
20    testing, yes.
21    MR. TAINTOR:  I apologize, I somehow ended up in
22    this room without the Isotrope report, and so I am
23    going to take about two minutes and go print off
24    another copy.
25    THE DEPONENT:  All right.
   THE REPORTING GROUP
   Mason & Lockhart

58

1     MR. TAINTOR:  Apologize, I'll be right back.
2     THE DEPONENT:  No problem.
3     (A brief break was taken followed by an
4     off-the-record discussion.)
5  BY MR. TAINTOR:
6  Q  So I want to ask you about the Isotrope report.  Do
7     you have that in front of you?
8  A  Yes, sir, I do.
9  Q  Okay.  So I want to just ask you, what -- to take a
10    look at Page 13 and ask you what this tells us
11    about --
12 A  Okay.
13 Q  -- about the measurements made by Isotrope within the
14    various residences, I think three residences, in New
15    York where they measured radio frequency signal.
16    So are you -- first of all, do you see the table
17    there on Page 13?
18 A  Yes, sir, I do.
19 Q  Are these -- are the devices that are identified there
20    devices you're familiar with?
21 A  I certainly understand what a spectrum analyzer is.  I
22    have not used the Hf35-c, but that -- that I'm not --
23    that I have not used.
24 Q  So where it talks about measurements -- so there are
25    -- there are two measurements for -- of exposure
   THE REPORTING GROUP
   Mason & Lockhart

59

1  levels inside occupied spaces, one by spectrum
2  analyzer and one by this other device, the Hf35-c.
3     What do those -- what do those measurements mean?
4  What do they tell us about, for example, how the
5  exposure levels within those occupied spaces compare
6  to the FCC standards for radio frequency power
7  density?
8  A  I don't know that I can answer that for you.  I can
9     see the measurements that they're giving, but I can't
10    quote you what the FCC standards are.
11 Q  I think -- as I recall, I -- I could be wrong, I think
12    it's one milliwatt per centimeter squared.  If that's
13    -- if that's correct, how do these measurements
14    correspond or compare to that standard?
15 A  Well, it -- it appears from the chart that these are
16    given in decibel milliwatts per centimeter squared,
17    and then there's an asterisk that says that the use of
18    decibels makes it easier to present data over a wide
19    and variable range, the more negative the number, the
20    -- the dB, the weaker the signal, so that gives you a
21    -- at least some idea of the magnitude.  But --
22 Q  Well, it -- it might give you an idea, but it doesn't
23    give me much of one, so I'm looking for your
24    explanation.
25 A  Well, what I'm saying is that -- and what they're --
   THE REPORTING GROUP
   Mason & Lockhart

60

1  what they're stating in the report is that negative
2  20 dB$_{mW}$ per centimeter squared is 1/100th of a
3  milliwatt per square meter, which they're saying is
4  .001 milliwatts per square centimeter.
5  Q  Okay.
6  A  So I mean, that's what they're giving in the report.
7     I have not converted watts per square centimeters to
8     decibels for -- decibel, you know, milliwatts per
9     centimeter squared.
10 Q  Okay.  Would you -- would you characterize the power
11    densities described in Table 1 at Page 13 of the
12    Isotrope report as intense exposures, as you use that
13    term in your report?
14 A  I haven't made that distinction, no.
15 Q  I'm sorry?
16 A  I haven't made that -- I have not come to that opinion
17    or analyzed it in that respect, no.
18 Q  And the reason I'm asking is I think if you go back to
19    -- and you don't necessarily need to open this up if
20    you don't want to, I'm sure you remember what it said
21    as you wrote that smart meters create intense exposure
22    to pulsed radio frequencies in a few ways, and then
23    one of those ways was by RF entering the house's
24    electrical system, and that's described at Pages 4 and
25    5 of your report, and you specifically cited the
   THE REPORTING GROUP
   Mason & Lockhart

61

1   Isotope report in support of that proposition.
2       So what I'm trying to understand is whether, in
3   fact, the Isotrope testing shows what you
4   characterized in your report at Page 3 as intense
5   exposures in other rooms of the house as a result of
6   RF entering the house's electrical system.
7   A   Well, I think this is definitely in support of that
8       opinion in regards to they were able to find it in
9       other parts of the house --
10  Q   Okay.
11  A   -- and that it shows that it does radiate into the
12      house, and this was one of the ways that the RF gets
13      into the house.
14  Q   Right.  And what I'm trying --
15  A   The only other --
16  Q   -- to --
17  A   The only other ways are with the switch mode power
18      supply, obviously, also --
19  Q   What I'm --
20  A   -- but this is one of the ways.
21  Q   What I'm trying to understand is whether the exposures
22      described in Table 1 at Page 13 are exposures you
23      would describe as intense.
24  A   I haven't come to that opinion.
25  Q   I'm sorry?

62

1   A   I have not come to that opinion at this time.
2   Q   Would you say they are not intense, as you use that
3       term in your report?
4   A   Again, I -- I haven't -- I wouldn't take this data, in
5       and of itself, to describe whether they're intense or
6       not.  I would have to take a closer look at that.
7   Q   Well, the Isotrope data is the only data you cited at
8       Pages 4 and 5 of your report as support for the
9       proposition that RF from wireless antennas enter the
10      house's electrical system; would you agree with that?
11  A   That -- that's true, I -- those were the only cites I
12      used.  I could have cited many other things, but I
13      only chose this one.
14  Q   Well, you say you could have cited many others, but I
15      -- I asked you before whether you had performed
16      similar testing and whether you were -- were aware of
17      other testing similar to the Isotrope tests, and I --
18      I thought you said you had not done any testing like
19      that and you were not aware of any; am I wrong about
20      that?
21  A   Well, you're just talking about the -- the tests from
22      the equivalent plane wave, you know.  There -- there
23      are other RF frequencies that are distributed
24      throughout the house and through the wiring that have
25      been tested and I have cited in other areas, but this

63

1   is just one of them that I cite for this particular
2   instance.  The -- the switch mode power supply creates
3   RF and that is distributed throughout the house,
4   also --
5   Q   Okay.
6   A   -- particularly when it's transmitting because when it
7       transmits, it requires more power.
8   Q   Okay.  There's a discussion in the Isotrope report of
9       the phenomenon known as reradiation and, specifically,
10      reradiation by appliances within a home; do you know
11      what I'm talking about?
12  A   Yes, sir, I am.
13  Q   Just to be clear, that reradiation can never enhance
14      or increase the RF signal, correct?
15  A   That's correct, that's my understanding.
16  Q   And the Isotrope report showed that reradiation
17      occurred differently in different -- the three
18      different houses that Isotrope studied, correct?
19  A   I would expect that's true.
20  Q   And why would you expect that's true?
21  A   Just by the various configuration of different houses.
22  Q   There's no indication in the Isotrope report, is
23      there, that there was RF signal exceeding the FCC
24      standard in any of the houses Isotrope studied?
25  A   I don't know that specifically, but I -- I have

64

1   nothing to believe that it -- that it did not.  I'd
2   expect that it more than likely did.
3   Q   You expect, I'm sorry, you expect that there was RF
4       signal exceeding FCC standards in these three houses?
5   A   No, I -- I expect that it did not exceed the FCC
6       standard.
7   Q   Okay.  And I want to ask you, I know we're getting
8       fairly close to the time we need to finish up, but the
9       -- the term dirty electricity is not a technical term,
10      is it?
11  A   I would say it's probably not a very technical term.
12      It's a descriptor.
13  Q   It's a descriptor of high-frequency voltage
14      transients?
15  A   It can include that, yes.
16  Q   And what else does it include?
17  A   It can include harmonics; it can include electr --
18      lightning; it can include -- it can include any number
19      of things.
20  Q   Okay.  And why -- what is, as a descriptor, what is it
21      about the electricity that, in your mind, makes the
22      adjective dirty an appropriate adjective to apply to
23      electricity?
24  A   The fact that it's not clean; it's the opposite of
25      clean, basically.  If you have a clean sine wave of

65

1    60-hertz, when you look at it with a -- some type of
2    measuring or metering equipment, you'll see that it
3    has a nice clean line, it has nothing riding on it, it
4    has no spikes, or it's a -- it doesn't have any other
5    frequencies other than the 60-hertz signal.
6        So the opposite of that does have a number of
7    other signals on it or waveforms that are of high --
8    typically of a higher frequency that you can see on
9    the waveform, which causes the 60-hertz signal or the
10   60-hertz sine wave to become distorted.  And so
11   instead of being a clean waveform, it becomes somewhat
12   less clean and distorted.
13       And, you know, a term that has been used is -- is
14   that it's a -- a dirty waveform.
15  Q  As that term is used by yourself as an electrical
16   engineer, it has no connotation for human health,
17   correct?
18  A  Not that I'm aware.
19       (Dogs barking.)
20  BY MR. TAINTOR:
21  Q  Someone else -- someone else wants to ask questions
22   apparently.
23  A  The dogs are like, come on, man, we've got to go here,
24   we're not -- we're not taking all day at this.
25  Q  That's your -- that's your one o'clock -- two o'clock

66

1    appointment I guess, huh?
2   A  Yeah, right, every hour there's an appointment for
3    those dogs; they need a lot of attention.
4   Q  I hear you.
5        So going back to, first of all, the -- the method
6    by which your report was drafted, were there initially
7    any citations in the report, or were those all added
8    either by others or at the suggestion of others?
9   A  Well, some of the citations were part of the report
10   that was put together for the Children's Health
11   Defense, and -- and some of those citations then were
12   suggested by others, yes.
13  Q  Okay.
14  A  Yes.
15  Q  And those others being either Mr. Friedman or his
16   counsel?
17  A  Ah, I -- I don't know specifically if Mr. Friedman or
18   his coun -- I believe they did have some input as to
19   where to put citations in, yes, yeah.
20  Q  What does it mean when you say in your report that
21   smart meters rely on AC for some of the nonelectronic
22   functions they perform?
23  A  Well, I believe that -- that there may be some
24   electronic functions in there that are not necessarily
25   designed for the -- the radio frequency signaling.  I

67

1    haven't totally analyzed the circuit for the smart
2    meter, but part of what the AC is for is driving the
3    converter to cause it to go to DC, and I am not
4    specifically aware of which components may be run by
5    the AC portion of that, but there -- there may be
6    some.
7   Q  Okay, thanks.  Deposition Exhibit 13 is your up-to-
8    date, ordinarily up-to-date invoice for all the work
9    that you've done in connection with your -- this
10   lawsuit; is that correct?
11  A  Yes, sir.
12  Q  I take it you may have reviewed some materials in
13   preparation for today's deposition; is that right?
14  A  Yes, sir, I have.
15  Q  Exhibit 7 is an article from Forbes magazine about EMI
16   shielding technology.
17       Am I correct in assuming that that's included
18   just as a reference to essentially support your
19   statement that EMI shielding can be performed at
20   relatively modest cost?
21  A  Yes, sir, it is.
22  Q  Exhibit 11 is an article by William Bathgate from
23   October 2016, and Exhibit 5 is some testimony provided
24   by Mr. Bathgate in connection with a -- some
25   litigation in the state of Pennsylvania.

68

1        Do you know Mr. Bathgate?
2   A  No, sir, I do not.
3   Q  Were these documents provided to you by Mr. Friedman?
4   A  Either through him or through the Children's Defense.
5   Q  Do you know which?
6   A  It may have -- it may have been both; I don't know.
7   Q  What significance, if any, did Mr. Bathgate's article,
8    Exhibit 7, have in you formulating your opinions in
9    this case?
10  A  Which one was 7?
11  Q  I'm sorry, 11, the --
12  A  Or 11?
13  Q  -- the article.  It's called Electrical engineer:  The
14   meter itself is the hazardous condition.
15  A  I -- I think that had to do with grounding issues as
16   far as I was concerned --
17  Q  Okay.
18  A  -- or trying to mitigate the -- the effects of the
19   smart meter adversely affecting the 60-hertz sine
20   wave, and potentially grounding or some form of
21   limiting that with the help of grounding would --
22   would be appropriate or could be used as a way to
23   mitigate the amount of transients that were produced
24   on the system.
25  Q  But you've not collaborated with Mr. Bathgate in any

69

1  litigation before?
2  A  I have not.
3  Q  And what about Exhibit 5, his testimony, what -- what
4     was the significance of that in your -- forming your
5     opinions in this case?
6  A  **From that testimony, I -- or that document, I think**
7     **mainly was that his testing showed that the -- the GE**
8     **or Alcara smart meter generated RF when it was**
9     **transmitting.**
10 Q  Is that pretty much all that that testimony meant to
11    you in -- in formulating your opinions?
12 A  **That was the gist of it, I think.  I mean, there --**
13    **there are other things in that I may or may not**
14    **agree with, but that -- that was what I believe I was**
15    **using it for.**
16 Q  Okay.  I'm just looking through your testimonial
17    history quickly, and it doesn't look like you've ever
18    testified in a court in Maine before; am I correct
19    about that?
20 A  **I don't recall ever testifying in Maine.**
21       MR. TAINTOR:  So it's 1:25.  Let me do this.  I
22    may be done.  I'd just like to have a conversation
23    with my client, so I'm going to put myself on mute, go
24    into another room and have a quick call, and I'll be
25    back in about five minutes, and we can hopefully

70

1  finish this up.
2       MR. LANSER:  Sounds good.
3       (A break was taken from 1:27 p.m. to 1:34 p.m.)
4  BY MR. TAINTOR:
5  Q  Mr. Anderson, are you ready to go?
6  A  **Yes, sir.**
7  Q  Finish up, at least for today for sure.
8       Has your testimony ever been excluded when it was
9     proffered by a party in a case, to your knowledge?
10 A  **It has not that I know of.**
11 Q  Do you know whether there have been motions to exclude
12    your testimony in any cases you've been involved in?
13 A  **Oh, absolutely, yes.**
14 Q  Are you able to identify, in particular by reference
15    to Exhibit 12, the cases in which motions of that kind
16    have been filed?
17 A  **No, sir, I -- I do not.**
18 Q  I just want to ask you a few questions about
19    Exhibit 13.  It looks like your initial conversation
20    about the case was solely with Mr. Friedman and not
21    his counsel.  Can you tell me what -- or would you
22    please tell me what you can recall about that
23    conversation?
24 A  **I believe Mr. Friedman discussed with me what he was**
25    **looking for an expert.  He discussed that he was**

71

1  **working to not have a smart meter on his house from**
2  **the power company there.  I believe he discussed with**
3  **me that he was ill and that he felt that it was in his**
4  **best interest not to have a smart meter on his house.**
5  **I think those -- those were the pertinent issues.**
6     We may have discussed some of the individuals
7  that we knew about or that we had -- you know, I
8  believe he may have found my name through the work --
9  or the -- the Arizona case, I think we may have
10 discussed that a little bit.
11 Q  Do you have notes of that conversation?
12 A  **I believe I do, yes.**
13 Q  It looks like on November 15th, you had another
14    conversation with Mr. Friedman that did not involve
15    his counsel.  Do you recall what that discussion
16    entailed?
17 A  **Yes, I believe we discussed the report and some of the**
18    **ways that we could maybe clean it up or be more**
19    **precise or flesh out some additional ideas, things**
20    **like that.**
21 Q  All right.  Do you have notes of that -- of that
22    conversation?
23 A  **I believe I do, yeah.**
24 Q  Were there any other phone conversations or Zoom
25    conversations that you recall having with Mr. Friedman

72

1  that did not involve his counsel besides those two?
2  A  **Yes, we had a discussion some time after this invoice**
3     **was sent to him.**
4  Q  Okay.  Was that about the invoice --
5  A  **Yes, sir.**
6  Q  -- or about --
7  A  **Yes, sir, it was.**
8  Q  Okay.  Was he objecting to what you had charged?
9  A  **Ah, I don't know if he was objecting or not.  He**
10    **sounded -- he seemed a little shocked.**
11 Q  Lawyers get that a lot, too, not just --
12 A  **So I'm not -- I'm not the lone ranger here, huh?**
13 Q  No, no, this is -- this is -- no, this is nice.
14    Do you have e-mail traffic with Mr. Friedman that
15    does not include his lawyers?
16 A  **I -- I don't know; I may.**
17       MR. TAINTOR:  If you -- I'd like to ask you to
18    produce the notes of your -- well, and, obviously,
19    Mr. Lanser's going to weigh in on this, but I'd like
20    to ask you to produce the notes of your two phone
21    calls with -- or -- or three phone calls with
22    Mr. Friedman, as well as any e-mail correspondence
23    that you may have had with him, and we'll figure that
24    out after this, and -- and I'll also look forward to
25    getting the, you know, the notes pertaining to the

73

1  testing that was done with the fellow in Arizona whose
2  name I can never remember -- Harding.
3       And with that, I think we will leave it for
4  today.  So thank you very much for your time and go
5  take your dogs for a walk.
6       THE DEPONENT:  Thank you, Chris, I appreciate it.
7       MR. LANSER:  Chris, Chris, I do -- I do have some
8  -- a few --
9       MR. TAINTOR:  Oh.
10      MR. LANSER:  -- follow-up questions, if that's
11  all right?
12      MR. TAINTOR:  Sure, oh, yeah.
13      MR. LANSER:  Unless -- unless you are -- if we're
14  certain he's coming back for more and you want to
15  continue your direct, but I mean, without having seen
16  the -- the notes, you know, I don't want to miss an
17  opportunity to -- to clarify some things.
18      MR. TAINTOR:  Yeah, sure.
19      MR. LANSER:  Great.
20              EXAMINATION
21  BY MR. LANSER:
22  Q   So where was this here?  So -- so speaking of the --
23      the Paul Harding testing, I just wanted to clarify a
24      couple things.
25       I know with the second testing you did with
              THE REPORTING GROUP
              Mason & Lockhart

74

1  Harding after this report was written, did that
2  testing produce any contradictions to your original
3  testing that the report was based off of?
4  A   No, it did not.
5  Q   Okay.  If there had been any -- any differences,
6  whether or not it was a true contradiction or
7  anything, was there any differences you noticed
8  between the testing previous to writing the report and
9  the testing after you wrote the report?
10 A   No, I don't believe so.
11 Q   Okay.  If it had produced any contradictions or there
12  had been any differences in the -- in -- in the
13  testing, is that something you would have included in
14  an update to the report?
15 A   Well, I don't know if I would have or not, but we
16  certainly would have discussed it here I'm sure.
17 Q   But there weren't any differences, so we didn't get to
18  that, you didn't have to make that decision of whether
19  or not to update your report, the -- the testing was
20  substantively the same?
21 A   That's correct, yes.
22 Q   Okay.  And also regarding the report itself, you said
23  a little bit ago that Mr. Friedman or his counsel had
24  -- I think your -- and I don't know if I have the
25  exact language right, but I think it was something
              THE REPORTING GROUP
              Mason & Lockhart

75

1  along the lines of you said they had some input on
2  where to put citations; does that sound like your
3  testimony?
4  A   Yes.
5  Q   Did that input -- did that include which specific
6  documents to cite to or just suggestions, you know,
7  that a citation could be helpful?
8  A   A suggestion that you could maybe cite the document at
9  this location or another location or something like
10  that.
11 Q   Okay.  And one other clarification from earlier, there
12  was some discussion regarding other appliances or
13  devices that also create transients, correct?
14 A   That's correct, yes.
15 Q   All right.  Is there any difference in the manner in
16  which transients are created or -- or are transmitted
17  between those devices and smart meters?
18 A   Is there a difference between the way they're
19  transmitted?  Well, the -- the transients that are
20  transmitted by the smart meters are throughout the
21  entire house, basically.  Those that are transmitted
22  by devices are typically more at the source of the
23  device, although some of that also can be on the
24  entire electrical system.
25 Q   Okay.  And is there a difference in that context
              THE REPORTING GROUP
              Mason & Lockhart

76

1  between, I think, what -- what's referred to in -- in
2  reports as linear versus nonlinear?
3  A   Linear and nonlinear what?
4  Q   Let me see if I have this language.  I believe I saw
5  somewhere -- I'm sorry, I should have done this.  I
6  don't have the exact language in front of me, but I
7  recall some discussion about linear versus nonlinear
8  transmissions.  Does that ring a bell at all?  I might
9  be off-base.
10 A   I don't -- I don't recall that.
11 Q   Okay.  Do you know of any -- is there a -- is there
12  any manner in which an individual could turn off their
13  -- the emissions from their smart meter at the -- at
14  the source in their home?
15 A   That -- not that I'm aware of.
16 Q   Okay.  And what about for other devices, is there any
17  way to shield or turn off those transients?
18 A   Yes, you can control those and determine whether you
19  want to use them or not or if you want to filter out
20  their RF or transients.
21 Q   Okay.  So that's one difference between some of the
22  other appliances you discussed and the smart meters is
23  that with those other appliances, you can -- you can
24  control the effect of those emissions or the amount of
25  those emissions in your home, but smart meters you
              THE REPORTING GROUP
              Mason & Lockhart

77

1     cannot; is that fair to say?

2  A   **Yes, that's correct.**

3         MR. LANSER:  All right.  I think that's all the

4     -- the follow-up I have right now.

5         MR. TAINTOR:  Okay.  So I -- I probably should

6     follow up on a couple things then.

7               EXAMINATION

8  BY MR. TAINTOR:

9  Q   So, Mr. Anderson, I'm sure I'll paraphrase this wrong,

10    but I think -- what I thought I heard you say in

11    response to one of Mr. Lanser's questions was that

12    there is -- one of the distinctions between transients

13    created by a smart meter and transients created by

14    appliances is that the transients generated by the

15    smart meters propagate throughout the house, whereas

16    the transients prop -- generated by the -- the

17    appliances sort of remain in proximity to the

18    appliances; did I understand you correctly?

19  A   **Not completely, no.  I mean, other devices in the**

20    **house cause transients on the system also, but the RF**

21    **generators, like through your monitor or something, is**

22    **at the monitor for the most part other than the**

23    **switching transients that are potentially in the -- in**

24    **the power supply of that type of device, or you can --**

25    **you can mitigate those transients at the source, at**

78

1    **the source of the appliance, such that it does not**

2    **propagate throughout the rest of the house.**

3      So there -- there is either a choice of not using

4    that appliance, or whatever, if you believe it is

5    causing harmful effects to you or to try and mitigate

6    the effects of that appliance at the appliance or get

7    a different type of appliance-type thing.

8      It's similar to when you have surge suppression

9    on a -- well, it's a relocatable power tap or an

10    outlet strip is what it's commonly called type of

11    thing.  Those are the kinds of things that you can do

12    inside your house that is more, oh, onerous or

13    difficult to do with a smart meter given its current

14    configuration.

15  Q   Focusing on the issue of the transients, is another --

16    another word for transients noise?  Is that a -- a

17    term that elec -- electrical engineers use to describe

18    these transients?

19  A   **Yes, that -- that is something that you can -- another**

20    **way to describe it.  Noise can be something like**

21    **that's always present on your system, causing it to be**

22    **what they would call a noisy system.**

23      Transients, by definition, are something that are

24    very short in duration and time, and that's why you

25    call it a transient --

79

1  Q   Gotcha.

2  A   **-- because it only shows up for a very short period of**

3    **time.  The -- the spike on -- on the waveform rises**

4    **very quickly and then goes -- you know, decreases very**

5    **quickly, and it's just a short little spike transient**

6    **which causes -- you know, if you get multitudes of**

7    **those, then they have a specific frequency that**

8    **they're associated with --**

9  Q   Okay.

10  A   **-- so --**

11  Q   So I shouldn't have taken us down that side road, I

12    didn't mean to, but what I thought I understood you to

13    say from your previous testimony when I was asking you

14    questions before was that once the transients are on

15    the system from the -- once they're created by the

16    smart meter, they stay on the system as the wave

17    propagates throughout the house; is that true?

18  A   **That's correct, those transients are throughout the**

19    **house on the system, yes.**

20  Q   And would that also be true for the transients created

21    by the appliances?

22  A   **To a certain extent, but they're at the load end.  So**

23    **you can -- you can look at it like those transients**

24    **are created at that location and they're reflected**

25    **back onto the system, there's no doubt about that, but**

80

1    **at that -- they're at the -- they're where the power's**

2    **being utilized and they're transmitting at that**

3    **location, and it's going no further than that, they're**

4    **not going further downstream --**

5  Q   Hm-hmm.

6  A   **-- basically.  But, yes, they're -- those transients**

7    **are on the system, also.**

8  Q   But once they're reflected back, again, I'm going to

9    display my ignorance to this stuff, but once they're

10    reflected back into the system, don't they travel

11    throughout the system in the house's wiring system?

12  A   **To a certain extent, they do, yes.**

13  Q   And then the -- the mitigation measures that you're

14    talking about that you can use for appliances, for

15    example, include things like surge suppressors you

16    said?

17  A   **Yes, sir.**

18  Q   Anything else in particular that you had mentioned?

19  A   **You can -- well, the surge suppression is all**

20    **encompassing.  So there's different ways to perform**

21    **surge suppression.**

22  Q   Okay.  So even though that's a term we might use for

23    that -- the power strip, it's actually a broader term.

24  A   **Surge suppression is a much broader term, and there**

25    **are many ways to suppress surges, yes.**

81

1    MR. TAINTOR:  Gotcha, okay.  All right.  Thank

2  you very much for your time, sir.

3    THE DEPONENT:  Thank you, Chris, I really

4  appreciate it.

5    MR. TAINTOR:  Are you all set, Dave?

6    MR. LANSER:  Yep, all set over here, thanks.

7    MR. TAINTOR:  Great, I'll just look forward to

8  getting that information from you, Mr. Anderson, and

9  we can figure out whether we have to come back another

10  day, hopefully not.

11    THE DEPONENT:  All right, great.

12    (The deposition concluded at 1:54 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

THE REPORTING GROUP
Mason & Lockhart

---

82

1    CERTIFICATE

2    I, Julie G. Edgecomb, a Notary Public in and for

3  the State of Maine, hereby certify that the within-in

4  named deponent was sworn to testify the truth, the

5  whole truth, and nothing but the truth, in the

6  aforementioned cause of action.

7    I further certify that this deposition was

8  stenographically reported by me and later reduced to

9  print through Computer-Aided Transcription, and the

10  foregoing is a full and true record of the testimony

11  given by the deponent.

12    I further certify that I am a disinterested

13  person in the event or outcome of the above-named

14  cause of action.

15    IN WITNESS WHEREOF, I subscribe my hand this

16  8th day of February, 2022.  Dated at Brewer, Maine.

17

18

19

20  /s/ Julie G. Edgecomb

Notary Public

21

22  My Commission Expires

23  July 19, 2023.

24

25

THE REPORTING GROUP
Mason & Lockhart

---

83

1    SIGNATURE PAGE

2    I, ERIK S. ANDERSON, P.E., have read the
foregoing pages of my transcript or have had the
3  foregoing pages of my testimony read to me and have
noted any changes in form or substance of my
4  testimony, together with their respective corrections
and the reasons therefore, on the following errata
5  sheet(s).

6

7    _____
ERIK S. ANDERSON, P.E.

8

9    _____
(Date)

10

11

12  ******************************************************

13  TO BE COMPLETED BY NOTARY PUBLIC OR ATTORNEY:

14    I, _____, a Notary
Public/Attorney in and for the State of Maine, hereby
15  acknowledge that the above-named witness personally
appeared before me, swore to the truth of the
16  foregoing statements and affixed his/her signature
above as his/her true act and deed.

17

18    _____
(Date)

19

20  My Commission Expires:

21

22

23

24

25

THE REPORTING GROUP
Mason & Lockhart

---

84

1    ERRATA SHEET INSTRUCTIONS

2    Please note on the errata sheet below any changes
in form or substance to your testimony contained in
3  your deposition transcript.  For each change, list the
page and line number, the words you wish to change,
4  the change, and the reason for the change; ex: typo,
wrong word, word omitted, etc.  Be sure to sign the
5  errata sheet.  You must also sign the signature page
and have it notarized.  Please return the errata sheet
6  and signature page to the attorney mentioned on the
cover letter.

7

8  _____

9  Page/Line:  Words to Change:  Changed to:  Reason:
_____

10

11

12

13

14

15

16

17

18

19

20

21

22    _____
Signature of Deponent

23

24

25

THE REPORTING GROUP
Mason & Lockhart

1        THE REPORTING GROUP
          P.O. Box 404
2        Springvale, ME  04083
          (207) 281-4230
3        thereportinggroupmaine@gmail.com

4

5    February 8, 2022

6

7    Re:  ED FRIEDMAN v. CENTRAL MAINE POWER COMPANY

8    Deposition of:  ERIK S. ANDERSON, P.E.

9

10        **INSTRUCTIONS FOR READING & SIGNING TRANSCRIPT**

      Enclosed please find a copy of your deposition taken
11    on January 26, 2022, in the above-referenced matter.
      Within thirty (30) days, please read the transcript,
12    indicating any errors on the enclosed errata sheet,
      and sign the signature page and errata sheet before a
13    notary public.  Please return the properly executed
      original signature page and errata sheet to:

14

15        CHRISTOPHER C. TAINTOR, ESQ.
          NORMAN, HANSON & DeTROY
16        Two Canal Plaza
          P.O. Box 4600
17        Portland, ME  04112-4600
          (207) 774-7000
18        ctaintor@nhdlaw.com
19
20
21
22
23
24
25

          THE REPORTING GROUP
          Mason & Lockhart

ANDERSON DEPOSITION EXHIBIT 1

## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

ED FRIEDMAN            )
                             )
                             )
     Plaintiff,           )
                             )    CIVIL ACTION
v.                          )
                             )    Case No.  20-cv-00237-JDL
CENTRAL MAINE POWER   )
COMPANY,              )
                             )
     Defendant.      )

## *NOTICE TO TAKE ORAL DEPOSITION OF ERIK A. ANDERSON, P.E.*

TO:   Erik A. Anderson, P.E.

     c/o William Most, Esq.             c/o Bruce M. Merrill, Esq.
     Law Offices of William Most    225 Commercial Street, Suite 501
     201 St. Charles Avenue          Portland, ME  04101
     New Orleans, LA  70170

     Please take notice that on Wednesday, January 26, 2022, via the online platform

Zoom, Defendant in the above-entitled action will take the deposition of Erik A.

Anderson, P.E., beginning at 10:00 a.m., upon oral examination pursuant to the Federal

Rules of Civil Procedure, before The Reporting Group, or some other officer duly

authorized by law to administer oaths, and will be recorded stenographically.

     The deponent is requested to produce for inspection and copying at the deposition

the following documents:

     1.     A current curriculum vitae;

2.      Any and all documents reviewed, referred to, or relied upon by the deponent in forming his opinion in regards to the above-captioned matter;

3.      Any and all documents including but not limited to any reports, prepared or created by the deponent, in regards to the above-captioned matter.

4.      A list of all publications authored by the deponent within the past ten years.

5.      A list of all cases in which the deponent has testified as an expert witness within the past ten years.

6.      All documents pertaining to any charges or payments for the services of the deponent as an expert witness in this case.

You are invited to attend and cross-examine.

Please provide The Reporting Group with your contact information and email address so that an email invitation can be sent to you and/or your representatives a link to Zoom to participate in this deposition.  The Reporting Group can be reached at (207) 281-4230 or thereportinggroupmaine@gmail.com.

Dated at Portland, Maine this 5th  day of January, 2022.

Christopher C. Taintor, Esq.
Russell B. Pierce, Jr., Esq.
Attorneys for Defendant
Central Maine Power

NORMAN, HANSON & DeTROY
Two Canal Plaza, P.O. Box 4600
Portland, Maine  04112-4600
(207) 774-7000
ctaintor@nhdlaw.com



| ANDERSON DEPOSITION EXHIBIT 2 |
| --- |

Arizona Office
9007 South 3rd Street
Phoenix, AZ 85042
PHONE: 952.292.6416
TOLL FREE: 800.893.4047
eanderson@aenpi.com

Anderson Engineering®
of New Prague Inc.

# Professional Engineering Report

**File Name:** **Smart Meter / Ed Friedman**

**Court File Number:** **2:20-cv-00237-JDL**

**Our File Number:** **2021341**

**Property Address:** **Bowdoinham, Maine**

**Prepared By:** **Erik S. Anderson, P.E.**

**Prepared For:** **William Most, Esq.**
**Law offices of William Most**
**201 St. Charles Avenue**
**New Orleans, LA 70170**
**E-mail: williammost@gmail.com**

**Issue Date:** **December 3, 2021**

## Introduction

On September 26, 2021, I was contacted by Mr. Ed Friedman and requested to assist him in determining the ability / propensity of the smart meter used by Central Maine Power ("CMP") to produce radio frequency ("RF") electromagnetic waves and other electromagnetic interference "noise" and distribute that RF and electromagnetic interference ("EMI") on the power system and distribution network of his residence.

Mr. Friedman is the plaintiff in a civil action against CMP regarding the added cost that CMP charges for the use of an analog electrical power meter. Mr. Friedman has lymphoma and has been advised, due to the illness, that he should avoid any unnecessary sources of electromagnetic waves.

Excellence in Engineering®
ARIZONA | ILLINOIS | MINNESOTA | WISCONSIN
www.aenpi.com | Toll Free: 800.893.4047

In summary and as explained further below, it is my opinion that:

1. The Landis + Gyr FOCUS AX SecureMesh DDX Electric [Smart] Meter and the GE (Aclara) I-210 + c SecureMesh DDX Electric [Smart] Meter used by CMP create RF electromagnetic fields / waves through their switch mode power supply's ("SMPS") and while transmitting a signal.
2. The analog electric meters used by CMP do not create RF electromagnetic fields / waves since they do not employ a SMPS and they do not transmit a signal.
3. The RF electromagnetic fields / waves produced by the electric smart meters used by CMP are not attenuated as they travel throughout the electrical distribution network of the residence the meter is controlling.
4. The use of EMI shielding technology and filters would reduce the RF electromagnetic fields / waves produced by the CMP smart meters.[1]
5. The implementation of a power supply other than SMPS power supply would reduce the RF electromagnetic fields / waves produced by the CMP smart meters.
6. The cost of integrating EMI shielding technology and non-RF generating power supplies is minimal in comparison to the cost of the smart meter.

## Qualifications

I have a Bachelor of Science degree in Electrical and Electronic Engineering from North Dakota State University, located in Fargo, North Dakota. I own and operate Anderson Engineering of New Prague, headquartered in rural New Prague, Minnesota. I have owned and operated Anderson Engineering since 1987.

Anderson Engineering is a diverse engineering firm. Anderson engineering works in the forensic field performing root cause failure analysis involving electrical devices. The failures often result in economic loss, personal injury, or wrongful death. The types of losses include fires, accidents, electric shock and electrocution.

Anderson engineering manufactures current transformers under the brand name Midwest Current Transformer. Midwest Current Transformer manufactures current transformers that are an Underwriters Laboratory (UL) Recognized Component in the United States and Canada. I have designed many of the products offered by Midwest Current Transformer.

As a designer and manufacturer of transformers, their operation is one of my main areas of expertise. Switch Mode Power Supply ("SMPS") modules used by smart and digital meters are merely another type of transformer. I have investigated the involvement of the operation of the SMPS in these meters and their involvement in the creation of radio frequency ("RF") emissions.

Anderson engineering performs electrical design work and analysis for devices and electrical systems for commercial buildings. I have consulted with manufacturers and electrical designers regarding their products and designs. I have designed the electrical system for an elementary school.

---

[1] Kavanaugh, Jack. EMI Shielding Technology: The Industries It Touches and Why You Should Care. Forbes.com, November 11, 2021.

Anderson engineering certifies Industrial Equipment per the National Fire Protection Association ("NFPA") 70 and 79, and Underwriters Laboratory ("UL") 508. I have performed multiple inspections of industrial equipment in the field and at manufacturing facilities internationally to certify industrial equipment. Anderson Engineering also performs fire investigation to determine the cause of fires. I am a certified fire and explosion investigator with the National Association of Fire Investigators and have investigated thousands of fires.

I am a member of the American Society of Heating, Refrigerating and Air-Conditioning Engineers ("ASHRAE"). I am an active member of ASHRAE Standing Standards Project Committee ("SSPC") 41 Standard Methods for Measurements. SSPC 41 oversees the writing of various published ASHRAE standards through their subcommittees. ASHRAE SSPC 41 encompasses Standards 41.1, 41.2, 41.3, 41.4, 41.6, 41.7, 41.8, 41.9, 41.11 and 41.13.  I am an active member and participant in all the Subcommittees for SSPC 41. I currently chair Subcommittee 41.1 – 2020, Standard Methods for Temperature Measurements. I am also an active member of other technical committees with ASHRAE.

I am a licensed Professional Engineer in the States of Minnesota, Illinois, Arizona, Wisconsin, Indiana, Iowa, New Mexico, Texas, Louisiana, California, Kentucky, Michigan, and Nevada. I am a Class A Master Electrician in the State of Minnesota. I am a Private Investigator in the States of Minnesota and Arizona, and I am a Private Detective in the State of Illinois. I have investigator and detective licenses in conjunction with my work as a fire cause and origin investigator.


## Documents Supplied & Reviewed

I have reviewed the following documents to assist me in formulating my opinions:

> See Attachment 1.


## Compensation / Sworn Testimony

I am currently compensated for my forensic work at a rate of $295 per hour for standard work, and at a rate of $395 per hour for sworn testimony.

I have given sworn testimony in court or through depositions in the following cases for the last four years.

> See Attachment 2.


## Analysis / Discussion

### Smart Meter Operation:

Smart meters create intense exposure to pulsed radio frequencies ("RF") in a few ways. RF antennas are embedded within the smart meter to transmit data usage to utility companies and/or to communicate with other smart meters or with other "smart" devices like home

thermostats. These antennas emit pulsed RF radiation. The meters various radiofrequencies emitted by these antennas also conduct through the home electric wiring. RF "wire conducted" frequencies come also from the conversion process from alternating current ("AC") to direct current ("DC") handled by the Switch Mode Power Supply ("SMPS").[2] The SMPS power the smart electric meters.

Non-transmitting digital meters also use SMPS, and therefore they too create RF, even though they do not contain a transmitting RF antenna for communications. These radio frequencies are transmitted on the residence's electrical distribution system and conduct over the internal wiring, thereby turning the home wiring into a whole-house antenna.

**RF Emissions from the Transmitting Antennas:**

The RF antennas that wirelessly transmit the consumer's electrical power usage data to the utility company typically use frequencies in the 900 MHz and 2.45 GHz ranges. CMP meters use approximately 2.45 GHz. These emissions are intense and can occur often, up to 190,000 times a day.[3] From my experience and testing done by others, these meters transmit more times than the electric companies report. This can easily be shown by measuring the emissions with a simple RF meter.

"Isotrope Wireless,"[4] which provides industry and municipalities with design, specification, evaluation, and construction support for wireless facilities, tested smart meters in three houses.[5] This testing showed that RF emissions from the smart meters' transmitting antennas could be detected throughout the house and were "well above" the ambient RF radiation levels.[6] These pulsed RF emissions exceed the absolute energy output limits[7] stated in Federal Communications Commission ("FCC") guidelines (if the emissions are not averaged over a 30-minute exposure as prescribed by those guidelines).[8]

**RF from Wireless Antennas Enter the House's Electrical System:**

The Isotrope testing also showed that the house's electrical wiring conducted substantial levels of the RF emissions at 915 MHz – the communications-related frequency for those meters[9] (in NYS) – and this frequency was then radiated from outlets (electrical power

---

[2] In some meters the conversion is done using capacitors instead of SMPS.
[3] Sage Associates. Assessment of Radiofrequency Microwave Radiation Emissions from Smart Meters. January 1, 2011.
[4] https://www.isotrope.im/about-2/.
[5] Isotope Wireless. Report on Examination of Selected Sources of Electromagnetic Fields at Selected Residences in Hastings-on-Hudson. November 23, 2013.
[6] Isotrope Wireless. Report on Examination of Selected Sources of Electromagnetic Fields at Selected Residences in Hastings-on-Hudson. November 23, 2013. Page 12.
[7] Sage Associates. Assessment of Radiofrequency Microwave Radiation Emissions from Smart Meters. January 1, 2011. Page 3.
[8] On August 13, 2021, the Court of Appeals for the DC Circuit ruled that the FCC's 2019 decision that its guidelines adequately protect the public's health are arbitrary, capricious and not evidence-based. The Children's Health Defense is a Petitioner in this case. *Envtl. Health Tr., et al v. FCC*, Nos. 20-1025, 20-1138, 2021 U.S. App. LEXIS 24138 (D.C. Cir. Aug. 13, 2021). The opinion specifically questioned whether the FCC's testing procedures adequately captured the effect of pulsation or modulation. 2021 U.S. App. LEXIS 24138, *12, *29.
[9] Smart meters use a variety of frequencies for communications depending on the manufacturer's choice. PECO's meters operate at around 901 MHz. They also contain a "Zigbee" antenna that can be turned on and then communicate with nearby wireless smart devices. Zigbee uses 2400 MHz band.

Smart Meter / Ed Friedman                   2021341

delivery points) and along the house wiring (branch circuitry). The electric smart meter is connected to the incoming power lines of the home. The power to run the electric smart meter is derived from the power lines connected to the home. The RF noise generated by the electric smart meter is then transmitted along the electrical wiring within the home along with the supplied electrical power. The wiring of the home acts as a direct transmitter of the RF noise and as an antenna broadcasting the RF noise. In this fashion, the wiring within the home becomes a whole house antenna for the RF noise.

Thus, the pulsed RF emissions from the smart meter's transmitting antenna not only enter the house wirelessly through the air, but also enter into, and are conducted along, the home's electrical wiring.

**RF "Noise" From the Switch Mode Power Supply:**

Other RF frequencies, besides the RFs from the transmitting antennas, also enter the house electric system. In my testing I have witnessed and analyzed smart meters' effects on the incoming electrical power voltage waveform. These frequencies are a byproduct of the AC/DC conversion process which is done by the Switch Mode Power Supply ("SMPS"). The conversion process is necessary because the utility service delivers alternating current whereas the electrical components in smart meters use direct current.[10]

SMPS converts the 240 Volt AC power coming into the meter from the main power transformer, into the much lower DC voltage that the electronic devices require to function. The rapid back-and-forth conversion process used to remove the "alternating" aspect creates *unintended* RF frequencies. The on/off, back-and-forth, pulses can occur up to 150,000 times per second, which means frequencies of up to 150,000 Hz (150 KHz[11]), are created. These kilohertz frequencies are within the RF band of frequencies.[12] Most of the observed "noise" spikes are in the range of 2 to 50 kHz (2,000 to 50,000 Hz). The switching RF "spikes" are variable, and they are being imposed on the 60 Hz house electricity waveform[13] creating significant unintended RF "noise." The RF "noise" distorts power quality and can also be described as "dirty" electrical power or "dirty" electricity.

These frequencies are present all the time but are worse when less electricity is being used (e.g., at night) and when the smart meter's electronics need more power, for example, when transmitting RF bursts to the utility. These RF transmission bursts cause spikes over the electric wiring, and they are created because the SMPS has to suddenly supply more DC power.

**Digital Meters Use SMPS and Therefore Also Created Unintended RF:**

Digital meters also use SMPS. Therefore, even though they do not contain an RF communications antenna, the AC/DC conversion process creates significant and variable RF spikes over the electrical wiring, which is then radiated into the house. The SMPS circuit is lacking effective ground references, lightning protection and "common mode"

---

[10] Smart meters also rely on AC for some of the non-electronic functions they perform.
[11] 1,000 Hz is a kilohertz ("KHz"). 1,000,000 Hz is a megahertz ("MHz"). 1,000,000,000 Hz is a gigahertz ("GHz").
[12] FCC defines RF as frequencies between 3 KHz – 300 GHz.
[13] Electricity comes to the house at a frequency of 60 Hz.

electromagnetic interference ("EMI") filters. The circuit boards are lacking a direct local connection to zero voltage potential ground at the meter to sink (ground) the current and voltage oscillations of the circuit boards.[14]

Filtering and EMI shielding are design options available to CMP. The use of filters and EMI shields are not cost prohibitive.

**Analog Meters Do Not Have SMPS and Do Not Create RF Spikes:**

In contrast, unlike wireless smart meters and digital meters, analog meters do not contain an SMPS or other electronic components that create unintended RF frequencies. No AC/DC conversion is necessary, and unlike smart and digital meters, analog meters incorporate a separate grounding electrode conductor / grounding rod that eliminates much of the "noise" that may come from the energy feed.

The images below compare a smart meter like that used by PECO[15] and similar to the one used by CMP with an analog meter. The red waveform is the 60 Hz house electricity frequency. The yellow waveform indicates the RF frequencies imposed over the 60 Hz.

**Image 1** shows that an analog meter does not create RF spikes. **Image 2** shows the smart meter causing significant RF spikes "noise" over the 60 Hz frequency house electric wiring system.[16]

**Image 1**: Analog Meter – No RF Spikes



---

[14] https://smartmeterharm.org/2019/05/31/electrical-engineer-the-meter-itself-is-the-hazardous-condition/
[15] Expert Report of William Bathgate, McKnight v. PECO, C-2017-2621057. March 26, 2018. Pages 17-18.
[16] Expert Report of William Bathgate, McKnight v. PECO, C-2017-2621057. March 26, 2018. Page 14.

**Image 2**: Smart Meter – Intense RF spikes.



## My Smart Meter Testing:

My test setup consisted of a meter socket enclosure suitable for 120/240 Volt, single-phase, three-wire connection. A smart meter, Landis & Gyr, Gridstream RF, Focus AXR-SD, Form 2S, CL200, 240 V, 3 W, 60 Hz, power meter was used. The voltage waveform was captured with a Fluke 215C Scopemeter. One input to the Scopemeter was connected to the incoming voltage, 120 Volts-to-Ground, unfiltered. The other input to the Scopemeter was connected to the incoming voltage with the 60 Hz waveform filtered out. A radiofrequency emissions meter was also used to indicate when an RF signal increase was detected.[17]

When the test equipment was connected to the incoming power, the waveform of the incoming electrical power was observed. The 60 Hz signal was recognized as the dominant frequency with some noise observed on the waveform. The 60 Hz was filtered out to analyze the noise on the signal.[18]

When the smart meter was not connected, the noise level was approximately 45 milliVolts at its peak. When the smart meter was added to the circuit, the noise on the 60 Hz sine wave was noticeably larger, approximately 85 milliVolts. This is nearly double the amount of noise than without the smart meter.[19]

The dominant frequencies are in the range of 2 to 50 kHz. These are the frequencies that the smart meter generates when it is transmitting.[20]

---

[17] Testimony of Erik S. Anderson, P.E. on behalf of Warren Woodward and in Opposition to the Settlement Agreement.
[18] ibid
[19] ibid
[20] ibid

**The Landis + Gyr FOCUS AX and the GE (Alcara) I-210 + c SecureMesh DDV Electric Meters:**

The Landis + Gyr Focus AX and the GE (Alcara) I-210 + c SecureMesh DDV Electric [smart] Meters used by CMP both incorporate a SMPS and RF communication. These electric smart meters create elevated RF signals.

## Conclusion

The following opinions are based on my review of the materials, my examination of the operation of an electric smart meter, and my experience, education, and training. I hold these opinions to a reasonable degree of scientific certainty.

There is no doubt that smart and digital meters create pulsed RF emissions and these emissions, from the smart meters' antennas and the RF created by the SMPS, both enter the house's electric system. The result is that the entire house is transformed into a radiating RF antenna.

Any meter with a switch mode power supply will create RF frequencies in the Kilohertz range that enter the electrical wiring system of the house. Smart meters and digital meters inject significant levels of RF onto the home's electrical distribution system, polluting the otherwise relatively clean AC sine wave. These power quality or dirty electricity issues can cause significant and sometimes costly mechanical and electrical problems.[21]

Since all living things are beings of frequency, the strange thing would be if we were not in various ways also affected by man-made RF (like that from smart meters) we had not enough time to co-evolve with.

This report is based on information learned to date. I reserve the right to amend, clarify, or change my opinions based on more work or information learned.

Respectfully Submitted:

_Erik S. Anderson, P.E._

Erik S. Anderson, P.E.

---

[21] Kennedy, Barry. Power Quality Primer, McGraw-Hill 2000

Attachment 1.

1. Objections and Answers to Plaintiff's Interrogatories Propounded upon Defendant Central Maine Power Company.
2. CMP Power Quality Web Page.
   https://www.cmpco.com/wps/portal/cmp/home/!ut/p/z0/ZY3JDoIwFEV_RRcs9bWC0 9IYhRDRGIdgN6QgIkptS60Dfy9ujNHdPcnJuUAgBiLpnTNguZJUNHwgg8TF0Szwp mg5irwxWnvuYuf7ezQfYwiBfAurTeg2gjfbBth3cTh8F3ommkYMiKa26HB5UhCbU9Y b4WG3sBfx2_g_aRr8XFVkAiRT0uZPC3F20ZSZ5HrTWhnroM_lZW5YLXhqqKkdVF B5TJUqHaTVIzet6kYFtzXokqR9wdov-0lUrQ!!/
3. Central Maine Power Company Response to Friedman Data Request No. 1.
4. Order on Defendant's Motion to Dismiss.
5. The Complaint.
6. Isotrope Wireless. Report on Examination of Selected Sources of Electromagnetic Fields at Selected Residences in Hastings-on-Hudson. November 23, 2013.
   http://stopsmartmetersny.org/images/Report_on_Examination_of_Selected_Sources _of_Electromagnetic_Fields_at_Selected_Residences_20140301.pdf
7. Sage Associates. Assessment of Radiofrequency Microwave Radiation Emissions from Smart Meters. January 1, 2011.
8. Expert Report of William Bathgate, McKnight v. PECO, C-2017-2621057. March 26, 2018.
9. Testimony of Erik S. Anderson, P.E. on behalf of Warren Woodward and in Opposition to the Settlement Agreement.
10. Kavanaugh, Jack. EMI Shielding Technology: The Industries It Touches and Why You Should Care. November 11, 2021.
    https://www.forbes.com/sites/forbestechcouncil/2021/11/11/emi-shielding-technology-the-industries-it-touches-and-why-you-should-care/?sh=462660b44365
11. https://smartmeterharm.org/2019/05/31/electrical-engineer-the-meter-itself-is-the-hazardous-condition/
12. Kennedy, Barry. Power Quality Primer, McGraw-Hill 2000
    https://vdocuments.mx/power-quality-primer-barry-w-kennedy.html

Attachement 2.

**ERIK S. ANDERSON**

| DATE | COURT | CASE NUMBER | DEPO/TRIAL |
|------|-------|-------------|------------|
| 2021 | In the Circuit Court of the Twelfth Judicial Circuit, Will County, Illinois | 18 L 947 | Deposition |
| 2020 | None | N/A | N/A |
| 2019 | In the Superior Court of the State of Arizona, In and for the County of Maricopa | CV 2017-012355 | Trial |
| 2018 | In the Circuit Court of the State of Wisconsin In and for the County of Eau Claire | 16-CV-31 | Deposition |
|  | In the Superior Court of the State of Arizona In and For the County of Maricopa | CV 2016-014713 | Deposition (Orig.) Deposition (Supp.) |
| 2017 | In the Superior Court of the State of Arizona In and For the County of Maricopa | CV 2016-050257 | Deposition |
|  | In the Superior Court of the State of California, In and For the County Solano | No. FCS048117 | Deposition |
|  | Before the Arizona Corporation Commission | Docket # E-01345a-16-0036  Docket # E-01345a-16-0123 | Admin. Hearing Testimony |
|  | In the Superior Court of the State of Arizona, In and For the County of Maricopa | CV 2015-005133 | Deposition |

ORIGINAL



0000178630

Erik S. Anderson, P.E.
3725 E. Roeser Road, Suite 20
Phoenix, AZ 85040
(602) 437-5455
eanderson@aenpi.com

RECEIVED
AZ CORP COMMISSION
DOCKET CONTROL

2017 APR -3 P 2 19

## BEFORE THE ARIZONA CORPORATION COMMISSION

**COMMISSIONERS**
TOM FORESE, CHAIRMAN
BOB BURNS
BOYD DUNN
DOUG LITTLE
ANDY TOBIN

Arizona Corporation Commission
DOCKETED

APR  3 2017

DOCKETED BY
GB

> ANDERSON DEPOSITION EXHIBIT 6

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF ARIZONA PUBLIC SERVICE COMPANY FOR A HEARING TO DETERMINE THE FAIR VALUE OF THE UTILITY PROPERTY OF THE COMPANY FOR RATEMAKING PURPOSES, TO FIX A JUST AND REASONABLE RATE OF RETURN THEREON, TO APPROVE RATE SCHEDULES DESIGNED TO DEVELOP SUCH RETURN. | DOCKET # E-01345A-16-0036<br><br>**DIRECT TESTIMONY OF ERIK S. ANDERSON, P.E. ON BEHALF OF WARREN WOODWARD AND IN OPPOSITION TO THE SETTLEMENT AGREEMENT** |
| IN THE MATTER OF FUEL AND PURCHASED POWER PROCUREMENT AUDITS FOR ARIZONA PUBLIC SERVICE COMPANY | DOCKET # E-01345A-16-0123 |

Erik S. Anderson, P.E., Witness in the above-referenced proceeding on behalf of

Intervenor Warren Woodward, hereby submits his Direct Testimony.

1

# TABLE OF CONTENTS

PAGE

I INTRODUCTION.................................................................................................3

II SUMMARY OF DIRECT TESTIMONY.......................................................4

III DIRECT TESTIMONY....................................................................................5

IV CONCLUSION..................................................................................................7

EXHIBIT A............................................................................................................8

EXHIBIT B............................................................................................................9

EXHIBIT C..........................................................................................................10

EXHIBIT D..........................................................................................................14

I.    INTRODUCTION

**Q:    Please state your name, address, and occupation.**

A:  Erik S. Anderson, P.E., 3725 E. Roeser Road, Suite 20, Phoenix, Arizona 85040.  I am a forensic electrical engineer working on root cause failure analysis of matters that cause loss of property, personal injury, and loss of life.  I am the President of an engineering firm that offers professional engineering services across the United States and that manufactures current transformers.

**Q:    What is your professional and educational background?**

A:  I have a Bachelor of Science degree from North Dakota State University, Fargo, North Dakota, in Electrical and Electronic Engineering.  I am a licensed Professional Engineer in the states of Minnesota, Illinois, Arizona, Wisconsin, Indiana, Iowa, New Mexico, Texas, Louisiana, California, Kentucky, Michigan, and Nevada.  I am a licensed Class A Master Electrician in the state of Minnesota.  I hold a Private Investigators License in Arizona and I am a Certified Fire and Explosion Investigator.  I have 30 years of experience as a forensic engineer.  I have over 20 years of experience of design and manufacture of current transformers.  I have been involved in many thousands of matters concerned with determining the root cause of failures of electrical devices that may have caused a loss of property, personal injury, or loss of life.  I have given expert witness testimony in approximately 113 separate matters.  [Attached hereto as Exhibit "D" is a copy of my current curriculum vitae.]

3

**Q:     What is the purpose of your direct testimony in these proceedings?**

A:  My direct testimony in these proceedings is regarding the effect the Smart Meter has on the 60 Hz waveform of the electrical power as delivered by the utility.  My direct testimony will be that the Smart Meter causes a significant amount of noise on the 60 Hz signal.

**Q:     Have you testified previously before the Commission?**

A:    No.

II.     <u>SUMMARY OF DIRECT TESTIMONY</u>

**Q:     Please summarize your direct testimony.**

A:  I have witnessed and analyzed the effects of the use of a Smart Meter on the incoming electrical power voltage waveform.  The Smart Meter, when transmitting data, causes a significant amount of noise on the incoming electrical power.   Power is delivered at 60 Hz.  The Smart Meter causes much higher frequencies to be imposed on the 60 Hz sinusoidal wave.  When the Smart Meter transmits information, there is a significant increase of the noise observed on the 60 Hz sinusoidal waveform.  There were significant increases in the noise in the range of 2 to 50 kHz, or 2,000 to 50,000 cycles per second.

## III.    DIRECT TESTIMONY

**Q:    Please describe the test setup of the incoming electrical power.**

A:  The test setup consists of a meter socket enclosure suitable for 120/240 Volt, single-phase, three-wire connection.  A Smart Meter, Landis & Gyr, Gridstream RF, Focus AXR-SD, Form 2S, CL200, 240 V, 3 W, 60 Hz, power meter was used.  The voltage waveform was captured with a Fluke 215C Scopemeter.  One input to the Scope meter was connected to the incoming voltage, 120 Volts-to-Ground, unfiltered.  The other input to the Scope meter was connected to the incoming voltage with the 60 Hz Sine wave filtered out.  A radio frequency (RF) meter was also used to indicate when an RF signal increase was detected.



5

**Q:    Please describe the observations you made during the testing of the Smart Meter.**

A:  When the test equipment was connected to the incoming power the waveform of the incoming electrical power was observed.  The 60 Hz signal was recognized as the dominant frequency with some noise observed on the waveform.  The 60 Hz was filtered out to analyze the noise on the signal.  Without the Smart Meter attached, the noise level was approximately 45 milliVolts at its peak.  When the Smart Meter was added to the circuit and the noise on the 60 Hz Sine wave was noticeably larger.  The peak noise voltage, with the Smart Meter attached was approximately 85 milliVolts.  The amount of noise, with the Smart Meter attached to the circuit was approximately twice as large than without the Smart Meter.

**Q:    Can you show us examples of the waveforms?**

A:  Yes. Exhibit A is a screenshot of the waveform without a smart meter in the circuit.  Exhibit A shows the 60 Hz waveform in red.  The noise waveform, after filtering out the 60 Hz, is shown in blue.  When the Smart Meter is installed in the circuit, and it is transmitting, the waveforms look like that in Exhibit B.  Exhibit B shows the noisy, dirty, waveform of the 60 Hz signal in red.  The noise waveform is shown in blue.

**Q:    What are the frequencies observed on the noise (blue) waveform, of Exhibit B?**

A:  The dominant frequencies found on the waveform of the noise (blue) waveform of Exhibit B are approximately in the range of 2 to 50 kHz.  These are the

6

frequencies that the Smart Meter generates when it is transmitting

    **Q:    Can you provide a sampling of those frequencies?**

    A:    Yes, Exhibit C showcases waveforms found to represent 12.5 kHz, 14.28 kHz, 16.6 kHz, 20 kHz, and 33.3 kHz. The point between the two cursors represents these frequencies.

IV.    <u>CONCLUSION</u>

    **Q:    DO YOU HAVE ANY CONCLUDING REMARKS?**

    A:    Yes. The Smart Meter tested exhibited a significant amount of noise generation on the incoming electrical power to the residence.

    RESPECTFULLY SUBMITTED this 3rd day of April, 2017.

> By: /s/ Erik S. Anderson
>     Erik S. Anderson, P.E., C.F.E.I.
>     3725 East Roeser Road, Suite 20
>     Phoenix, AZ 85040

Original and 13 copies of the
foregoing hand-delivered
this <u>3rd</u> day of April, 2017 to: Arizona Corporation Commission, Attn: Docket Control
Center, 1200 W. Washington, Phoenix, AZ 85007

Copies of the foregoing
mailed/e-mailed this 3rd
day of April, 2017 to:  Docket Service List

By, *[signature]*

Warren Woodward
200 Sierra Rd.
Sedona, AZ 86336

# Exhibit "A"



The waveforms were collected without a smart meter using a Fluke 215C
Scopemeter. Channel A was connected to a 120 VAC receptacle. Channel B
was attached to the same potential except through a Graham Ubiquitous
filter (removes the 60 cycle).

8

# Exhibit "B"



The waveforms were collected from a transmitting smart meter using a
Fluke 215C Scopemeter. Channel A was connected to a 120VAC receptacle.
Channel B was connected to the same potential except through a Graham
Ubiquitous filter (removes the 60 cycle). The point between the two
cursors represents a frequency of 50 kilo Hertz.

9

# Exhibit "C"



The waveforms were collected from a transmitting smart meter using a
Fluke 215C Scopemeter. Channel A was connected to a 120VAC receptacle.
Channel B was connected to the same potential except through a Graham
Ubiquitous filter (removes the 60 cycle). The point between the two
cursors represents a frequency of 14.28 kilo Hertz.

10



The waveforms were collected from a transmitting smart meter using a
Fluke 215C Scopemeter. Channel A was connected to a 120VAC receptacle.
Channel B was connected to the same potential except through a Graham
Ubiquitous filter (removes the 60 cycle). The point between the two
cursors represents a frequency of 12.5 kilo Hertz.



The waveforms were collected from a transmitting smart meter using a
Fluke 215C Scopemeter. Channel A was connected to a 120VAC receptacle.
Channel B was connected to the same potential except through a Graham
Ubiquitous filter (removes the 60 cycle). The point between the two
cursors represents a frequency of 16.6 kilo Hertz.

11



The waveforms were collected from a transmitting smart meter using a
Fluke 215C Scopemeter. Channel A was connected to a 120VAC receptacle.
Channel B was connected to the same potential except through a Graham
Ubiquitous filter (removes the 60 cycle). The point between the two
cursors represents a frequency of 20 kilo Hertz.

12



The waveforms were collected from a transmitting smart meter using a
Fluke 215C Scopemeter. Channel A was connected to a 120VAC receptacle.
Channel B was connected to the same potential except through a Graham
Ubiquitous filter (removes the 60 cycle). The point between the two
cursors represents a frequency of 33.3 kilo Hertz.

13

# Exhibit "D"

## ANDERSON ENGINEERING OF NEW PRAGUE, INC.
3725 E. Roeser Road, Ste. 20
Phoenix, Arizona 85040
Phone: (602) 437-5455
Fax:  (602) 437-3272

### ERIK S. ANDERSON
**Registered Professional Engineer**

| | | | |
|---|---|---|---|
| REGISTRATION: | **Licensed Professional Engineer** | | |
| | State of Minnesota | 1991 | 21471 |
| | State of Illinois | 1999 | 062052733 |
| | State of Arizona | 2003 | 39627 |
| | State of Wisconsin | 2008 | 39418-006 |
| | State of Indiana | 2008 | PE.10809314 |
| | State of Iowa | 2008 | 18758 |
| | State of New Mexico | 2008 | 19001 |
| | State of Texas | 2009 | 102714 |
| | State of Louisiana | 2009 | PE.0034787 |
| | State of California | 2010 | 105359 |
| | State of Kentucky | 2012 | 28492 |
| | State of Michigan | 2013 | 6201060247 |
| | State of Nevada | 2013 | 022690 |
| | | | |
| | **Other Licenses:** | | |
| | Licensed Class A Master Electrician – State of Minnesota | 1995 | AM005344 |
| | Private Investigator – Arizona | 2011 | 1615601 |
| | Certified Fire and Explosion Investigator  (C.F.E.I.) | 2012 | 17853-9760 |
| EDUCATION: | B.S. in Electrical and Electronic Engineering North Dakota State University, Fargo, North Dakota, 1987. | | |
| | Chemical Engineering Course Work University of Minnesota, Minneapolis, Minnesota, 1981-1983. | | |
| CONTINUING | Hazardous Materials: HAZWOPER: 40-hour worker 2008 | | |

14

EDUCATION:    Annual 8-Hr. HAZWOPER Refresher Course: 2009, 2010, 2011, 2012, 2013, 2014, 2015,

Asbestos Awareness: 05/09, 3/14, 09/16

Annual Fire Investigation Seminar Instructor
Maricopa AZ: 04/08, 03/09, 03/12, 03/13

Minnesota Chapter IAAI Fire & Arson Conference
3/88, 3/89, 3/90, 3/01, 3/05, 3/06.

Instructor: Fire/Arson Level 3
Mesa, Arizona, 10/03.

Illinois Chapter IAAI Northern Zone Winter Seminar
Instructor: Electrical Appliance Fires, 2/03.

Completed Code & Code Change Class
Minnesota Electrical Association -- National Electrical Code
1/99, 2/01, 1/03, 1/05, 1/07, 1/09, 1/11, 2/13, 5/15

Illinois Chapter IAAI Fire Investigation Conference
Instructor: Forensic Electrical Engineering Principles & Practices, 9/99.

Graduate Course Work, University of Minnesota
Minneapolis, Minnesota, 1995-1997.

Master Electrician Course, Hennepin County Technical College, Eden Prairie, Minnesota 3/95.

Completed Designing Electrical Systems for Hazardous Locations
University of Wisconsin-Madison, 4/92.

Completed Electrical Fires Accidental and Deliberate
Sponsored by Georgia Chapter of IAAI, 12/91.

Completed Fire and Arson Investigation Course,
Nebraska State Fire & Arson Investigators Conference, 10/87

**EXPERIENCE:**    Anderson Engineering of New Prague, Inc., *Phoenix, AZ*
**01/05 - Present**    President & Forensic Electrical Engineer. Responsible for all aspects of business operations including engineering services to clients, product testing, fire investigation, and failure analysis.

Our case load also includes construction defect cases involving the evaluation of the workmanship of the electrical subcontractor and personal injury cases involving electric shock and/or electrocutions.

15

| | |
|---|---|
| 4/87 – 1/05 | Anderson Engineering of New Prague, Inc., *New Prague, MN*<br>Electrical Engineer. Responsible to client for engineering services including product testing, fire investigation, and failure analysis.<br>Midwest Current Transformer, Division of Anderson Engineering of New Prague, Inc., *New Prague, MN.*<br>Designer, manufacturer, and quality control engineer of current transformers. |
| 1/84 - 11/84 | O.S. Anderson Engineering, Inc., *New Prague, MN.*<br>Research and Design Coordinator.  Duties included work on transponder design for communications system through earth. |
| 6/83 - 9/83 | Koch Refinery, *Southeast St. Paul, MN.*<br>Conducted ultrasound testing on oil refinery systems. |
| 1981 & 1982<br>(Summers) | O.S. Anderson Engineering, Inc., *New Prague, MN.*<br>Assistant Engineer.  Designed software for and compiled data of E-fields generated by high voltage transmission lines, assisted in investigations of various cases involving questions of product liability. |

| | |
|---|---|
| **PROFESSIONAL AFFILIATIONS:** | Member Institute of Electrical and Electronic Engineers (IEEE)<br>Member National Society of Professional Engineers (NSPE)<br>Member Minnesota Society of Professional Engineers (MnSPE)<br>Member International Association of Arson Investigators (IAAI)<br>Member National Fire Protection Association (NFPA)<br>Member National Association of Fire Investigators (NAFI)<br>Member American Society of Heating, Refrigerating and Air-Conditioning Engineers, Inc. (ASHRAE) |

| | | |
|---|---|---|
| **EXPERT TESTIFYING WITNESS:** | Arbitrations: | 02 |
| | Depositions: | 85 |
| | Trials: | 26 |

16

**/**

**/s** [1] - 82:20

**0**

**001** [1] - 60:4
**04083** [1] - 85:2
**04112-4600** [1] - 85:17

**1**

**1** [12] - 2:9, 5:2, 15:21, 19:14, 19:23, 22:20, 22:22, 23:4, 46:7, 56:18, 60:11, 61:22
**1,000** [1] - 48:17
**1/100th** [1] - 60:2
**10** [2] - 2:13, 4:25, 9:13
**11** [4] - 2:14, 67:22, 68:11, 68:12
**11:00** [1] - 1:13
**12** [5] - 2:14, 5:23, 6:22, 7:1, 70:15
**12:01** [1] - 35:9
**12:03** [1] - 35:16
**12:09** [1] - 35:16
**13** [9] - 1:12, 2:15, 23:6, 58:10, 58:17, 60:11, 61:22, 67:7, 70:19
**15th** [1] - 71:13
**19** [3] - 2:9, 2:10, 82:23
**190,000** [4] - 32:25, 33:2, 40:5, 40:20
**1:25** [1] - 69:21
**1:27** [1] - 70:3
**1:34** [1] - 70:3
**1:54** [1] - 81:12

**2**

**2** [7] - 2:9, 19:12, 25:7, 31:11, 41:14, 42:3, 46:9
**2,000** [2] - 48:14, 48:17
**20** [1] - 60:2
**2012** [1] - 23:6
**2016** [1] - 67:23
**2021** [2] - 8:9, 38:21
**2022** [5] - 1:12, 1:13, 82:16, 85:5, 85:11
**2023** [1] - 82:23
**207** [2] - 85:2, 85:17
**22** [1] - 2:12
**24-hour** [1] - 48:4
**26** [2] - 1:13, 85:11

**26th** [2] - 8:9, 38:20
**281-4230** [1] - 85:2
**2:20-cv-00237-JDL** [1] - 1:6

**3**

**3** [15] - 2:4, 2:10, 15:21, 19:20, 20:1, 21:4, 22:20, 27:25, 31:15, 40:1, 40:3, 40:25, 41:13, 43:9, 61:4
**30** [2] - 56:21, 85:11
**30-minute** [2] - 40:10, 46:25
**33** [1] - 2:10

**4**

**4** [14] - 2:10, 2:13, 30:3, 32:19, 33:6, 34:22, 38:15, 39:25, 44:13, 44:19, 44:21, 48:20, 60:24, 62:8
**404** [1] - 85:1
**4600** [1] - 85:16

**5**

**5** [7] - 2:9, 2:11, 2:14, 60:25, 62:8, 67:23, 69:3
**50** [1] - 10:7
**508** [1] - 10:22

**6**

**6** [10] - 2:11, 6:4, 6:8, 21:7, 49:17, 49:18, 50:2, 50:7, 51:8
**60** [1] - 48:13
**60-hertz** [5] - 65:1, 65:5, 65:9, 65:10, 68:19
**67** [4] - 2:11, 2:12, 2:14, 2:15

**7**

**7** [13] - 2:12, 36:6, 36:15, 37:15, 40:2, 40:25, 41:13, 43:9, 49:4, 49:6, 67:15, 68:8, 68:10
**70** [2] - 10:14, 10:19
**73** [1] - 2:5
**77** [1] - 2:4
**774-7000** [1] - 85:17
**79** [1] - 10:14, 10:20

**8**

**8** [9] - 2:12, 22:2, 27:7, 27:17, 27:20, 34:19, 40:15, 85:5
**85** [1] - 3:25
**8th** [1] - 82:16

**9**

**9** [2] - 2:13, 21:6

**A**

**a.m** [1] - 1:13
**ability** [1] - 16:25
**able** [3] - 8:22, 61:8, 70:14
**above-named** [2] - 82:13, 83:15
**above-referenced** [1] - 85:11
**absolute** [3] - 40:8, 46:23, 47:12
**absolutely** [7] - 7:10, 7:18, 9:1, 9:18, 21:20, 35:9, 70:13
**AC** [5] - 30:18, 30:24, 66:21, 67:2, 67:5
**acceptable** [1] - 42:16
**accessible** [1] - 19:11
**accident** [1] - 11:23
**accidents** [1] - 12:3
**according** [1] - 52:4
**account** [1] - 20:6
**acknowledge** [2] - 3:2, 83:15
**acronyms** [1] - 10:15
**act** [1] - 83:16
**ACTION** [1] - 1:5
**action** [3] - 38:10, 82:6, 82:14
**added** [1] - 66:7
**addition** [1] - 52:15
**additional** [1] - 71:19
**additive** [1] - 15:13
**adjective** [1] - 64:22
**administered** [1] - 3:8
**administrative** [1] - 7:24
**adverse** [1] - 29:19
**adversely** [1] - 68:19
**Advocate** [1] - 25:5
**affecting** [1] - 68:19
**affixed** [1] - 83:16
**aforementioned** [1] - 82:6
**ago** [6] - 3:25, 6:23, 37:14, 41:25, 44:10, 74:23

**agree** [6] - 9:10, 9:11, 34:1, 45:19, 62:10, 69:14
**ahead** [3] - 20:8, 54:3, 54:5
**ahold** [1] - 14:7
**Aided** [1] - 82:9
**air** [1] - 18:14
**alarms** [1] - 23:24
**Alcara** [1] - 69:8
**alerted** [1] - 38:14
**ALSO** [1] - 1:23
**alternating** [1] - 30:10
**ambient** [12] - 53:21, 53:22, 53:23, 53:25, 54:7, 54:10, 54:12, 54:23, 55:13, 55:15, 55:16
**amicus** [3] - 34:16, 38:8, 40:21
**amount** [2] - 68:23, 76:24
**analysis** [1] - 27:24
**analyzed** [2] - 60:17, 67:1
**analyzer** [2] - 58:21, 59:2
**ANDERSON** [6] - 1:11, 2:2, 3:11, 83:2, 83:7, 85:8
**Anderson** [11] - 2:9, 2:13, 3:15, 5:1, 10:10, 16:20, 25:7, 35:18, 70:5, 77:9, 81:8
**answer** [6] - 21:6, 21:9, 31:2, 38:3, 55:12, 59:8
**answering** [1] - 4:15
**answers** [3] - 19:19, 19:21, 19:23
**Answers** [1] - 2:10
**antenna** [2] - 32:4, 32:7
**antennas** [6] - 28:4, 30:5, 32:21, 48:21, 53:16, 62:9
**anticipate** [1] - 16:19
**anyway** [1] - 37:7
**apologize** [5] - 39:7, 39:13, 54:21, 57:21, 58:1
**appear** [1] - 44:14
**APPEARANCES** [1] - 1:19
**appeared** [1] - 83:15
**appliance** [6] - 18:3, 78:1, 78:4, 78:6, 78:7
**appliance-type** [1] -

**78:7**
**appliances** [12] - 18:2, 18:5, 18:9, 63:10, 75:12, 76:22, 76:23, 77:14, 77:17, 77:18, 79:21, 80:14
**applications** [1] - 11:10
**apply** [1] - 64:22
**appointment** [2] - 66:1, 66:2
**appreciate** [4] - 4:9, 42:22, 73:6, 81:4
**appropriate** [2] - 64:22, 68:22
**approved** [2] - 41:15, 41:20
**arc** [2] - 12:17, 12:18
**area** [1] - 9:9
**areas** [3] - 53:22, 55:14, 62:25
**Arizona** [33] - 2:11, 5:24, 6:3, 6:4, 6:10, 6:13, 6:24, 7:2, 7:22, 14:4, 14:9, 14:14, 14:22, 36:4, 36:5, 36:10, 36:17, 36:19, 36:22, 37:3, 49:2, 49:8, 49:13, 49:21, 50:2, 50:7, 50:10, 50:15, 50:21, 53:1, 53:2, 71:9, 73:1
**arrangement** [1] - 3:5
**article** [4] - 67:15, 67:22, 68:7, 68:13
**Article** [2] - 2:12, 2:14
**articles** [2] - 5:18, 5:20
**articulate** [1] - 17:17
**aside** [1] - 19:8
**asserting** [1] - 7:24
**assignment** [1] - 8:21
**assist** [4] - 8:14, 19:15, 19:21, 38:7
**associated** [2] - 18:8, 79:8
**Associates** [25] - 2:10, 33:1, 33:3, 33:5, 34:5, 34:7, 34:22, 35:4, 38:14, 39:25, 40:12, 40:25, 41:12, 43:7, 43:11, 43:18, 44:1, 44:12, 44:25, 46:7, 46:21, 47:2, 47:9, 47:11, 47:25
**Association** [2] - 10:14, 10:16
**assume** [1] - 51:6
**assuming** [1] - 67:17
**assumption** [2] - 48:4,

52:22
**assumptions** [6] - 47:10, 47:15, 47:24, 48:5, 48:9, 48:18
**asterisk** [1] - 59:17
**attach** [1] - 23:1
**Attachment** [2] - 19:14, 22:20
**attachment** [1] - 22:23
**attention** [1] - 66:3
**attenuated** [3] - 31:17, 31:22, 32:14
**ATTORNEY** [1] - 83:13
**Attorney** [1] - 5:7
**attorney** [1] - 84:6
**attorneys** [3] - 3:1, 13:17, 41:9
**author** [1] - 25:7
**authored** [4] - 5:20, 34:22, 35:1, 46:8
**authority** [2] - 11:13, 11:19
**authors** [1] - 47:10
**averaged** [3] - 40:9, 46:24, 56:21
**aware** [16] - 9:25, 22:13, 36:2, 38:19, 44:11, 46:11, 46:15, 50:8, 52:16, 56:14, 56:17, 62:16, 62:19, 65:18, 67:4, 76:15

**B**

**background** [2] - 20:3, 22:12
**barking** [2] - 39:1, 65:19
**Barry** [1] - 23:8
**base** [1] - 76:9
**based** [4] - 29:21, 51:24, 57:12, 74:3
**baseline** [1] - 54:1
**basement** [1] - 51:11
**basis** [3] - 46:1, 48:17, 56:3
**Bathgate** [6] - 2:11, 2:14, 67:22, 67:24, 68:1, 68:25
**Bathgate's** [1] - 68:7
**BE** [1] - 83:13
**become** [1] - 65:10
**becomes** [1] - 65:11
**becoming** [1] - 11:9
**behalf** [2] - 6:9, 25:4
**behaved** [1] - 39:4
**behind** [1] - 37:5
**beings** [1] - 9:5
**bell** [2] - 38:25, 76:8

**below** [2] - 56:6, 84:2
**best** [4] - 25:16, 36:1, 42:17, 71:4
**better** [2] - 10:7, 26:1
**between** [10] - 14:22, 27:21, 48:13, 51:4, 74:8, 75:17, 75:18, 76:1, 76:21, 77:12
**beyond** [1] - 9:9
**Bio** [1] - 2:13
**bit** [4] - 26:1, 41:5, 71:10, 74:23
**bless** [2] - 37:4, 37:8
**body** [3] - 12:7, 12:8, 29:10
**bottom** [2] - 21:7, 27:25
**bound** [1] - 4:11
**Box** [2] - 85:1, 85:16
**break** [6] - 4:6, 16:23, 35:8, 35:16, 58:3, 70:3
**Brewer** [1] - 82:16
**brief** [4] - 34:16, 38:8, 40:21, 58:3
**broader** [2] - 80:23, 80:24
**broken** [2] - 10:8, 10:9
**brought** [3] - 3:17, 39:14, 49:14
**Brown** [2] - 23:8, 23:9
**burns** [1] - 12:20
**BY** [13] - 3:14, 7:20, 17:9, 21:3, 23:18, 35:17, 39:2, 58:5, 65:20, 70:4, 73:21, 77:8, 83:13

**C**

**cabinets** [1] - 10:22
**Canal** [1] - 85:16
**cancer** [1] - 27:21
**cannot** [1] - 77:1
**Carpenter** [1] - 13:10
**case** [58] - 3:17, 3:21, 4:25, 5:9, 5:19, 6:2, 6:6, 6:11, 6:21, 6:23, 7:5, 7:21, 7:23, 8:5, 9:2, 9:8, 9:12, 9:22, 13:8, 13:18, 14:10, 14:12, 14:15, 14:16, 14:18, 15:8, 15:23, 16:9, 17:12, 19:9, 19:22, 21:11, 22:11, 24:2, 34:4, 35:24, 36:17, 38:9, 38:13, 38:18, 38:24, 39:15, 39:22, 49:2, 49:13, 49:15, 50:2, 50:7,

50:16, 53:1, 53:3, 56:5, 68:9, 69:5, 70:9, 70:20, 71:9
**cases** [10] - 5:21, 5:24, 7:7, 7:12, 7:13, 7:17, 12:10, 12:11, 70:12, 70:15
**caused** [1] - 9:4
**causes** [3] - 12:20, 65:9, 79:6
**causing** [2] - 78:5, 78:21
**centimeter** [6] - 56:19, 59:12, 59:16, 60:2, 60:4, 60:9
**centimeters** [1] - 60:7
**CENTRAL** [2] - 1:7, 85:7
**Central** [8] - 3:16, 8:15, 19:19, 22:7, 22:20, 23:3, 23:5, 25:2
**certain** [11] - 6:20, 9:1, 11:24, 18:2, 26:2, 26:13, 29:23, 56:13, 73:14, 79:22, 80:12
**certainly** [9] - 7:16, 25:19, 26:6, 27:1, 35:2, 44:23, 45:12, 58:21, 74:16
**CERTIFICATE** [1] - 82:1
**certification** [1] - 11:7
**certified** [4] - 11:11, 11:18, 11:20
**certify** [3] - 82:3, 82:7, 82:12
**certifying** [2] - 10:12, 10:25
**challenge** [1] - 38:10
**Chamberlin** [1] - 13:12
**Change** [1] - 84:9
**change** [5] - 17:14, 84:3, 84:3, 84:4
**Changed** [1] - 84:9
**changed** [3] - 25:21, 26:4, 27:6
**changes** [3] - 42:7, 83:3, 84:2
**characterize** [1] - 60:10
**characterized** [1] - 61:4
**charge** [1] - 8:20
**charged** [1] - 72:8
**chart** [1] - 59:15
**check** [1] - 22:24
**Children's** [15] - 34:10, 34:14, 38:8,

38:9, 38:18, 38:23, 39:14, 39:22, 40:16, 41:4, 41:9, 53:3, 53:6, 66:10, 68:4
**choice** [1] - 78:3
**chose** [1] - 62:13
**Chris** [9] - 3:15, 16:22, 20:11, 20:14, 35:7, 73:6, 73:7, 81:3
**CHRISTOPHER** [1] - 85:15
**Christopher** [1] - 1:21
**Cindy** [2] - 38:23, 39:21
**circuit** [1] - 67:1
**citation** [1] - 75:7
**citations** [7] - 43:3, 43:9, 66:7, 66:9, 66:11, 66:19, 75:2
**cite** [7] - 32:25, 40:15, 42:18, 47:21, 63:1, 75:6, 75:8
**cited** [20] - 27:11, 27:20, 29:1, 33:22, 34:18, 37:15, 40:1, 40:6, 40:12, 41:13, 46:21, 47:7, 47:9, 48:17, 53:7, 60:25, 62:7, 62:12, 62:14, 62:25
**cites** [3] - 42:17, 42:18, 62:11
**citing** [1] - 26:2
**CIVIL** [1] - 1:5
**clarification** [1] - 75:11
**clarify** [3] - 20:12, 73:17, 73:23
**clean** [9] - 19:1, 19:2, 64:24, 64:25, 65:3, 65:11, 65:12, 71:18
**clear** [5] - 8:25, 38:3, 46:6, 46:25, 63:13
**clearly** [1] - 41:7
**client** [2] - 26:7, 69:23
**close** [6] - 4:11, 12:13, 12:16, 29:17, 29:20, 64:8
**closer** [1] - 62:6
**CMP** [7] - 16:10, 21:16, 21:24, 22:13, 31:16, 32:24, 56:5
**Code** [4] - 2:13, 9:14, 9:19, 10:20
**cold** [1] - 37:9
**collaborated** [1] - 68:25
**collaborative** [2] - 41:6, 41:8
**comfortable** [2] -

42:13, 42:15
**coming** [3] - 15:6, 43:2, 73:14
**commencing** [1] - 1:13
**Commission** [10] - 6:3, 6:4, 7:2, 7:22, 14:4, 49:22, 56:5, 56:8, 82:22, 83:20
**commonly** [1] - 78:10
**communicate** [2] - 28:6, 54:19
**communicating** [1] - 25:22
**communication** [2] - 24:7, 29:6
**Communications** [1] - 56:8
**companies** [6] - 28:5, 48:24, 49:10, 49:24, 50:12, 52:18
**COMPANY** [2] - 1:7, 85:7
**company** [8] - 28:10, 29:3, 50:21, 51:16, 51:22, 51:25, 52:5, 71:2
**Company** [3] - 8:16, 23:3, 23:6
**Company's** [4] - 19:19, 22:8, 22:21, 25:3
**compare** [2] - 59:5, 59:14
**complaint** [1] - 5:15
**COMPLETED** [1] - 83:13
**completed** [1] - 37:16
**completely** [1] - 77:19
**compliance** [1] - 11:1
**comply** [1] - 16:6
**components** [1] - 67:4
**Computer** [1] - 82:9
**computer** [2] - 44:17, 44:23
**Computer-Aided** [1] - 82:9
**computerized** [1] - 16:14
**computers** [1] - 18:12
**concerned** [2] - 46:7, 68:16
**concerning** [1] - 16:9
**concerns** [1] - 6:14
**concluded** [1] - 81:12
**conclusions** [2] - 21:23, 45:21
**condition** [2] - 29:5, 68:14
**conditioning** [1] -

18:14

**conditions** [1] - 29:5
**conduct** [1] - 30:5
**conducted** [3] - 30:9, 54:25, 56:25
**conductors** [2] - 32:1, 32:2
**configuration** [2] - 63:21, 78:14
**confused** [1] - 36:13
**confusion** [1] - 55:9
**conjunction** [2] - 7:9, 7:17
**connect** [2] - 18:20, 35:24
**connected** [1] - 15:3
**connection** [12] - 3:20, 4:24, 27:20, 34:13, 34:17, 38:12, 49:13, 50:15, 52:25, 56:4, 67:9, 67:24
**Connolly** [2] - 1:23, 7:19
**connotation** [1] - 65:16
**consent** [1] - 3:5
**consideration** [2] - 45:5, 46:2
**considerations** [1] - 12:18
**consists** [1] - 11:22
**consulting** [1] - 13:1
**consumer** [1] - 28:13
**contact** [3] - 13:6, 38:20, 38:21
**contacted** [3] - 8:4, 8:9, 39:16
**contacting** [1] - 8:17
**contain** [2] - 18:7, 18:10
**contained** [2] - 57:13, 84:2
**content** [1] - 34:24
**context** [1] - 75:25
**continue** [1] - 73:15
**continuous** [2] - 48:4, 56:14
**contradiction** [1] - 74:6
**contradictions** [2] - 74:2, 74:11
**control** [2] - 76:18, 76:24
**controlling** [1] - 31:19
**conversation** [7] - 8:12, 69:22, 70:19, 70:23, 71:11, 71:14, 71:22
**conversations** [2] - 71:24, 71:25

**conversion** [3] - 30:10, 30:17, 30:23
**converted** [1] - 60:7
**converter** [1] - 67:3
**convey** [2] - 28:8, 28:14
**conveyed** [1] - 8:17
**copper** [2] - 32:1, 32:2
**copy** [3] - 22:1, 57:24, 85:10
**Corporation** [5] - 6:4, 7:2, 7:22, 14:4, 49:21
**correct** [43] - 5:4, 5:17, 5:25, 6:1, 7:5, 7:6, 7:10, 9:5, 18:18, 18:21, 23:10, 28:24, 28:25, 29:3, 30:7, 31:24, 36:18, 37:2, 37:19, 38:5, 38:10, 38:15, 41:2, 46:10, 47:2, 49:5, 53:12, 53:13, 53:18, 54:13, 59:13, 63:14, 63:15, 63:18, 65:17, 67:10, 67:17, 69:18, 74:21, 75:13, 75:14, 77:2, 79:18
**corrections** [1] - 83:4
**correctly** [2] - 50:22, 77:18
**correspond** [1] - 59:14
**correspondence** [1] - 72:22
**cost** [1] - 67:20
**coun** [1] - 66:18
**counsel** [11] - 2:16, 3:4, 5:14, 25:10, 25:23, 43:1, 66:16, 70:21, 71:15, 72:1, 74:23
**couple** [4] - 3:25, 20:9, 73:24, 77:6
**course** [3] - 10:5, 12:17, 25:9
**court** [4] - 27:19, 45:5, 46:2, 69:18
**COURT** [1] - 1:1
**Court** [1] - 3:18
**cover** [1] - 84:6
**crazy** [1] - 39:11
**create** [12] - 17:5, 18:4, 28:2, 28:11, 28:15, 28:18, 28:20, 29:6, 29:14, 31:8, 60:21, 75:13
**created** [14] - 10:18, 15:23, 16:9, 17:23, 35:24, 36:8, 46:4,

53:7, 75:16, 77:13, 79:15, 79:20, 79:24
**creates** [3] - 17:22, 30:24, 63:2
**credentials** [1] - 46:3
**critique** [1] - 46:13
**CRR** [1] - 1:14
**ctaintor@nhdlaw.com** [1] - 85:18
**cumulative** [3] - 31:1, 31:5, 31:10
**current** [4] - 5:3, 30:11, 78:13
**Current** [1] - 10:11
**curtain** [1] - 39:10
**cut** [2] - 23:17, 23:19
**CV** [2] - 5:3, 11:22
**CVs** [1] - 3:24
**cycle** [5] - 21:16, 47:16, 47:25, 48:4, 52:4
**cycled** [3] - 52:2, 52:7, 52:9
**cycles** [1] - 48:3
**cycling** [1] - 50:24

# D

**Dafna** [1] - 39:17
**damage** [2] - 12:8, 12:12
**data** [12] - 28:5, 28:9, 29:2, 32:9, 44:22, 47:23, 57:13, 57:19, 59:18, 62:4, 62:7
**Data** [2] - 22:21, 23:4
**date** [2] - 67:8
**Date** [2] - 83:9, 83:18
**dated** [2] - 1:12, 23:6
**Dated** [1] - 82:16
**Dave** [5] - 16:16, 22:1, 22:24, 23:11, 81:5
**David** [2] - 1:20, 13:10
**days** [1] - 85:11
**dB** [1] - 59:20
**dBmW** [1] - 60:2
**DC** [3] - 30:18, 30:24, 67:3
**De** [1] - 38:8
**deal** [1] - 17:4
**dealing** [1] - 10:11
**death** [2] - 12:4, 12:9
**decades** [1] - 11:17
**decibel** [2] - 59:16, 60:8
**decibels** [2] - 59:18, 60:8
**deciding** [2] - 45:2, 45:24
**decision** [5] - 27:15,

27:16, 27:20, 41:12, 74:18
**decreases** [1] - 79:4
**deed** [1] - 83:16
**Defendant** [2] - 1:8, 1:21
**Defense** [14] - 34:10, 34:14, 38:9, 38:18, 38:24, 39:15, 39:22, 40:16, 41:4, 41:9, 53:4, 53:6, 66:11, 68:4
**definitely** [2] - 32:12, 61:7
**definition** [2] - 54:7, 78:23
**Defund** [1] - 53:3
**degree** [1] - 11:24
**densities** [1] - 60:11
**density** [5] - 56:7, 56:12, 59:7
**Deponent** [2] - 2:2, 84:22
**DEPONENT** [12] - 17:2, 20:15, 20:17, 20:25, 35:7, 35:12, 35:14, 57:25, 58:2, 73:6, 81:3, 81:11
**deponent** [3] - 3:8, 82:4, 82:11
**deposed** [1] - 3:12
**DEPOSITION** [1] - 1:11
**Deposition** [7] - 2:9, 5:1, 15:21, 25:7, 41:14, 49:18, 85:8
**deposition** [14] - 3:1, 3:3, 3:4, 3:20, 3:23, 5:2, 15:20, 16:3, 67:7, 67:13, 81:12, 82:7, 84:3, 85:10
**depositions** [1] - 4:1
**describe** [4] - 61:23, 62:5, 78:17, 78:20
**described** [10] - 24:10, 30:17, 36:6, 36:11, 36:15, 44:7, 49:3, 60:11, 60:24, 61:22
**Description** [1] - 2:8
**description** [2] - 16:1, 23:20
**descriptor** [3] - 64:12, 64:13, 64:20
**designated** [1] - 13:7
**designed** [1] - 66:25
**detailed** [1] - 20:6
**detectable** [3] - 54:12, 54:15, 55:5
**detected** [2] - 53:17, 55:6

**determine** [5] - 45:15, 45:19, 51:23, 57:1, 76:18
**determined** [2] - 50:19, 53:15
**DeTROY** [1] - 85:15
**developed** [1] - 43:15
**device** [7] - 7:14, 51:17, 51:20, 59:2, 75:23, 77:24
**devices** [16] - 7:9, 14:12, 17:24, 18:1, 18:6, 28:7, 28:11, 31:6, 31:7, 58:19, 58:20, 75:13, 75:17, 75:22, 76:16, 77:19
**difference** [4] - 75:15, 75:18, 75:25, 76:21
**differences** [4] - 74:5, 74:7, 74:12, 74:17
**different** [20] - 22:7, 25:17, 27:3, 33:23, 34:3, 48:3, 53:11, 53:17, 54:15, 55:6, 55:7, 55:13, 55:14, 57:2, 63:17, 63:18, 63:21, 78:7, 80:20
**differently** [3] - 36:21, 54:20, 63:17
**difficult** [1] - 78:13
**direct** [3] - 30:11, 49:20, 73:15
**direction** [1] - 41:1
**directly** [1] - 8:10
**dirty** [3] - 64:9, 64:22, 65:14
**discharge** [1] - 12:13
**discoverability** [1] - 16:17
**discuss** [2] - 8:23, 25:25
**discussed** [13] - 12:6, 14:3, 25:10, 25:25, 41:24, 70:24, 70:25, 71:2, 71:6, 71:10, 71:17, 74:16, 76:22
**discussion** [8] - 25:15, 27:24, 58:4, 63:8, 71:15, 72:2, 75:12, 76:7
**disinterested** [1] - 82:12
**dismiss** [1] - 5:16
**display** [1] - 80:9
**dispute** [3] - 16:16, 16:19, 16:21
**disputing** [1] - 56:3
**distance** [1] - 32:5
**distinction** [1] - 60:14
**distinctions** [1] -

77:12
**distinguish** [1] - 51:4
**distorted** [2] - 65:10, 65:12
**distributed** [2] - 62:23, 63:3
**distribution** [1] - 31:18
**District** [1] - 3:18
**DISTRICT** [2] - 1:1, 1:1
**Docket** [1] - 1:6
**doctor** [1] - 13:14
**document** [13] - 20:19, 22:9, 22:22, 23:2, 23:5, 23:12, 23:16, 24:1, 24:3, 46:4, 56:23, 69:6, 75:8
**documents** [11] - 5:6, 5:7, 5:11, 15:22, 16:7, 19:15, 27:11, 42:19, 43:1, 68:3, 75:6
**dog** [1] - 39:4
**Dogs** [1] - 65:19
**dogs** [6] - 39:1, 39:5, 39:11, 65:23, 66:3, 73:5
**done** [14] - 27:6, 36:12, 36:16, 37:13, 44:5, 44:22, 48:22, 52:16, 52:19, 62:18, 67:9, 69:22, 73:1, 76:5
**doubt** [2] - 56:22, 79:25
**down** [2] - 20:18, 79:11
**downstream** [1] - 80:4
**Dr** [1] - 13:10
**draft** [3] - 27:4, 41:21, 41:23
**drafted** [2] - 42:4, 66:6
**drafting** [1] - 42:7
**driving** [1] - 67:2
**due** [1] - 12:15
**duly** [1] - 3:11
**duration** [1] - 78:24
**during** [3] - 16:23, 43:15, 52:2
**duty** [5] - 21:16, 47:16, 47:25, 48:3, 48:4

### E

**e-mail** [2] - 72:14, 72:22
**easier** [2] - 17:1, 59:18
**economic** [2] - 11:25, 12:1

**ED** [2] - 1:3, 85:7
**Ed** [2] - 1:23, 3:17
**Edgecomb** [3] - 1:14, 82:2, 82:20
**edification** [1] - 52:8
**edits** [1] - 42:9
**effect** [1] - 76:24
**effects** [6] - 8:23, 9:23, 12:6, 68:18, 78:5, 78:6
**effort** [2] - 41:7, 41:8
**either** [11] - 11:11, 12:25, 16:19, 25:3, 25:22, 38:4, 40:13, 66:8, 66:15, 68:4, 78:3
**ejected** [1] - 12:19
**elec** [1] - 78:17
**electr** [1] - 64:17
**Electric** [1] - 46:18
**electric** [10] - 12:16, 31:16, 46:13, 48:24, 49:9, 49:23, 50:12, 50:21, 52:17, 53:10
**electrical** [19] - 4:11, 8:24, 12:2, 12:13, 13:1, 17:24, 30:5, 30:15, 31:18, 31:25, 32:1, 32:17, 51:25, 60:24, 61:6, 62:10, 65:15, 75:24, 78:17
**Electrical** [2] - 10:20, 68:13
**electricity** [5] - 12:7, 51:16, 64:9, 64:21, 64:23
**electrocution** [2] - 12:10, 12:11
**electromagnetic** [1] - 31:15
**electronic** [1] - 66:24
**electronics** [1] - 18:11
**electrosensitive** [1] - 30:1
**embedded** [1] - 28:4
**EMI** [2] - 67:15, 67:19
**emissions** [18] - 32:20, 32:24, 40:4, 40:7, 40:9, 46:22, 46:24, 47:12, 48:21, 53:16, 53:20, 54:12, 54:15, 56:6, 56:18, 76:13, 76:24, 76:25
**emitted** [2] - 9:3, 30:4
**emphasize** [1] - 28:4
**Enclosed** [1] - 85:10
**enclosed** [1] - 85:12
**encompassing** [1] - 80:20
**end** [1] - 79:22

**ended** [1] - 57:21
**energy** [4] - 32:3, 40:8, 46:23, 47:12
**engineer** [6] - 4:11, 11:13, 18:22, 30:15, 65:16, 68:13
**Engineering** [2] - 2:9, 10:10
**engineers** [1] - 78:17
**Engineers** [3] - 2:13, 9:14, 9:17
**enhance** [1] - 63:13
**enlisted** [1] - 38:7
**entailed** [1] - 71:16
**enter** [1] - 62:9
**entering** [2] - 60:23, 61:6
**entire** [2] - 75:21, 75:24
**envious** [1] - 37:11
**environment** [7] - 53:14, 54:24, 55:16, 55:18, 55:21, 55:22, 55:23
**environmental** [1] - 23:23
**equipment** [9] - 10:12, 11:4, 11:6, 11:10, 11:16, 14:11, 14:13, 14:15, 65:2
**equivalent** [1] - 62:22
**Erik** [1] - 20:12
**ERIK** [6] - 1:11, 2:2, 3:11, 83:2, 83:7, 85:8
**errata** [7] - 83:4, 84:2, 84:5, 84:5, 85:12, 85:12, 85:13
**ERRATA** [1] - 84:1
**errors** [1] - 85:12
**Esq** [2] - 1:23, 7:19
**ESQ** [1] - 85:15
**Esquire** [2] - 1:20, 1:21
**essentially** [2] - 38:9, 67:18
**established** [3] - 50:10, 56:12, 56:14
**etc** [1] - 84:4
**Ethics** [2] - 2:13, 9:15, 9:19
**event** [1] - 82:13
**events** [1] - 23:23
**ex** [1] - 84:4
**exact** [2] - 74:25, 76:6
**exactly** [2] - 31:2, 35:20
**Examination** [1] - 2:3
**EXAMINATION** [3] - 3:13, 73:20, 77:7

**examined** [1] - 3:12
**example** [7] - 5:15, 29:1, 42:25, 51:7, 55:1, 59:4, 80:15
**examples** [1] - 28:23
**exceed** [6] - 40:7, 46:22, 47:12, 56:18, 56:20, 64:5
**exceeded** [1] - 50:20
**exceeding** [2] - 63:23, 64:4
**exception** [2] - 5:10, 6:23
**exclude** [1] - 70:11
**excluded** [1] - 70:8
**executed** [1] - 85:13
**Exhibit** [37] - 4:25, 5:1, 5:22, 6:4, 6:8, 6:22, 7:1, 9:13, 15:21, 19:12, 19:20, 20:1, 21:4, 22:2, 25:7, 33:6, 34:22, 38:15, 39:25, 41:14, 42:3, 44:13, 44:19, 44:21, 49:17, 49:18, 50:2, 50:7, 51:8, 67:7, 67:15, 67:22, 67:23, 68:8, 69:3, 70:15, 70:19
**Exhibits** [1] - 2:16
**exhibits** [3] - 4:21, 20:13, 21:25
**EXHIBITS** [1] - 2:7
**existence** [1] - 38:14
**expect** [13] - 18:2, 18:11, 29:16, 45:23, 54:17, 56:16, 57:17, 63:19, 63:20, 64:2, 64:3, 64:5
**expected** [1] - 24:6
**experience** [3] - 48:22, 48:25, 52:15
**expert** [5] - 3:20, 8:5, 8:21, 13:6, 70:25
**expertise** [1] - 9:9
**Expires** [2] - 82:22, 83:20
**explain** [1] - 30:6
**explanation** [1] - 59:24
**explicitly** [1] - 56:17
**Exponent** [1] - 25:4
**exposure** [20] - 9:3, 27:21, 28:2, 28:12, 28:16, 28:18, 28:20, 29:7, 29:15, 29:21, 30:18, 30:20, 40:10, 46:25, 56:7, 56:15, 56:19, 58:25, 59:5, 60:21

**exposures** [4] - 60:12, 61:5, 61:21, 61:22
**express** [1] - 25:19
**expressed** [2] - 17:12, 43:17
**extent** [7] - 6:20, 27:13, 27:14, 29:23, 56:13, 79:22, 80:12

### F

**face** [1] - 29:13
**fact** [2] - 61:3, 64:24
**facts** [1] - 43:14
**failure** [1] - 7:14
**failures** [2] - 7:9, 7:17
**fair** [1] - 77:1
**fairly** [1] - 64:8
**fall** [1] - 15:25
**falls** [1] - 32:4
**familiar** [6] - 9:20, 34:5, 34:7, 46:18, 56:11, 58:20
**far** [5] - 9:9, 16:9, 29:8, 46:6, 68:16
**fault** [1] - 51:3
**FCC** [11] - 38:10, 40:8, 46:23, 47:13, 56:12, 56:17, 59:6, 59:10, 63:23, 64:4, 64:5
**February** [2] - 82:16, 85:5
**Federal** [1] - 56:8
**fellow** [1] - 73:1
**felt** [1] - 71:3
**few** [5] - 28:3, 28:22, 60:22, 70:18, 73:8
**field** [1] - 25:2
**fields** [3] - 12:15, 12:16
**fields/waves** [1] - 31:15
**figure** [6] - 33:3, 33:7, 33:10, 33:18, 72:23, 81:9
**file** [1] - 16:11
**filed** [2] - 49:12, 70:16
**filing** [1] - 34:16
**filter** [1] - 76:19
**finally** [1] - 27:6
**fine** [1] - 39:8
**finer** [1] - 55:19
**finish** [3] - 64:8, 70:1, 70:7
**Fire** [2] - 10:13, 10:16
**fire** [2] - 11:23, 12:1
**fires** [1] - 11:24
**first** [13] - 6:25, 8:6, 13:24, 19:18, 27:5, 28:17, 30:23, 34:9,

35:21, 38:13, 38:20, 58:16, 66:5
**five** [4] - 10:6, 35:8, 35:10, 69:25
**five-minute** [1] - 35:8
**flash** [2] - 12:18
**flesh** [1] - 71:19
**fleshed** [1] - 26:1
**flip** [1] - 31:11
**flood** [1] - 12:1
**fluctuation** [1] - 22:14
**focusing** [1] - 78:15
**follow** [4] - 32:7, 73:10, 77:4, 77:6
**follow-up** [2] - 73:10, 77:4
**followed** [1] - 58:3
**following** [1] - 83:4
**follows** [1] - 3:12
**Footnote** [6] - 27:7, 27:17, 27:20, 34:19, 40:1, 40:2
**footnote** [2] - 27:12, 40:3
**Footnotes** [3] - 40:25, 41:13, 43:9
**FOR** [1] - 85:9
**Forbes** [2] - 2:12, 67:15
**foregoing** [4] - 82:10, 83:2, 83:3, 83:16
**forensic** [2] - 10:6, 11:21
**form** [5] - 10:2, 50:1, 68:20, 83:3, 84:22
**format** [2] - 22:7, 42:16
**formatting** [3] - 26:3, 42:8, 43:3
**forming** [3] - 5:8, 21:18, 69:4
**formulating** [5] - 19:16, 19:22, 45:4, 68:8, 69:11
**forum** [1] - 13:1
**forward** [2] - 72:24, 81:7
**forwarded** [1] - 20:13
**frequencies** [14] - 28:3, 28:12, 28:16, 28:22, 29:7, 29:9, 29:11, 29:15, 29:19, 30:4, 30:9, 60:22, 62:23, 65:5
**frequency** [11] - 5:25, 9:3, 9:23, 32:8, 57:1, 58:15, 59:6, 64:13, 65:8, 66:25, 79:7
**FRIEDMAN** [2] - 1:3, 85:7

**Friedman** [24] - 1:23, 3:17, 8:10, 8:14, 13:17, 19:8, 22:21, 23:4, 25:10, 25:22, 29:25, 38:17, 38:19, 43:1, 66:15, 66:17, 68:3, 70:20, 70:24, 71:14, 71:25, 72:14, 72:22, 74:23
**Friedman's** [1] - 39:3
**front** [2] - 58:7, 76:6
**full** [2] - 20:5, 82:10
**function** [1] - 45:16
**functionality** [1] - 23:21
**functions** [3] - 23:21, 66:22, 66:24

**G**

**gain** [1] - 8:13
**GE** [2] - 14:24, 69:7
**gee** [1] - 26:7
**general** [1] - 45:2
**generally** [1] - 15:11
**generated** [10] - 15:14, 31:9, 31:24, 32:11, 36:19, 40:18, 40:22, 69:8, 77:14, 77:16
**generators** [1] - 77:21
**gentleman** [2] - 6:9, 36:10
**gist** [1] - 69:12
**given** [13] - 3:25, 21:12, 43:24, 44:22, 47:14, 47:17, 47:23, 52:21, 54:16, 55:5, 59:16, 78:13, 82:11
**God** [2] - 37:4, 37:8
**gotcha** [7] - 11:21, 25:1, 32:19, 39:19, 53:5, 79:1, 81:1
**grateful** [1] - 4:18
**Great** [2] - 73:19, 81:7
**great** [1] - 81:11
**greater** [2] - 55:4, 55:17
**grounding** [3] - 68:15, 68:20, 68:21
**GROUP** [1] - 85:1
**guess** [7] - 4:4, 17:4, 21:4, 30:13, 49:16, 55:19, 66:1
**guidelines** [4] - 40:9, 40:10, 46:24, 47:13
**Gyr** [1] - 36:8
**GYR** [1] - 36:8

**H**

**hand** [1] - 82:15
**handled** [1] - 30:11
**handwritten** [2] - 16:14, 16:15
**HANSON** [1] - 85:15
**Harding** [27] - 13:21, 13:25, 14:2, 14:8, 14:11, 14:17, 15:25, 17:11, 17:19, 18:18, 18:20, 18:22, 19:6, 24:9, 24:13, 24:20, 35:22, 35:25, 36:10, 36:12, 37:14, 37:17, 37:25, 51:18, 73:2, 73:23, 74:1
**Harding's** [5] - 14:9, 14:20, 14:23, 14:24, 16:8
**harm** [1] - 9:4
**harmful** [1] - 78:5
**harmonics** [2] - 19:4, 64:17
**hazardous** [1] - 68:14
**head** [4] - 33:19, 57:8
**heading** [2] - 32:20, 48:20
**health** [3] - 8:2, 9:23, 65:16
**Health** [14] - 34:10, 34:14, 38:8, 38:9, 38:18, 38:23, 39:15, 39:22, 40:16, 41:4, 41:9, 53:3, 53:6, 66:10
**hear** [1] - 66:4
**heard** [1] - 77:10
**heat** [1] - 18:14
**heightens** [1] - 30:19
**help** [3] - 8:18, 17:13, 68:21
**helpful** [1] - 75:7
**hereby** [2] - 82:3, 83:14
**Heroux** [1] - 13:14
**HEROUX** [1] - 13:14
**Hf35-c** [2] - 58:22, 59:2
**high** [5] - 5:24, 5:25, 9:23, 64:13, 65:7
**high-frequency** [3] - 5:25, 9:23, 64:13
**high-voltage** [1] - 5:24
**higher** [2] - 32:8, 65:8
**his/her** [2] - 83:16, 83:16
**history** [1] - 69:17
**Hm** [1] - 42:20
**hm** [1] - 80:5

**Hm-hmm** [1] - 42:20
**hm-hmm** [1] - 80:5
**hmm** [2] - 42:20, 80:5
**hold** [1] - 56:23
**home** [11] - 13:4, 28:7, 30:5, 37:2, 39:9, 51:17, 51:19, 54:16, 63:10, 76:14, 76:25
**homes** [2] - 53:11, 53:18
**hooked** [1] - 51:11
**hopefully** [4] - 17:6, 37:23, 69:25, 81:10
**hour** [1] - 66:2
**house** [21] - 32:7, 32:10, 32:13, 54:24, 55:3, 55:22, 61:5, 61:9, 61:12, 61:13, 62:24, 63:3, 71:1, 71:4, 75:21, 77:15, 77:20, 78:2, 78:12, 79:17, 79:19
**house's** [4] - 60:23, 61:6, 62:10, 80:11
**household** [1] - 19:5
**houses** [2] - 63:18, 63:21, 63:24, 64:4
**human** [6] - 9:5, 9:23, 12:7, 12:8, 29:7, 65:16
**hundred** [1] - 48:13
**hunting** [1] - 20:18
**hypersensitive** [1] - 30:1

**I**

**I-210** [1] - 14:24
**idea** [2] - 59:21, 59:22
**ideas** [1] - 71:19
**identical** [2] - 22:4, 22:6
**identified** [1] - 58:19
**identify** [3] - 25:21, 26:22, 70:14
**ignorance** [2] - 30:16, 80:9
**ill** [1] - 71:3
**impact** [2] - 8:1
**implementation** [1] - 6:12
**important** [1] - 26:8
**importantly** [1] - 4:10
**impregnation** [1] - 12:20
**IN** [1] - 82:15
**include** [10] - 5:7, 64:15, 64:16, 64:17, 64:18, 72:15, 75:5, 80:15

**included** [4] - 23:13, 40:25, 67:17, 74:13
**including** [1] - 15:22
**increase** [1] - 63:14
**INDEX** [1] - 2:1
**indicating** [1] - 85:12
**indication** [1] - 63:22
**individual** [12] - 7:23, 12:12, 12:19, 14:2, 20:19, 29:12, 29:22, 34:23, 35:1, 35:3, 39:24, 76:12
**individuals** [4] - 12:3, 18:25, 34:23, 71:6
**industrial** [6] - 10:12, 10:21, 10:22, 11:3, 11:10, 11:11
**industry** [1] - 46:14
**influenced** [1] - 44:14
**inform** [1] - 24:1
**information** [14] - 17:5, 21:5, 21:16, 21:19, 21:20, 22:9, 22:12, 24:3, 27:19, 34:21, 40:19, 43:14, 52:12, 81:8
**informed** [2] - 21:10, 22:10
**initial** [2] - 8:12, 70:19
**injured** [1] - 12:22
**injuries** [1] - 12:15
**injury** [1] - 12:4
**input** [4] - 25:9, 66:18, 75:1, 75:5
**inside** [2] - 59:1, 78:12
**installed** [2] - 51:16, 51:21
**instance** [1] - 63:2
**instances** [4] - 12:5, 12:17, 26:13, 47:6
**instead** [1] - 65:11
**Institute** [1] - 46:19
**INSTRUCTIONS** [2] - 84:1, 85:9
**intend** [1] - 9:2
**intended** [1] - 54:19
**intense** [15] - 28:2, 28:11, 28:15, 28:18, 28:20, 29:6, 29:15, 29:21, 40:5, 60:12, 60:21, 61:4, 61:23, 62:2, 62:5
**intensity** [1] - 32:10
**intent** [1] - 28:14
**intention** [1] - 28:8
**interact** [1] - 29:10
**interest** [1] - 71:4
**interpretation** [1] - 54:6
**interrog** [1] - 19:25

**Interrogatories** [1] - 2:10
**interrogatories** [3] - 19:20, 19:21, 21:10
**Interrogatory** [1] - 21:6
**interrogatory** [1] - 21:9
**interrupt** [1] - 54:4
**interruption** [1] - 39:21
**investigations** [1] - 11:23
**invoice** [3] - 67:8, 72:2, 72:4
**Invoice** [1] - 2:15
**involve** [2] - 71:14, 72:1
**involved** [3] - 5:24, 10:6, 70:12
**involvement** [1] - 34:4
**involves** [1] - 7:3
**involving** [1] - 22:13
**Isotrope** [19] - 53:8, 53:15, 55:2, 55:20, 57:1, 57:9, 57:22, 58:6, 58:13, 60:12, 61:1, 61:3, 62:7, 62:17, 63:8, 63:16, 63:18, 63:22, 63:24
**issue** [4] - 6:6, 7:16, 35:21, 78:15
**issues** [8] - 5:18, 5:24, 7:3, 7:8, 22:13, 26:16, 68:15, 71:5
**item** [1] - 22:20
**iterations** [1] - 41:17
**itself** [5] - 26:18, 26:23, 62:5, 68:14, 74:22

**J**

**January** [3] - 1:12, 1:13, 85:11
**joined** [1] - 7:19
**judicial** [1] - 7:24
**Julie** [3] - 1:14, 82:2, 82:20
**July** [1] - 82:23
**jump** [1] - 20:11
**jurisdiction** [2] - 11:14, 11:19

**K**

**Kent** [1] - 13:12
**kidding** [1] - 39:8
**kind** [6] - 8:18, 10:1, 30:21, 36:9, 54:1,

70:15
**kinds** [1] - 78:11
**knowledge** [3] - 7:23, 20:3, 70:9
**known** [1] - 63:9

**L**

**Laboratories** [1] - 10:22
**laboratory** [1] - 11:12
**Landis+Gyr** [1] - 36:8
**Lane** [2] - 23:9, 23:10
**Laney** [2] - 23:9, 23:10
**language** [12] - 25:12, 25:15, 26:11, 26:17, 26:23, 27:17, 43:2, 43:4, 43:6, 74:25, 76:4, 76:6
**Lanser** [3] - 1:20, 2:5, 5:7
**LANSER** [15] - 16:18, 20:11, 20:16, 20:18, 20:23, 21:1, 23:13, 70:2, 73:7, 73:10, 73:13, 73:19, 73:21, 77:3, 81:6
**Lanser's** [2] - 72:19, 77:11
**large** [4] - 41:21, 42:2, 42:3, 55:22
**last** [4] - 8:8, 10:6, 30:17, 39:17
**lawsuit** [3] - 8:15, 34:17, 67:10
**lawyer** [1] - 26:7
**lawyers** [3] - 19:8, 72:11, 72:15
**lays** [1] - 23:16
**least** [5] - 3:25, 41:15, 47:1, 59:21, 70:7
**leave** [2] - 17:7, 36:22, 73:3
**leaving** [2] - 19:7, 37:7
**legal** [1] - 5:10
**less** [1] - 65:12
**letter** [1] - 84:6
**level** [1] - 56:20
**levels** [16] - 53:22, 54:12, 54:13, 54:15, 54:23, 55:3, 55:4, 55:5, 55:6, 55:7, 55:13, 56:7, 56:18, 57:1, 59:1, 59:5
**lightning** [1] - 64:18
**likely** [4] - 11:17, 13:5, 18:9, 64:2
**limited** [2] - 15:22, 27:13
**limiting** [1] - 68:21

**limits** [3] - 40:8, 46:23, 47:13
**line** [2] - 65:3, 84:3
**linear** [3] - 76:2, 76:3, 76:7
**lines** [1] - 75:1
**link** [1] - 20:12
**list** [4] - 5:21, 16:5, 16:6, 84:3
**listed** [2] - 5:11, 8:6
**listen** [1] - 37:9
**litigation** [2] - 67:25, 69:1
**live** [1] - 50:4
**living** [1] - 18:24
**load** [1] - 79:22
**location** [4] - 75:9, 79:24, 80:3
**lone** [1] - 72:12
**look** [19] - 6:22, 16:5, 27:24, 33:25, 44:8, 44:13, 44:16, 45:8, 45:13, 48:2, 49:17, 55:24, 58:10, 62:6, 65:1, 69:17, 72:24, 79:23, 81:7
**looked** [4] - 46:5, 46:16, 48:19, 56:9
**looking** [7] - 8:18, 8:22, 19:14, 48:12, 59:23, 69:16, 70:25
**looks** [6] - 6:24, 70:19, 71:13
**loss** [4] - 11:25, 12:1, 32:2, 32:18
**low** [1] - 32:18

**M**

**machinery** [2] - 10:21, 11:11
**magazine** [1] - 67:15
**magnetic** [1] - 12:15
**magnitude** [2] - 43:13, 59:21
**mail** [2] - 72:14, 72:22
**main** [1] - 7:24
**MAINE** [3] - 1:1, 1:7, 85:7
**Maine** [17] - 1:15, 3:16, 3:18, 8:15, 19:19, 22:8, 22:21, 23:3, 23:5, 25:2, 25:5, 56:4, 69:18, 69:20, 82:3, 82:16, 83:14
**majority** [1] - 42:6
**malfunction** [1] - 7:13
**man** [1] - 65:23
**manner** [3] - 3:6,

75:15, 76:12
**manufactured** [2] - 11:1, 11:3
**manufacturers** [1] - 10:12
**manufacturing** [1] - 10:10
**marked** [5] - 4:21, 5:22, 21:24, 21:25, 22:2
**material** [3] - 15:18, 22:1, 45:3
**materials** [1] - 67:12
**matter** [3] - 6:18, 14:3, 85:11
**maximum** [1] - 56:6
**ME** [2] - 85:2, 85:17
**mean** [23] - 16:24, 19:2, 21:19, 27:4, 31:4, 41:17, 42:17, 43:15, 44:21, 47:19, 50:3, 53:22, 54:4, 54:18, 55:1, 55:24, 59:3, 60:6, 66:20, 69:12, 73:15, 77:19, 79:12
**meaning** [1] - 48:23
**meant** [1] - 69:10
**measurable** [1] - 55:3
**measure** [2] - 51:16, 51:23
**measured** [5] - 15:4, 15:5, 50:19, 58:15
**measurement** [3] - 51:5, 55:15
**measurements** [7] - 54:25, 58:13, 58:24, 58:25, 59:3, 59:9, 59:13
**measures** [1] - 80:13
**measuring** [3] - 14:11, 51:19, 65:2
**mechanism** [1] - 30:16
**medical** [2] - 10:1, 10:2
**member** [2] - 9:16, 9:18
**mention** [2] - 24:12, 24:23
**mentioned** [4] - 18:17, 27:2, 80:18, 84:6
**mesh** [1] - 24:6
**met** [1] - 14:2
**metal** [1] - 12:20
**meter** [40] - 6:12, 8:23, 13:4, 14:12, 14:24, 15:3, 15:14, 17:16, 17:21, 21:13, 23:20, 24:15, 24:17, 28:4,

28:10, 29:2, 29:9, 29:14, 31:19, 36:8, 36:9, 50:14, 50:23, 51:6, 51:10, 51:15, 51:24, 52:2, 60:3, 67:2, 68:14, 68:19, 69:8, 71:1, 71:4, 76:13, 77:13, 78:13, 79:16
**metering** [1] - 65:2
**meters** [41] - 9:4, 13:2, 17:24, 21:17, 23:17, 23:24, 24:4, 25:3, 28:2, 28:6, 28:10, 28:18, 28:19, 28:23, 29:3, 31:16, 32:24, 40:5, 40:7, 44:7, 47:16, 48:1, 48:23, 49:8, 49:23, 50:11, 52:17, 53:10, 53:11, 53:15, 53:21, 56:5, 60:21, 66:21, 75:17, 75:20, 76:22, 76:25, 77:15
**meters'** [2] - 30:4, 53:16
**method** [1] - 66:5
**middle** [1] - 32:23
**midway** [1] - 6:25
**Midwest** [1] - 10:11
**might** [9] - 17:1, 21:5, 33:16, 44:1, 46:1, 59:22, 76:8, 80:22
**milliwatt** [3] - 56:18, 59:12, 60:3
**milliwatts** [2] - 59:16, 60:4, 60:8
**mind** [3] - 18:16, 45:11, 64:21
**Minnesota** [2] - 36:25, 37:2
**minute** [1] - 35:8
**minutes** [4] - 35:11, 56:21, 57:23, 69:25
**mis** [1] - 24:18
**miss** [1] - 73:16
**misspoke** [1] - 24:19
**misunderstood** [1] - 24:18
**mitigate** [5] - 22:18, 68:18, 68:23, 77:25, 78:5
**mitigation** [1] - 80:13
**mode** [9] - 17:21, 18:7, 18:10, 30:11, 30:24, 31:9, 32:12, 61:17, 63:2
**model** [1] - 44:1
**modeling** [3] - 44:3, 44:17, 44:23

**modest** [1] - 67:20
**moment** [4] - 6:23, 27:23, 41:25, 44:10
**monitor** [3] - 50:14, 77:21, 77:22
**monitoring** [1] - 50:13
**monitors** [2] - 18:11, 18:12
**morning** [7] - 3:15, 4:23, 5:6, 15:18, 22:1, 22:24, 23:12
**most** [4] - 4:10, 4:22, 26:4, 77:22
**mostly** [1] - 20:2
**motion** [1] - 5:16
**motions** [2] - 70:11, 70:15
**MR** [45] - 3:14, 7:20, 16:16, 16:18, 16:23, 17:3, 17:9, 20:11, 20:16, 20:18, 20:21, 20:23, 21:1, 21:3, 23:11, 23:13, 23:18, 35:9, 35:13, 35:15, 35:17, 39:2, 57:21, 58:1, 58:5, 65:20, 69:21, 70:2, 70:4, 72:17, 73:7, 73:9, 73:10, 73:12, 73:13, 73:18, 73:19, 73:21, 77:3, 77:5, 77:8, 81:1, 81:5, 81:6, 81:7
**multiple** [1] - 26:21
**multitudes** [1] - 79:6
**must** [2] - 24:18, 84:5
**mute** [1] - 69:23

**N**

**name** [9] - 3:15, 13:24, 23:2, 38:25, 39:16, 39:17, 39:24, 71:8, 73:2
**named** [4] - 6:9, 82:4, 82:13, 83:15
**National** [5] - 9:14, 9:16, 10:13, 10:16, 10:19
**nationally** [1] - 11:12
**necessarily** [9] - 9:11, 34:1, 39:17, 41:23, 42:6, 44:21, 53:2, 60:19, 66:24
**need** [5] - 4:6, 29:5, 60:19, 64:8, 66:3
**negative** [4] - 7:25, 8:1, 59:19, 60:1
**network** [1] - 31:18
**never** [2] - 63:13, 73:2

**New** [2] - 53:11, 58:14
**new** [5] - 11:4, 11:6, 43:2, 43:3, 43:5
**newly** [2] - 10:25, 11:3
**next** [1] - 30:3
**NFPA** [4] - 10:16, 10:19, 10:20, 11:1
**nice** [2] - 65:3, 72:13
**noise** [2] - 78:16, 78:20
**noisy** [1] - 78:22
**nonelectronic** [1] - 66:21
**nonlinear** [3] - 76:2, 76:3, 76:7
**NORMAN** [1] - 85:15
**notarized** [1] - 84:5
**Notary** [6] - 1:14, 3:9, 3:12, 82:2, 82:20, 83:14
**NOTARY** [1] - 83:13
**notary** [1] - 85:13
**note** [1] - 84:2
**noted** [1] - 83:3
**notes** [17] - 15:16, 16:7, 16:11, 16:12, 16:17, 16:18, 33:9, 37:21, 37:22, 37:24, 49:4, 71:11, 71:21, 72:18, 72:20, 72:25, 73:16
**nothing** [4] - 48:9, 64:1, 65:3, 82:5
**Notice** [1] - 2:9
**notice** [4] - 1:12, 5:2, 15:20, 16:3
**noticed** [1] - 74:7
**November** [1] - 71:13
**NSPE** [1] - 9:18
**number** [4] - 4:13, 4:21, 12:5, 31:15, 43:16, 59:19, 64:18, 65:6, 84:3
**Number** [1] - 2:8
**numbered** [1] - 20:14
**numbers** [1] - 31:13

**O**

**o'clock** [2] - 65:25
**oath** [3] - 3:8, 6:5, 45:5
**objecting** [2] - 72:8, 72:9
**objections** [2] - 3:5, 19:23
**observation** [1] - 51:4
**observed** [1] - 50:20
**obtain** [1] - 14:13
**obtuse** [1] - 54:21

**obviously** [6] - 36:7, 43:17, 44:21, 51:3, 61:18, 72:18
**occupied** [2] - 59:1, 59:5
**occur** [5] - 12:3, 18:1, 29:6, 32:24, 40:5
**occurred** [3] - 12:12, 42:9, 63:17
**occurring** [1] - 49:23
**occurs** [1] - 30:20
**October** [2] - 8:8, 67:23
**OF** [2] - 1:1, 1:11
**off-base** [1] - 76:9
**off-the-record** [1] - 58:4
**offer** [3] - 8:14, 9:2, 46:1
**offered** [1] - 6:15
**office** [1] - 37:2
**Office** [1] - 25:4
**often** [4] - 32:25, 40:5, 49:23, 52:4
**omitted** [1] - 84:4
**once** [4] - 79:14, 79:15, 80:8, 80:9
**one** [32] - 3:24, 4:11, 4:23, 5:23, 6:14, 6:24, 10:19, 14:15, 29:1, 29:16, 30:14, 30:23, 33:15, 40:17, 48:5, 52:23, 56:23, 59:1, 59:2, 59:12, 59:23, 60:23, 61:12, 61:20, 62:13, 63:1, 65:25, 68:10, 75:11, 76:21, 77:11, 77:12
**onerous** [1] - 78:12
**ones** [1] - 44:7
**open** [4] - 17:7, 25:19, 26:15, 60:19
**operate** [1] - 7:14
**operates** [1] - 21:13
**operating** [1] - 51:14
**operation** [1] - 8:24
**opine** [2] - 9:7, 56:10
**opinion** [8] - 17:15, 17:18, 21:10, 46:1, 60:16, 61:8, 61:24, 62:1
**opinions** [15] - 5:9, 9:2, 17:12, 17:13, 17:14, 19:16, 19:22, 21:18, 22:10, 24:1, 43:17, 45:4, 68:8, 69:5, 69:11
**opportunity** [2] - 45:18, 73:17
**opposing** [1] - 6:12

**opposite** [2] - 64:24, 65:6
**option** [1] - 17:7
**OR** [1] - 83:13
**order** [3] - 5:16, 18:19, 29:14
**ordinarily** [1] - 67:8
**organization** [1] - 53:8
**original** [2] - 74:2, 85:13
**originally** [1] - 39:16
**ought** [2] - 40:12, 41:12
**outages** [1] - 22:15
**outcome** [2] - 6:21, 82:13
**outdoors** [1] - 55:4
**outlet** [1] - 78:10
**outlined** [1] - 56:7
**output** [3] - 40:8, 46:23, 47:13
**overall** [1] - 51:12

**P**

**P.E** [6] - 1:11, 2:2, 3:11, 83:2, 83:7, 85:8
**p.m** [5] - 35:16, 70:3, 81:12
**P.O** [2] - 85:1, 85:16
**page** [9] - 6:25, 20:20, 30:3, 31:13, 84:3, 84:5, 84:6, 85:12, 85:13
**Page** [18] - 2:3, 2:8, 21:7, 27:25, 30:3, 31:11, 32:19, 36:6, 36:15, 37:15, 48:20, 49:4, 49:6, 58:10, 58:17, 60:11, 61:4, 61:22
**PAGE** [1] - 83:1
**Page/Line** [1] - 84:9
**Pages** [2] - 60:24, 62:8
**pages** [3] - 16:12, 83:2, 83:3
**paragraph** [2] - 8:7, 32:23
**Paragraph** [1] - 15:21
**parameters** [1] - 21:15
**paraphrase** [1] - 77:9
**parse** [1] - 28:17
**part** [12] - 10:25, 21:21, 26:4, 40:20, 41:3, 45:20, 45:25, 47:1, 48:8, 66:9, 67:2, 77:22
**participating** [1] - 3:1

**particular** [13] - 6:6, 22:9, 24:12, 25:12, 25:20, 26:11, 34:8, 53:14, 53:15, 55:3, 63:1, 70:14, 80:18
**particularly** [4] - 21:17, 29:18, 45:10, 63:6
**parties** [2] - 3:4, 26:14
**parts** [5] - 42:2, 42:3, 57:2, 61:9
**party** [1] - 70:9
**passage** [1] - 26:20
**passages** [3] - 25:20, 26:21, 27:1
**passive** [1] - 32:7
**Paul** [6] - 13:21, 13:25, 14:2, 18:17, 36:10, 73:23
**peer** [7] - 44:25, 45:7, 45:9, 45:14, 45:15, 45:16, 46:9
**peer-review** [1] - 45:16
**peer-reviewed** [5] - 44:25, 45:7, 45:9, 45:14, 45:15
**Pennsylvania** [1] - 67:25
**per** [11] - 10:13, 33:2, 40:20, 56:19, 59:12, 59:16, 60:2, 60:3, 60:4, 60:7, 60:8
**percent** [6] - 10:7, 48:13, 48:14, 48:18
**percentages** [1] - 48:11
**perfectly** [1] - 39:3
**perform** [6] - 15:1, 15:2, 35:25, 43:18, 66:22, 80:20
**performance** [1] - 23:21
**performed** [10] - 16:8, 17:11, 24:8, 25:3, 36:7, 37:17, 43:20, 43:23, 62:15, 67:19
**period** [1] - 79:2
**periodically** [1] - 11:8
**permit** [1] - 56:18
**person** [3] - 46:3, 50:4, 82:13
**personal** [1] - 12:3
**personally** [1] - 83:15
**persons** [1] - 25:13
**pertain** [1] - 43:17
**pertaining** [1] - 72:25
**pertinent** [2] - 14:12, 71:5
**phenomenon** [1] -

63:9
**Phoenix** [1] - 14:22
**phone** [3] - 71:24,
72:20, 72:21
**phrase** [1] - 25:18
**phrased** [1] - 27:2
**physical** [1] - 23:23
**physically** [1] - 3:2
**picked** [1] - 32:6
**piece** [1] - 11:16
**place** [1] - 37:1
**places** [1] - 32:9
**plaintiff** [1] - 13:7
**Plaintiff** [2] - 1:4, 1:20
**plaintiff's** [1] - 19:25
**plane** [1] - 62:22
**plasma** [1] - 12:18
**Plaza** [1] - 85:16
**point** [7] - 6:25, 17:8,
33:18, 39:18, 40:17,
42:12, 55:20
**poorly** [1] - 17:17
**portion** [1] - 67:5
**portions** [3] - 25:24,
41:21, 53:17
**Portland** [1] - 85:17
**position** [3] - 6:16,
12:25, 30:16
**possible** [2] - 44:23,
47:3
**possibly** [3] - 18:3,
22:19, 55:14
**potential** [1] - 28:15
**potentially** [4] - 18:14,
48:3, 68:20, 77:23
**Power** [10] - 2:12,
3:16, 8:15, 19:19,
22:8, 22:21, 23:3,
23:5, 25:2, 46:18
**power** [34] - 7:8, 7:15,
7:25, 13:2, 15:5,
15:14, 17:21, 18:7,
18:10, 19:1, 19:2,
21:24, 22:8, 22:15,
23:23, 30:12, 30:24,
31:9, 32:12, 46:14,
51:16, 51:22, 52:4,
56:7, 56:12, 59:6,
60:10, 61:17, 63:2,
63:7, 71:2, 77:24,
78:9, 80:23
**POWER** [2] - 1:7, 85:7
**power's** [1] - 80:1
**powering** [1] - 17:20
**practice** [1] - 10:5
**precise** [1] - 71:19
**precisely** [2] - 6:20,
7:6
**preparation** [1] -
67:13

**prepared** [2] - 15:23,
23:8
**prescribed** [1] - 40:10
**PRESENT** [1] - 1:23
**present** [3] - 3:2,
59:18, 78:21
**presented** [1] - 27:5
**pressed** [1] - 29:13
**pretty** [1] - 69:10
**previous** [2] - 74:8,
79:13
**previously** [2] - 37:25,
39:3
**primarily** [2] - 11:22,
12:10
**print** [2] - 57:23, 82:9
**problem** [4] - 25:17,
33:8, 42:21, 58:2
**proceeding** [1] - 7:25
**process** [4] - 3:24,
30:10, 30:18, 30:19
**produce** [7] - 15:18,
16:11, 34:15, 56:6,
72:18, 72:20, 74:2
**produced** [8] - 5:3,
16:10, 22:5, 22:6,
31:16, 41:3, 68:23,
74:11
**products** [2] - 10:13,
11:1
**profess** [1] - 25:15
**Professional** [2] -
9:14, 9:17
**professional** [5] -
10:5, 10:25, 11:13,
18:22, 46:13
**proffered** [1] - 70:9
**projecting** [1] - 47:11
**prompted** [1] - 35:23
**proofread** [3] - 41:18,
41:22, 42:5
**proofreading** [1] -
42:1
**prop** [1] - 77:16
**propagate** [2] - 77:15,
78:2
**propagates** [1] - 79:17
**properly** [1] - 85:13
**property** [1] - 12:2
**proposition** [5] - 40:6,
45:2, 46:22, 61:1,
62:9
**propositions** [2] -
40:13, 43:8
**prosecuting** [1] - 8:15
**Protection** [2] - 10:13,
10:16
**provided** [6] - 6:5,
26:23, 33:16, 38:4,
67:23, 68:3

**proximity** [3] - 12:13,
12:16, 77:17
**PUBLIC** [1] - 83:13
**Public** [8] - 1:14, 3:9,
3:12, 6:3, 25:4, 56:4,
82:2, 82:20
**public** [2] - 12:25,
85:13
**Public/Attorney** -
83:14
**pull** [5] - 20:5, 20:8,
20:16, 23:14, 27:10
**pulsed** [9] - 28:3,
28:12, 28:16, 28:22,
29:7, 40:7, 46:22,
47:12, 60:22
**pump** [1] - 18:14
**pursuant** [1] - 1:12
**put** [4] - 66:10, 66:19,
69:23, 75:2
**puts** [1] - 55:19

### Q

**qualifications** [2] -
46:3, 46:8
**Quality** [1] - 2:12
**quality** [5] - 7:8, 7:15,
7:25, 21:24, 22:8
**quantify** [1] - 29:23
**questions** [10] - 4:12,
4:15, 20:10, 30:21,
31:2, 65:21, 70:18,
73:10, 77:11, 79:14
**quick** [1] - 69:24
**quickly** [3] - 69:17,
79:4, 79:5
**quite** [1] - 29:17
**quote** [1] - 59:10

### R

**radiate** [1] - 61:11
**radiation** [2] - 53:21,
54:13
**radio** [13] - 9:3, 28:3,
28:12, 28:16, 28:22,
29:7, 29:15, 30:4,
57:1, 58:15, 59:6,
60:22, 66:25
**radius** [1] - 32:4
**ran** [1] - 33:6
**range** [1] - 59:19
**ranger** [1] - 72:12
**rather** [3] - 12:14,
17:16, 20:18
**Re** [1] - 85:7
**reactions** [1] - 29:19
**read** [7] - 16:5, 33:13,
40:17, 52:22, 83:2,

83:3, 85:11
**readily** [1] - 18:16
**reading** [6] - 33:13,
52:24, 52:25, 53:25,
54:1
**READING** [1] - 85:9
**ready** [1] - 70:5
**really** [6] - 20:5, 30:15,
36:13, 42:22, 42:24,
81:3
**reason** [7] - 4:7, 17:6,
24:12, 25:22, 56:22,
60:18, 84:4
**Reason** [1] - 84:9
**reasonable** [2] - 26:6,
45:3
**reasons** [2] - 4:13,
83:4
**received** [1] - 5:6
**recent** [1] - 37:20
**recently** [1] - 33:25
**recognize** [1] - 11:14
**recognized** [1] - 11:12
**recollection** [2] - 8:11,
51:1
**reconvene** [1] - 17:6
**record** [3] - 4:14, 58:4,
82:10
**records** [2] - 37:24,
50:18
**reduce** [1] - 19:4
**reduced** [4] - 31:25,
32:10, 32:14, 82:8
**refer** [1] - 21:8
**reference** [2] - 67:18,
70:14
**referenced** [1] - 85:11
**references** [1] - 40:24
**referred** [6] - 5:8,
19:14, 23:3, 37:25,
38:21, 76:1
**referring** [2] - 20:14,
48:25
**refers** [1] - 22:20
**refined** [1] - 41:24
**reflected** [6] - 15:8,
44:18, 49:12, 79:24,
80:8, 80:10
**reflection** [2] - 48:10,
48:18
**reforward** [1] - 20:23
**refrigerator** [1] - 18:3
**regard** [2] - 15:23,
34:13
**regarding** [6] - 7:7,
47:15, 47:25, 48:10,
74:22, 75:12
**regardless** [1] - 37:12
**regards** [4] - 14:18,
49:2, 52:22, 61:8

**regularly** [2] - 50:24,
52:2
**regulations** [1] - 56:17
**relatively** [1] - 67:20
**relevance** [1] - 17:10
**relevancy** [1] - 45:12
**relevant** [4] - 21:5,
21:17, 22:10, 45:10
**reliability** [1] - 45:21
**relied** [2] - 5:8, 53:7
**relocatable** [1] - 78:9
**rely** [6] - 35:4, 43:7,
45:3, 45:25, 47:4,
66:21
**relying** [2] - 46:25,
47:1
**remain** [2] - 31:23,
77:17
**remember** [9] - 23:11,
33:13, 33:17, 35:20,
57:7, 57:8, 60:20,
73:2
**REMOTE** [1] - 1:11
**remotely** [1] - 3:4
**repeat** [1] - 10:15
**repeatedly** [1] - 52:7
**replicate** [4] - 57:14,
57:18, 57:19
**replicated** [3] - 57:10,
57:12, 57:16
**Report** [3] - 2:9, 2:10,
2:11
**report** [123] - 5:11,
5:19, 7:5, 8:6, 9:1,
15:8, 17:12, 19:11,
19:15, 23:23, 24:10,
24:14, 24:23, 24:24,
25:8, 25:12, 25:20,
25:24, 26:5, 26:11,
26:16, 26:21, 27:1,
27:3, 27:7, 27:23,
30:7, 31:11, 32:20,
33:1, 33:3, 33:5,
33:16, 33:18, 33:22,
33:23, 33:25, 34:2,
34:3, 34:8, 34:15,
34:19, 34:22, 35:4,
35:24, 36:7, 36:15,
36:20, 37:15, 37:16,
38:1, 38:15, 38:21,
39:25, 40:1, 40:12,
40:21, 41:3, 41:12,
41:13, 41:22, 43:7,
43:11, 43:19, 43:24,
44:1, 44:12, 44:15,
44:25, 45:13, 46:7,
46:12, 46:21, 47:2,
47:9, 47:11, 47:14,
47:17, 47:25, 48:8,
48:10, 48:20, 48:24,

49:4, 49:10, 49:12, 49:20, 49:24, 52:18, 53:7, 53:20, 55:2, 55:21, 55:25, 57:13, 57:22, 58:6, 60:1, 60:6, 60:12, 60:13, 60:25, 61:1, 61:4, 62:3, 62:8, 63:8, 63:16, 63:22, 66:6, 66:7, 66:9, 66:20, 71:17, 74:1, 74:3, 74:8, 74:9, 74:14, 74:19, 74:22

**reported** [5] - 43:25, 50:12, 50:20, 51:25, 82:8

**reporting** [2] - 3:3, 3:6

**REPORTING** [1] - 85:1

**reports** [5] - 15:22, 41:18, 42:19, 52:21, 76:2

**represent** [1] - 3:16

**Request** [2] - 22:22, 23:4

**required** [1] - 11:7

**requires** [1] - 63:7

**reradiation** [4] - 63:9, 63:10, 63:13, 63:16

**Research** [1] - 46:18

**residence** [8] - 8:24, 14:20, 14:23, 14:25, 16:8, 31:18, 50:15, 57:2

**residences** [2] - 58:14

**residential** [2] - 17:23, 19:5

**resolved** [1] - 6:18

**resource** [2] - 45:6, 45:25

**respect** [2] - 6:8, 60:17

**respective** [1] - 83:4

**response** [6] - 21:12, 22:21, 23:4, 23:6, 23:8, 77:11

**responsible** [1] - 34:23

**rest** [4] - 10:8, 10:9, 31:1, 78:2

**result** [1] - 61:5

**results** [7] - 15:24, 43:25, 44:11, 44:12, 44:14, 44:18, 44:20

**retained** [1] - 2:16

**return** [2] - 84:5, 85:13

**reveal** [2] - 15:10, 15:12

**revealed** [1] - 15:13

**review** [3] - 16:21, 19:21, 45:16

**reviewed** [13] - 5:8, 19:15, 25:2, 27:11, 44:25, 45:7, 45:9, 45:14, 45:15, 46:10, 48:16, 57:4, 67:12

**RF** [32] - 27:21, 28:3, 29:19, 30:1, 30:9, 31:15, 32:8, 32:20, 40:7, 43:12, 46:22, 47:12, 48:20, 53:15, 53:21, 54:12, 54:13, 54:15, 54:23, 55:4, 60:23, 61:6, 61:12, 62:9, 62:23, 63:3, 63:14, 63:23, 64:3, 69:8, 76:20, 77:20

**riding** [1] - 65:3

**ring** [2] - 38:25, 76:8

**rises** [1] - 79:3

**RMR** [1] - 1:14

**road** [2] - 4:4, 79:11

**role** [1] - 14:9

**room** [11] - 3:3, 54:9, 54:16, 54:25, 55:3, 55:5, 55:7, 55:8, 55:23, 57:22, 69:24

**rooms** [1] - 61:5

**rough** [1] - 27:4

**rug** [1] - 37:4

**ruled** [1] - 27:16

**rules** [1] - 4:4

**run** [1] - 67:4

## S

**Sage** [31] - 2:10, 32:25, 33:3, 33:5, 33:25, 34:5, 34:7, 34:22, 35:4, 38:14, 38:23, 39:21, 39:25, 43:7, 43:11, 43:18, 43:25, 44:12, 44:25, 46:6, 46:21, 47:2, 47:9, 47:11, 47:24, 48:10, 48:17

**saw** [8] - 3:24, 22:23, 33:14, 34:9, 34:25, 43:19, 47:8, 76:4

**scan** [1] - 37:22

**scanner** [1] - 17:2

**scenario** [2] - 29:14, 29:21

**search** [1] - 33:6

**second** [2] - 56:23, 73:25

**section** [1] - 27:25

**SecureMesh** [1] - 23:25

**see** [14] - 16:21, 20:15, 23:1, 25:1, 31:11, 31:13, 35:6, 36:14, 37:4, 58:16, 59:9, 65:2, 65:8, 76:4

**seeing** [1] - 33:18, 34:2

**seem** [1] - 25:25

**send** [3] - 5:12, 16:20, 16:25

**sending** [1] - 42:25

**sense** [3] - 4:12, 4:17, 51:15

**sensitive** [1] - 29:18

**sent** [3] - 22:24, 23:12, 72:3

**sentence** [5] - 28:17, 30:17, 40:3, 49:1, 54:19

**sentences** [2] - 28:9, 33:15

**separate** [1] - 30:18

**September** [4] - 8:7, 8:9, 23:6, 38:20

**serve** [1] - 8:4

**Service** [1] - 6:3

**set** [4] - 45:21, 51:8, 81:5, 81:6

**setup** [3] - 15:4, 36:1, 51:13

**Share** [1] - 20:19

**ShareFile** [2] - 20:12, 20:20

**sheet** [7] - 23:19, 84:2, 84:5, 84:5, 85:12, 85:12, 85:13

**SHEET** [1] - 84:1

**sheet(s)** [1] - 83:5

**sheets** [1] - 23:17

**shield** [1] - 76:17

**shielding** [2] - 67:16, 67:19

**shocked** [1] - 72:10

**short** [3] - 78:24, 79:2, 79:5

**shorter** [1] - 56:19

**show** [2] - 44:16, 50:18

**showed** [6] - 49:8, 50:23, 52:7, 52:16, 63:16, 69:7

**shows** [7] - 17:20, 22:12, 51:10, 61:3, 61:11, 79:2

**side** [2] - 10:10, 79:11

**sign** [3] - 84:4, 84:5, 85:12

**signal** [12] - 9:3, 27:21, 30:1, 43:12, 57:2, 58:15, 59:20, 63:14, 63:23, 64:4, 65:5, 65:9

**signaling** [1] - 66:25

**signals** [1] - 65:7

**SIGNATURE** [1] - 83:1

**signature** [5] - 83:16, 84:5, 84:6, 85:12, 85:13

**Signature** [1] - 84:22

**significance** [2] - 68:7, 69:4

**significant** [1] - 12:14

**significantly** [1] - 56:6

**SIGNING** [1] - 85:9

**similar** [4] - 37:17, 56:25, 57:4, 62:16, 62:17, 78:8

**similarly** [1] - 14:7

**simply** [1] - 54:14

**sine** [3] - 64:25, 65:10, 68:19

**situation** [1] - 54:11

**six** [2] - 31:13, 35:10

**slightly** [2] - 22:7, 36:20

**smart** [55] - 6:12, 8:23, 9:3, 13:2, 13:4, 14:11, 15:14, 17:15, 17:21, 17:24, 21:12, 21:17, 28:2, 28:4, 28:6, 28:9, 28:10, 28:11, 28:18, 28:19, 28:23, 29:2, 29:3, 29:14, 31:16, 40:4, 40:7, 48:23, 49:8, 49:23, 50:14, 51:6, 51:10, 51:14, 53:16, 53:21, 56:5, 60:21, 66:21, 67:1, 68:19, 69:8, 71:1, 71:4, 75:17, 75:20, 76:13, 76:22, 76:25, 77:13, 77:15, 78:13, 79:16

**Society** [2] - 9:14, 9:16

**solely** [2] - 47:5, 70:20

**solidifies** [1] - 17:19

**solidify** [2] - 17:13, 17:15

**someone** [9] - 8:22, 26:12, 26:24, 33:16, 41:21, 42:4, 42:24, 65:21

**somewhat** [1] - 65:11

**somewhere** [4] - 33:13, 36:4, 51:11, 76:5

**sorry** [14] - 13:22, 23:10, 24:16, 24:18, 36:13, 36:25, 39:19, 50:4, 54:4, 60:15, 65:5, 65:9

**sort** [4] - 5:16, 6:24, 45:3, 77:17

**sound** [2] - 4:1, 75:2

**sounded** [1] - 72:10

**sounds** [3] - 30:21, 53:13, 70:2

**source** [5] - 30:18, 75:22, 76:14, 77:25, 78:1

**sources** [1] - 30:20

**spaces** [2] - 59:1, 59:5

**speaking** [2] - 39:23, 73:22

**speaks** [1] - 26:17

**specific** [3] - 15:2, 75:5, 79:7

**specifically** [12] - 13:3, 16:2, 25:14, 26:22, 26:25, 27:22, 33:4, 33:11, 33:14, 33:17, 33:24, 40:14, 43:10, 43:20, 44:4, 45:8, 45:13, 46:5, 47:4, 47:6, 49:14, 52:23, 57:5, 60:25, 63:9, 63:25, 66:17, 67:4

**specify** [1] - 55:25

**spectrum** [2] - 58:21, 59:1

**spend** [1] - 4:3

**spent** [1] - 10:24

**spike** [2] - 79:3, 79:5

**spikes** [1] - 65:4

**spoken** [6] - 13:18, 13:20, 13:21, 14:6, 19:7, 19:9

**Springvale** [1] - 85:2

**square** [6] - 32:4, 32:5, 56:19, 60:3, 60:4, 60:7

**squared** [4] - 59:12, 59:16, 60:2, 60:9

**stand** [2] - 15:4, 26:16

**standard** [4] - 11:10, 59:14, 63:24, 64:6

**standards** [6] - 10:18, 11:2, 56:12, 59:6, 59:10, 64:4

**start** [2] - 5:1, 35:7

**started** [2] - 27:4, 41:23

**starts** [3] - 21:7, 27:25, 28:23

**state** [3] - 6:10, 6:13, 67:25

**State** [4] - 1:15, 25:5, 82:3, 83:14

**reviewed** [13] - 5:8, (continued column)

61:25, 64:3, 68:11, 76:5

**statement** [4] - 32:24, 33:1, 47:1, 67:19
**statements** [1] - 83:16
**States** [1] - 3:17
**STATES** [1] - 1:1
**stating** [1] - 60:1
**stay** [2] - 27:23, 79:16
**stenographically** [1] - 82:8
**strip** [2] - 78:10, 80:23
**studied** [2] - 63:18, 63:24
**studies** [4] - 25:2, 48:16, 48:19, 57:4
**study** [5] - 45:22, 53:10, 56:25, 57:1, 57:9
**stuff** [1] - 80:9
**subject** [3] - 5:19, 7:4, 7:5
**subjected** [1] - 46:13
**submit** [1] - 50:6
**submitted** [2] - 49:20, 49:21
**subscribe** [1] - 82:15
**substance** [2] - 83:3, 84:2
**substantial** [1] - 42:3
**substantive** [2] - 43:4, 43:5
**substantively** [2] - 22:5, 74:20
**suggested** [2] - 40:11, 66:12
**suggestion** [3] - 41:1, 66:8, 75:8
**suggestions** [1] - 75:6
**supplied** [3] - 14:15, 16:4, 25:13
**supplies** [1] - 18:10
**supply** [10] - 15:15, 17:21, 18:7, 30:12, 30:24, 31:9, 32:12, 61:18, 63:2, 77:24
**support** [7] - 6:16, 33:1, 40:12, 61:1, 61:7, 62:8, 67:18
**suppose** [1] - 45:18
**suppress** [1] - 80:25
**suppression** [4] - 78:8, 80:19, 80:21, 80:24
**suppressors** [1] - 80:15
**surge** [5] - 78:8, 80:15, 80:19, 80:21, 80:24
**surges** [1] - 80:25
**surrounding** [2] - 53:23, 55:18

**susceptible** [1] - 29:10
**sustained** [1] - 12:14
**switch** [9] - 17:21, 18:7, 18:10, 30:11, 30:24, 31:9, 32:12, 61:17, 63:2
**switching** [3] - 22:14, 77:23
**swore** [1] - 83:15
**sworn** [2] - 3:11, 82:4
**system** [29] - 6:12, 8:24, 17:22, 17:24, 23:25, 24:7, 30:25, 31:1, 31:6, 31:7, 31:23, 31:25, 60:24, 61:6, 62:10, 68:24, 75:24, 77:20, 78:21, 78:22, 79:15, 79:16, 79:19, 79:25, 80:7, 80:10, 80:11
**systems** [2] - 19:1, 19:3

## T

**table** [1] - 58:16
**Table** [2] - 60:11, 61:22
**Taintor** [3] - 1:21, 2:4, 3:16
**TAINTOR** [31] - 3:14, 7:20, 16:16, 16:23, 17:3, 17:9, 20:21, 21:3, 23:11, 23:18, 35:9, 35:13, 35:15, 35:17, 39:2, 57:21, 58:1, 58:5, 65:20, 69:21, 70:4, 72:17, 73:9, 73:12, 73:18, 77:5, 77:8, 81:1, 81:5, 81:7, 85:15
**talks** [1] - 58:24
**tap** [1] - 78:9
**technical** [2] - 64:9, 64:11
**technology** [1] - 67:16
**temperature** [2] - 54:8, 54:9
**term** [13] - 53:22, 55:21, 60:13, 62:3, 64:9, 64:11, 65:13, 65:15, 78:17, 80:22, 80:23, 80:24
**terribly** [2] - 4:5, 16:24
**test** [13] - 15:4, 24:17, 36:14, 43:25, 44:11, 44:14, 44:18, 44:20, 45:20, 51:12, 51:20, 51:24

**tested** [4] - 14:14, 14:24, 49:9, 62:25
**testified** [8] - 5:22, 7:7, 7:12, 7:22, 9:22, 12:6, 50:1, 69:18
**testify** [3] - 45:4, 50:4, 82:4
**testifying** [1] - 69:20
**testimonial** [1] - 69:16
**Testimony** [2] - 2:11, 2:14
**testimony** [24] - 5:23, 6:5, 6:9, 6:15, 7:1, 7:3, 7:4, 8:14, 34:15, 40:21, 49:21, 50:6, 67:23, 69:3, 69:6, 69:10, 70:8, 70:12, 75:3, 79:13, 82:10, 83:3, 83:4, 84:2
**testing** [75] - 11:12, 14:16, 14:17, 14:19, 14:23, 15:1, 15:7, 15:10, 15:12, 15:13, 15:16, 15:24, 16:8, 17:10, 17:19, 24:8, 24:9, 24:13, 24:20, 24:25, 35:25, 36:2, 36:6, 36:10, 36:11, 36:12, 36:15, 36:16, 36:20, 37:13, 37:14, 37:18, 37:20, 37:21, 37:24, 43:15, 43:18, 43:20, 43:23, 44:4, 44:5, 44:11, 48:22, 49:2, 49:3, 49:7, 49:8, 50:10, 50:23, 50:25, 51:5, 51:6, 51:8, 52:2, 52:16, 52:19, 52:20, 57:17, 57:18, 57:20, 61:3, 62:16, 62:17, 62:18, 69:7, 73:1, 73:23, 73:25, 74:2, 74:3, 74:8, 74:9, 74:13, 74:19
**tests** [3] - 15:2, 62:17, 62:21
**THE** [13] - 17:2, 20:15, 20:17, 20:25, 35:7, 35:12, 35:14, 57:25, 58:2, 73:6, 81:3, 81:11, 85:1
**therefore** [1] - 83:4
**thereportinggroupmaine@gmail.com** [1] - 85:3
**thermostats** [1] - 28:7
**they've** [1] - 10:18
**thirty** [1] - 85:11
**thoughts** [1] - 26:5

**thousand** [1] - 48:13
**three** [5] - 53:11, 58:14, 63:17, 64:4, 72:21
**throughout** [15] - 27:3, 31:17, 31:23, 31:25, 32:13, 54:24, 62:24, 63:3, 75:20, 77:15, 78:2, 79:17, 79:18, 80:11
**Tim** [2] - 1:23, 7:19
**TO** [1] - 83:13
**today** [7] - 3:19, 4:6, 16:3, 16:24, 37:22, 70:7, 73:4
**today's** [1] - 67:13
**together** [2] - 66:10, 83:4
**took** [1] - 53:25
**top** [4] - 30:3, 31:13, 33:19, 57:8
**topics** [1] - 30:14
**totally** [2] - 27:5, 67:1
**towards** [1] - 45:8
**traffic** [1] - 72:14
**training** [2] - 10:1, 10:3
**transcript** [3] - 83:2, 84:3, 85:11
**TRANSCRIPT** [1] - 85:9
**Transcription** [1] - 82:9
**Transformer** [1] - 10:11
**transient** [3] - 7:8, 78:25, 79:5
**transients** [42] - 5:25, 7:11, 9:24, 15:14, 17:22, 17:23, 18:4, 18:8, 19:4, 22:14, 22:15, 30:25, 31:5, 31:8, 31:23, 31:24, 32:11, 64:14, 68:23, 75:13, 75:16, 75:19, 76:17, 76:20, 77:12, 77:13, 77:14, 77:16, 77:20, 77:23, 77:25, 78:15, 78:16, 78:18, 78:23, 79:14, 79:18, 79:20, 79:23, 80:6
**transmission** [4] - 28:9, 29:2, 32:9, 49:22
**transmissions** [3] - 50:14, 50:19, 76:8
**transmit** [3] - 28:5, 48:23, 52:17
**transmits** [1] - 63:7
**transmitted** [10] -

32:3, 32:12, 49:9, 50:11, 50:24, 75:16, 75:19, 75:20, 75:21
**transmitting** [12] - 32:21, 48:21, 51:24, 52:10, 52:11, 52:13, 52:14, 53:16, 63:6, 69:9, 80:2
**travel** [4] - 31:17, 32:1, 37:13, 80:10
**tried** [2] - 16:6, 57:14
**triggers** [1] - 11:25
**true** [8] - 62:11, 63:19, 63:20, 74:6, 79:17, 79:20, 82:10, 83:16
**truth** [4] - 82:4, 82:5, 83:15
**try** [4] - 17:16, 33:6, 45:14, 78:5
**trying** [18] - 14:7, 19:1, 23:14, 26:10, 26:19, 30:13, 41:11, 42:22, 42:24, 44:9, 54:6, 54:22, 55:10, 55:11, 61:2, 61:14, 61:21, 68:18
**Tucson** [1] - 14:22
**turn** [2] - 76:12, 76:17
**twice** [1] - 40:1
**Two** [1] - 85:16
**two** [7] - 28:8, 30:21, 57:23, 58:25, 65:25, 72:1, 72:20
**type** [8] - 12:1, 26:15, 48:14, 65:1, 77:24, 78:7, 78:10
**types** [1] - 24:4
**typical** [1] - 28:12
**typically** [4] - 18:11, 42:18, 65:8, 75:22
**typo** [1] - 84:4

## U

**UL** [2] - 10:22, 11:2
**UL508** [1] - 10:14
**under** [7] - 6:5, 29:5, 32:20, 45:5, 48:20, 51:20
**understood** [1] - 79:12
**Underwriter** [1] - 10:21
**unit** [1] - 51:20
**UNITED** [1] - 1:1
**United** [1] - 3:17
**unless** [2] - 43:24, 73:13
**Unless** [1] - 73:13
**up** [28] - 10:8, 10:9,

17:21, 19:1, 19:2,
20:5, 20:9, 20:16,
23:14, 27:10, 32:6,
32:25, 40:5, 49:14,
51:8, 51:11, 57:21,
60:19, 64:8, 67:7,
67:8, 70:1, 70:7,
71:18, 73:10, 77:4,
77:6, 79:2
**up-to** [1] - 67:7
**up-to-date** [1] - 67:8
**update** [2] - 74:14,
74:19
**usage** [3] - 28:5,
51:17, 51:19
**users** [1] - 13:1
**Utilities** [1] - 56:5
**utility** [3] - 28:5,
28:10, 29:3
**utilized** [1] - 80:2

**V**

**validity** [1] - 45:20
**variable** [1] - 59:19
**various** [8] - 12:8,
12:22, 23:17, 30:4,
41:17, 43:14, 58:14,
63:21
**versus** [3] - 51:5, 76:2,
76:7
**vicinity** [1] - 44:6
**video** [1] - 18:11
**view** [2] - 30:19, 51:12
**vintage** [1] - 11:5
**voltage** [7] - 5:24,
5:25, 7:11, 9:23,
15:5, 22:14, 64:13
**voltages** [1] - 7:8
**vs** [1] - 1:5

**W**

**waive** [1] - 3:5
**walk** [1] - 73:5
**walks** [1] - 39:10
**wants** [1] - 65:21
**warmer** [1] - 37:3
**Warren** [4] - 6:9,
13:23, 14:6, 18:17
**water** [1] - 53:11
**watts** [1] - 60:7
**wave** [5] - 62:22,
64:25, 65:10, 68:20,
79:16
**waveform** [4] - 65:9,
65:11, 65:14, 79:3
**waveforms** [2] - 15:5,
65:7
**waves** [1] - 31:21

**ways** [16] - 12:9,
12:22, 25:17, 25:19,
27:3, 28:3, 28:22,
29:1, 60:22, 60:23,
61:12, 61:17, 61:20,
71:18, 80:20, 80:25
**weaker** [1] - 59:20
**webpage** [2] - 21:24,
22:8
**website** [2] - 11:22,
34:25
**weigh** [1] - 72:19
**weight** [1] - 45:24
**whatever's** [1] - 55:16
**whereas** [1] - 77:15
**WHEREOF** [1] - 82:15
**whole** [3] - 4:3, 54:24,
82:5
**wide** [1] - 59:18
**William** [1] - 67:22
**wire** [1] - 30:9
**Wireless** [1] - 53:8
**wireless** [1] - 62:9
**wiring** [7] - 19:4, 19:5,
30:6, 32:6, 32:17,
62:24, 80:11
**wish** [1] - 84:3
**withdraw** [1] - 35:5
**within-in** [1] - 82:3
**witness** [4] - 3:20, 8:5,
8:21, 83:15
**WITNESS** [1] - 82:15
**witnessed** [1] - 14:16
**witnesses** [1] - 13:7
**woman** [1] - 39:16
**wood** [1] - 19:6
**Woodward** [9] - 6:10,
6:11, 6:19, 6:23,
13:23, 14:6, 18:17,
18:19, 19:6
**word** [3] - 78:16, 84:4
**wording** [1] - 42:8
**Words** [1] - 84:9
**words** [2] - 28:17,
84:3
**works** [1] - 18:25
**world** [2] - 25:16,
55:22
**writer** [1] - 25:16
**writing** [2] - 42:18,
74:8
**written** [3] - 5:18,
50:6, 74:1
**wrongful** [1] - 12:4
**wrote** [4] - 24:24,
48:21, 60:21, 74:9

**Y**

**year** [1] - 8:8

**years** [4] - 3:25, 10:6,
36:17, 37:14
**York** [2] - 53:11, 58:15
**yourself** [2] - 42:4,
65:15

**Z**

**Zoom** [2] - 7:19, 71:24