**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| ED FRIEDMAN, )<br>)<br>  Plaintiff, )<br>) 2:20-cv-00237-JDL<br>v. )<br>)<br>CENTRAL MAINE POWER COMPANY, )<br>)<br>  Defendant ) | |

### DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE THE OPINION TESTIMONY OF DAVID CARPENTER

In response to CMP's Motion to Exclude the Opinion Testimony of David Carpenter, the Plaintiff's primary argument is that the Court should postpone its *Daubert* analysis until trial. That approach would defy basic principles of fairness and judicial economy. CMP should not be forced to bear the burden and expense of trial, and there is no justification for consuming scarce judicial resources, unless the Plaintiff can demonstrate that there is scientifically valid evidentiary support for his claim that exposure to radiofrequency (RF) fields would make his cancer worse.

As explained below, Carpenter's testimony does not provide that support. Even if he were qualified to opine on the relationship between RF exposure and cancer (which he clearly is not), he lacks the most basic information he would need to offer reliable opinion testimony in this case. He knows nothing about the RF emissions from a CMP smart meter, or about the level at which RF exposure is supposedly harmful to persons who suffer from this Plaintiff's rare blood cancer. Without that basic foundational information, his testimony must be excluded.

1. **Even in a bench trial, the experts proffered by the Plaintiff may testify only to opinions that have been developed through a scientifically reliable process.**

The Plaintiff argues that for two reasons, the Court should be reluctant to engage in a *Daubert* analysis before trial. First, citing *Cortes-Irizarry v. Corporacion Insular De Seguros*, 111 F.3d 184 (1st Cir. 1997), Plaintiff argues that "'the summary judgment process does not conform well to the discipline that Daubert imposes.'" Therefore, he says, a court should exclude expert testimony before trial only in "clearcut cases." ECF 104 at 3 (quoting *Cortes-Irizarry*, 111 F.3d at 188). Second, because this case would be tried to the Court, not a jury, he says "'the importance of the trial court's gatekeeper role is significantly diminished.'" ECF 104 at 3 (*quoting Whitehouse Hotel Ltd. Partnership v. Commissioner of Internal Revenue*, 615 F.3d 321, 330 (5th Cir. 2010)). Neither argument should dissuade the Court from closely scrutinizing, and ultimately excluding, the unreliable expert testimony at issue here.

To be sure, the First Circuit said in *Cortes-Irizarry* that "a trial setting *normally* will provide the best operating environment for the triage which *Daubert* demands." *Cortes-Irizarry*, 111 F.3d at 188 (emphasis added). That is so because "summary judgment practice," in which the parties are limited to filing competing statements of material fact, may not afford the proponent of "debatable scientific evidence . . . adequate opportunity to defend its admissibility." *Id.* See *Murphy v. Mattis*, 2017 WL 1157086, *2 n.4 (D. Me. March 27, 2017). This Court has addressed that precise concern, however, by encouraging litigants to file *Daubert* motions before they move for summary judgment, a procedure which ensures that there can be a "definitive, separate ruling as to the extent to which, if at all, the proposed expert testimony is admissible." *Id.* That is the procedure the Court is employing here. The Plaintiff has not even tried to suggest that by following this path, the Court will deprive him of an "adequate opportunity to defend [the] admissibility" of his experts' testimony. In short, the concerns that led the First Circuit to caution trial courts that they should not be "profligate" in the pretrial exclusion of expert witnesses are not present here.

The Plaintiff's second argument – that there is little need for "gatekeeping" when the trial judge will be the factfinder – ignores the Court's and the Defendant's interest in avoiding a lengthy trial of a case that lacks essential evidentiary support. To be sure, trial judges have broad discretion to decide when, and in what procedural context, they should evaluate the reliability and admissibility of expert testimony. In some cases, particularly where a trial is inevitable, and where the Court will benefit from hearing other evidence that provides important context for an expert's testimony, it may well make sense to delay that inquiry until trial. However where, as here, a plaintiff's ability to present a prima facie case depends on the admissibility of an expert's testimony, and where the relevant evidentiary record is fully developed, considerations of judicial economy and fairness to the defendant should cause the trial court to decide the issue before trial.

This Court acknowledged as much in *Murphy v. Mattis*, where it chose to "defer a decision on the admissibility of [an expert's] testimony, and to assume that [it was] admissible for purposes of the motion for summary judgment." *Id.* In explaining its decision, though, the Court thought it important to note that "admitting [the] testimony for summary judgment [did] not compromise the [defendant's] summary judgment position." *Id.* That is, the decision whether to admit or exclude the testimony would not dictate whether summary judgment was or was not warranted.

In contrast, bypassing the *Daubert* analysis here *would* compromise CMP's summary judgment position. Although there are alternative grounds for the forthcoming motion that warrant judgment as a matter of law even if some of the Plaintiff's expert testimony is assumed to be admissible, orders excluding their testimony now would be independently dispositive and would address Plaintiff's failure to meet his burden of proof. Pretrial motions to exclude testimony are valuable tools for promoting judicial economy. Indeed, in the criminal context one District Judge within this circuit has said that "it would present a disservice to judicial economy and the orderly

administration of justice to sit idly by awaiting the raising of an objection that is now ripe and which defendant has unequivocally indicated his intent to invoke." *United States v. Bulger*, 928 F.Supp.2d 294, 300 (D. Mass. 2013). The Court cited *United States v. Brimberry*, 744 F.2d 580, 586-87 (7th Cir. 1984), for the proposition that "the trial judge should be alerted to the possible superfluity of the impending trial so that if [ a dispositive motion] proves to have merit the time and effort of a trial might be saved." *See also United States v. Booker*, 557 F.Supp.2d 153, 156 (D. Me. 2008) ("'[W]here the evidence to be presented would be insufficient as a matter of law [to establish an entrapment defense] . . . no proper interest of the defendant would be served by permitting his legally insufficient evidence to be aired at trial, and interests of judicial economy suggest that the jury should not be burdened with the matter.'") (quoting *United States v. Villegas*, 899 F.2d 1324, 1343 (2nd Cir. 1990)).

The same logic dictates early resolution of CMP's *Daubert* challenge to the testimony of the Plaintiff's expert witnesses. If the Court agrees that the challenged testimony, including Carpenter's, is unreliable, or that it does not satisfy Daubert's "fit" requirement, any time spent at trial will be superfluous, and an unjustifiable burden on both the Court and CMP. A litigant should not be able to force his adversary to endure the rigors of a lengthy and expensive trial, simply by designating experts with flimsy opinions and then resisting any close pretrial scrutiny of the methodology by which those opinions were developed.

**2. The Plaintiff cannot prevail unless he proves that exposure to RF creates a heightened risk of significant harm that exists because of his particular disability.**

CMP has argued that in order to prevail, the Plaintiff must prove that his cancer makes him "uniquely" or "individually" vulnerable to adverse health effects from radiofrequency (RF) fields, such that CMP's installation of a smart meter on his property would create a "risk to his health" that is both specific to his disease and "significant enough to deprive him of 'full and equal access'

to CMP's services." ECF 26 at 7-8.  The Plaintiff takes issue with this formulation of the case, arguing that proof of "uniqueness" is not required.  He says: "A person who uses a wheelchair does not have to prove that they are uniquely impacted by the lack of a ramp."  ECF 104 at 5.

But when CMP refers to a "uniqueness" requirement (as when the Court alluded to that requirement in its order on the Motion to Dismiss), we simply mean the Plaintiff must prove that, *because of his particular disease*, RF affects him differently than it would affect a healthy member of the public (who we know, because of the Maine PUC's decision, would not be adversely affected at all).  This requirement is dictated by the case law applying the ADA, which uniformly holds that in a "reasonable accommodation" analysis, "an *individualized inquiry* must be made to determine whether a specific modification for a particular person's disability would be reasonable under the circumstances as well as *necessary for that person*, and yet at the same time not work a fundamental alteration."  *PGA Tour, Inc. v. Martin,* 532 U.S. 661, 688 (2001) (emphasis added) (citing S.Rep. No. 101–116, at 61; H.R.Rep. No. 101–485, pt. 2, at 102, U.S.Code Cong. & Admin.News 1990, pt. 2, at pp. 303, 385, for the proposition that "public accommodations 'are required to make decisions based on facts applicable to individuals'").[1]

The wheelchair analogy is inapposite because everyone who is confined to a wheelchair is, by definition, "uniquely" (that is, individually) impaired, as compared to the general public, in their ability to climb stairs.  Except in the rare case where there might be a dispute about whether

---

[1] So, for example, in *PGA Tour v. Martin*, the Supreme Court did not simply identify Casey Martin's disease (Klippel–Trenaunay–Weber Syndrome) and assume that as a result of that disease, the accommodation he asked for was "necessary."  Instead, the Court considered how the disease affected Martin as an individual, "caus[ing] him pain, fatigue, and anxiety, [and] creat[ing] a significant risk of hemorrhaging, developing blood clots, and fracturing his tibia so badly that an amputation might be required."  *PGA Tour, Inc. v. Martin*, 532 U.S. at 668.

a person genuinely needs a wheelchair, no expert testimony is necessary to prove, on an individualized basis, the existence of the impairment – the only question is whether the impaired person has been reasonably accommodated. This case is fundamentally different. CMP categorically denies that a person who suffers from Waldenstroms Macroglobulinemia is distinguishable from any healthy person, insofar as the effects of exposure to RF are concerned. It is the Plaintiff's burden to prove that his disease differentiates him from the public at large. If he fails to prove that the risk to him, as an individual, is different from, and significantly greater than, the (non-existent) risk to the general public, he is bound by the decision of the Maine PUC, and his claim fails as a matter of law. Here, Plaintiff has not put forth any credible, reliable, or relevant expert evidence required to meet his burden.

### 3. The publications and testimonial history identified by the Plaintiff do not qualify Carpenter to opine about the individual risk to any individual.

The Plaintiff argues that Carpenter is qualified to testify because he is widely published and because he has been permitted to testify in other cases, one of which involved a claim of injury due to exposure to radiofrequency (RF) fields.

The Plaintiff does not identify which of his numerous publications supposedly support, or even relate to, the opinions he proposes to offer in this case. Without that explanation, the assertion that he has "authored over 475 major publications," ECF 104 at 5, is meaningless. The fact that Carpenter has published articles about PCBs, hazardous waste sites, and other forms of environmental contamination (ECF 99-2 at 108-132) says nothing about whether he is qualified to testify about the relationship between RF exposure and cancer.

The Plaintiff's reliance on *The Bioinitiative Report* is likewise misplaced. As recently as 2021, one federal appellate judge characterized *The Bioinitiative Report* as "hardly worth discussing," because it "has been widely discredited as a biased review of the science."

*Environmental Health Trust. v. Federal Communications Comm'n,* 9 F.4th 893, 916 n.3 (D.C. Cir. 2021) (Henderson, J., dissenting in part).

Nor does Carpenter's history as a witness show that he is qualified to testify here. The fact that he has been deemed qualified to testify concerning PCB's (the subject of his testimony in both *Town of Halfmoon v. GE* and *Liebhart v. SPX Corp.*, the cases cited in ECF 104 at page 6) does not mean he is qualified to testify about the effects of exposure to RF on a person with Waldenstroms Macroglobulanemia. And in the one RF case the Plaintiff has cited where Carpenter was permitted to testify, his testimony was limited to describing the phenomenon of electromagnetic hypersensitivity (EHS). *G. v. Fay School, Inc.*, 282 F.Supp. 3d 381, 389 (D. Mass. 2017) ("Plaintiffs provided the expert testimony of Dr. Carpenter to prove general causation – that EHS is a real, albeit rare, phenomenon.").[2] But there is not, and never has been, a claim that *this* Plaintiff suffers from EHS. Thus, the fact that Carpenter was deemed qualified to offer testimony on that issue, which is irrelevant here, says nothing about his qualification to analyze the individualized risk to Ed Friedman, on account of his rare blood cancer.

Next, the Plaintiff purports to identify an inconsistency in CMP's position where none exists. CMP has argued that Carpenter is not qualified to testify about Ed Friedman's individualized risk because he is not licensed to practice medicine, he is not trained in oncology, and he has never treated a patient with any disease, let alone one with cancer. As the Plaintiff correctly observes, we have also argued that even "licensed physicians may be unqualified to opine on the issue of

---

[2] Two different experts were designated to testify about specific causation in the *Fay School* case. *G. v. Fay School, Inc.*, 282 F.Supp. 3d at 390-93. Ultimately, however, the public accommodation claim did not go to trial. It became moot when the Plaintiff progressed to a new school, where he would not be exposed to RF. *See G. v. Fay Sch.,* 931 F.3d 1, 11 (1st Cir. 2019) ("G's completion of the ninth grade has mooted the claim for preventive injunctive relief, the only relief available to the family under [the ADA].").

specific causation" if they lack expertise in the relevant specialty. ECF 102 at 6. He suggests that there is some discord between these arguments, but there is not. CMP's argument boils down to this: to be qualified as a medical expert on specific causation, licensure alone is not enough; a physician must *at least* have experience treating the disease in question. And because Carpenter is *both* unlicensed *and* utterly without experience in treating cancer (or any other disease), he is unqualified to offer an opinion about the effect of RF on an individual with cancer. The Plaintiff tries to twist this argument, suggesting that if licensure isn't always *enough* to qualify an expert, then it can't be *necessary* to qualify an expert. If this logic were extended to its logical conclusion, then anyone who had read books about cancer, and about RF, might be "qualified" to testify that RF makes cancer worse. That is a ludicrous position, and one the Court should reject.

Finally, the Plaintiff asserts that CMP "completely misstate[s] Dr. Carpenter's testimony." ECF 104 at 11. That is flatly false. We have accurately quoted his testimony (where he admits that he does not know at what level of RF exposure there is a clearly defined adverse human health effect), and have compared it to the controlling law (where courts have said that "[i]n toxic tort cases, '[s]cientific knowledge of the harmful level of exposure to a chemical plus knowledge that plaintiff was exposed to such quantities are minimal facts necessary to sustain the plaintiff's burden,'" *McClain v. Metabolife Int'l, Inc.,* 401 F.3d 1233, 1241 (11th Cir. 2005) (quoting *Allen v. Pennsylvania Eng'g Corp.,* 102 F.3d 194, 199 (5th Cir.1996)). There is no misstatement.

The Plaintiff argues, though, that it is not important for Carpenter to know the exposure level at which adverse health effects occur, because "the specific exposure level is covered by Mr. Anderson, Dr. Heroux, and Dr. Chamberlin." ECF 104 at 11 n.1. Again, that is not true. Chamberlin has been withdrawn as an expert, ECF 106; Heroux has admitted that he has no information about the intensity of the RF fields produced by CMP smart meters, ECF 102 at 15

(citing Heroux Depo. at 48:3-49:2); and Anderson's report says nothing about the intensity of those RF fields. See ECF 100-1. In short, the Plaintiff has designated *no* expert to testify about the intensity of the exposure the Plaintiff would experience if he had a smart meter at his home. And even if he had designated an expert to describe the anticipated or potential RF exposure, that would not salvage Carpenter's testimony. Knowing a plaintiff's exposure, and knowing whether that exposure could be harmful, are two different things. Because Carpenter admits he does not know the RF exposure level at which adverse health effects occur, he cannot possibly testify that the exposure described by some other expert would have an adverse effect on the Plaintiff's health.

### 4. Even an expert who proposes to testify on general causation must possess information about the Plaintiff's actual or expected exposure.

In his response to CMP's motion, the Plaintiff clarifies that Carpenter is offered solely as "an expert on *risk*." Accordingly, he says Carpenter can render "an informed, scientifically-reliable analysis and opinion on *general causation*." ECF 104 at 12 (emphasis added).

With the concession that Carpenter will opine only on general causation, the Plaintiff effectively acknowledges that he will *not* testify to a key opinion he offered during his deposition: that exposure to a CMP smart meter would likely reduce the length of time that Mr. Friedman's cancer is in remission. That is an opinion about *specific* causation – it purports to describe the effect exposure to an allegedly toxic agent (in this case, RF) would have on a particular individual. At a minimum, therefore, the Court should bar Carpenter from testifying to *that* opinion.[3]

Furthermore, even with his role limited to testifying about general causation, Carpenter must familiarize himself with the exposure that would occur if a CMP smart meter were installed at the

---

[3] Because, as the Plaintiff now says, Carpenter is being proffered solely as an expert on general causation, there is no need to address CMP's argument that he should be excluded because he has not reviewed any medical records, and therefore knows nothing about Mr. Friedman's medical condition. As long as Carpenter will not offer any opinions about specific causation – and the Plaintiff says he will not – his ignorance of Mr. Friedman's medical condition is not important.

Plaintiff's home.  The Plaintiff has not challenged the proposition that, in order to offer a causation opinion, an expert must have information documenting the plaintiff's "actual or probable exposure." *Polaino v. Bayer Corp.,* 122 F. Supp. 2d 63, 70 (D. Mass. 2000) (citing *Reference Manual on Scientific Evidence* at 206 (Fed. Jud. Center 1994)).  *See id.* (because plaintiff's expert on general and specific causation was "unable to estimate through modeling (or any other technique) the dose to which [the plaintiff] could have been exposed," his testimony could not "prove that [he] was exposed to a toxic agent, much less that he was exposed to a *sufficient dose* to produce a RADS response") (emphasis added).  Because Carpenter, by his own admission, does not know either (a) what "dose" of RF would be "sufficient" to cause this plaintiff harm, or (b) whether the Plaintiff would be exposed to that dose if he had a smart meter on his property, he cannot offer an opinion even on the issue of *general* causation.

## CONCLUSION

Although a trial of this action would be a bench trial, and not a jury trial, it remains critically important to subject Carpenter's testimony to a rigorous *Daubert* analysis.  Neither CMP nor this Court should be required to invest weeks in the trial of a claim for which no reliable scientific support exists.  Carpenter, who has no information about the RF exposure the Plaintiff would experience if a smart meter were installed at his home, cannot offer a reliable, scientifically-sound opinion that the exposure would be at a dose sufficient to exacerbate Ed Friedman's rare blood cancer.  Accordingly, his testimony should be excluded.

Dated at Portland, Maine this 5th day of July, 2023.

NORMAN, HANSON & DETROY, LLC

/s/ Christopher C. Taintor, Esq.
Russell B. Pierce, Esq.
Attorneys for Defendant Central Maine Power

Norman, Hanson & DeTroy, LLC
Two Canal Plaza, P.O. Box 4600
Portland, ME  04112-4600
(207) 774-7000

-12-

## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

### Certificate of Service

I hereby certify that on July 5, 2023, I electronically filed the Defendant's Reply Memorandum in Support of Motion to Exclude the Opinion Testimony of David Carpenter with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ Russell B. Pierce, Jr., Esq.
Attorney for Defendant Central Maine Power

Norman, Hanson & DeTroy, LLC
Two Canal Plaza, P.O. Box 4600
Portland, ME  04112-4600
(207) 774-7000