**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| ED FRIEDMAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | 2:20-cv-00237-JDL |
| v. ) | |
| ) | |
| CENTRAL MAINE POWER COMPANY, ) | |
| ) | |
| Defendant ) | |

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION**
**TO EXCLUDE THE OPINION TESTIMONY OF PAUL HEROUX**

In response to CMP's Motion to Exclude the Opinion Testimony of Paul Heroux, the Plaintiff's primary argument is that the Court should postpone its *Daubert* analysis until trial. That approach would defy basic principles of fairness and judicial economy. CMP should not be forced to bear the burden and expense of trial, and there is no justification for consuming scarce judicial resources, unless the Plaintiff can demonstrate that there is scientifically valid evidentiary support for his claim that exposure to radiofrequency (RF) fields would make his cancer worse.

As explained below, Heroux's testimony does not provide that support. His opinions are based almost entirely on two bodies of evidence: animal studies, with respect to which he has provided no "credible scientific explanation" for why the results should be extrapolated to humans; and an ecological or "geographic proximity" study which was not controlled for *any* variable other than RF exposure. These are not the kinds of evidence from which valid causal inferences can be drawn. Accordingly, Heroux's testimony must be excluded.

1. **Even in a bench trial, the experts proffered by the Plaintiff may testify only to opinions that have been developed through a scientifically reliable process.**

The Plaintiff argues that for two reasons, the Court should be reluctant to engage in a *Daubert* analysis before trial. First, citing *Cortes-Irizarry v. Corporacion Insular De Seguros*, 111

F.3d 184 (1st Cir. 1997), he argues that "'the summary judgment process does not conform well to the discipline that Daubert imposes.'" Therefore, he says, a court should exclude expert testimony before trial only in "clearcut cases." ECF 104 at 3 (quoting *Cortes-Irizarry*, 111 F.3d at 188). Second, because this case will be tried with a bench trial, not a jury, he says "'the importance of the trial court's gatekeeper role is significantly diminished.'" ECF 104 at 3 (*quoting Whitehouse Hotel Ltd. Partnership v. Commissioner of Internal Revenue*, 615 F.3d 321, 330 (5th Cir. 2010)). Neither argument should dissuade the Court from closely scrutinizing, and ultimately excluding, the unreliable expert testimony at issue here.

To be sure, the First Circuit said in *Cortes-Irizarry* that "a trial setting *normally* will provide the best operating environment for the triage which *Daubert* demands." *Cortes-Irizarry*, 111 F.3d at 188 (emphasis added). That is so because "summary judgment practice," where the parties are limited to filing competing statements of material fact, may not afford the proponent of "debatable scientific evidence . . . adequate opportunity to defend its admissibility." *Id.* See *Murphy v. Mattis*, 2017 WL 1157086, *2 n.4 (D. Me. March 27, 2017). This Court has addressed that precise concern, however, by encouraging litigants to file *Daubert* motions before they move for summary judgment, a procedure which ensures that there can be a "definitive, separate ruling as to the extent to which, if at all, the proposed expert testimony is admissible." *Id.* That is the procedure the Court is employing here. The Plaintiff has not suggested that by following this path, the Court will deprive him of an "adequate opportunity to defend [the] admissibility" of Heroux's testimony. In short, the concerns in *Cortes-Irizarry* that led the First Circuit to caution trial courts that they should not be "profligate" in the pretrial exclusion of expert witnesses are not present here.

The Plaintiff's second argument – that there is little need for "gatekeeping" when the trial judge will be the factfinder – ignores the Court's and the Defendant's interest in avoiding a lengthy trial of a case that lacks essential evidentiary support. To be sure, trial judges have broad discretion to decide when, and in what procedural context, they should evaluate the reliability and admissibility of expert testimony. In some cases, particularly where a trial is inevitable, and where the Court will benefit from hearing other evidence that provides important context for an expert's testimony, it may well make sense to delay that inquiry until trial. However where, as here, a plaintiff's ability to present a prima facie case depends on the admissibility of an expert's testimony, and where the relevant evidentiary record is fully developed, considerations of judicial economy and fairness to the defendant should cause the trial court to decide the issue before trial.

This Court acknowledged as much in *Murphy v. Mattis*, where it chose to "defer a decision on the admissibility of [an expert's] testimony, and to assume that [it was] admissible for purposes of the motion for summary judgment." *Id.* In explaining its decision, though, the Court thought it important to note that "admitting [the] testimony for summary judgment [did] not compromise the [defendant's] summary judgment position." *Id.* That is, the decision whether to admit or exclude the testimony would not dictate whether summary judgment was or was not warranted.

In contrast, bypassing the *Daubert* analysis here *would* compromise CMP's summary judgment position. Although there are alternative grounds for the forthcoming motion that warrant judgment as a matter of law even if some of the Plaintiff's expert testimony is assumed to be admissible, orders excluding their testimony now would be independently dispositive and would address Plaintiff's failure to meet his burden of proof. Pretrial motions to exclude testimony are valuable tools for promoting judicial economy. Indeed, in the criminal context one District Judge within this circuit has said that "it would present a disservice to judicial economy and the orderly

administration of justice to sit idly by awaiting the raising of an objection that is now ripe and which defendant has unequivocally indicated his intent to invoke." *United States v. Bulger*, 928 F.Supp.2d 294, 300 (D. Mass. 2013). The Court cited *United States v. Brimberry*, 744 F.2d 580, 586-87 (7th Cir. 1984), for the proposition that "the trial judge should be alerted to the possible superfluity of the impending trial so that if [a dispositive motion] proves to have merit the time and effort of a trial might be saved." *See also United States v. Booker*, 557 F.Supp.2d 153, 156 (D. Me. 2008) ("'[W]here the evidence to be presented would be insufficient as a matter of law [to establish an entrapment defense] . . . no proper interest of the defendant would be served by permitting his legally insufficient evidence to be aired at trial, and interests of judicial economy suggest that the jury should not be burdened with the matter.'") (quoting *United States v. Villegas*, 899 F.2d 1324, 1343 (2nd Cir. 1990)).

The same logic dictates early resolution of CMP's *Daubert* challenge to the testimony of the Plaintiff's expert witnesses. If the Court agrees that the challenged testimony, including Heroux's, is unreliable, or that it does not satisfy *Daubert*'s "fit" requirement, any time spent at trial will be superfluous, and an unjustifiable burden on both the Court and CMP. A litigant should not be able to force his adversary to endure the rigors of a lengthy and expensive trial – regardless of whether it is a bench trial or jury trial – simply by designating experts with flimsy opinions and then resisting close pretrial scrutiny of the methodology by which those opinions were developed.

### 2. The Plaintiff cannot prevail unless he proves that exposure to RF creates a heightened risk of significant harm that exists because of his particular disability.

CMP has argued that in order to prevail, the Plaintiff must prove that his rare blood cancer makes him "uniquely" or "individually" vulnerable to adverse health effects from radiofrequency (RF) fields, such that CMP's installation of a smart meter on his property would create a "risk to his health" that is both specific to his disease and "significant enough to deprive him of 'full and

equal access' to CMP's services." ECF 26 at 7-8. The Plaintiff takes issue with this formulation of the case, arguing that proof of "uniqueness" is not required. He says: "A person who uses a wheelchair does not have to prove that they are uniquely impacted by the lack of a ramp." ECF 104 at 5.

As explained in CMP's Reply Memorandum in Support of Motion to Exclude the Opinion Testimony of Dr. David Carpenter (ECF 109 at 4-5), in any "reasonable accommodation" analysis under the ADA, "an *individualized inquiry* must be made to determine whether a specific modification for a particular person's disability would be reasonable under the circumstances as well as *necessary for that person*, and yet at the same time not work a fundamental alteration." *PGA Tour, Inc. v. Martin,* 532 U.S. 661, 688 (2001) (emphasis added) (citation omitted).[1] The wheelchair analogy proposed by the Plaintiff is therefore inapposite, because everyone who is confined to a wheelchair is, by definition, "uniquely" (that is, individually) impaired, as compared to the general public, in their ability to climb stairs. This case, though, is fundamentally different. CMP categorically denies that a person who suffers from Waldenstroms Macroglobulinemia is distinguishable from any healthy person, insofar as the effects of exposure to RF are concerned. It is the Plaintiff's burden to prove that his disease differentiates him from the public at large. If he fails to prove that the risk to him, as an individual, is different from, and significantly greater than, the (non-existent) risk to the general public, he is bound by the decision of the Maine PUC, and his claim fails as a matter of law.

---

[1] So, for example, in *PGA Tour v. Martin*, the Supreme Court did not simply identify Casey Martin's disease and assume that as a result of that disease, the accommodation he asked for was "necessary." Instead, the Court considered how the disease affected Martin as an individual, "caus[ing] him pain, fatigue, and anxiety, [and] creat[ing] a significant risk of hemorrhaging, developing blood clots, and fracturing his tibia so badly that an amputation might be required." *PGA Tour, Inc. v. Martin*, 532 U.S. at 668.

### 3. The Animal Studies Upon Which Heroux Relies Do Not Support His Opinions.

In response to CMP's critique of Heroux's reliance on certain animal studies, see ECF 102 at 9-11, the Plaintiff points to the report submitted by a defense expert, Dr. Gabor Mezei. Dr. Mezei has acknowledged that a scientist conducting a "weight of evidence" analysis may consider a range of evidence, including animal studies. ECF 102-5 at 14-15. According to the Plaintiff, this means it is unfair to "attack" Heroux's reliance on certain animal studies. ECF 107 at 6. But the Plaintiff reads too much into Dr. Mezei's report.

First, Heroux did not purport to conduct a weight of evidence analysis – a comprehensive survey and analysis of the existing scientific data on the relationship between RF exposure and cancer. He identified only ten (10) scientific articles in support of his opinions, two of which were cited specifically as support for the proposition that RF emissions "can adversely impact the heart," an issue that has not been generated by the pleadings. See ECF 102 at 7-8.[2]

More importantly, CMP has not argued that animal studies are *never* relevant to a toxicology analysis. What CMP has said is that animal studies are irrelevant "in the absence of a credible scientific explanation of why such extrapolation is warranted." *Siharath v. Sandoz Pharms. Corp.*, 131 F. Supp. 2d 1347, 1366–67 (N.D. Ga. 2001), *aff'd sub nom. Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194 (11th Cir. 2002) (citing cases). Here, no effort has been made to explain how the results of the NTP and Ramazzini Institute studies – which involved rodent exposure to RF at high intensities, over a prolonged time, and some heightened incidence of "malignant brain and cardiac Schwannoma cancers" – can be extrapolated to support the conclusion that exposure to RF at the level emitted by a CMP smart meter could exacerbate Ed Friedman's blood cancer.

---

[2] The Plaintiff has not responded to CMP's argument that "the relationship, if any, between exposure to RF fields and cardiac function is wholly irrelevant to this action," ECF 102 at 7, and presumably agrees.

Finally, Dr. Mezei himself was careful to explain that while animal studies *can* sometimes be helpful in analyzing certain agents' toxicity to human beings, ECF 102-5 at 14-15, that is *not* true of the NTP and Ramazzini Institute studies. ECF 102-5 at 40-44. Simply put, there is nothing whatsoever in Dr. Mezei's report that is inconsistent with CMP's challenge to Heroux's reliance on animal studies to support his opinion, or with the motion to exclude his testimony.

**4. The Dode Study Does Not Support Heroux's Opinions.**

The Plaintiff suggests that CMP's criticism of the Dode study (which he characterizes as a "geographic proximity" study) is premised entirely on the fact that the study does not identify adverse effects of RF exposure among persons who have been diagnosed with Waldenstroms Macroglobulanemia. ECF 107 at 6. But that is not CMP's only criticism of Heroux's reliance on the Dode study, or even the principal one.

As CMP has explained, ECF 102 at 12-13, the more fundamental problems with Heroux's reliance on the Dode study are that (1) the study did not examine other factors, besides RF exposure – things like "food and life habits, activity level, smoking, self-medication, individual pathologies, or genetic factors" – that could have affected the health of any individual who died from cancer; (2) there is no indication that the intensity of the RF to which the study subjects were exposed was even remotely similar to the intensity of the exposure produced by a smart meter; and (3) the authors themselves acknowledge that the group results could not be "extrapolated to each person in the population." Thus, even if Dode et al. *had* identified a patient with Waldenstroms Macroglobulanemia who had been exposed to RF, and who appeared to have experienced a worsening of symptoms, the design of the study would not have permitted them to conclude that the RF exposure *caused* that adverse outcome.

## CONCLUSION

Although this action, if tried, would be tried to the Court, it remains critically important to subject Heroux's testimony to a rigorous *Daubert* analysis. Neither CMP nor this Court should be required to invest weeks in the trial of a claim for which no reliable scientific support exists. For the reasons set forth above, and in ECF 102, Heroux's testimony should be excluded.

Dated at Portland, Maine this 5th day of July, 2023.

NORMAN, HANSON & DETROY, LLC

/s/ Christopher C. Taintor, Esqs
Russell B. Pierce, Esq.
Attorneys for Defendant Central Maine Power

Norman, Hanson & DeTroy, LLC
Two Canal Plaza, P.O. Box 4600
Portland, ME 04112-4600
(207) 774-7000

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

**Certificate of Service**

I hereby certify that on July 5, 2023, I electronically filed the Reply Memorandum in Support of Defendant's Motion to Exclude the Opinion Testimony of Paul Heroux with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ Russell B. Pierce, Jr., Esq.
Attorney for Defendant Central Maine Power

Norman, Hanson & DeTroy, LLC
Two Canal Plaza, P.O. Box 4600
Portland, ME  04112-4600
(207) 774-7000