# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

<table>
<tr><td>ED FRIEDMAN,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Plaintiff,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td>2:20-cv-00237-JDL</td></tr>
<tr><td>v.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>CENTRAL MAINE POWER COMPANY,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Defendant</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
</table>

## DEFENDANT'S RESPONSE TO PLAINTIFF'S "RESPONSE TO QUESTIONS BY COURT" (ECF 118)

The Defendant Central Maine Power Company (CMP) submits this response to the the Court's questions in ECF 115 and in response to the Plaintiff's submission captioned "Response to Questions by Court." (ECF 118)

**1. Whether the standard the Court must apply to determine whether Plaintiff's disability entitles him to the accommodation he seeks is set out in *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 668 (2001):**

> The ADA was enacted to eliminate discrimination against "individuals" with disabilities, 42 U. S. C. § 12101(b)(1), and to that end Title III of the Act requires without exception that any `Policies, practices, or procedures" of a public accommodation be reasonably modified for disabled "individuals" as necessary to afford access unless doing so would fundamentally alter what is offered, § 12 182(b)(2)(A)(ii). <u>To comply with this command, an individualized inquiry must be made to determine whether a specific modification for a particular person's disability would be reasonable under the circumstances as well as necessary for that person,</u> and yet at the same time does not work a fundamental alteration. See S. Rep. No. 101-116, at 61; H. R. Rep. No. 101-485, pt. 2, at 102 (public accommodations "are required to make decisions based on facts applicable to individuals. Cf. Sutton v. United Air Lines, Inc., 527 U. S. 471, 483 (1999) ("Whether a person has a disability under the ADA is an individualized inquiry.")

**A. Is this a complete and accurate statement of the standard the Court must apply in this case?**

CMP agrees that this is an accurate, but not a complete, statement of the standard.

1

*PGA Tour, Inc. v. Martin* establishes that (1) there must be an "individualized inquiry" – not every person with a particular disease requires the same accommodation; (2) the focus must be on an individual's "particular disability"; and (3) the modification must be "necessary for that person." The *Martin* case does not, however, answer the question of what it means for an accommodation to be "necessary," because the question was not presented.[1] The Supreme Court accepted as a given the lower courts' factual determination that using a golf cart was "necessary" for Martin. *Martin v. PGA Tour, Inc.,* 994 F. Supp. 1242, 1244 (D. Or. 1998) (citing doctor's opinion that it was "medically necessary for Casey Martin to be permitted a cart if he is to play the game of golf"); *Martin v. PGA Tour, Inc.,* 204 F.3d 994, 999 (9th Cir. 2000) ("[T]there was ample evidence to support the district court's finding that Martin could not walk the course, even with artificial aids. These matters are no longer in serious contention.").

In summary, *Martin* stands for the proposition that a modification must be "necessary," but it does not define "necessary." Other cases, however, establish that a modification is "necessary" only if two conditions are met:  the modification must (1) alleviate the effects of an individual's disability and (2) be "essential" or "indispensable."

i.   <u>The modification must alleviate the effects of an individual's disability</u>.  *See Forest City Daly Hous., Inc. v. Town of N. Hempstead,* 175 F.3d 144, 152 (2d Cir. 1999) (explaining that the

---

[1] The questions presented in the Petition for Certiorari were:

1.   Whether Title III of the ADA, 42 U.S.C. § 12101 et seq., regulates standards established for competitors (here, professional golfers) in athletic competitions held at places of public accommodation.

2.   Whether, if so, Title III requires professional sports organizations to grant selective waivers of their substantive rules of athletic competition in order to accommodate disabled competitors.

relevant inquiry is whether "the non-complying features of the proposed residence are 'necessary' in light of the disabilities of proposed residents"); *Lapid–Laurel, L.L.C. v. Zoning Bd. of Adjustment of Twp. of Scotch Plains,* 284 F.3d 442, 460 (3d Cir. 2002) ("[I]f the proposed accommodation provides no direct amelioration of a disability's effect, it cannot be said to be necessary."); *Bryant Woods Inn, Inc. v. Howard Cnty., Md.,* 124 F.3d 597, 604 (4th Cir. 1997) ("The 'necessary' element—the FHA provision mandating reasonable accommodations which are *necessary* to afford an equal opportunity—requires the demonstration of a direct linkage between the proposed accommodation and the 'equal opportunity' to be provided to the handicapped person. This requirement has attributes of a causation requirement. And if the proposed accommodation provides no direct amelioration of a disability's effect, it cannot be said to be 'necessary.'"); *Wisconsin Cmty. Servs., Inc. v. City of Milwaukee,* 465 F.3d 737, 749 (7th Cir. 2006) ("[T]he [FHA] requires only accommodations necessary to ameliorate the effect of the plaintiff's disability so that she may compete equally with the non-disabled in the housing market."); *Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.,* 765 F.3d 1277, 1288 (11th Cir. 2014).

ii.   The modification must be "essential" or "indispensable," not just a preference. *Vorchheimer v. Philadelphian Owners Ass'n,* 903 F.3d 100, 107 (3d Cir. 2018) ("The [FHA's] necessity element requires that an accommodation be essential, not just preferable."); *Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George City,* 685 F.3d 917, 923 (10th Cir. 2012) ("What does it mean to be 'necessary'? The word implies more than something merely helpful or conducive. It suggests instead something 'indispensable,' 'essential,' something that 'cannot be done without.'"); *Rood v. Town of Ft. Myers Beach, Fla.,* 622 F. Supp. 3d 1217, 1233 (M.D. Fla. 2022) ("Th[e] term [necessary] carries its plain meaning of "indispensable,

3

requisite, essential . . . or absolutely required.'"); *Summers v. City of Fitchburg,* 325 F. Supp. 3d 203, 210 (D. Mass. 2018), *aff'd,* 940 F.3d 133 (1st Cir. 2019) ("To be necessary to afford equal opportunity to use and enjoy a dwelling unit, an accommodation must be "indispensable or essential[ ] to achieving the objective of equal housing opportunities between those with disabilities and those without.") (citing *Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George City, supra*).

**B.  Is the Defendant's summarization of this standard—that "The Plaintiff cannot prevail unless he proves that exposure to RF creates a heightened risk of significant harm that exists because of his particular disability?"— a correct statement of the law? ECF No. 110, at 4.**

Yes.  As applied to the claim asserted here, which is predicated on the alleged existence of enhanced risk, it is a correct statement of the law.

In the vast majority of disability discrimination cases (exemplified by *PGA Tour, Inc. v. Martin*), involving plaintiffs who allege that their disabilities presently limit their access to goods, services, or housing, there is no dispute that the accommodation sought is necessary to ameliorate the plaintiff's disability.  In these cases, there is no dispute about the fact that the disabled person alleges the existence of an immediate, tangible, individualized harm, for which he has Article III standing to sue.

This case is fundamentally different.  Plaintiff cannot demonstrate Article III standing to sue. Plaintiff alleges that if he avails himself of CMP's standard electrical service (which includes installation of a Smart Meter), he is at risk of suffering harm at some point in the future based on his disability. Therefore, as explained further below, it is incumbent upon this Plaintiff to demonstrate both (1) that his increased risk of harm is quantitatively significant, and (2) the harm that is risked is itself significant. Plaintiff's experts fail to meet this standard based on reliable scientific grounds.

2.  **What other decision or decisions should the Court be guided by in framing the applicable standard?**

The following cases, which are cited in CMP's Pre-Filing Memorandum, set forth the legal principles the Court must consider in determining whether the Plaintiff has standing to seek a modification of CMP's policy and practice:

- *Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.,* 489 F.3d 1279, 1295 (D.C. Cir. 2007) (to establish standing in an "increased risk of harm case," a plaintiff must demonstrate "at least *both* (i) a *substantially* increased risk of harm and (ii) a *substantial* probability of harm with that increase taken into account") (emphasis in original);

- *Kerin v. Titeflex Corp.,* 770 F.3d 978, 983 (1st Cir. 2014) ("[W]hether a risk is speculative . . . depends on the chance that the risked harm will occur," and a plaintiff who does not "allege facts sufficient to even calculate or estimate the risk" fails to meet his burden of establishing concreteness);

- *Kansas Corp. Comm'n v. FERC,* 881 F.3d 924, 930 (D.C. Cir. 2018) ("A petitioner that asserts a harm that may occur 'some day' with no 'specification of *when* the some day will be,' does not establish its standing.") (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992)).

For additional relevant authority, *see Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.,* 513 F.3d 234, 240-41 (D.C. Cir. 2008) (finding no standing where consumer group, after having been directed to produce evidence to establish those propositions, failed to submit statistically sound calculation estimating incremental risk of accidents that would result from agency's adoption of new safety standard); *Wilkins v. Genzyme Corp.* 2022 WL 4237528, *21 (D. Mass., Sept. 14, 2022) ("vague prognostications" about the possibility that a defendant's conduct

could cause injury in the future are "insufficient" to establish harm that is "actual or imminent, not conjectural or hypothetical"). [2]

3.  **Have any of the Plaintiff's expert witnesses offered an opinion as to the level or levels of RF radiation that the Plaintiff would be exposed to if a smart meter is installed at his home? If so, for each witness, identify the specific excerpt or excerpts from the witness's or witnesses' reports or depositions where this information appears.**

No.  The testimony of Erik Anderson, cited in ECF 118 at page 4, does not identify "the level or levels of RF radiation that the Plaintiff would be exposed to if a smart meter is installed at his home."

First, Anderson's own smart meter testing, described in his Report at pages 7 and 8, does not purport to establish "exposure" levels.  It demonstrates only that "noise" levels would increase if a smart meter were installed in the Plaintiff's home.  It does not say what the Plaintiff's exposure to RF would be either with or without the smart meter and the "noise" it produces.

Second, the Report created by "Isotrope Wireless" does not establish exposure levels.  Although the Plaintiff cites Anderson's analysis (at page 4 of his Report) of the Isotrope Wireless findings for the proposition that the RF levels emitted by a smart meter antenna would "exceed the absolute energy output limits stated in the Federal Communications Commission ("FCC") guidelines (if the emissions are not averaged over a 30-minute exposure as prescribed by those guidelines)," Anderson retracted that opinion in his deposition.  Anderson Depo. at 63:22-64:6.

Third, Anderson has not said that "the findings from the Isotrope Report" – based on its analysis of RF signal detected in just three homes – would provide data sufficient to predict Ed Friedman's RF

---

[2] The Plaintiff has cited case law addressing the circumstances under which places of public accommodation may be required to waive generally-applicable fees for disabled persons.  See ECF 118 at 3.  Because that issue is not relevant to the *Daubert* motions, which are the subject of the upcoming hearing, CMP has not responded to that part of the Plaintiff's argument.  CMP does, however, preserve for summary judgment its argument that the opt-out fee is not a discriminatory surcharge, because it is applicable to the disabled and the non-disabled alike.

exposure if a smart meter were installed at his home.  In his view, any person's exposure would depend on a variety of factors, including the meter's proximity to that individual's living space.[3] He does not profess to have knowledge of how those factors would apply to Ed Friedman.

**4.  The Plaintiff indicates that the specific level of RF exposure from a smart meter at which, under the ADA, his disability supports a reasonable modification, is not established by Dr. Carpenter or Dr. Chamberlin (the latter of whom will not be presented as an expert witness) but is established by the expert opinion testimony of Mr. Anderson and Dr. Heroux.** *See* **Opposition to Defendant's Motion to Exclude the Opinion Testimony of Dr. David Carpenter, ECF No. 104, at 11, n. 1 ("The specific exposure level is covered by Mr. Anderson, Dr. Heroux, and Dr. Chamberlin — Dr. Carpenter's expert testimony fills in additional gaps on issues Plaintiff must prove in this matter.").**

**A.  Is the preceding assessment of the Plaintiff's position correct?**

CMP objects to the Plaintiff's reliance on the testimony of his treating oncologist, Dr. David Benton, for the proposition that he is entitled to a modification if he would be "stressed" by a smart

---

[3] See Anderson Depo. at 29:5-24:

> Q. . . . [W]hat conditions would need to occur for that communication to create intense exposure to pulsed radio frequencies in a human being?
>
> A. Well, I -- I think it has to do with how far away you are from the meter and how -- how those frequencies interact with your body and how susceptible you are to those frequencies.
>
> Q. Would you -- would a -- would an individual have to have his or her face basically pressed against the smart meter in order for that scenario to create an intense exposure to radio frequencies?
>
> A. Well, I would expect that would be one way to do it, but I don't believe you have to be quite that close, particularly if you're sensitive to it or if you have adverse reactions to those RF frequencies.
>
> Q. How close do you think you would have to be to have an intense exposure based on that scenario?
>
> A. I -- I think that would depend on the individual to a certain extent. I don't know that I can quantify that for you.

Anderson also clarified that he would *not* characterize the power densities described in the Isotrope Report as "intense exposures."  Anderson Depo. at 60:10-62:6.

meter, regardless of whether there is any evidence that he is at significant risk of being harmed by a meter's presence on his property.  The Plaintiff has not designated Dr. Benton as an expert, and this Court's expert designation requirement applies to treating physicians, like Dr. Benton, as well as to experts retained for litigation. See ECF 32 at 2.

If the Plaintiff is permitted to rely on the opinion testimony of Dr. Benton, the more relevant aspect of his testimony is Dr. Benton's admission that his letter dated November 30, 2016, which was cited in the Complaint and which the Plaintiff relied on in opposing CMP's Motion to Dismiss, was drafted largely by Ed Friedman, Benton Depo. at 12:15-22 – not by Dr. Benton himself – and it was profoundly misleading.  Although the letter asserted that Dr. Benton was "concerned that low-level non-ionizing radiation exposure of the type and level emitted by Electromagnetic Frequency (EMF) invoicing tools may exacerbate problems already experienced by my patient including fatigue, cognitive difficulties, memory issues and multiple cancer types," and it recommended that "Mr. Friedman's request for reasonable accommodation without penalty be granted to minimize his risk of disease progression symptoms exacerbation," we learned in Dr. Benton's deposition that when he agreed to sign the letter, he in fact had *no* such concerns.  To the contrary, Dr. Benton admitted that:

- When he agreed to sign the letter, he had never known Mr. Friedman to have problems with cognition or memory, and Mr. Friedman was not reporting that he was currently experiencing fatigue.  Benton Depo. at 9:3-10:11 & 12:23-13:2

- When he agreed to sign the letter, he had performed no research to support the proposition that exposure to RF may exacerbate any medical condition the Plaintiff had experienced.  Benton Depo. at 13:13-17.

8

- When he agreed to sign the letter, he had not formed the opinion that exposure to RF had any negative effect on the physical health of any human being.  Benton Depo. at 15:6-16.

- In the course of his practice, Dr. Benton had never before recommended to any patients that they not have smart meters in their homes.  Benton Depo. at 13:22-25.

- Dr. Benton signed the letter solely because he was concerned that Mr. Friedman was emotionally stressed by the prospect of having to live with a smart meter.  Benton Depo. at 14:6-24.

**B. Identify the specific excerpt from Mr. Anderson's and/or Dr. Heroux's reports and depositions where this information appears.**

There is no reference to exposure levels in the report or deposition of either Erik Anderson or Paul Heroux.

### Erik Anderson

The testimony of Erik Anderson, cited in ECF 118 at page 5, does not identify "the specific level of RF exposure from a smart meter at which, under the ADA, his disability supports a reasonable modification."  He simply says that installing a smart meter would create "additive transients," and that a smart meter can cause a person to experience "intense exposure to pulsed radio frequencies."

The adjective "intense" is qualitative, not quantitative, and it is not sufficiently specific to inform a scientific analysis of risk.  Mr. Anderson also acknowledges that in order to predict whether an "intense" exposure (as he defines it) is likely to occur in a human being, one would need to know "how far away [the person is] from the meter and . . .  how those frequencies interact with your body and how susceptible you are to those frequencies," Anderson Depo. at 29:5-24 – all facts he is ignorant of, as far as this Plaintiff is concerned.

<u>Paul Heroux</u>

Contrary to the Plaintiff's claim, the testimony of Paul Heroux does not establish that "*any* level of exposure [to RF] is unsafe for human health, especially for someone suffering from cancer." ECF 118 at 5.  More specifically, and more relevant here, Heroux does not purport to claim that exposure to RF is unsafe for a person who suffers from Waldenstroms macroglobulinemia.

 What Heroux actually says is that:

- Exposure to radiofrequency fields generates reactive oxygen species. Heroux Depo. at 30:8-14.

- The physiological make up of a person can change as a result of aggression by reactive oxygen species, which alter the mitochondrial genome.  Heroux Depo. at 28:14-30:14.

- *Everyone* who is exposed to radiofrequency fields has increased levels of reactive oxygen species in their body. Heroux Depo. at 36:22-24.

- Alteration of mitochondria can cause cancer and "*should* be able to affect *all* cancers."  Heroux Depo. at 31:1-32:1 (emphasis added).

- There is no "detailed documentation" of the connection between mitochondrial mutation and cancer, but "on a physiological level, [it] is perfectly logical."  Heroux Depo. at 32:1-3.

- Even if it is true that RF can cause cellular changes, those cellular changes do not necessarily translate into a health hazard.  It just means there is a *possible* connection between exposure to a toxin and an adverse effect on human health.   Heroux Depo. at 63:6-13.

- When science identifies a plausible mechanism to explain how exposure to a substance might cause cellular injury, the next step is to look at animal experiments, and try to find models that simulate human situations. Heroux Depo. at 63:11-16.

- There are two animal studies that supposedly demonstrate an association between RF exposure and cancer.  Heroux Depo. at 45:19-48:21.[4]

- However, even if those animal studies are otherwise worthy of reliance, neither speaks to the question of whether survival is diminished in a cancer patient who is exposed to RF.  Heroux Depo. at 54:16-20.

- Furthermore, Herouox cannot compare the exposure levels in the animal studies to the exposure Friedman would receive from a smart meter, because he is not familiar with the exposure produced by a smart meter. Heroux Depo. at 48:3-50:8.

- There is no literature establishing a dose-response relationship between exposure to RF and adverse health effects, except among people who are electrosensitive. Heroux Depo. at 50:4-15.

- The alleged connection between reactive oxygen species and cancer is a statistical one, with the percentage of people who acquire cancer as a result of exposure to radiofrequency fields dependent on the cancer. Heroux Depo. at 36:9-37:25.

---

[4] As explained in CMP's Motion to Exclude Heroux's testimony, his reliance on the animal studies is misplaced because he has not offered a "credible scientific explanation of why . . . extrapolation [from animals to humans] is warranted." ECF 102 at 10 (quoting *Siharath v. Sandoz Pharms. Corp.,* 131 F. Supp. 2d 1347, 1366–67 (N.D. Ga. 2001), *aff'd sub nom. Rider v. Sandoz Pharms. Corp.,* 295 F.3d 1194 (11th Cir. 2002) (citing cases)).

Crucially, Heroux has not offered any opinion about the statistical relationship between exposure to RF and the worsening of Waldenstroms macroglobulinemia.  In fact, his Report says only that having a smart meter installed at Mr. Friedman's home carries some wholly unquantified "risk of worsening his lymphoma's progression or symptoms."  His Report and deposition shed no light whatsoever on the question of whether that risk is 1%, whether it is some fraction of 1%, or whether it is greater than 1%.  Nor does it tell us which symptoms might get worse, or how severe those exacerbated symptoms might be.  In short, there is nothing in Heroux's testimony that "indicates that the specific level of RF exposure from a smart meter at which, under the ADA, his disability supports a reasonable modification."

5. **Several of the expert witnesses refer to the potential for "electrical transients," "noise," "spikes," and "dirty electricity" (hereinafter referred to collectively as "spikes").**

A. **Do these terms all describe the same phenomenon?**

Yes. See Anderson Deposition at page 64:7-65:18 & 78:15-79:8.

B. **Do any of the Plaintiff's or Defendant's designated expert witnesses offer an opinion as to the level or levels of RF radiation that the Plaintiff could be exposed to as a result of spikes if a smart meter is installed in his home? If so, for each witness, identify the specific excerpts from the witness's or witnesses' reports or depositions where this information appears.**

No.  The report and testimony of Erik Anderson, cited in ECF 118 at page 4 and adopted by reference at page 7, describes only an increase in "noise level."  It does not link that increase in noise level to the "level or levels of RF radiation that the Plaintiff could be exposed to" if those "spikes" occur.

Dated at Portland, Maine this 30th day of August, 2023.

NORMAN, HANSON & DETROY, LLC

/s/ Christopher C. Taintor, Esq.

12

Christopher C. Taintor, Esq.
Russell B. Pierce, Jr., Esq.
Attorneys for Defendant Central Maine Power

Norman, Hanson & DeTroy, LLC
Two Canal Plaza, P.O. Box 4600
Portland, ME  04112-4600
(207) 774-7000
ctaintor@nhdlaw.com
rpierce@nhdlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 30, 2023, I electronically filed the Defendant's Response
to Plaintiff's "Response to Questions by Court" (ECF 118) with the Clerk of Court using the
CM/ECF System which will send notification of such filing to all counsel of record.

/s/ Russell B. Pierce, Jr., Esq.
Attorney for Defendant Central Maine Power

Norman, Hanson & DeTroy, LLC
Two Canal Plaza, P.O. Box 4600
Portland, ME  04112-4600
(207) 774-7000
rpierce@nhdlaw.com