## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| ED FRIEDMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 2:20-cv-00237-JDL |
| | ) |
| CENTRAL MAINE POWER COMPANY, | ) |
| | ) |
| Defendant. | ) |

**ORDER ON MOTIONS TO EXCLUDE EXPERT WITNESS TESTIMONY**

Ed Friedman brings this action against Central Maine Power Company ("CMP") for allegedly violating the Americans with Disabilities Act, the Rehabilitation Act, and the Fair Housing Act by charging him a monthly fee to opt out of CMP's program to replace analog meters with "smart meters" to measure customer electricity usage remotely. Friedman, who has a rare form of non-Hodgkin's lymphoma, argues that waiving the opt-out fee is a reasonable accommodation to avoid exacerbating his cancer prognosis and associated symptoms through exposure to radiofrequency ("RF") radiation that a CMP smart meter will emit if installed on his property. Both Friedman and CMP have retained expert witnesses and move to exclude testimony from all or a portion of their adversary's experts under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

### I. PROCEDURAL HISTORY

After Friedman brought this action in July 2020 (ECF No. 1), CMP moved to dismiss the claims against it for failure to state a claim (ECF No. 11). I denied CMP's

1

motion while noting that "Friedman must eventually prove . . . that having a smart meter installed at his home actually risks worsening his lymphoma's progression or symptoms" to ultimately prevail.  ECF No. 26 at 9.  The parties completed discovery and designated several expert witnesses to support their positions.  Friedman designated four experts: Dr. David Carpenter, a public health physician and professor of environmental health science; Dr. Paul Héroux, a physicist and professor of health science; Erik Anderson, an electrical engineer; and Dr. Kent Chamberlin, a professor of electrical and computer engineering.  CMP enlisted an expert lineup that included, among others, Dr. Robert Gale, a medical doctor and academic who has published on topics including cancer biology and radiation biology.

On March 29, 2023, CMP filed a notice of intent to move for summary judgment and to exclude or limit the testimony of each of Friedman's four designated experts (ECF No. 86), and Friedman moved to exclude Dr. Gale's testimony shortly thereafter (ECF No. 91).  Pursuant to Local Rule 56(h), I held a case management conference with the parties on May 17, 2023 (ECF No. 96) and issued a report after explaining that I would decide the parties' *Daubert* motions before setting a schedule for summary judgment practice (ECF No. 97).  CMP subsequently moved to exclude or limit the testimony of Dr. Carpenter, Mr. Anderson, Dr. Chamberlin, and Dr. Héroux (ECF Nos. 99, 100, 101, 102).  I held oral argument on the five pending *Daubert* motions on August 31, 2023 (ECF No. 123).

## II.  LEGAL STANDARD

Federal Rule of Evidence 702 governs expert witness testimony and provides the framework for assessing the parties' pending motions.  Rule 702 provides in full:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.[1]

As a threshold matter, Rule 702 requires "that a putative expert be qualified to testify by knowledge, skill, experience, training or education." *Levin v. Dalva Bros., Inc.*, 459 F.3d 68, 78 (1st Cir. 2006).  Because courts interpret Rule 702 "liberally in favor of the admission of expert testimony . . . expert witnesses need not have overly specialized knowledge to offer opinions."  *Id.*; *see also Daubert*, 509 U.S. at 588 (recognizing the "'liberal thrust' of the Federal Rules" of Evidence broadly—and Rule 702 specifically—as well as the Rules' "general approach of relaxing the traditional barriers to 'opinion' testimony" (quoting *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169 (1988)).  Still, a witness qualified as expert on certain topics "does not mean that he or she is qualified to express expert opinions as to other fields." *Levin*, 459 F.3d at 78 (quoting *Nimely v. City of New York*, 414 F.3d 381, 399 n.13 (2d Cir. 2005) (alteration omitted)).  Courts, therefore, should exclude proffered opinions that are

---

[1]  The most recent amendments to Federal Rule of Evidence 702 became effective December 1, 2023.  This Order references Rule 702's current language.

outside the witness's established expertise as circumscribed by one or more of the five bases in Rule 702. *Id.*

Beyond establishing the bases for qualification, the purpose of Rule 702 is to probe the "validity and thus the evidentiary relevance and reliability" of the principles and methodology underlying proffered expert testimony. *Daubert*, 509 U.S. at 594-95. Subsection (a) of the rule speaks to the relevance or "fit" of the proposed testimony; its "'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 591-92. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.* at 587 (quoting Fed. R. Evid. 401 prior to its amendment effective Dec. 1, 2011).

Subsections (b), (c), and (d) of Rule 702 speak to reliability. *See* Fed. R. Evid. 702 advisory committee's note to 2023 amendments. "Reliability" in this context means "*evidentiary* reliability—that is, trustworthiness." *Daubert*, 509 U.S. at 590 n.9. "In a case involving scientific evidence, *evidentiary reliability* will be based upon *scientific validity*"—*i.e.*, whether "the principle support[s] what it purports to show[.]" *Id.* Factors that may inform a reliability determination include: "(1) whether the theory or technique can be and has been tested; (2) whether the technique has been subject to peer review and publication; (3) the technique's known or potential rate of error; and (4) the level of the theory or technique's acceptance within the relevant discipline." *United States v. Mooney*, 315 F.3d 54, 62 (1st Cir. 2002) (citing *Daubert*,

4

509 U.S. at 593-94). Which *Daubert* factors are pertinent to assessing reliability "depend[s] on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Milward v. Acuity Specialty Prods. Grp. Inc.*, 639 F.3d 11, 14 (1st Cir. 2011) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999)). In any event, less stringent application of those factors is appropriate in a bench trial where *Daubert*'s usual concern—"keeping unreliable expert testimony from the jury"—is not present. *Issokson v. Ins. Co. of N. Am.*, No. 3:18-cv-30070-MGM, 2023 WL 4195941, at *1 (D. Mass. May 4, 2023). However rigorously applied, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Civ. P. 702 advisory committee's note to 2000 amendments.

## III. ANALYSIS

### A. CMP's *Daubert* Motions

CMP initially moved to exclude, in whole or in part, the testimony of all four of Friedman's designated experts: Dr. David Carpenter, Dr. Paul Héroux, Erik Anderson, and Dr. Kent Chamberlin. Friedman has since withdrawn Chamberlin as an expert (ECF No. 106), so I deny CMP's motion to exclude him as moot. The following discussion examines CMP's remaining *Daubert* motions in turn.

#### 1. Dr. David Carpenter

CMP moves to exclude the testimony of Dr. David Carpenter on the basis that he is not qualified to opine about the general causal relationship between exposure to RF radiation and cancer. Even if Carpenter is qualified to testify about general causation, CMP further contends that his testimony is nonetheless inadmissible

because his opinions lack the requisite foundation to be considered reliable.[2] In support, CMP argues that Carpenter neither knows what level of RF radiation exposure causes adverse human health effects nor has any information about Friedman's expected exposure if a smart meter were installed on his property.

Friedman disagrees and urges the Court to consider the admissibility of Carpenter's testimony based on the specific question he says Carpenter's expert report addressed: "whether having a smart meter in [Friedman's] home risks exacerbating [Friedman's] cancer and or symptoms." ECF No. 104 at 7. Friedman points to Carpenter's extensive experience as a public health physician as qualifying him to opine on that general causal link and the attendant risks. He also contests the alleged gaps in Carpenter's opinions, which he claims that CMP misstates.

**(a) Expert Qualifications: General vs. Specific Causation**

A brief discussion of general versus specific causation is necessary to contextualize my analysis of the parties' arguments. General causation answers whether a "particular stimulus [is] known to produce a particular reaction." Fed. Jud. Ctr., Reference Manual on Scientific Evidence xiv (3d ed. 2011). By contrast, specific causation answers whether "a particular stimulus cause[d] a particular

---

[2] CMP also challenges Carpenter's reliability to the extent that he formed opinions based on evidence that CMP says is irrelevant to Friedman's particular case, namely evidence related to electro-hypersensitivity—a condition that Friedman does not claim to have—and evidence that exposure to RF radiation at intensities emitted by cell phones and cell towers causes certain cancers (not including the type Friedman has been diagnosed with) in rodents. CMP also initially sought to exclude Carpenter's opinions about specific causation, arguing that he is not qualified to assess Friedman's individual medical risks because, among other reasons, he has never examined Friedman or reviewed his medical records. As CMP acknowledges, the Court need not address the specific-causation argument because Friedman has indicated that he is offering Carpenter to opine on general causation only.

consequence in a specific instance." *Id.* As I will explain, Carpenter's opinion and CMP's motion to exclude it conflate those distinct concepts.

In his report, Carpenter concludes "with a reasonable degree of medical certainty that if a smart meter were placed on Mr. Friedman's house, the elevated exposure [to RF radiation] coming from it would increase the risk his cancer could worsen which in turn logically may exacerbate his symptoms affecting his quality of life and likely shortening it." ECF No. 99-1 at 5. That conclusion encompasses opinions on causation both general and specific. First, on general causation, Carpenter's conclusion is premised on the existence of a causal relationship between exposure to RF radiation and shortened life expectancy for persons who have certain conditions, including cancers similar to but distinct from Friedman's lymphoma. *See* ECF No. 99-1 at 5 (considering the effects of exposure to electromagnetic fields on children with leukemia). Carpenter also attests to specific causation, albeit hypothetically given the nature of Friedman's claims, by applying that general causal relationship to Friedman's particular circumstances to gauge the prospective risk of harm he faces. Both opinions assume that smart meters emit some amount of RF radiation, which CMP concedes. In response, CMP argues that Carpenter "cannot offer a reliable, scientifically-sound opinion that the exposure [to RF radiation from a smart meter on Friedman's property] would be at a dose sufficient to exacerbate Ed Friedman's rare blood cancer." ECF No. 109 at 10. The essence of CMP's opposition, then, is to Carpenter's qualification to opine on specific causation.

In response, Friedman sidesteps CMP's argument by offering Carpenter as an "expert on risk" who will testify about "the effect of smart meter radiofrequency on humans generally and humans suffering from similar cancers specifically"—but Friedman does not refute the argument entirely. ECF No. 104 at 12, 10 (emphasis omitted). Because Friedman effectively concedes that Carpenter will not render opinions on specific causation, CMP's motion is properly granted to the extent that Carpenter may not offer testimony applying his observations on general causation to Friedman's particular circumstances. By the same token, I find that Carpenter's experience as a public health practitioner and academic qualifies him to testify about general causation, as circumscribed above.

**(b) Reliability**

Even with Carpenter's testimony limited to general causation, CMP argues that his opinions are unreliable for lack of foundation because Carpenter does not know what dose of RF radiation causes adverse human health effects. When asked at his deposition to clarify whether he could identify the level of RF exposure that "would create an appreciable risk of harm to human beings," ECF No. 99-2 at 59:13-14,[3] Carpenter testified:

> A: There are biological effects at any exposure, exposures we all get all the time because of sun, because of AM and FM radio, from television, and so forth. But we're -- we cannot avoid exposure on this earth. But the greater the exposure, the greater the risk of developing these diseases, of developing cancer, of developing fertility problems, of developing electrohypersensitivity. And the threshold of exposure for

---

[3] Citations to Carpenter's deposition testimony use the page numbers of the deposition transcript itself, not of the docket filing (ECF No. 99-2) in which the transcript is incorporated.

> any of those outcomes is going to vary somewhat from person to person depending on the genetic makeup and so forth.
>
> But I do not believe that we will ever be able to define an exposure level that's the boundary between safe and unsafe. Therefore, the rational thing to do is to accept the fact that we cannot avoid exposure totally, but that there is a health hazard from exposure and, therefore, we should take steps to reduce our exposure to the degree we can, without major disruption of lifestyle.
>
> . . . .
>
> Q. You're basically saying, ["]I don't know what the health risks are of having smart meters, but because they don't serve any particular or any particularly compelling purpose, it would be better to do away with them so as not to incrementally increase exposure to a potentially harmful energy;["] is that fair?
>
> A. That's correct. That's exactly correct.

ECF No. 99-2 at 61:24-62:18; 63:11-18. In subsequent deposition testimony, Carpenter could not quantify how much RF radiation smart meters emit and could only suppose whether it was more or less than emissions from other manmade sources. Indeed, Friedman does not claim that Carpenter "know[s] the exact figures of exposure,"[4] but Friedman nonetheless insists Carpenter can opine on "the health effects of the type of [RF radiation emitted] by smart meters and their effects on the human body." ECF No. 104 at 11.

Inadmissible statements on specific causation aside, Carpenter's report and deposition testimony boil down to two essential opinions. First, because smart meters emit a type of RF radiation that has deleterious effects on human health, the presence

---

[4] Friedman represents that other experts will opine on the specific exposure level and notes more broadly that none of his designated experts, on their own, "is qualified to testify to both the engineering and human health aspects of smart meters, but together they provide a complete picture." ECF No. 104 at 11 n.1.

of a smart meter in or near a person's home would elevate their aggregate exposure to that radiation and, therefore, risk worsening their preexisting conditions and associated symptoms. Second, the greater the exposure to RF radiation, the greater the risk of harm. Carpenter's opinion relies on two studies that examined the relationship between magnetic field exposure and survival rates among children previously diagnosed with leukemia.[5] Both studies suggest that Carpenter's theory has been tested, published, and garnered at least some acceptance in the public health community—all indications of reliability under *Daubert*. Despite objecting to many of the other studies Carpenter relied on to inform his opinions, CMP does not challenge either leukemia study as unreliable. CMP does not dispute the conclusions of the leukemia studies, critique them as methodologically unsound, or contend that the disease, human subjects, or type of electromagnetic fields they examine are too distinct from Friedman's circumstances to be analogous. On that last point, Carpenter likens leukemia to Friedman's lymphoma because both are cancers that impact the immune system, which CMP does not dispute. *See* ECF No. 99-2 at 112:20-23. Though the leukemia studies do not compel any conclusions about the relationship between RF radiation and Friedman's particular cancer, they lay the foundation necessary for me to find Carpenter's opinions on general causation sufficiently reliable to survive CMP's challenge.

---

[5] Though Carpenter relies on other studies as support for the proposition that RF radiation can *cause* certain types of cancers, I disregard that opinion and the cited authorities supporting it because Friedman contends only that the installation of a smart meter on his property will *exacerbate* his cancer prognosis and symptoms.

10

For the foregoing reasons, I grant CMP's motion in part to the extent that the Court will not consider Carpenter's opinions on specific causation. I deny CMP's motion in part as to Carpenter's opinions regarding the general causal relationship, if any, between exposure to RF radiation and its potential to worsen cancer prognoses and symptoms.

### 2. Dr. Paul Héroux

CMP next moves to exclude the testimony of Dr. Paul Héroux, who Friedman designates as an expert on "the effect of exposure [to RF radiation] on the human body." ECF No. 118 at 5. CMP argues that (1) Héroux is not qualified to opine about Friedman's individualized medical risk, (2) Héroux's testimony about the relationship between RF exposure and cardiac function is irrelevant to Friedman's claims, and (3) Héroux's opinion that RF radiation promotes cancer is unreliable.

Héroux's report consists largely of prefatory observations that contextualize brief conclusions about, as summarized by Friedman, the "link between the existence of smart meter-created RF and human health." ECF No. 118 at 5. Héroux opines, in relevant part:

> Having a smart meter installed at Mr. Friedman's home carries a risk of worsening his lymphoma's progression or symptoms. As the National Toxicology Program and Ramazzini Institute findings show, there is also clear evidence from toxicological animal experiments that electromagnetic radiation as that from smart meters can adversely impact the heart. Low levels of radiofrequency radiation are also known to create oxidative stress which in turn can cause chronic inflammation, a well-established cause and promoter of cancers, cardiovascular and other diseases.

ECF No. 118-3 at 2 (footnotes omitted).

Like Carpenter, Héroux may testify on general causation only. Héroux's experience in health sciences, which includes authoring a book on the health effects of electromagnetism, qualify him to opine about the general causal relationship between RF radiation and human health. As Héroux concedes, he is not Friedman's physician and, aside from Friedman's general diagnosis, he does not claim to have any special knowledge specific to Friedman's prognosis or symptoms. To the extent Héroux is offered to testify about Friedman's specific condition, Héroux lacks the requisite foundation to render reliable opinions about Friedman's individual medical circumstances. Héroux may, however, offer his perspective on the relative risk of harm that increased exposure to RF radiation poses to individuals with a cancer diagnosis affecting cells, like white blood cells, that have been the subject of his scholarly and experimental work.

In addition, though Héroux may testify about general causation, he may not offer opinions about the relationship between exposure to RF radiation and cardiac function. As CMP rightly observes, Friedman does not claim to require accommodation to avoid exacerbating his coronary artery disease. Even assuming that Friedman is correct that the effects of RF radiation exposure on his coronary artery disease would "compound" his health risks, ECF No. 107 at 7 n.1, that fact has not been shown to be relevant to his claims seeking accommodation to prevent his cancer prognosis and symptoms from worsening. Friedman's cancer and heart condition are comorbidities. Although the effect of one worsening comorbidity on the other could, hypothetically, have "a valid scientific connection to the pertinent

inquiry" presented by Friedman's claims, Héroux has not offered any opinion connecting the two. *Daubert*, 509 U.S. at 592. That missing link leads me to conclude that Héroux's opinions about heart health are irrelevant for present purposes.

Finally, CMP argues that Héroux should not be permitted to opine that exposure to RF radiation "promotes" cancer because the studies that opinion relies on are inapt. ECF No. 102 at 2; *see also* ECF No. 102 at 13-15; ECF No. 118-3 at 2. For reasons I will explain, I disagree.

Héroux cites a study (the "Yakymenko study") on the "[o]xidative mechanisms of biological activity of low-intensity radiofrequency radiation" to support the proposition that "[l]ow levels of radiofrequency radiation are . . . known to create oxidative stress." ECF No. 118-3 at 2-3 & n.6. He cites a second study (the "Khansari study") on "[c]hronic inflammation and oxidative stress as a major cause of age-related diseases and cancers" to support the related conclusion that oxidative stress "can cause chronic inflammation, a well-established cause and promoter of cancers." ECF No. 188-3 at 2-3 & n.7. CMP critiques the Yakymenko study as unreliable for failing to consider any study that demonstrated a causal relationship between (1) RF radiation at levels emitted by smart meters and oxidative stress, and (2) RF radiation at any level and the worsening of Friedman's particular type of cancer. Those arguments may inform what weight and credibility Héroux's opinions should be afforded, but they do not compel excluding them outright before subjecting them to further scrutiny through the adversarial process. As to the Khansari study, CMP contends it is irrelevant because Héroux does "not know what exposure Ed

13

Friedman would have if a smart meter were installed on his property" and therefore "lacks the foundation essential to an opinion that the exposure would be sufficient to cause oxidative stress." ECF No. 102 at 15. Because Héroux cannot opine on the specific causation—*i.e.*, the prospective effect of smart-meter-emitted RF radiation on Friedman's cancer prognosis and symptoms—I find that CMP's objection to Héroux's reliance on the Khansari study is moot.

In sum, Héroux may opine on the general causal relationship, if any, between exposure to RF radiation and worsening cancer prognoses and symptoms as well as associated risks of harm, but no more.

### 3. Erik Anderson

Lastly, CMP moves to exclude the testimony of electrical engineer Erik Anderson, but only in part. CMP specifically requests that the Court bar Anderson from testifying about (1) "the phenomenon of electrical transients or 'dirty electricity,' or suggesting that the phenomenon poses a risk to human health;" and (2) "the phenomenon of conducted emissions, or suggesting that the phenomenon poses a risk to human health."[6] ECF No. 100 at 9. In support, CMP attacks those proffered opinions as irrelevant. Friedman blunts CMP's arguments by conceding that he is not offering Anderson to "opine on the medical effects of radiofrequency." ECF No. 105 at 4. I conclude that Anderson may not testify about the adverse health effects,

---

[6] CMP also initially moved to prevent Anderson from testifying that its smart meters "transmit [RF radiation] more times than CMP reports." ECF No. 100 at 9 (quoting ECF No. 100-1 at 28) (CMP's alterations omitted). Friedman agrees to this limitation but reserves the right to ask Anderson about his testing on other smart meter models and comparing those results to specifications reported by CMP. CMP acknowledges Friedman's concession and notes that it may file a motion in limine as to what Friedman does not concede on this topic should the case proceed to trial. ECF No. 111 at 6 n.3.

14

if any, of various electrical phenomena, though that limitation does not preclude Friedman's other designated experts from relying on Anderson's opinions as scaffolding for their own conclusions.

As to what remains of CMP's motion, its arguments that Anderson's opinions about "dirty electricity" and "conducted emissions" are irrelevant are inexorably tied to the testimony that Drs. Carpenter and Héroux may offer.  Though the limitations I impose on Carpenter and Héroux's testimony may well render Anderson's opinions irrelevant or otherwise inadmissible, I reserve judgment on that question, which CMP may raise in a motion for summary judgment or at trial.

**B.     Friedman's *Daubert* Motion: Dr. Robert Gale**

For his part, Friedman moves to exclude the testimony of one of CMP's expert witnesses, Dr. Robert Gale.  Friedman concedes that he does not challenge Gale's qualifications, but seeks to exclude his expert testimony because it is irrelevant to "the question posed in this litigation" or, for that matter, "any issue in this case." ECF No. 103 at 3.  In support, Friedman contends that the scope of Gale's expert report is limited to "whether the exposure risk was more or less than 50 percent." ECF No. 103 at 5.  Friedman argues that Gale's deposition testimony clarified that scope and implies that the clarification was only required because Gale's report did "not necessarily speak for itself." ECF No. 103 at 5.

Contrary to Friedman's contentions, Gale's report clearly delineates the scope of his opinions without need for further clarification, and those opinions—which would be the basis for the testimony Friedman seeks to exclude, Fed. R. Civ. P.

15

26(a)(2)(B)(i)—are plainly relevant to the issues this case raises considered against the "permissive backdrop" of the federal evidentiary rules. *Daubert*, 509 U.S. at 589. The "Opinion" section of Gale's report provides:

> Based on data I reviewed and considered I opine, to a reasonable degree of medical probability, it is less likely than not [that] exposure to radiofrequency electromagnetic fields from a smart meter of the type proposed to be installed by [CMP] in the residence of Mr. Edward Friedman, would worsen signs, symptoms and/or prognosis of Mr. Friedman's lymphoplasmacytic lymphoma/Waldenström macroglobulinemia.
>
> Put otherwise, after an extensive review of the biomedical literature and reports from scientific bodies, medical authorities and regulatory agencies *I found no credible evidence [that] exposure to radiofrequency [electro]magnetic fields such as those emitted from a smart meter of the type proposed to be installed by [CMP] at the residence of Mr. Edward Friedman would worse[n] signs, symptoms or prognosis in someone with lymphoplasmacytic lymphoma/Waldenström macroglobulinemia including Mr. Friedman.*

ECF No. 98-1 at 48-49 (emphasis added).

Friedman's claims against CMP are premised on the theory that "exposure to [RF] radiation" emitted by a CMP smart meter "may exacerbate [the symptoms and] the progression" of his cancer if installed on his property. ECF No. 1 at 3, ¶ 14 (alteration omitted). Gale's opinion that Friedman's cancer symptoms and prognosis would not likely be worsened by exposure to RF radiation from a CMP smart meter squarely confronts that theory, framed in the same prospective terms as the claims that CMP seeks to rebut. That opinion alone may be insufficient to ultimately fend off Friedman's claims. But there is no serious question that it is potentially consequential and, therefore, relevant to the matter at hand. Thus, Friedman's motion as to Gale is properly denied.

## IV. CONCLUSION

For the foregoing reasons, CMP's Motion to Dismiss the Testimony of Expert Witness Dr. Kent Chamberlin (ECF No. 101) is **DENIED** as moot; CMP's Motions to Exclude the Testimony of Expert Witnesses Dr. David Carpenter, Erik Anderson, and Dr. Paul Héroux (ECF Nos. 99, 100, 102) are **GRANTED IN PART AND DENIED IN PART** as explained herein; and Friedman's Motion to Exclude the Testimony of Expert Witness Dr. Robert Gale (ECF No. 91) is **DENIED**.

**SO ORDERED.**

**Dated this 28th day of March, 2024.**

                                             **/s/ Jon D. Levy**
                                          **U.S. DISTRICT JUDGE**