Ed Friedman * 42 Stevens Rd. * Bowdoinham, ME 04008 * 207-666-3372

2/3/17

Stuart Evans
Maine Human Rights Commission
51 State House Station
Augusta, ME 04333
207-624-8724
stuart.evans@mhrc.maine.gov

Dear Stuart,

Please find attached my initial response to CMP. It has three parts. An Executive Summary dealing with what I see are the main issues involved, the in depth Response wherein I have gone through CMP's Response completely and addressed points they have raised and finally a large stack of exhibits with annotated index sheets for each of six categories as well as an introduction sheet.

Thank you very much,

Sincerely,

Ed Friedman

RECEIVED on FEB -3 2017 by Maine Human Rights Commission

ESI00054502

Friedman v. Central Maine Power
MHRC # H/PA16-0495, HUD # 01-17-5493-8
Complainant Reply to Central Maine Power (CMP) Request for Dismissal (RFD)

# EXECUTIVE SUMMARY
Date; 2/2/17

## Introduction

In 2016 the Americans with Disabilities Act was amended (ADAAA) because as the Department of Justice states in their Federal Register Summary in Vol. 81, No. 155, Page 53204:

> **SUMMARY:** The Department of Justice (Department) is issuing this final rule to amend its Americans with Disabilities Act (ADA) regulations in order to incorporate the statutory changes to the ADA set forth in the ADA Amendments Act of 2008 (ADA Amendments Act or the Act), which took effect on January1, 2009. In response to earlier Supreme Court decisions that significantly narrowed the application of the definition of "disability" under the ADA, *Congress enacted the ADA Amendments Act to restore the understanding that the definition of "disability" shall be broadly construed and applied without extensive analysis. Congress intended that the primary object of attention in cases brought under the ADA **should** be whether covered entities have complied with their statutory obligations not to discriminate based on disability.*

The word "should" used in the excerpt above does not equal "must" so it allows for a mistake on the part of the Respondent. Should however is analogous to "ought", i.e. CMP ought to provide accommodation. Now that they have been educated to their responsibilities under the law, "should" becomes "must" befitting congressional intent of the Act.

A close or textual read of the ADAAA by any facile person can divine this intent easily. It follows that the refusal by CMP and the PUC to accommodate the EMF disabled is intentional.

What did congress intend? The entire basis for these ADAAA amendments was to close loopholes consistently used by courts to exclude the disabled.

Is the object (meter]) emitting EMF? Is the case brought under the ADA/FHA? Is there a disability? Is CMP obligated by law to comply with the ADAAA?

Federal Register Vol. 81, No. 155, August 11, 2016/ Rules & Regulations  Pg. 53229
*Sections 35.108(d)(1)(ii) and
36.105(d)(1)(ii)—Primary Object of ADA Cases*

> The legislative history clarifies that: "Throughthis broad mandate [of the ADA], Congress sought to protect anyone who is treated less favorably because of a current, past, or perceived disability. Congress did not intend for the threshold question of

disability to be used as a means of excluding individuals from coverage. Nevertheless, as the courts began interpreting and applying the definition of disability strictly, individuals have been excluded from the protections that the ADA affords because they are unable to meet the demanding judicially imposed standard for qualifying as disabled."). H.R. Rep. No. 110–730, pt. 2, at 5 (2008) (House Committee on the Judiciary).

The Fair Housing Act (FHA) was enacted in 1968 (42 U.S.C. 3601-3619, 3631) to combat and prevent segregation and discrimination in housing. As is noted in the Federal Register Vol. 78, No. 32, Page 11461 on February 15, 2013, the FHA's language prohibiting discrimination in housing is "broad and inclusive." And also that:

> HUD has consistently concluded that the Act is violated by facially neutral practices that have an unjustified discriminatory effect on the basis of a protected characteristic, regardless of intent.

Maine Housing Rules could not be more clear, Chapter 8, Section 8.04 Discriminatory Housing Practices, C. Discrimination in terms, conditions and privileges and in services and facilities

> (4) Limiting the use of privileges, services or facilities associated with a dwelling because of race, color, religion, sex, sexual orientation, national origin, ancestry, familial status, or physical or mental disability, of an owner, tenant or a person associated with him or her.

And in Title 5 MRSA Section 4553 Definitions:

> 6. **Housing accommodation**. "Housing accommodation" includes any building or structure or portion thereof, or any parcel of land, developed or undeveloped, that is occupied, or is intended to be occupied or to be developed for occupancy, for residential purposes.

CMP's Request for Dismissal must be dismissed without merit. The primary objective of the Americans with Disabilities Act as Amended (ADAAA) in 2016 is whether or not the covered entities have met their obligation not to discriminate based on disability (ADAAA, 2016, Fed. Reg. Vol. 81, No. 155, Pg. 53204). In other words, has respondent cured the discriminatory act pending resolution? The answer here is no.

Even though the ADAAA shall be applied without extensive analysis, I will address the following questions:

1. Am I disabled?
2. Are CMP and the MPUC required to comply with the ADAAA & FHA?
3. What is physically causing the problem?
4. What policy is causing the problem?

ESI00054504

5.  Has discrimination occurred & is it still?
6.  Is an extensive analysis required?
7.  Can accommodation be reasonably granted?
8.  Is accommodation in this domain preempted by the FCC?
9.  Does MHRC have jurisdiction over ADAAA/FHA in disability/discrimination matters?
10. Has a systemic and organized pattern of purposeful suppression of civil rights occurred?

## 1. Am I disabled?

Mr. Farber, representing CMP refers to my cancer as an "alleged disability" in his letter of August 23, 2016 (see EF HUD exhibits). This is either insulting audacity or a demonstration of his ignorance on ADA issues. Even so, Farber goes on to say: *Specifically, even if we assume for the sake of discussion, that one could establish that (i) lymphoplasmacytic lymphoma is a disability*...Which begs the question, does CMP have any intention of applying with federal law? Whether or not cancer is considered a disability is altogether obvious as the ADAAA continues from the first cite on the following pages:

Page 53223:

(b)(1) Physical or mental impairment means:

(i) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, **hemic**, **lymphatic,** skin, and endocrine; or

(ii) Any mental or psychological disorder such as intellectual disability, organic brain syndrome, emotional or mental illness, and specific learning disability.

(2) Physical or mental impairment includes, but is not limited to,

contagious and noncontagious diseases and conditions such as the following: orthopedic, visual, speech, and hearing impairments, and cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, **cancer,** heart disease, diabetes, intellectual disability, emotional illness, dyslexia and other specific learning disabilities, Attention Deficit Hyperactivity Disorder, Human Immunodeficiency Virus infection (whether symptomatic or asymptomatic), tuberculosis, drug addiction, and alcoholism.

And Page 53224:

(iii) For example, applying these principles it should easily be concluded that the types of impairments set forth in paragraphs (d)(2)(iii)(A) through (K) of this section will, at a minimum, substantially limit the major life activities indicated. The types of impairments described in this paragraph may substantially limit additional major life

activities (including major bodily functions) not explicitly listed in paragraphs (d)(2)(iii)(A) through (K).

## (F) Cancer substantially limits normal cell growth;

As a matter of legal fact, the only worthy analysis for me and my condition comes from my treating physician, in this case my oncologist who has established through research, examination and opinion a nexus of connection between my disability and low-level EMF exposure from EMF-emitting invoicing tools. Had CMP accepted my offer of this documentation proffered with my request for reasonable accommodation and reiterated in a follow-up letter, we might not be here today. I have included as exhibits to supplement the letter from Dr. Benton, a number of papers in support of the cancer connection with low level EMF exposure as well as additional cautions for mixing the two.

## 2. Are CMP and the MPUC required to comply with the ADAAA?

CMP claims the Statutes cited in their RFD only apply to "…discriminatory practices related to the sale or leasing of housing." CMP also claims it is a private company and as such "…the Statute's reach is not broad enough to impose a duty on a private company, simply because it provides goods or services to a homeowner or tenant." And yet, CMP's assertion of private status is contradicted by their own citation in the RFD pages 5-6 starting at B. "The Maine Legislature has vested the MPUC with the power to regulate the State's public utilities; to ensure that [public] utilities such as CMP provide safe, reasonable and adequate services; and also to ensure that rates of public utilities are just and reasonable to customers and public utilities. By their own admission, CMP is a "Public Utility." Their particular ownership structure, as a private company, does not negate their obligation to the Statutes nor is the claim that "…the Statute's reach is not broad enough to impose a duty on a private company, simply because it provides goods or services to a homeowner or tenant."

Both CMP assertions above directly conflict with 42 U.S.C. Chapter 126 Subchapter II PUBLIC SERVICES Part A – Prohibitions Against Discrimination and Other Generally Applicable Provisions; section 12131(1)(B) "The term "public entity" means; any department, agency, special purpose district, or other instrumentality of a State or States or local government." The prohibitions apply equally to MPUC. CMP is a Public Utility, regulated by the state agency, MPUC, providing the public service of electricity delivery. As such CMP is an instrumentality, agency, state actor and thus a "Public Entity" according to section 12131(1)(B). By virtue of this status as a "Public Entity" providing essential monopolistic services of electricity delivery for the habitability of housing, it is subject to sections 12131(2) and 12132 and by extension to all federal laws regarding discrimination based on disability. These sections of the Americans with Disabilities Act (ADA) alone voids the Respondent's claim of not being subject to Sections 804[42U.S.C.3604](f)(2) and 804[42 U.S.C.3604] (f)(3)(B) of the FHA. The same statutes apply

ESI00054506

to MPUC which while not the end use provider of the service, is the entity authorizing all CMP services, plans and tariffs.

42 U.S.C. Chapter 126 Subchapter II PUBLIC SERVICES Part A – Prohibitions Against Discrimination and Other Generally Applicable Provisions; section 12131(1)(B)

> "The term "public entity" means; any department, agency, special purpose district, or other instrumentality of a State or States or local government." ; Section 12131(2) "Qualified individual with a disability. The term "qualified individual with a disability" means an individual who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of *services* or the participation in programs or activities *provided by a public entity*."; (emphasis added) and Sec. 12132. "Discrimination Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in *or be denied the benefits of services,* programs, or activities of a public entity, or be subjected to discrimination *by any such entity*." (emphasis added).

As the Respondent stated in the request for dismissal, CMP is a Public Utility, regulated by the state agency, MPUC, providing the public service of electricity delivery. As such CMP is an instrumentality, agency, state actor and thus a "Public Entity" according to section 12131(1)(B). By virtue of this status as a "Public Entity" providing essential services of electricity delivery for the habitability of housing it is subject sections 12131(2) and 12132 and by extension to all federal laws regarding discrimination based on disability. These sections of the Americans with Disabilities Act (ADA) alone voids the Respondent's claim of not being subject to Sections 804[42U.S.C.3604](f)(2) and 804[42 U.S.C.3604] (f)(3)(B) of the  FHA

Section 804[42 U.S.C. 3604](f)(2) makes it unlawful "To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap" 804[42 U.S.C. 3604](f)(3)(B) defines discrimination to include "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to *use and enjoy* a dwelling;"

Under the Maine Human Rights Act, CMP is considered a **Public Accommodation**, defined here in Chapter 7, 7.01 as

> A public or private entity that owns, leases, leases to or operates a place of public accommodation.

**A Place of Public Accommodation** is:

ESI00054507

(14)Any establishment that in fact caters to, or offers its goods, facilities or services to, or solicits or accepts patronage from, the general public

**A Facility** means:

All or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal property, including the site where the building, property, structure, or equipment is located.

Thus, CMP, under Maine law, whether a public or private entity is a public accommodation operating in a very geographically large place of accommodation delivering its services to customers through its large network of facilities (meters, wires, transformers, rights of way, etc.).

Under Chapter 7, 7.02 **Prohibition of Discrimination**

No individual shall be discriminated against on the basis of physical or mental disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any public or private entity who owns, leases (or leases to), or operates a place of public accommodation.

And under 7.15 C

A public accommodation may not impose a surcharge on a particular individual with a physical or mental disability or any group if individuals with physical or mental disabilities to cover the costs of measures, such as the provision of auxiliary aids, barrier removal, and reasonable modifications in policies, practices, or procedures, that are required to provide that individual or group with the nondiscriminatory treatment required by the Act or this Chapter.

And 7.16 A

A public accommodation shall make reasonable modifications in policies, practices, or procedures, when the modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with physical or mental disabilities, unless the public accommodation can demonstrate that making the modifications would fundamentally alter the nature of the goods, services, facilities, privileges, advantages, or accommodations.

While this complaint is only mine, the problem I bring to HUD and MHRC is large. CMP has skated by for years without addressing it. Effective communication to their customers is required under 7.17 C-1

ESI00054508

A public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with physical or mental disabilities. This includes an obligation to provide effective communication to companions who are individuals with disabilities.


### 3. What is physically causing the problem?

There are four basic types of electric meters. The old standard meter now available only for a fee to customers is the analog or electromechanical meter or invoicing tool. Working via magnetic induction as current passes through it, this meter records electrical usage in kilowatt hours (kwh). Analog meters use no power to operate, provide excellent heat resistance, circuitry protection from over-voltage spikes, last 30-50 years and generate no EMF emissions either airborne as wifi communications or radiating on wiring.

There are three basic types of EMF emitting invoicing tools, AMR (Advanced Meter Reading) meters which generally provide one-way wireless EMF communication that can received by a drive by or pedestrian meter reader (these are considered by the Institute of Electrical & Electronics Engineers (IEEE) to be early generation "smart meters."

CMP uses AMI (Advanced Meter Infrastructure) type meters which use wireless EMF signals in the 2.4 gigahertz range to collect detail electronic usage data at specific intervals (generally 15 minutes) and transmitting and receiving these data using wifi to other meters in the area and so on down the line until reaching a more powerful collector meter which transmits the data into the cell system and back to the utility.

While not transmitting a large total time each day, these meters send between 9,000-170,000 micro bursts daily. Electrically sensitive individuals can often feel each transmission. These meters are lightweight, do not provide adequate protection from voltage spikes, are prone to fires and lack heavy heat absorption qualities of the analogs and they use electricity to operate. The predicted life span of these meters is more in the 5-15 year range.

All of our electronic devices provide a unique digital fingerprint and these digital meters record this information allowing extremely detailed information gathering if the aggregate data are parsed out with disaggregation software. Marketers clamor for these data. CMP's AMI meters also can accept a second communicating chip known as a Zigbee chip designed to communicate actively with the coming generation of "smart" home devices. All of this wireless is of course prone to hacking from the outside which poses individual risks as well as national security risks when you consider much of the grid is accessible if any individual digital portal is hacked into.

Because AMI and AMR meters require direct current to operate and our electric lines convey alternating currents, the meters have low quality conversion or transforming devices to convert from AC to DC. This polluting process creates power quality issues also known as dirty electricity because it induces electrical harmonics and transients onto an otherwise smooth sine

ESI00054509

wave of 60 hertz AC. Major companies running heavy machinery can spend a lot of money on power quality engineers because poor power quality means inefficient delivery of electricity and can also harm the equipment. Many people also suffer ill effects from this.

Lastly, there are digital meters such as Emera Maine (formerly Bangor Hydro) use that relay their electricity use data back to the utility via power lines. This method is known as powerline communication or PLC. While PLC methodology creates no external EMF emissions from wifi, powerlines are not designed to move data and doing this can create major power quality issues, polluting the neighborhood with this "dirty electricity" or DE.

## 4. What policy is causing the problem?

CMP customers may choose to opt out of EMF emitting meters for a wide variety of socio-economic or political reasons including for example the fire hazard or cybersecurity/privacy concerns. Those with health issues who are either sensitive to EMFs (recognized by both the Federal Access Board, HUD and Department of Labor) or with medical conditions likely to be exacerbated by exposure to low level EMF's do not have the luxury of choice to remain safe in their own homes. CMP claims everyone is treated equally but MHRC knows the disabled are not everyone. We are a special class.

CMP treats opt out customers differently from customers with EMF emitting meters and also has a separate class for low income populations. In June of 2016 their revised rate sheet dated 6/16/16 was 51 pages of different rates! However they continue erroneously, as does the MPUC, to ignore a nationally recognized class, the disabled. Society is not homogenous. Not everybody is the same. There is no universal application in a society where everyone is different. The disabled, including me, are a heterogenic class suffering a disparate impact in this case. Indeed HUD's final rule (II HUD Discriminatory Effects Standard) declares that "liability may be established under the Fair Housing Act based on a practice's discriminatory effect . . . even if the practice was not motivated by a discriminatory intent."

The ADA in 28 CFR § 35.130(3) provides:

> "A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration—(i) That have **_the effect of_** subjecting qualified individuals with disabilities to discrimination on the basis of disability;" (emphasis added). The 2008 ADAAA clarifies this intent of the law even further, 28 CFR § 35.130(b)(7)(i) "Nothing in this part shall provide the basis for a claim that an individual without a disability was subject to discrimination because of a lack of disability, including a claim that an individual with a disability was granted a reasonable modification that was denied to an individual without a disability."

**5. Has discrimination occurred and is it still?**

CMP claims even if the stars were aligned for me and my cancer and the ADA that no modifications (no discrimination) exists because everyone can opt out under the same terms and conditions by paying a fee approved by the Maine Public Utilities Commission (MPUC) (hopelessly intertwined with those they regulate and equally guilty of ignoring the ADA).

CMP denies they have an obligation to accommodate the disabled in this situation. One has to then ask, did Congress intend by the ADAAA for the disabled not to be accommodated? If answered in the negative as it must be, then Congress must have intended for the disabled to be accommodated.

When CMP forces the disabled to pay to avoid a service (delivery of power) others receive with no surcharge, this is discrimination. That other ratepayers may choose to pay a fee to avoid EMF emitting meters for their own reasons has no bearing on the fact our disabled class is forced into opting out to avoid harm or a credible threat thereof. That the MPUC investigation into the AMI meters found they were safe enough has no bearing on this because the merits of the ADA, FHA were never discussed. In spite of this, one of the two Commissioners felt there should be a no cost medical opt out and discussed it at length. That this was not reflected in the Commissioner's final Order was one basis for the subsequent appeal. The Order did not reflect nor was supported by the lengthy report and could thus be classified as arbitrary and capricious along with errors of fact and law.

Discrimination against me began with assessment of an opt out fee when I was required to opt out because of my cancer. Not only has CMP continued their discrimination, and intimidation of me as a member of a disabled class but they have escalated their efforts to include retaliation. Their actions have gone from charging me a fee to avoid possible harm and continually sending disconnect notices, to placing an operating EMF-emitting invoicing tool or meter on my home knowing I had opted out because of a medical condition and knowing they had already disconnected me, to just recently handing my supposed debt of past opt out fees over to a credit collection agency (Notice supplied to MHRC). All while they still owe me for power I generated and conveyed to them (billing records part of HUD Complaint and forwarded to MHRC).

42 U.S.C. Chapter 126 Subchapter II PUBLIC SERVICES Part A – Prohibitions Against Discrimination and Other Generally Applicable Provisions; section 12131(1)(B)

"The term "public entity" means; any department, agency, special purpose district, or other instrumentality of a State or States or local government."; Section 12131(2) "Qualified individual with a disability. The term "qualified individual with a disability" means an individual who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of _services_ or the participation in programs or activities _provided by a public entity_."; (emphasis added) and Sec. 12132. "Discrimination Subject to the provisions of

this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in *or be denied the benefits of services,* programs, or activities of a public entity, or be subjected to discrimination *by any such entity*." (emphasis added).

CMP's disconnection put me in jeopardy both commercially for my farm production requiring operating freezers and with cold weather coming on. My long-time net metering solar PV system ceased to generate because the invertors required a small amount of line power to operate. I was forced to spend considerable sum and take considerable time and effort to convert my solar system to off grid with replacement invertors, standby generator and a battery bank.

## 6. Is an extensive analysis required?

No, as cited above, *Congress enacted the ADA Amendments Act to restore the understanding that the definition of "disability" shall be broadly construed and applied without extensive analysis.* Nothing I have provided in this response is actually required. My complaint with its exhibits and the addition of the attached exhibits make clear the disability, connection to the radiation source, discrimination, ease of accommodation and failure of both CMP and MPUC to abide by federal laws.

CMP in their response to my request for accommodation, rhetorically asks even if the ADA applied to opt out customers, even if there was an ADA recognized causal connection between wireless EMF emitting meters and EMF sensitivity and even if such sensitivity were shown to aggravate my specific cancer, only then would the ADA require reasonable accommodation and non-discriminatory treatment of a disabled person. Again attorney Farber shows either his ignorance of disability law or his intent to deceive, because the ADAAA could not be more clear (from the first cite): *the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis.*

## 7. Can accommodation be reasonably granted?

Quite easily. There are over 6,000 ratepayers already opting out and getting their meters read manually every other month. Some ratepayers still send in postcards self-reporting their usage, data could easily be self-reported via an automated phone system, and there are also many EMF emitting meters that don't communicate as planned that are being read manually. There are already countless different CMP rate structures as mentioned above. CMP is part of Avangrid which in turn is part of Iberdrola, a Spanish company and largest wind producer in the world. Avangrid has assets of over 10 billion dollars in the US. Not charging one customer an opt out fee is not going to break their financial bank. Not charging one customer an opt out fee is not going to adversely impact an already complex billing system. To use a double negative, not charging one disabled customer an opt out fee is not unreasonable.

ESI00054512

It is worth noting here a few more things. Two states away from Maine, Vermont offers a free opt out from AMI meters. So far, their majestic Green Mountains have not been flattened by the falling sky CMP fears. CMP's concerns allowing one reasonable accommodation are worth noting, again by looking at the VT system operating with no problem but then also asking the question, if there are many ratepayers adversely affected by EMF's or concerned they may be, don't disability laws require their protection? In a number of countries around the world there have been court judgments ordering financial compensation for the EMF disabled who have been wronged. Ironically perhaps, one of those countries is Spain, home of CMP's parent company.


**8. Is accommodation in this domain preempted by the FCC?**

The Federal Communications Commission and other national and international agencies weighing in on EMF are irrelevant. Their guidelines promulgated in 1996 are based on 1986 data and attempt to protect against only thermal exposures as measured by a temperature rise (specific absorption rate) in a gel-filled dummy head designed to mimic a 200 pound man. They do not protect against "non-thermal" low level EMF exposure from such newer technologies as EMF emitting meters, cell phones and wifi routers and even the thermal exposure standards exclude sensitive, disabled, and elderly populations and those of children. The FCC provides questionable guidelines for general population and electronic interference and we are not them. This is an issue well-defined by The Access Board and ADA and it is these agencies that govern actions by MHRC.

> 47 U.S.C. § 152 (b) specifically excludes AMI meters from application of Chapter 5 covering wire or radio (wireless) communication which AMI meters fall under. From Section 152; "...nothing in this chapter shall be construed to apply or to give the Commission jurisdiction with respect to (1) **charges**, classifications, **practices**, **services**, facilities, or regulations for or in connection with ***intrastate*** communication service by wire or radio of any carrier..." (emphasis added). AMI meters are clearly in this circumstance an intrastate service and hence the FCC has NO jurisdiction over them. Any determination or opinion issued by the FCC in relation to other devices that emit EHF or RF then can only be construed to be advisory or guidance not a standard. Problems with the FCC guidelines were well noted in the MPUC report and a lack of federal preemption was implicit in the Maine Supreme Judicial Court when they remanded the initial complaint back to MPUC despite CMP's arguments even then for FCC preemption.

Even if, CMP were correct in their assertion of FCC preemption, this would be irrelevant to enforcement of the ADA, FHA, ADAAA and to DOJ which enforces civil rights violations. The FCC is on record as denying they are a health agency. They look to health and safety agencies (typically the EPA and FDA) for health related guidance and the EPA is on record as stating the FCC RF guidelines are obsolete and irrelevant to non-thermal exposures. See exhibit. So too is the Department of Interior in this regard. In fact, the FCC is currently in their very slow

reevaluation of the current guidelines because their inadequacy when it comes to current technology is universally known.

## 9. Does MHRC have jurisdiction over ADAAA/FHA in disability/discrimination matters?

Yes. While ultimate jurisdiction may rest with HUD and or the DOJ in these matters, HUD generally just acts in the intake capacity for disability/discrimination complaints related to housing. HUD maintains working relationships and agreements with most state human rights or DOJ agencies. These contracts delegate authority to the state agencies to investigate, facilitate conciliations and or prosecute disability/discrimination complaints. MHRC has a contract with HUD to perform these duties. And, Maine statutes and Rules in these areas follow the "substantially equivalence" doctrine, meaning our disability rights statutes and Rules must echo those of the federal agencies and Acts.

## 10. Has a systemic and organized pattern of purposeful suppression of civil rights occurred?

Yes. Both CMP and MPUC knew about the health issues associated with low level EMF from their invoicing tools back it 2010. While not brought to their attention under the ADA, both the utility and agency knew for years they needed to be in compliance with this Act through the required self-evaluation process:

ADA. 28 CFR § 35.105 *Self-evaluation.*, states as follows:

> (a) A public entity shall, within one year of the effective date of this part, evaluate its current services, policies, and practices, and the effects thereof, that do not or may not meet the requirements of this part and, to the extent modification of any such services, policies, and practices is required, the public entity shall proceed to make the necessary modifications.
> (b) A public entity shall provide an opportunity to interested persons, including individuals with disabilities or organizations representing individuals with disabilities, to participate in the self-evaluation process by submitting comments.
> (c) A public entity that employs 50 or more persons shall, for at least three years following completion of the self-evaluation, maintain on file and make available for public inspection:

>> (1) A list of the interested persons consulted;
>> (2) A description of areas examined and any problems identified; and
>> (3) A description of any modifications made.

> (d) If a public entity has already complied with the self-evaluation requirement of a regulation implementing section 504 of the Rehabilitation Act of 1973, then the

ESI00054514

requirements of this section shall apply only to those policies and practices that were not included in the previous self-evaluation.

The first effective date of 26 CFR § 35.105 was April 5, 1993. The effective date has been restated with the passing of the ADAAA. The most current effective date is March 15, 2011 for the amended provisions to the original 1990 ADA. For almost 20 years prior to the consideration of opt-out fees for AMI meters both CMP and MPUC have been legally bound by the ADA to evaluate "…services, policies, and practices, and the effects thereof, that do not or may not meet the requirements [of the ADA]."

Lack of self-evaluation under 28 CFR Part 35, by CMP and MPUC in not considering their obligations and responsibilities under the requirements of the FHA, ADA and ADAAA, in requesting and determining the structure and granting of opt-out fees places both of these public entities in direct violation of 28 CFR § 35.105.

Additionally, 28 CFR § 35.106 imparts the added obligation on public entities to give notice to all interested persons regarding the provisions of the ADA and ADAAA and the applicability to the services they provide:

> "A public entity shall make available to applicants, participants, beneficiaries, and other interested persons information regarding the provisions of this part and its applicability to the services, programs, or activities of the public entity, and make such information available to them in such manner as the head of the entity finds necessary to apprise such persons of the protections against discrimination assured them by the Act and this part."

Section § 35.106 has been effective since July 26, 1991.

Considering; a) The total lack of consideration of the ADA, ADAAA and FHA during the lengthy decision making process to establish the opt-out fee structure; b) Refusal by both CMP and MPUC to the Complainants original request for accommodation dated August 16, 2016; c) CMP's continual efforts to claim that the ADA, ADAAA and FHA does not apply to their services and d) The absence of any easily available public information as required by § 35.106 on either web sites or written publications of either CMP or MPUC, the reasonable conclusion is that both CMP and MPUC are and have been in violation of these sections of the ADA for over 20 years due to at best organizational, institutional ignorance and at worst intentional malfeasance.

CMP and MPUC were obligated to correct these problems first and they have failed to do so. This in spite of a long ADA history of accommodation for EMF exposure, from arc welding induced frequency sensitivity to video display monitors causing skin rashes for office workers to removal of smart water meter with establishment of a protective perimeter in OR. EMF exposure sensitivities are specifically recognized by the Federal Access Board, Department of Labor Job Accommodation Network, HUD Region 10 and by their effects in the ADAAA.

ESI00054515

Given the scientific facts brought forward over the last few years and the opinions expressed by former MPUC Commissioner Littell recognizing the problems with EMF emitting meters, it is clear that agency and CMP are acting willfully to avoid their responsibilities to me and to this substantial class of people. One could say the MPUC and CMP are just really ignorant but given the vast amounts of evidence made clear in the prior investigations, it is abundantly clear both parties are lying to cover up a major and libelous mistake made in the deployment of known EMF-emitting invoicing tools. The putting forth of essentially a tort case to defend against my claim establishes an impediment to my discrimination-free access, attempting to railroad me into submission. A response of this sort is ample evidence of CMP's intimidation and should by its submission automatically enable a reasonable grounds decision by MHRC.

CMP's attack on the EMF disabled or those with other medical issues exacerbated by EMF is obstructionist and intimidating. Their arguments and attempts to address this as a tort case are a sideways facial challenge to existing solid federal law and policies (ADAAA, Federal Housing Act, Access Board and HUD) and are misplaced in denying accommodation to those adversely impacted by EMF meters.

Even if CMP ends the still existing discrimination, which they are obligated to do, they would have to disqualify me as a member of a disabled class in order to deny me accommodation and my medical history makes this impossible. CMP's attempt to drag this argument off into the weeds through their RFD including 500 pages of Exhibits is one more example of their intent to coerce and intimidate by avoiding their required actions when faced with an ADA/ FHA complaint. For these grounds alone, I request MHRC reject forthwith the respondent's arguments to dismiss this complaint, find reasonable grounds for my complaint and forward this case file to the DOJ to consider possible criminal charges.

ESI00054516

MAINE HUMAN RIGHTS COMMISSION

**Friedman v. Central Maine Power**
**MHRC # H/PA16-0495 & HUD # 01-17-5493-8**
**Response to CMP Request for Dismissal**

**1. Reply to CMP's "OVERVIEW"**

The request for dismissal by Central Maine Power Company (CMP) of the above referenced complaint should be rejected because their reasons set forth below are either purely in error, are misrepresented, or do not represent any distinct procedural/ jurisdictional grounds despite CMP's claims to the contrary. In accordance with pertinent State and Federal laws it is not necessary to engage in extensive review governing assertion of disabled rights for unlawful conditions of terms and services to access a public commons. However, the Complainant does so here for the sake of thoroughness and to underscore the egregious nature of the unlawful practice of systemic and widespread discrimination against me, and anyone like me on the basis of my EMF disability and that I, Ed Friedman, assert CMP engages in through a depravedly indifferent policy and practice.

Nothing I have provided in this response is actually required on the basis:

> "*Congress enacted the ADA Amendments Act to restore the understanding that the definition of "disability" shall be broadly construed and applied without extensive analysis.*"

This is the exact language of the recent final rule that took effect on October 11, 2016. The discrimination I allege has not ended, and in fact retaliation in the form of sending me to collections has expanded the unlawful conduct of CMP. This behavior- and failure to enter into an effective communication to address and solve my assertion of disabled rights began in August of 2016, occurring in the same month as the New Rule's release date- is a deliberate thwarting of the

ESI00054517

Congressional intent for action. Congress intended the primary object of attention in cases brought under the ADA should be whether covered entities have complied with their statutory obligations not to discriminate based on disability. The rule was explicit in its first page summary:

"***Congress intended that the primary object of attention*** (emphasis added) *in cases brought under the ADA should be whether covered entities have complied with their statutory obligations not to discriminate based on disability.*" (Final Rule, October 16, 2011 Dept. of Justice, Office of the Atty. General, 81 FR 53203, **Page:** 53203 -53243 (41 pages), **CFR:** 28 CFR 35, 28 CFR 36, **Agency/Docket Numbers:** CRT Docket No. 124, AG Order No. 3702-2016, **RIN:** 1190-AA59, **Document Number:** 2016-17417, **Shorter URL:** https://federalregister.gov/a/2016-17417).

My original complaint with its exhibits and the addition of the attached exhibits make clear the disability I claim is qualified by both my doctor's advice, previous HUD precedent, current prima facie tests under the three-part burden shifting standard and identifies the nexus of connection to the radiation source; EMF emitting invoicing tools, used to provide for CMP accounting and data collection to itself. I respond to CMP and document how the discrimination is occurring and ongoing despite my efforts to resolve the case. I also address how readily achievable accommodation can be provided without interfering with CMP's main purpose or allowed parameters of business operation under their Title II and III convergence. And, how the failure of CMP- while taking cover under MPUC's rational review standards and arguably erroneous conclusions in the face of the public's interest, has obstructed and fails to comply with, the assertion of my disabled rights and compliance with federal laws under ADA and FHA. These federal laws have been substantially and equivalently adopted by the Maine legislature and jurisdictionally enforced by MHRC, including through their partnership with HUD. In the previous 2014 HUD precedent, Regional Counsel at HUD Regional Office 10 developed a comprehensive and accurate term, EMF emitting invoicing tool, to encompass any and all devices that might generate and/or emanate EMF emissions exacerbating to the EMF disabled, whether through the air, or by transients/harmonics etc., over wiring.

2

ESI00054518

In their response to my request for accommodation, CMP refers to my cancer as "alleged" then asks - it seems at best rhetorical or at worst obstructive - if the ADA even applies to opt out customers, and is there even any ADA recognized causal connection between wireless EMF emitting meters and EMF sensitivity? If the question is not rhetorical then MHRC should consider recommending an inquiry to Maine DOJ for investigation of awarding a contract in the public's interest to a formerly local company, now purchased by a Foreign Direct Investment multinational firm.

CMP's counsel appears not conversant with basic disability rights law structure, or application of US law in the public's interest, or in accommodation of disabled rights as is required under US law and by convention and treaty with respect to 'host country' rules as foreign agents involved in the US political economy. Mr. Farber instead doubles down on his rhetorical/obstructive question making a known to be wrongly interpreted statement that 'even if such sensitivity were shown to aggravate the Complainant's specific cancer, only then would the ADA require reasonable accommodation and non-discriminatory treatment of a disabled person'.

As I will show later, though attorney Farber is allowed to defend his client it is not cost-free to his client, himself, or to the public's interest to intentionally misrepresent the simple textual contents of the disabled rights law. This interpretation blocks an accurate view of CMP's demographic and therefore blocks not only disabled rights, but blocks a proper market response to solve a public interested problem. Mr. Farber shows by these early statements either his ignorance of disability law, or by obstruction, his lack of seriousness in front of the Commission, or plausible intent for disparate treatment, because the ADAAA could not be more clear (from the first cite): *the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis (emphasis added).*

And even if those diminutive grounds claimed by CMP exist, which they do not, such grounds do not overcome prior and supervening grounds making CMP subject to rules and statutes that flow from the Americans with Disabilities Act, the Fair Housing Act and its enforcement

3

ESI00054519

Agency HUD and HUD's partnered agency Maine Human Rights Commission, all of whom require of CMP it uphold the rules and obligations of Congressional Acts and the adoption of those acts by Maine, through substantially equivalent State instruments such as administrative rules.

Mr. Farber, and CMP begin their defense- and end it- with a series of specious claims, erroneous quotes of items they present to defend themselves including misrepresentations of the law, and frivolously waste MHRC's time on a matter whose resolution is readily achievable with good faith and under simple, easy to implement solutions. And, that are in the public's interest and consistent with CMP's public accommodation contract to deliver public interested services and power to a monopoly demographic. Further, the matter can be solved also in a way consistent with market based solutions that can unleash more efficient and responsive products to the public with accurately portrayed risk management, both to its customers and investors. At present, that risk has not been portrayed correctly. While CMP discounts it's duties under disability rights compliance, and this may rise to a different matter of concern, under a different action, about full disclosure to MPUC, CMP and their counsel choose instead, to reject compliance with US and Maine Law and to obstruct the agencies and commissions put in place to ensure enforcement of those laws.

**First, CMP claims that it is not subject to Sections 804(t) (2) and 804(f) (3) (B) of the Federal Fair Housing Act.** This is false and will be amply addressed below. CMP provides no reasonable evidence it is exempt from FHA, it incorrectly interprets the sections it quotes in its defense and attempts to claim MHRC has no jurisdiction over them.

**Second, CMP wrongly claims superior authority over the Claimant's assertion of his disabled rights.** CMP makes insufficient assertions that Maine Public Utilities Commission (MPUC) is the sole state agency with authority granted by the Maine Legislature to regulate public utilities. CMP attempts to claim this defense purely based on a past MPUC 'extensive investigation' and erroneously concludes, MPUC is solely in charge of determining the validity of a disabled rights claim for individual citizens. The Respondent reaches this conclusion despite claims in the previous investigation being brought under different case law on an

4

entirely different topic, under an entirely different system of evidence and standard of review. CMP produces no definitive rules or evidence they can therefore, be absolved of their duties in this case. Nor can they exchange rules and statutes upheld by ADA, FHA and MHRC for any rulings from MPUC. CMP is not exempt from compliance with federal matters of disabled rights accommodations in the fair and equal access for delivery of power to the Complainant.

CMP's wrongly, therefore, frames this complaint under MPUC rules that follow a rational standard of review and removes the equal protection clause from rules governing disability rights. The case CMP repeatedly refers to here, and throughout the remaining text, has no bearing on this matter except that MPUC may be complicit with CMP in the violation of the Complainant's disabled rights by unlawfully providing cover of law for CMP's failure to comply with the assertion of these disabled rights. But that matter is for another discussion, or may be for MHRC to correct through interagency administrative actions.

CMP makes the erroneous assumption their demographic is homogenous and equal - when it is not - and claims no disparate impact is delivered to the EMF disabled by forcing them to pay an opt out fee to receive the same power for which the able-bodied do not have to pay. But to the contrary, CMP's EMF emitting invoicing system is not neutral and equal in its consequences of effect across its entire population. The invoicing system and policy therefore impacts a portion of its demographic disparately and with effects that are well-known and recognized by the ADA's Access Board as 'sensitizing and irritating' to those who are disabled by EMF emissions. It is well known that, in 2002, Electromagnetic Sensitivity (EMS) was recognized by the Access Board and a project to produce guidelines for Indoor Air Quality was undertaken by the National Institute of Building Sciences (NIBS) with funding support from The Architectural and Transportation Barriers Compliance Board (Access Board), an enforcement arm of ADA (See NIBS's 97 page report, at ada.gov).

CMP's attempt to gain cover of law to exempt itself from the ADA's recognition of EMS (also referred to as Electrical Sensitivity (ES) and Electromagnetic Hypersensitivity (EHS) and historically as microwave sickness) is not made successful merely by quoting a lower order

5

ESI00054521

MPUC finding 'in favor' of CMP's EMF emitting metering program. The Access Board's declaration and HUD's recent beginning of enforcement for the disabled rights of EMF disabled is sufficient evidence in the public record that there is an official established nexus of connection confirming, at the highest levels of disability rights law, that EMF sensitization qualifies those individuals who can provide proper documentation and accommodation recommendations from health care providers, to receive accommodations and modifications reducing exposure to EMF emitting devices on the basis of risk for exacerbation of medically disabling symptoms.

CMP instead attempts to cast doubt on the sufficiency of evidence, using standards of 'proof' for nexus of effect that are not required for sufficiency of proof in compliance with rules and law at the level of the public's interest. Instead CMP and Mr. Farber attempt to litigate a disabled rights matter in the access to public goods as if it were a civil tort claim- which this is not- and so the standards and levels they enumerate and falsely claim, for tort evidentiary burdens and proof of science, are not required in public interested areas of access.

The NIBS document- a 97 page treatise, entirely devoted to the characteristic and class to which the EMF disabled belongs- seems to have predicted this error of standards in scientific nexus of effect in application of proof sufficient to enforce the public's interest. NIBS clarifies,

> *"The Committee acknowledges that while the scientific evidence may be inconclusive about whether ambient electromagnetic fields pose a substantial health risk to the general population, the presence of EMF is an access barrier for people who are electromagnetically sensitive.* "(NIBS document, above at ADA.gov, Pg. 69)

The standard for enforcement clearly distinguishes in a categorical statement, pronouncements about '*general*' population guidelines are not sufficient to meet the burden of liability when a public interest or access to common services is invoked on an individual basis for those who qualify as disabled by EMF sensitization or exposure, as does the Complainant.

6

ESI00054522

The MHRC should reject CMP's reasons to dismiss as an attempted ruse to relieve them of compliance with the assertion of the Complainant's disabled rights. CMP's reasons for dismissal lack cohesion with the subject matter of the assertion of disabled rights and MHRC should reject CMP's request to dismiss the complaint. CMP's first and second procedural/jurisdiction objections wrongly frame the dispute's object as something other than an assertion of disabled rights claim. These are unconvincing attempts to relieve itself from answering assertions on an individual, disabled rights claim of discrimination under the disparate effects rules, and CMP's claims for relief on these grounds should be rejected as without merit.

**Third, CMP's assertion on MHRC's lack of jurisdiction to hear the matter based on Federal preemption of the FCC or any other agency is false**; FCC has no jurisdiction or interest in this matter whatsoever and even if they did, which they do not, MHRC is authorized under the FCC by express dual regulatory authority to maintain jurisdiction and control in all matters that are left to the States to administer, such as this one. Even if The 1996 Telecommunications Act (The TCA) applied to intrastate EMF emitting meters and accounting, which it does not, The TCA states in PUBLIC LAW 104-104—FEB. 8, 1996 110 STAT. 69 under section "(3) PRESERVATION OF AUTHORITY":

*"Notwithstanding paragraph (2), but subject to section 253, nothing in this section shall prohibit a State commission from establishing or enforcing other requirements of State law in its review of an agreement, including requiring compliance with intrastate telecommunications service quality standards or requirements."*

There is no claim, here, that excites qualification of oversight by the FCC.

The FCC provides rules for managing the telecommunications spectrum, its infrastructure and its competitiveness, but with only very narrow and express areas for preemption having only to do with the roll-out of infrastructure, the pricing of personal wireless telecommunications services and elimination of barriers to competitive entry into the market. The guidelines that CMP alludes loosely to are only that, guidelines for general population on exposure to

7

ESI00054523

infrastructure expressly enumerated in connection with personal and mobile telecommunications. The 'compliance' CMP mentions, therefore, can only refer to machine interference like for UL types of electronic interference with other devices.

No such explicit interest exists in my claims of facial challenge to the FCC - sideways or otherwise. CMP attempts to "bootstrap" for themselves, exemption from their duties under disability rights law through an oversight claim. I will expand later on how CMP's claim of preemption is in the first case false. And secondly, even if any oversight exists it must do so only in conjunction with not interfering in State aims or using the State as a '*mere instrument*' of federal aims (*New York v. US),* and not make indistinguishable where federal jurisdiction ends and the state's begins (*US v. Lopez) 'in an overreach of federal authority.'*

Further, 47 U.S.C. § 152 (b) specifically excludes AMI meters from application of Chapter 5 covering wire or radio (wireless) communication which AMI meters fall under. From Section 152;

> "*...nothing in this chapter shall be construed to apply or to give the Commission jurisdiction with respect to (1) charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio of any carrier..." (emphasis added).*

AMI meters are clearly in this circumstance, an intrastate service and hence the FCC has no jurisdiction over them. Any determination or opinion issued by the FCC in relation to other devices that EMF radiation (sometimes referred to as RF or RFR) then can only be construed to be advisory or guidance not a standard. Problems with the FCC guidelines were well noted in the MPUC report on "the Friedman action" (as CMP later begins referring to the case). The lack of federal preemption was implicit in the Maine Supreme Judicial Court when they remanded the initial complaint back to MPUC despite CMP's arguments even then for FCC preemption.

Even if, CMP were correct in their assertion of some kind of FCC interest -which there is not - this would be irrelevant to and overcome by enforcement of the ADA, FHA, ADAAA and or referral to DOJ, including MHRC, all of whom retain authority to enforce civil rights violations. The FCC is on record as denying they are a health agency; and it has no expertise or agency

8

ESI00054524

oversight on cases that emanate from a federal action on matters of disabled rights qualifications.

On the other hand, Electromagnetic Sensitivity (EMS) is an issue well-defined by The Access Board and ADA and it is these agencies' ultimate contours of definition governing the actions of enforcement by MHRC under substantial equivalence in Maine Administrative Rules.

The primary objective of the Americans with Disabilities Act as Amended (ADAAA) in 2016 is whether or not the covered entities have met their obligation not to discriminate based on disability (ADAAA, 2016, Fed. Reg. Vol. 81, No. 155, Pg. 53204) Therefore, the Commission should not dismiss the complaint based on any of the above procedural/jurisdictional grounds CMP suggests and MHRC should proceed with this complaint on its merits.

The Complainant has amply established his case for reasonable modifications/accommodations not only reasonable but readily achievable by the Respondent. The accommodation can easily be established inside rules already required of CMP by MPUC that allow for mesh network gaps such as the one requested in my accommodation (and as was and is, already present, in this instant through electromechanical meters in use prior to CMP's meter removal - and including now with no meter at all).

The MPUC ruled those gaps were determined as inconsequential to CMPs efficiency and reliability when they are generated by the tariffed opt-out consumers. The small gap around the Complainant's home will merely be one more of the approved operating practice, only differing by not requiring a surcharge from a disabled person whose membership in the 'by choice' opt out group cannot be, due to the Complainant's disabled and disparately impacted status, causing his heterogeneity in what CMP considers a homogenous population.

With restoration to the Complainant of his substantial rights CMP has abrogated by their discriminatory policy, the Complainant will no longer be wrongfully combined into the homogenous group of voluntary 'objectors' in a manner not neutral to the Complainant. This existing practice impacts the Complainant disparately, as well as anyone who is like him and therefore a surcharge is wrongfully assessed because of his disability. Chapter 7. 7.15 C. Accessibility Regulations of the Maine Human Rights Commission states,

9

> *"A public accommodation may not impose a surcharge on a particular*
> *individual with a physical or mental disability or any group if [sic] individuals*
> *with physical or mental disabilities to cover the costs of measures, such as the*
> *provision of auxiliary aids, barrier removal, and reasonable modifications in*
> *policies, practices, or procedures, that are required to provide that individual or*
> *group with the nondiscriminatory treatment required by the Act or this Chapter."*

## 2. In Reply to CMP's "DISCUSSION"

**A. CMP is, in Fact, Subject to Fair Housing Act Provisions Cited by the Complainant.** CMP attempts to assert it is not violating Sections 804(f) (2) and 804(f) (3) (B) of the Federal Fair Housing Act ("FHA"). CMP's position errs in alleging violations of federal law are beyond the jurisdiction of the MHRC, who not only enforces State laws having substantially adopted equivalence to HUD and the FHA, but MHRC has also entered into a contract with HUD to formally enforce their provisions, including the New Rule Amendments to the ADA, amended specifically to end resistance of the sort perpetrated here by CMP to Congressional Intent. In 2016 the Americans with Disabilities Act was amended (ADAAA) because as the Department of Justice states in their Final Rule, October 11, 2016, 81 FR 53203,

> *"The Department of Justice (Department) is issuing this final rule to amend its*
> *Americans with Disabilities Act (ADA) regulations in order ... to restore the*
> *understanding that the definition of "disability" **shall be broadly construed***
> ***and applied without extensive analysis** (emphasis added). Congress intended*
> *that **the primary object of attention in cases brought under the ADA should be***
> ***whether covered entities have complied** with their statutory obligations not to*
> *discriminate based on disability."* (Federal Register Summary in Vol. 81, No. 155, Page 53204)

In plain language, the word "should" follows the use of the word "shall" in the ADA AA's 2016 Final Rule and does not allow for a mistake in interpretation by the Respondent and is

ESI00054526

plausible evidence that CMP's entire defense is poised on a subtle and sophisticated ruse to escape compliance. A close or textual read of the ADA AA by any facile person can divine the obligation of duty under "shall" is not conditional- as CMP seems to imply. It follows that the refusal by CMP to accommodate the EMF disabled due to an error of understanding is implausible and may be, instead, intentional. Congress intended that the entire basis for these ADA amendments was to close loopholes consistently used by courts to exclude the disabled. What is first required, now, is removal of the "object" of discrimination by the covered entity.

In the Federal Register, Vol. 81, No. 155, August 11, 2016/ Rules & Regulations  Pg. 53229, it is clarified in *Sections 35.108(d)(1)(ii) and 36.105(d)(1)(ii)—Primary Object  of ADA Cases*

*"This section of the legislative history clarifies that: "Through this broad mandate [of the ADA], Congress sought to protect anyone who is treated less favorably because of a current, past, or perceived disability. Congress did not intend for the threshold question of disability to be used as a means of excluding individuals from coverage. Nevertheless, as the courts began interpreting and applying the definition of disability strictly, individuals have been excluded from the protections that the ADA affords because they are unable to meet the demanding judicially imposed standard for qualifying as disabled."*. (H.R. Rep. No. 110–730, pt. 2, at 5 (2008) House Committee on the Judiciary).

The Fair Housing Act (FHA) was enacted in 1968 (42 U.S.C. 3601-3619, 3631) to combat and prevent segregation and discrimination in housing. As is noted in the Federal Register Vol. 78, No. 32, Page 11461 on February 15, 2013, the FHA's language prohibiting discrimination in housing is "*broad and inclusive.*" And here, "*HUD has consistently concluded the Act is violated by facially neutral practices that have an unjustified discriminatory effect on the basis of a protected characteristic, regardless of intent.*"

11

ESI00054527

CMP is, in fact subject to FHA provisions that do not allow for arbitrary narrowing by authorities of disabled rights laws. This is especially so because the Maine legislature has adopted language substantially equivalent to federal statutes. MHRC administers these laws through their rules. In fact, MHRC Rules Chapter 8, 8.06 **PROHIBITION AGAINST DISCRIMINATION BECAUSE OF PHYSICAL OR MENTAL DISABILITY**

A.  1. It shall be unlawful to discriminate in the sale or rental of, or to **otherwise make unavailable or deny**, a dwelling to any buyer or renter because of a physical or mental disability of:

   (b) **A person residing in or intending to reside in that dwelling after it is sold, rented, or made available**; or

   (c) Any person associated with that person.

   2. **It shall be unlawful to discriminate against any person in the terms, conditions**, or privileges of the sale or rental of a dwelling, or **in the provision of services or facilities in connection with such dwelling**, because of a physical or mental disability of:

   (b) **A person residing in or intending to reside in that dwelling after it is so sold**, rented, **or made available**; or

   (c) **Any person associated with that person**.

ESI00054528

## CMP Must Comply with the ADAAA on its Own and via MHRC Enforcement

CMP claims the Statutes cited in their defense only apply to "…discriminatory practices related to the sale or leasing of housing." This is a false interpretation. CMP also claims it is a private company and as such "…the Statute's reach is not broad enough to impose a duty on a private entity, simply because it provides goods or services to a homeowner or tenant." And yet, CMP's assertion of private status is contradicted by their own citation on pages 5-6 starting at B. "The Maine Legislature has vested the MPUC with the power to regulate the State's public utilities; to ensure that [public] utilities such as CMP provide safe, reasonable and adequate services; and also to ensure that rates of public utilities are just and reasonable to customers and public utilities. By their admission, CMP is a "Public Utility." Their particular ownership structure, as a private company, does not negate their obligation to the content covered for disabled rights Statutes nor is that duty negated by the incorrectly framed claim that "…the Statute's reach is not broad enough to impose a duty on a private company, simply because it provides goods or services to a homeowner or tenant." CMP defines for itself "goods and services" erroneously and this will be addressed later.

Both CMP assertions above directly conflict with 42 U.S.C. Chapter 126 Subchapter II PUBLIC SERVICES Part A – Prohibitions Against Discrimination and Other Generally Applicable Provisions; section 12131(1)(B) *"The term "public entity" means; any department, agency, special purpose district, or other instrumentality of a State or States or local government."* The prohibitions apply equally to MPUC. CMP is a Public Utility (with a monopoly), regulated by the state agency, MPUC, providing the public service of electricity delivery. As such CMP is an instrumentality of a state agency, a state actor and thus *"Public Entity"* according to section 12131(1) (B). By virtue of this status as a "Public Entity" providing essential services of electricity delivery for the habitability of housing, it is subject to sections 12131(2) and 12132 and by extension to all federal laws regarding discrimination based on disability. These sections of the Americans with Disabilities Act (ADA) alone voids the Respondent's claim of not being subject to Sections 804[42U.S.C.3604] (f) (2) and 804[42 U.S.C.3604] (f) (3) (B) of the FHA. The same statutes apply to MPUC, whom CMP claims gives them cover of law, and though MPUC is not the end use provider of the service, it is also the entity claimed to be authorizing

13

ESI00054529

all CMP services, plans and tariffs to be exempt from compliance with disability laws whether federal or state. MPUC, itself, is bound by through substantial equivalences to federal law adopted by Maine's own legislature.

CMP's claim of cover from law by MPUC, and to be exempted therefore from conformity with disability rights law, is not plausible or credible. 42 U.S.C. Chapter 126 Subchapter II PUBLIC SERVICES Part A – Prohibitions Against Discrimination and Other Generally Applicable Provisions; section 12131(1) (B)

> *"The term "public entity" means; any department, agency, special purpose district, or other instrumentality of a State or States or local government."* Section 12131(2) *"Qualified individual with a disability. The term "qualified individual with a disability" means an individual who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of <u>services</u> or the participation in programs or activities <u>provided by a public entity</u>.";* (emphasis added) and Sec. 12132. *"Discrimination Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in <u>or be denied the benefits of services,</u> programs, or activities of a public entity, or be subjected to discrimination <u>by any such entity</u>."* (emphasis added).

Further, Section 804[42 U.S.C. 3604](f)(2) makes it unlawful "To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap" 804[42 U.S.C. 3604](f)(3)(B) defines discrimination to include "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to *use and enjoy* a dwelling;" Complainant cannot, on his basis of disability, use and enjoy his dwelling with an EMF emitting invoicing tool attached to his home's wall, and nearby.

MHRC Rules Chapter 7 at 7.02:

14

ESI00054530

*No individual shall be discriminated against on the basis of physical or mental disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any public or private entity who owns, leases (or leases to), or operates a place of public accommodation.*

And at 7.15A:

*A public accommodation shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with physical or mental disabilities from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations, unless such criteria can be shown to be necessary for the provision of the goods, services, facilities, privileges, advantages, or accommodations being offered.*

**MHRC has Jurisdiction over ADA/FHA in Disability/Discrimination Matters under the Doctrine of Substantial Equivalence to Federal Statutes and Rules.** While ultimate jurisdiction may rest with HUD and or the DOJ in these matters, HUD generally just acts in the intake capacity for disability/discrimination complaints related to housing. HUD maintains working relationships and agreements with most state human rights or DOJ agencies. These contracts delegate authority to the state agencies to investigate, facilitate conciliations and or prosecute disability/discrimination complaints. MHRC has a contract with HUD to perform these duties.

**CMP is bound to Self-Evaluation of Compliance with ADA and FHA.**

CMP knew health issues associated with EMF emissions from their invoicing tools affected the disabled and medically vulnerable back it 2010. While not brought to their attention under the ADA, both the utility and MPUC knew for years they needed to be in compliance with this Act through the required self-evaluation process:

ADA. 28 CFR § 35.105 *Self-evaluation.*, states as follows:

15

(a) A public entity shall, within one year of the effective date of this part, evaluate its current services, policies, and practices, and the effects thereof, that do not or may not meet the requirements of this part and, to the extent modification of any such services, policies, and practices is required, the public entity shall proceed to make the necessary modifications.

(b) A public entity shall provide an opportunity to interested persons, including individuals with disabilities or organizations representing individuals with disabilities, to participate in the self-evaluation process by submitting comments.

(c) A public entity that employs 50 or more persons shall, for at least three years following completion of the self-evaluation, maintain on file and make available for public inspection:

(1) A list of the interested persons consulted;

(2) A description of areas examined and any problems identified; and

(3) A description of any modifications made.

(d) If a public entity has already complied with the self-evaluation requirement of a regulation implementing section 504 of the Rehabilitation Act of 1973, then the requirements of this section shall apply only to those policies and practices that were not included in the previous self-evaluation.

The first effective date of 26 CFR § 35.105 was April 5, 1993. The effective date has been restated with the passing of the ADAAA. The most current effective date is March 15, 2011 for the amended provisions to the original 1990 ADA. For almost 20 years prior to the consideration of opt-out fees for AMI meters both CMP and MPUC have been legally bound by the ADA to evaluate "…services, policies, and practices, and the effects thereof, that do not or may not meet the requirements [of the ADA]."

Lack of self-evaluation under 28 CFR Part 35, by CMP in not considering its obligations and responsibilities under the requirements of the FHA, ADA and ADAAA, in requesting and determining the structure and granting of opt-out fees places both of these public entities in direct violation of 28 CFR § 35.105.

ESI00054532

Additionally, 28 CFR § 35.106 imparts the added obligation on public entities to give notice to all interested persons regarding the provisions of the ADA and ADAAA and the applicability to the services they provide:

> "*A public entity shall make available to applicants, participants, beneficiaries, and other Interested people's information regarding the provisions of this part and its applicability to the services, programs, or activities of the public entity, and make such information available to them in such manner as the head of the entity finds necessary to apprise such persons of the protections against discrimination assured them by the Act and this part.*"

Section § 35.106 has been effective since July 26, 1991.

CMP is obligated to correct these problems first and they have failed to do so. This in spite of a long ADA history of accommodations under HUD and EEOC for EMF exposure, rom arc welding induced frequency sensitivity to video display monitors causing skin rashes for office workers, to the removal of an EMF emitting invoicing tool on a municipal water meter that established a protective perimeter in OR. EMF exposure sensitivities are specifically recognized by the Federal Access Board, Department of Labor Job Accommodation Network, and the 10 HUD Regions.

Given the scientific facts brought forward over the last few years and the opinions expressed by former MPUC Commissioner Littell recognizing the problems with EMF emitting meters; it is clear CMP is acting willfully to avoid their responsibilities to me and to this substantial class of people. Instead, CMP litigates the existence of the disability in the style of a torte case in retaliation to the assertion of my disabled rights, attempting to railroad me into submission. A response of this sort is ample evidence of CMP's intimidation by legal force against a pro se private citizen and should, by the tenor of its submission for defense, show sufficient evidence to enable a reasonable grounds decision by MHRC.

**CMP's Attack on the EMF Disabled or Those with Other Medical Issues Exacerbated by EMF is Obstructionist and Intimidating.** CMP's arguments and attempts to address this as a torte case are a sideways facial challenge to existing and settled federal law and policies

17

ESI00054533

(ADAAA, Federal Housing Act, Access Board and HUD) and are misplaced in denying accommodation to those adversely impacted by EMF meters.

Even if CMP ends the still existing discrimination, which they are obligated to do, in order to prevail when faced with an ADA/ FHA complaint they would have to disqualify me as disabled which they cannot. My medical history makes this impossible.

For these reasons, it can be plausibly argued CMP has engaged in a systemic and organized pattern of practice in discrimination against me by attempts to disqualify me from a vetted and approved disabled status. This, alone, is explicitly prohibited in the ADAAA's plain language. A covered entity must first 'end the object of discrimination' and then determine if I am qualified to receive the accommodation they have made available. Nowhere in the ADAAA is the standard allowed to disqualify a formerly qualified recipient- CMP does so, then, in retaliation and with intimidation.

Further, rather than acting in the public's interest as a subcontracted state actor for delivery of and equal access to services, CMP layers this disqualification attempt over its tactic to use a majority rule PUC Commission vote decided under rational review, to exclude me from the equal protection clause under which my disabled status qualifies me for reasonable accommodation.  For these grounds alone, I request MHRC reject forthwith the respondent's arguments to dismiss this complaint, find reasonable grounds for my complaint as well forward this case file to the DOJ for considerations of possible 818 violations under disparate treatment with intent.

**CMP's Opt-out Policy *Appears* Facially Neutral but is Disparately Impactful with Evidence of Disparate Treatment.** Even if discriminatory intent is not immediately apparent, and CMP continues to assert that they intended their policy to be neutral, CMP's continued imposition of the 'Futile Gesture Doctrine' on the EMF disabled makes this absence of evidence of disparate treatment unlikely. Therefore, HUD enforcement guidelines allow MHRC to analyze CMP's intent behind the policy of opt-outs as discriminatory treatment even if it was not adopted with the intent to discriminate. Such a policy violates the Act unless the respondent proves, in the 3 part burden shifting test (or a substantially equivalent test at MHRC) the policy

ESI00054534

was needed to accomplish some substantial and legitimate business goal and no other means exist that are less intrusive to my civil rights. CMP cannot succeed in this burden.

However, since the Complainant shows CMP's systematic rejection of EMF disabled complaints, then disparate impact discrimination also can be shown easily.

Therefore, despite CMP's claims their policy is facially neutral, the fact pattern shows differently; their wrongful inclusion of the EMF-disabled into their opt out program can be shown to disproportionately exclude equal access to power without an additional surcharge on the EMF disabled, a surcharge the able bodied do not have to pay. Therefore the opt-out policy discriminates by disproportionately requiring extra costs to the entire class of EMF disabled on the basis of their protected characteristic. Further, when brought to CMP's attention the discrimination continued, and effective communication ended. Escalation arose by threats and administrative acts, like installation of an EMF emitting meter after CMP had entirely ended my service contract with them. CMP's policy of disparate treatment then became formalized and use of escalation was enforced with debt collection harassment, despite the debt in question still actively in dispute.

Intimidation by economic and legal force has had the consequence of imposing the Futile Gesture Doctrine.  HUD's Title VIII Intake Manual describes how "... [t]he futile gesture doctrine applies to cases in which the respondent's intent 'to discriminate is so apparent that a reasonable person of the complainant's class would realize that any attempt to secure the desired housing or... [services] accommodation... would be futile."  In fact, any member of my class who is polled will agree that all attempts to gain relief for themselves via CMP and MPUC will be futile when predicated on previous actions. Any person in my class will likely respond that they expect their requests for accommodation will be refused quickly and in such a forceful manner that therefore the assertion of their disabled rights- prior to requesting or asserting them- is effectively chilled. Collectively these treatments represent a clear and egregious undue burden.

19

ESI00054535

**CMP Treats Opt Out Customers Differently from Customers with EMF Emitting Meters and Also has a Separate Class for Low-income Populations.** Those with health issues who are either sensitive to EMFs (recognized by both the Federal Access Board and Department of Labor) or with medical conditions likely to be exacerbated by exposure to low level EMF's do not have the luxury of choice to remain safe in their own homes. But CMP claims to MHRC that everyone in their program to opt out is treated equally despite that MHRC knows the disabled are not everyone, but is a special class.

Heterogeneity exists for a wide variety of socio-economic or political reasons, as does the choice to opt out under any neutral policy including, for example, risks associated with fire hazard or cybersecurity/privacy issues. Yet, in June of 2016 CMP's revised rate sheet dated 6/16/16 shows 51 pages of different rates, for different 'groups' of its customers. Despite this evidence of substantial rate provisions for other classes of customer CMP excludes the EMF disabled from equal recognition and lumps us in with a rate category in which we suffer disparate impact and therefore burdened with an unjust surcharge based only on the fact t we are EMF disabled. CMP failed, however, to accurately identify the natural heterogeneity present in any 100% monopoly of an economic sector. Indeed, HUD's final rule (II HUD Discriminatory Effects Standard) declares that "liability may be established under the Fair Housing Act based on a practice's discriminatory effect . . . even if the practice was not motivated by a discriminatory intent." Therefore CMP's "effect" of imposing a disparately impactful policy on me and anyone like me is covered by the MHRC's substantial equivalent enforcement of the ADA's 28 CFR § 35.130(3) which provide:

> "*A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration—(i) That have **the effect of** subjecting qualified individuals with disabilities to discrimination on the basis of disability;" (emphasis added). The 2008 ADAAA clarifies this intent of the law even further, 28 CFR § 35.130(b) (7) (i) "Nothing in this part shall provide the basis for a claim that an individual without a disability was subject to discrimination because of a lack of*

ESI00054536

> *disability, including a claim that an individual with a disability was granted a*
> *reasonable modification that was denied to an individual without a disability.*"

Further, CMP attempts to speciously narrow the application of Section 804(f)(3)(B) to narrowly and exhaustively define its reach to "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling;" while inventing for CMP's own use a definition, namely, it "does not reach ", for their actions related to the "habitability of housing already secured." (Clifton Terrace Associates, Ltd. v. United Technologies Corp., 929 F.2d 714, 719 D.C. Cir. 1991)"

*Clifton* is not an analogous case and CMP shows no nexus of connection for the standards that apply to *Clifton* and are not the same standards of applicability in the Complainant's claim against CMP for liability under disparate impact. The lack of elevator services is not commiserating with the barrier to access occasioned by fundamental change in the previous state of indoor air quality through the forcible adoption of an EMF-emitting invoicing tool. CMP uses this tool for its proprietary choice of accounting methods, a usage that was not in effect when I acquired my house, though it will be obvious that use of those services was intended as ongoing.

The subsequent adoption of EMF emitting invoicing methodology is not part of the nature of the delivery of electricity and is not a business necessity that cannot be effected in a means less intrusive to the my Civil Rights. Yet, CMP asserts they are not liable after the acquisition of the dwelling. But 'post acquisition claims' are cognizable under the applicable statutes claimed here by the Complainant. On April 21, 2016, a Department of Justice (DOJ) statement of interest was filed in Drayton et al v. MacIntosh County et al (in Georgia) defining that 'post-acquisition' utility services claims are cognizable under the FHA". This establishes that HUD jurisdiction is allowed in cases of unequal provision of utility services and it was said,

21

ESI00054537

*"Equal access to utility services is fundamental to fair housing,"* said John Trasviña, HUD
Assistant Secretary for Fair Housing and Equal Opportunity. *"We are pleased that Huntsville
Utilities is now working with HUD to remove any unnecessary barriers."*
http://portal.hud.gov/hudportal/HUD?src=/press/press_releases_media_advisories/2
012/HUDNo.12-123A

So CMP's invoking of "intangible interests" in "already-owned property. . ." is revealed here
as a tortured and incoherent interpretation of the original contract for services over the arc of
time the law was designed to hold its effect. Their argument for *pre* v. *post* habitability has no
common sense application with respect to the obvious, on-going nature of delivery for utility
service. The argument fails any intersection with the Complainant's charge, CMP's new policy
occasions new conditions on the delivery of services. CMP's new policy rests on the
requirement that- in order to be neutrally applied- the customer must be able-bodied and not be
disabled by EMF-emitting invoicing tools. This argument and the others advanced under
habitability versus accessibility, like comparing font size complaints for Blind persons as
equivalent to being made ill by EMF-emissions 24/7 in one's own home, are frivolous, at best,
and are dismissive of the suffering imposed on the EMF disabled to the level of depraved
indifference. Further, the Complainant's disabled request is not any expansion of the FHA, as
is implied with the examples provided by *Adler, Harding, Underhill Park,* etc., but is merely
an application of the FHA that is routinely and currently applied. CMP cannot make any
cognizable arguments that equivalently compare the nexus of effects between their example
cases and mine.

Further, CMP cites in its defense an old, 2004 HUD/DOJ Joint Statement that disingenuously
ends a 2004 quote at a truncated definition thus falsely framing the cite as an exhaustive
limitation in CMP's favor.

This 2004 enumerated limitation – claimed as reading in favor of the Respondent -  does not
exist in the March 5, 2008 HUD/DOJ Joint Statement. CMP's use of the obsolete 2004 version

22

ESI00054538

showing the word 'accommodation' in the place where 'modification' belongs is problematic. (See the 2008 HUD/DOJ Joint, point 8) This substitution of terms shifts the actual meaning and application of the definition CMP claims for its own defense. *Modification* typically refers to structural access or change. Use of the word *'accommodation'* in place of the word *modification* conveniently confuses the reader that structural modifications are the only requirements in policy accommodations, as well.

This use of the obsolete 2004 document, and its interpretation, appears as no accident. At best, use of this document is a wildly careless error of negligence on CMP's part. At worst, it is intentionally false and is obstruction of justice. Either scenario disqualifies their entire argument on the grounds that this erroneous interpretation is pivotal in the reasoning for CMP's defense. Even if this error in their interpretation is laid at the door of the HUD/DOJ statement, CMP had only to cite the 2008 Joint Statement. But they did not. It remains that CMP's use of the obsolete 2004 document's interpretation was wrong and the entire basis of CMP's argument above fails and should be rejected as invalid.

The missing language not included by CMP in the 2004 document states, *"Courts have also applied The Act to state and local governments…"* It is false for CMP to say further, therefore, that FHA's coverage is limited to those involved in making housing available, or any other extension of their erroneously defined Joint Statement.  In fact, the reach of the FHA is recently in the ADAAA Final Rule made newly broad in so far as to reach any service whose effects are likely to disparately impact- through policy, rules, practices and/or services- a protected class; depending on the circumstance this could include professions or providers such as "carpenters, roofers, painters, landscapers, heating oil suppliers, appliance repair technicians, garbage collectors, chimney sweeps, electricians, plumbers, and snow removal companies, to name a few". CMP seeks a conflating and sweeping re-interpretation of disability rights law in order to submerge its own Title II and III convergence duties back into private business practices like those delivered by "carpenters, roofers, painters, landscapers, heating oil suppliers, appliance repair technicians, garbage collectors, chimney sweeps,

23

ESI00054539

electricians, plumbers, and snow removal companies, to name a few". However, CMP errs in their interpretation. Even if those other businesses are typically not subject to FHA concerns, if they began a practice in the area of critical services of housing and, like CMP, they forcibly impose a punitive policy and introduce an agent that causes an architectural barrier to access for the occupant, i.e., like CMP's fundamental altering of delivery of invoicing and accounting through the use of an EMF-emitting invoicing tool, then those other businesses' practices also rise to cognizance under section 2(a)(2) ADA and will violate the findings and purposes of Congress. This situation, even in the case of private business engaged in a critical service that later transformed into one bound to a monopoly agent servicer, would invoke the ADA's 'purpose' clause's *mandate* (2(b)(1-4) to include the "sweep of Congressional authority, including the power to enforce the 14th Amendment", and more. The Complainant seeks no expansion of reach in the FHA, as CMP implies, but merely the enforcement of what is already allowed under pertinent and applicable disability rights laws.

CMP continues in its vein of narrowing and misrepresenting the application of the ADA and the FHA, and also MHRC's authority to enforce both. CMP's actions are opposite of how it is accepted as to who is covered under the October 2016 ADAAAA New Rule, summarized in an article that describes DOJ's enforcement of Congress's intent to "Broaden who's covered under the ADA". This article includes a statement by Vanita Gupta, head of the Justice Department's Civil Rights Division who says the New Rule "clarifies Congress' original mandate… [With]…new regulations significantly expanding… what disability means and who the law covers". (Diament, Michelle. August 16, 2016, *"Regulations Broaden who's Covered Under the ADA"*. Disability Scoop. https://www.disabilityscoop.com/2016/08/15/regulations-broaden-covered-ada/22632) Therefore, on this account CMP's assertions they are not 'covered entities' is wrong and should be refused.

**CMP Wrongly Asserts Provisions of MHRC's Enforcement Authority Do Not Apply to its Private Actor Sale of "Goods and Service" Services.** CMP is not a private actor but is a Title II & III converged actor delivering public interest services. CMP distorts and reinterprets the

24

plain language of the FHA and common law in order to exempt itself from disability rights law. CMP is not the provider simple of "goods and services" as if they were a T-shirt seller at the mall, or an automotive dealership in the suburbs. Instead, CMP voluntarily trades its wholly private status for the substantial benefits and reduced risk awarded to privatized state enterprises. As such CMP is a quasi-state agency bound by the intersection of Title II & Title III, and cannot assert entirely Title III privileges when that assertion interferes with their first duty as a provider of 'in common' services.

When the government and a private party conduct a "joint enterprise" or enter a "symbiotic relationship" with each other, it is state action. (*Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961)). CMP is not "simply a seller of goods and services". A simple debunking of their "goods and services" terminology shows CMP conflates the phrases *common-ordinary* seller of "goods and services" with seller of *common- public* "goods and services". The former phrase refers to 'simple' goods and services under Title III, like T shirts in the mall or automobiles on a lot in the suburbs, while the latter phrase refers to 'public' goods and services bound under Title II government duties, an 'in-common' supply to all with embedded rights, privileges, and immunities "*appertaining to and enjoyed by all citizens equally and in common, and which have their foundation in common law*". (Blacks Law. 1968. Revised 4th Addition, West Publishing, St. Paul, Minn.)

CMP's attempt to diminish the 'goods and services' they have sub-contracted to sell in place of the state can be argued in this context, and in conjunction with their other conduct, as a collateral attack on state sovereignty  by diminishing the standards for supply of government services. The ADA Technical Assistance Manual describes how private parties converge, when "…public and private entities act jointly… in compliance with the accessibility guidelines of both titles II and III….to meet the standard providing the highest degree of access to individuals with disabilities. (ADA Title II Technical Assistance Manual, II-1.3000 Relationship to title III)

CMP goes further in its defense and attempts to change its duty under the complaint from *ending the object of discrimination* to *who should be subject to MHRA*. This attempt continues their attempt to reclassify themselves as purely private. CMP says, "The MHRA explicitly

ESI00054541

limits its reach to those who sell, rent or manage a housing accommodation" and therefore
"There is simply no basis to argue for… or MHRC to find…. Federal Housing Act
provisions…or comparable state provisions." But this interpretation cannot even logically
follow from a precedent setting HUD action ordering a utility provider to end *use of an EMF
emitting invoicing tool* on the basis it was an architectural barrier to a Complainant's access.
Eight other HUD actions, in two separate HUD regions and in 5 states, have already passed the
prima facie test, the "basis" CMP denies exists. And finally, ADA Title II Technical Assistance
Manual, at 28 CFR Part 35 "implements subtitle A of title II of the Americans with Disabilities
Act, Pub. L. 101-336, which prohibits discrimination on the basis of disability by public
entities."

CMP makes contortions in language and interpretations to unjustly exempt itself from
compliance with the law. These attempts should be rejected as specious and disingenuous.

**CMP Reawakens the Doctrine of 'Separate but Equal'.** CMP's opt out fee for those who
are disabled by EMF-emitting invoicing tools places a burden on those who are EMF disabled
and opens the path to instant creation of a segregated community. This segregation is already
in effect to exclude persons like the complainant, or send a message of futility to others,
chilling their willingness to assert their disabled rights. The Complainant, upon fearing
exacerbation of symptoms resulting from disparate impact was forced, upon receiving CMP's
threat to cut off his electricity, to begin purchasing and assembling an off the grid substitute for
his formerly accessible safe and reliable power.

Disabled group members harmed by inclusion in what CMP treats as a homogenous class, are
forced to pay to pay, or forced to pay to stay away, monetarily or socially. They are
immediately deprived of their capital and social investment into the public commons
infrastructure. They either must pay more than their share simply because that they are ill, or
are deprived of their savings and financial leverage by being pressured into and burdened with
purchase of expensive and experimental alternative main-power solutions – or they must flee,

26

ESI00054542

becoming homeless and forced to live in their cars in the wilderness. I can provide immediate evidence of this occurring throughout ADA jurisdictions, of persons who are homeless due to EMF emitting invoicing tools despite their ability to afford housing, or even when they own or rent a house they can no longer access due to their own meter or that of a nearby neighbor.

This instant consequence of CMP's policy shows by testimony and actual actions of the complainant and others like him, existence of a segregated power services community. It is well known to any who want to know, that many of the civil actions of so-called 'opt-out' activists join that effort, like the "the Friedman Action" (that CMP continually refers to) because they are disabled by imposed EMF emissions and have no other means of expressing their fear and the actual segregation within their own community. Like *Plessy v. Ferguson* (163 U.S. 537 (1896)) CMP bases its theory of exemption from, and for overcoming, its disabled rights duty by reducing and transmogrifying the 14th Amendment's equal protection clause to State level, rational review.

CMP continually uses the exact logic that brought *Plessy* into practice. CMP continually seeks to impose a rational level review standard onto what is fundamentally a civil rights matter, using MPUC rulings on tariff approvals, etc., as the test upon which shall rest its customers' access to their disabled rights. This standard is settled as having proved "pernicious" and "inconsistent with the personal liberty of citizens", as Justice John Marshal Harlan opined in his dissent to *Plessy*. CMP furthers the "mischief" here by an attempt to remake for itself exemptions to Title II and III convergence in delivery of its contract for providing 'in common' public services by insisting upon re-delegating to MPUC the power Congress gave to the ADA and to HUD – and by extension MHRC.

Notwithstanding, racial segregation was the first protected characteristic qualified for equal protection; CMP's policy consequentially creates a new segregation within the equal access to power community. The HUD Strategic Plan for 2014-2018 expands its goal to end discrimination specifically stating "*housing discrimination still takes on blatant forms in some*

27

ESI00054543

*instances, it has become more subtle and sophisticated through the years, resulting in underreporting and complicating effective enforcement".* (HUD-564, Strategic Objective 4A. Pg. 38) These complex and sophisticated ruses to discriminate in housing are the new target of HUD, imposing access to a $100,000 fine in order to measure outcomes for this particular *"focus on systemic cases (those matters involving widespread discrimination affecting multiple people)"* with *"enforcement strategies that identify and change widespread policies and practices."* (HUD-564, 2014-2018 Strategic Plan, Strategic Objective 4A: Fair Housing)

The consequence of CMP's repeated carving out of a special place for its attempt to create "excessive" stability of contract, which I will later describe in more detail, is the creation of an unequal class of persons incrementally segregated within power accessible communities that exclude or condition entry to the EMF-disabled. They are forced to flee, or like me they are forced to stand-up alternative main power sources for themselves, or worse- forced to attempt 'shelter in place' strategies while enduring escalating illness and more. All this is occurring across Maine (with CMP's knowledge), and other jurisdictions, despite the fact EMF disabled are qualified under a protected characteristic acknowledged by the Access Board under Authority of the ADA and being actively enforced by statutorily authorized arms of the ADA. My case against CMP exemplifies the circumstances that qualify for HUD-564's strategic focus on systemic cases because of the *"sophisticated"* but *"blatant"* tactics of discrimination and disparate effects that result in *"underreporting and complicating effective enforcement."*

There is simply no basis, then, for the Respondent to argue MHRC cannot find CMP subject to both Federal Housing Act provisions cited by the Complainant as well as the comparable state administrative rules and laws substantially equivalent to federal law, Acts and regulations. Accordingly, the Commission should reject CMP's request for dismissal and find CMP liable under all the claims by the Complainant.

28

ESI00054544

**HUD's Enforcement Guidelines for the ADA Allow MHRC to Find Liability for Disparate Treatment against CMP** on evidence that discriminatory effect may be coupled with evidence of discriminatory intent, as, for example, where a respondent's policy has a large exclusionary impact on a protected class. The evidence for disparate treatment flows from CMP's adoption of this policy after protracted knowledge of the problems of the EMF disabled (as mentioned previously) since 2010. HUD says, "*In other words, a single case may produce evidence of the respondent's violation of the Act under both a discriminatory impact theory and a discriminatory intent theory.*" HUD Title VIII Handbook 8024.01, CHAPTER 2. THEORIES OF DISCRIMINATION) CMP has repeatedly shown evidence of indifference to the EMF-disabled class, admitting as much by their own discussion of the same at MPUC in the case, Friedman v. Maine.

CMP ignored evidence presented by a Maine PUC Commissioner that it [paraphrase] 'may be the case the EMF-disabled might qualify for no surcharge when included in the opt-out program'. Had CMP adopted this suggestion it would have cured the disparate impact. CMP did not adopt this suggestion. CMP cannot claim, therefore, no knowledge of my class or claim exemption from my own eventual claim. My disabled characteristic is disproportionately impacted by CMP's opt-out program, as well as anyone like me, all of us a class whose very description by ADA's Access Board is defined 'disabled by Electromagnetic Sensitivity' (see the NIBS report, ada.gov). In fact, CMP was made aware of this problem in the 2010 MPUC Boxer-Cook et al complaints preceding mine brought this problem to the fore. CMP is now in their seventh year of ignoring this problem. It is clear, therefore, CMP intends to discriminate against the Complainant and my class despite our protected characteristic.

This is not CMP's first case of discrimination against a protected and disadvantaged class. In a two-part series article by a small law firm, specializing in economic and regulatory consulting, a partner at Fisher, Sheehan & Colton, Public Finance and General Economics (FSC) describes "*De facto discrimination against low-income households found [that] Central Maine Power Company's policy of telephone based offers [of payment plans] engaged in discriminatory effects.*" This article describes a similar pattern of disparate impact to mine where, "*A 1988 report for the Maine PUC, prepared by the National Consumer Law Center, found that*

29

ESI00054545

*[CMP's] rules operated, however unintentionally, to discriminate against a discrete population of low-income households…The Maine utility had, in effect, made the presence of a telephone a prerequisite to maintaining energy service, establishing unintentional discrimination."*

The second part in the series puts down CMP's false assertions about FHA's jurisdiction and MHRC's jurisdiction over utility providers, as well as CMP's attempt to misrepresent that 'services' are not included in a covered entity's obligation to provide equal access without discrimination. The article cites eventual finding that with regards to "*FHA" and "…Discrimination Under the Act… [and]…Despite occasional references in cases and comments to the contrary, the FHA clearly prohibits practices which are neutral in form, but which disproportionately impact upon protected groups, as well as actions motivated by invidiously discriminatory motives. The Supreme Court has indicated a disparate impact standard under the FHA, and nearly every Federal Circuit has directly so held.78…*" and that "*Despite the popular focus on a limited number of fair housing players, the Act does not limit its proscriptions to owners of residential housing, to real estate agents, and to banks…The Act makes it unlawful to discriminate against "any person … in the provision of services or facilities…"*

(Colton, Roger D. "*Energy and Low-Income Housing: Part I, Energy Policy Hurts the Poor".* National Housing Institute. Issue #76, July/August 1994.
http://www.nhi.org/online/issues/76/energy1.html)

**In response to CMP's B: It is Irrelevant under the Equal Protection Clause that Maine Public Utilities Commission Has Found CMP's EMF Emitting Meters Are Safe and Opt-out Fees Reasonable.** The Maine Legislature vests MPUC with the rational review power to regulate the State's public utilities. Those powers do not give cover of law to utilities such as CMP to externalize their duty under Title II/III. Nor do they declare categorically if any objects, like invoicing meters, are assigned a "*generally*" safe, reasonable and adequate designation then it follows "*individually*" and exhaustively in all cases this will be true. This is a logically invalid statement and an environmental fallacy. So, despite CMP's assertions to the contrary, MPUC is unlikely to produce language categorically exempting CMP from its duties under applicable

ESI00054546

disabled rights statutes at the state or federal level. MPUC is or should be, well aware it resides within a separation of powers framework and its rulings can only refer to the powers it holds for itself under the Constitutions of the United States and Maine. Any of MPUC's bindings or tariffs must also comply with and not supervene statutes and laws the Maine legislature has also adopted that are, in substance, equivalent to federal statutes and Acts, like the ADA and FHA, etc. Therefore, when MPUC ensures rates of public utilities are just and reasonable to customers and public utilities they can only do so in the narrow level of their rational review and cannot supervene any laws that forbid interference with federal ones.

Utilities such as CMP must adhere to more duties and obligations than to those imposed by MPUC and CMP's own narrowly interpreted duties for themselves, such as approved rate schedules. CMP must pay federal taxes; abide by federal DOT duties and Commerce Clause obligations, etc. CMP cannot produce any valid evidence or statement of cover of law by MPUC to expressly exempt CMP from complying on its own with Title II/III convergence and with the ADA and the FHA; MPUC simply has not the authority to do so.

**CMP Does Not Apportion Disabled Costs and Wrongly Claims Complainant Seeks Unjust Personal Benefit.** CMP attempts to externalize their obligations enumerated and illustrated in the ADA Title II Technical manual (discussed previously, and extensive in the Manual) requiring them to provide disabled accommodation as a part of the entire monopoly cost and benefit contract. <u>Disability compliance costs for accommodation with the ADA and FHA under the Equal Protection clause are to be borne equally by all, amortized across the entire demographic</u>. MHRC Rules Chapter 7, 7.15. C.

> *A public accommodation may not impose a surcharge on a particular individual with a physical or mental disability or any group if individuals with physical or mental disabilities to cover the costs of measures, such as the provision of auxiliary aids, barrier removal, and reasonable modifications in policies, practices, or procedures, that are required to provide that individual or group with the nondiscriminatory treatment required by the Act or this Chapter.*

31

ESI00054547

It is CMP who is attempting to obtain for itself a free cost- not the Complainant- attempting to avoid a natural burden that is part of the usual heterogeneity of their 100% access and monopoly over citizens within their district. There is, therefore, no credence to their claim the Complainant's assertion of his disabled rights creates for CMP any situation to give Complainant any undue or unreasonable preference, advantage, prejudice, or disadvantage to a particular person as a result of CMP's complying with disability rights laws.

CMP also makes a false accusation that I attempt to gain for myself services from CMP that are free or at a rate less than named in the schedules in force. 35-A M.R.S.A. In fact, CMP has imposed an extra cost on me one the EMF-able bodied do not pay. And CMP still owes me for power I generated and conveyed to them (billing records part of HUD Complaint and forwarded to MHRC).

Discrimination against me began with assessment of an opt out fee and accumulated while I disputed the policy because of my cancer and other health concerns. Not only has CMP continued their discrimination, and intimidation of me as a member of a disabled class but they have escalated their efforts to include retaliation. Their actions have gone from charging me a fee to avoid possible harm and continually sending disconnect notices, to placing an operating EMF-emitting invoicing tool or meter on my home knowing I had opted out because of a medical condition and knowing they had already disconnected me, to just recently handing my supposed debt of past disputed opt out fees over to a credit collection agency (Notice supplied to MHRC). CMP's disconnection put me in jeopardy both commercially for my farm production requiring operating freezers and personally with cold weather coming on. My long-time net metering solar PV system ceased to generate because the invertors required a small amount of line power to operate. I was forced to spend a considerable sum and take considerable time and effort to convert my solar system to off grid with replacement invertors, standby generator and a battery bank. MHRC 9438 Chapter 7, at 7.07, Retaliation or Coercion:

32

A. *No private or public entity shall discriminate against any individual because that individual has opposed any act or practice made unlawful by this part, or because that individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the Act or this Chapter.*

B. *No private or public entity shall coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by the Act or this Chapter.*

C. *Illustrations of conduct prohibited by this section include, but are not limited to:*

*(1) Coercing an individual to deny or limit the benefits, services, or advantages to which he or she is entitled under the Act or this Chapter;*

*(2) Threatening, intimidating, or interfering with an individual with a disability who is seeking to obtain or use the goods, services, facilities, privileges, advantages, or accommodations of a public accommodation;*

*(3) Intimidating or threatening any person because that person is assisting or encouraging an individual or group entitled to claim the rights granted or protected by the Act or this part to exercise those rights; or*

*(4) Retaliating against any person because that person has participated in any investigation or action to enforce the Act or this Chapter.*

CMP's reference to MPUC's broad investigative authority does not, as they imply, guarantee CMP can retain the past due tariff they charge me unlawfully. MPUC's exercise of its full regulatory and investigative authority to examine CMP's EMF emitting meters as a general state matter is irrelevant in this individual civil rights claim. The requirement by MPUC, as a result of that investigation, that CMP be allowed payment from me of a past due opt-out fee established by the MPUC did not obligate me to pay CMP's deferred tariff. I dispute the tariff

ESI00054549

because the tariff was assessed to me despite my disability and as such is invalid. Resolution of this case in my favor will eliminate the obligation of a past due tariff they wrongfully assign me.

**"Evidence of No Credible Threat" at Standard Review Not Equal to "Sufficient Evidence for the Public's Interest".** References made by CMP to the proceedings "Ed Friedman et al." should be discarded as irrelevant and prejudicial, including mentions of standards of evidence, of appeals, rules, procedures and definitions made by MPUC on this matter. They arise from an entirely different topic where disabled rights were ancillary and meaningless to State business conclusions. There was no extensive nature of the MPUC's investigation extending beyond local and rational review subjects reserved for the PUC and Legislature to ensure utility services are generally safe. This can only be deemed a generalized and non-exhaustive local ruling and cannot be made appropriate for the MHRC to rely on, especially given MHRC's duty and agreements to uphold its own enforcement of Maine Legislature laws that were adopted as substantially equivalent to the ADA and the FHA. MHRC should ignore and reject CMP's request to substitute rational review findings at MPUC, etc., since they cannot pass the high scrutiny review test to which disabled rights law conforms.

Complainant does not 're-litigate the safety issue,' he presents an entirely different case. Even if I was the lead Complainant before the MPUC on this other matter, it does not negate my claims under the Fair Housing Act, and particularly this is so given the fact CMP's liability burden is not exhausted by merely engaging a rational review conclusion. The "threat of harm" standard CMP quotes, is not the same standard at the federal level and under the federal question, which my complaint to MHRC invokes. The MPUC standard for 'No credible threat' to a generalized population is not any 'probable and convincing' requirement that overcomes the 'sufficient for the public's interest' standard used under the ADA and FHA and substantially equivalent laws at MHRC.

34

ESI00054550

MHRC should reject this persistent and pernicious barrage of claims by CMP to unleash *Plessy's* separate but equal doctrine and to create a segregated class of power consumers who are blocked from equal access 'in common' services. CMP, in its campaign to persuade MPUC to its bidding, attempts to remake public, in-common services, with all their attendant rights and duties, into an unfettered and cherry-picked market for its own "excessive" stability. This move is risk laden for the public's interest and is even contrary to the duties of CMP's parent Iberdrola Spanish Company) that is a Foreign Direct Investment (FDI) multinational corporation. CMP is a host country anchored subsidiary, now, and as such offers a local and monopolized access to Maine's 'US domestic market sector', made attractive because of its reduction to political risk and unrest in a mature and stable democracy. CMP attempts to remake the tacit and explicit trade rules that bind any Foreign Direct Investment firm, by contract for entry, to follow the laws of the land.

This agreement does not extend to the adversarial use of their vast FDI wealth (115.85 billion dollars total assets reported in September 2016 with 2,194.7 million dollars in net profit for 9 months ending in September) in a persistent and arguably collateral attack to undermine the sovereignty of the host state. If CMP, as a subsidiary of a foreign multinational corporations is unsatisfied with its 'market stability' burden then other appropriate legislative avenues exist for negotiation of treaty rules abatement.

'Bleeding out' local infrastructure asset reserves, with frivolous actions against a host nation's regional and national laws is an adversarial 'decapitalization thesis' tactic to gain "excessive" stability of a market contract. It is not rational for CMP, and its Spanish parent, to undermine a market friendly investment in highly stable American communities while they interfere with the sovereignty that created the risk reduction to their market entry in the first place. (Jensen, Nathan M. 2006. *Nation-States and the Multinational Corporation, a Political Economy of Foreign Direct Investment.* Princeton University Press: Princeton, NJ; Cohen, Stephen, J. 2007. *Multinational Corporations and Foreign Direct Investment, Avoiding Simplicity, Embracing Complexity.* Oxford University Press: New York, NY)

ESI00054551

Therefore, CMP's persistence in their attempt to persuade and rewind local and regional laws from 2016 backwards and to doctrinal laws from 1899 and the *Plessy v.* Ferguson era, exhibits plausible evidence of their intent towards adopting a policy of disparate treatment towards the disabled by using a sophisticated, entrenched and persistent ruse that gains them unjust and unlawful advantage in the face of the Complainant's assertion of his disabled rights.

### 3. In reply to C: There is No Interest of Federal Preemption Prohibiting the MHRC from Granting the Complainant's Request

The MHRC is categorically *not* preempted under federal law from granting the Complainant's request. CMP states no statute, provides no specific rationale, or order whatsoever that invokes any federal preemption. CMP merely quotes generalized explanations about what preemption might look like in any non-specific case but offers no specifics rules, no CFR that mentions the topic under this discussion, or the objects involved. CMP attempts a scare-tactic invoking some alternative Federal agency that will be empowered by some other Act than the ADA to overcome MHRC authority. This is false.

No Congressional Act or its Agency of enforcement may overturn the aims of another. All Acts and their empowered agencies must act in accordance with all other agencies, simultaneous. The Commission has all authority to do as I ask. Complainant's individual circumstance is different from the general and homogenous recommendations imposed by CMP. CMP's attempt to invoke FCC oversight on the basis of generalized recommendations is invalid and is an environmental fallacy. In order to invoke a generalized rule on a localized population it must apply universally to all individuals. Under analogy: if the general population is not- in general- allergic to peanuts, therefore it is categorically safe that all persons, individually, are never allergic to peanuts.

CMP's invoking the Federal Communications Commission (FCC) as if it is vested by Congress to make categorical conclusions in all cases, on all things related to electronic devices is reductive and absurd, and should be discarded. FCC has no such exclusive jurisdiction in determining in all cases, acceptable levels of emissions from wireless devices

36

ESI00054552

such as EMF emitting meters, or rates associated with them.  EMF emitting meters are inherently intrastate devices under the express and dual regulatory authority by the State's and its instruments, like MHRC.

But even if FCC was found to have some kind of interest, which it does not, it would be impermissible for the FCC to extend any mandate over a matter of enforcement into State's authorized agencies in any "simple command to state governments to implement legislation enacted by Congress… [T]he Constitution does not empower Congress to subject the States to this type of instruction." (*New York v. United States*, 505 U.S. 144 at III (c))

New York v. United States was a case inspired by the shortage of disposal sites for low level radioactive waste in a majority of the states where Congress enacted the Low-Level Radioactive Waste Policy Amendments Act of 1985.This Act, among other things, imposes upon States the specific manner in which they were to meet the Federal obligation to provide for the disposal of waste generated within their borders. The Supreme Court found even though New York was a willing participant to The Act, The Act's instruction in the means to compliance with it was an unconstitutional infringement on State sovereignty.

The reasoning was held as an understanding of "the fundamental purpose served by our Government's federal Structure" that the benefit of State sovereignty did not serve to protect the "abstract political entity" of the States, or State governments, or even to protect the decisions of compliant public state officials; but that the purpose of protecting State sovereignty, is "To the contrary, the Constitution divides authority between federal and state governments for the protection of individuals. State sovereignty is not just an end in itself: "Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power."(Coleman *v. Thompson*, 501 U.S. 722, 759, 111 S.Ct. 2546, 2570, 115 L.Ed.2d 640 (1991)) "

It is in this manner the FCC is not empowered by Congress "simply to direct" any state to comply with its pre-emptive authority under The 1996 Telecommunications Act. CMP attempts too far a reach to protect its own internal policy failures. FCC can neither pre-empt or invoke

37

ESI00054553

intrastate State actions unless that action is directly "contrary to Federal interests, under New York v. United States, and further, under Sprint v. San Diego, 543 F.3d 571 (2008) that action must be proven to "actually" interfere, not merely projected or speculated to interfere with the goals of The Act.

 CMP attempts to insert an alternative standard and one that is a far reach from *Sprint's* 'actual interference' doctrine and *New York's* rejection of the notion that Congress may simply direct the states to implement its goals. The narrow and categorical statement by CMP that "EMF emitting meters are certified to comply with the FCC exposure limits" does not create material fact - or create grounds for preemption - where there is none. It is irrelevant, then, for CMP to quote generalized science like "in fact the RF emissions from EMF emitting meters are orders of magnitude below those standards and are therefore safe." The FCC's generalized guidelines empowered by the Commerce Clause allow only for a very narrow, proscribed and expressly defined preemptive standard on 3 legs, firstly to facilitate the roll-out and expansion of cell towers and their infrastructure, secondly to encourage regulation to reduce the costs of cell phone service plans to mobile customer users and thirdly to not interfere with entry into the market by new competitors. None of this pertains in this action.

CMP's simple 'verbal invocation' of some unspecified preemptive interest in an intrastate matter could actually- if acted upon, which it won't be- endanger the FCC's mission by creating a regulatory reach that allows challenge, as unconstitutional. CMP's example of FCC oversight if implemented, would quickly reveal the virtual impossibility of distinguishing where the State's jurisdiction ended and the Federal jurisdiction began… requiring 'inference upon inference' in a standard contrary to the doctrine established in *US v. Lopez*.

Under the Gun Free School Zone Act (GFSZ) any attempt to uphold the kind of preemption suggested, here, by CMP was rejected by *Lopez*. It was found the Act would have to have had "upheld the Government's contention that the Act is justified because firearms possession in a local school zone does indeed substantially affect interstate commerce. This logic would require- in every action brought- that the Court "pile inference upon inference" in a manner that would convert congressional Commerce Clause authority to a general police power of the sort

38

held only by the States." *(United States v. Lopez*, 514 U.S. 549, 115 S. Ct. 1624, 131 L. Ed. 2d 626 (1995)) The result in *Lopez* was that the GFSZ Act was overturned on the grounds that its reach was unconstitutional.

To invoke preemption, CMP must define a direct relationship that it cannot succeed at. Under the governing agency's own rules, an order for the judicial review standard must be triggered: "To fall within this category of challenges, the challenge must present "a 'facial, or systemic' challenge, and not an 'as-applied, or particularized challenge,' . . . and [cannot] attempt to bootstrap other claims regarding a[n] [administrative] Board ['s] order or rule." Free Enter., 537 F.3d at 671 (citations omitted) Live365 Inc. v. Copyright Royalty Board. http://www.loc.gov/crb/proceedings/2009-1/memo-opinion-judge-walton.pdf

Further, settled law finds "no fixed formula exists for applying the doctrine of primary jurisdiction. In every case, the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation. These reasons and purposes have often been given expression by this Court". (*United States v. Western Pacific R. Co.* - 352 U.S. 59 (1956) at Page 352). CMP attempts to claim t a finding in favor of Friedman would directly conflict with the FCC's determination that CMP's EMF emitting meters are certified to meet the FCC's RF emissions standards. CMP makes no case, at all, for preemption or FCC interest in this matter.


**In reply to D: CMP Engages in a Fallacy the Complaint Fails on its Merits**

CMP uses defeasible generalizations like, "if the Complainant were to get past the procedural/jurisdictional hurdles facing his claims", but fails to support their ignoring of qualifications and evidence. CMP argues unconvincingly the Complainant cannot demonstrate he has reasonable grounds for discrimination. Except that Complainant already successfully passed the first procedural/jurisdictional hurdles embedded in the prima fascia process for HUD and its' 3 part burden shifting test. CMP mistakes its liability burden here as it attempts to litigate or overturn a process already settled.

39

ESI00054555

The FHA Discriminatory Effects Final Rule was implemented through HUD, who is statutorily charged with the authority and responsibility to interpret and enforce FHA's discriminatory effects liability and who formally establishes nationwide consistency in the application of that form of liability.  Under this test- or a substantially equivalent one by MHRC, the Complainant first bears the burden of proving its prima facie case a practice results in, or would predictably result in, a discriminatory effect on the basis of a protected characteristic. I have successfully proved this phase of the prima facie case. The burden of proof has now shifted to the respondent who has *not* proved the challenged practice is necessary to achieve one or more of CMP's substantial, legitimate, nondiscriminatory interests (billing). Instead the Respondent engages in a red herring in this next part:

**In reply to CMP: "There is No Credible Scientific Link Between RF Exposure and Alleged Disability is a False Claim.** This is false due to the fact the standard has already been adopted sufficient to meet the public's interest by the ADA and the Access Board. Even if CMP attempts to attack that qualification it will not succeed. Respondent's assertion of 'no credible scientific link' is not credible as is obviated on the 2005 Access board's recognition of Electromagnetic Sensitivities that qualify as so severely disabling that they qualify under HUD and ADA guidelines. (See ADA.gov), and also the World Health Organization's (WHO) 2011 inclusion of EMF emissions from electric meters within its 2B possible carcinogen category (see exhibits).

Additionally there exists a large body scientific literature of independent peer reviewed studies where approximately 70% conclude biological effects from low level EMF exposure. (Slesin, L., 2006, *Radiation Research and the Cult of Negative Result"*, Microwave News, July 2006, Vol. XXVI, No.4.)  Even if, CMP favored results from industry funded research showing only 30% effects, isn't 30% of the population significant enough to take action?

Complainant has provided, already, adequate evidence to satisfy standards sufficient to public interest qualifications. Any other claim by CMP is nothing more than a sideways attack on the ADA and the Access Board and CMP should take up its objections with the Access Board and not attempt to re-litigate in a MHRC disability rights process settled federal disability rights law. HUD, ADAA, Access Board and WHO are all governmental entities that have recognized

40

electrical sensitivities along with the Department of Labor's Jobs Accommodation Network (see exhibits), purely scientific evidence amounts to thousands of peer-reviewed studies describing the EMF sensitivity issue and its connection to a wide host of biological conditions including but not limited to cancer, reproductive, ophthalmic and nervous system problems. A sampling of this information is provided as exhibits despite no extensive analysis required.

Even if the respondent satisfies the second phase of the burden of liability, the Complainant may still establish liability by proving the substantial, legitimate, nondiscriminatory interest could be served by a practice having less discriminatory effect.

CMP equivocates 'for the sake of argument', here, and makes an unsupported statement that 'even if Mr. Friedman suffers a disability, the Complainant has not demonstrated, nor will he be able to demonstrate, the necessary nexus between Mr. Friedman's disability and his claim that RF emissions exacerbate that disability.' In contrast, Mr. Farber, representing CMP reveals his failure of critical thinking and inquiry when he refers to my cancer as an "alleged disability" in his letter of August 23, 2016 (see EF HUD exhibits). This is either insulting audacity or a demonstration of his ignorance on ADA issues that anyone can be informed about by a simple Google search. Even so, Farber goes on to say: *Specifically, even if we assume for the sake of discussion, that one could establish that (i) lymphoplasmacytic lymphoma is a disability...* Which begs the question; does CMP have any intention of complying with federal law? Whether or not cancer is considered a disability is altogether obvious as the ADAAA continues from the first cite on the following pages:

Page 53223:

(b)(1) *Physical or mental impairment means:*

(i) *Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, **hemic**, **lymphatic**, skin, and endocrine; or*

41

ESI00054557

(ii) *Any mental or psychological disorder such as intellectual disability, organic brain syndrome, emotional or mental illness, and specific learning disability.*

(2) *Physical or mental impairment includes, but is not limited to, contagious and noncontagious diseases and conditions such as the following: orthopedic, visual, speech, and hearing impairments, and cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, **cancer,** heart disease, diabetes, intellectual disability, emotional illness, dyslexia and other specific learning disabilities, Attention Deficit Hyperactivity Disorder, Human Immunodeficiency Virus infection (whether symptomatic or asymptomatic), tuberculosis, drug addiction, and alcoholism.*

And Page 53224:

(iii) *For example, applying these principles it should easily be concluded that the types of impairments set forth in paragraphs (d) (2) (iii) (A) through (K) of this section will, at a minimum, substantially limit the major life activities indicated. The types of impairments described in this paragraph may substantially limit additional major life activities (including major bodily functions) not explicitly listed in paragraphs (d) (2) (iii) (A) through (K). **(F) Cancer substantially limits cell growth.**

Cancer substantially limits normal cell growth and is qualified as a disability under the ADA. As a matter of legal fact, the only worthy analysis for me and my condition comes from my treating physician, in this case my oncologist who has established through research, examination and opinion a reasonable nexus of connection between my disability and low-level EMF exposure from EMF-emitting invoicing tools. Had CMP accepted my offer of this documentation proffered with my request for reasonable accommodation and reiterated in a follow-up letter, we might not be here today. I have included as exhibits to supplement the letter from Dr. Benton, a number of papers in support of the cancer connection with low level EMF exposure as well as additional cautions against mixing the two.

**In Reply: the Complainant's Requested Accommodation is Reasonable and is Required to be Provided at No Charge Except as Internally Amortized Across the Customer Base, as is**

ESI00054558

**Required by Title II and III Convergence.** CMP assumes many things for the sake of argument, but at this point the Complainant has well met his burden for proof and demonstrated an accommodation is warranted. The Respondent bears all liability and more. Complainant's request for accommodation that includes his three adjacent neighbors willing to remove their EMF emitting meters at no cost is reasonable. It cannot result in a fundamental alteration in the nature of CMP's EMF emitting meter program (at least one already opts out) nor impose undue administrative burdens because CMP has already been ordered by the MPUC to accept the eventuality of the same arrangement by any voluntary 'opt-outers' who all may reside adjacent to each other. This burden has already been deemed by MPUC as insignificant, and normal contour of the voluntary opt out program.

The argument against this 'three adjacent meters' is made more specious and irrelevant when CMP claims for its own defense Complainant's equally impacted, if not even more, by other exposure to other EMF emitting devices. This is simply untrue. Even if I did own a cell phone or use any Wi-Fi devices, which I don't, I would have the choice and ability to turn them on or off as needed, something not possible with a meter transmitting up to 170,000 times per day.

I have ample ability to avoid widespread use that CMP calls 'other devices' such as Wi-Fi in buildings or cell phones- especially any that produce orders of magnitude higher levels of higher exposure than CMP's EMF emitting invoicing tools. Requiring CMP to eliminate their EMF loads/trespass or level of exposure inside my own home and property lines is not an unreasonable accommodation/modification of policy, practices and procedures to CMP conditions and terms of service in the face of my disabled state due to cancer. The fact other short-term exposures might exacerbate my condition is no legitimate defense by CMP absolving them of their 24/7 contribution in and around my own home, where I cannot avoid it; That a *"man's home is his castle"* is a fundamental precept of our law reflected in the Bill of Rights: *"The right of the people to be secure in their ... houses ..."* as is the Castle Doctrine, also known as *defense of habitation law*, designating a person's home as a place where certain protections and immunities are permitted. Requiring me to pay to avoid an EMF pollutant

43

ESI00054559

likely harmful to me and generated by CMP on and in my home while requiring me to pay to avoid it simply does not pass any straight-faced disability accommodation metric.

### Accommodation can be reasonably granted

There are over 6,000 ratepayers already opting out and getting their meters read manually every other month. Some ratepayers still send in postcards self-reporting their usage, data could easily be self-reported via an automated phone system, and there are also many EMF emitting meters that don't communicate as planned that are being read manually. There are already countless different CMP rate structures as mentioned above (see exhibits). CMP is part of Avangrid which in turn is part of Iberdrola, a Spanish company and largest wind producer in the world. Avangrid has assets of over 10 billion dollars in the US. Not charging one customer an opt out fee is not going to break their financial bank. Not charging one customer an opt out fee is not going to adversely impact an already complex billing system. To use a double negative, not charging one disabled customer an opt out fee is not unreasonable.

It is worth noting here a few more things. Two states away from Maine, Vermont offers a free opt out from AMI meters. So far, their majestic Green Mountains have not been flattened by the falling sky CMP fears. CMP's concerns allowing one reasonable accommodation are worth noting, again by looking at the VT system operating with no problem but then also asking the question, if there are many ratepayers adversely affected by EMF's or concerned they may be, don't disability laws require their protection as well? In a number of countries around the world there have been court judgments ordering financial compensation for the EMF disabled who have been wronged. Ironically perhaps, one of those countries is Spain, home of CMP's parent company.

In fact, if as CMP claims, providing accommodation/modifications for individuals with EMF sensitivity has the likely potential for creating a cascading effect of substantially greater accommodation/modifications then this raises an entirely additional question of disclosures of effects through effective communication important to the public's interest. Chapter 7, 7.17 C,

ESI00054560

*1. A public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with physical or mental disabilities. This includes an obligation to provide effective communication to companions who are individuals with disabilities. and:*

*1. (ii) A public accommodation should consult with individuals with disabilities whenever possible to determine what type of auxiliary aid is needed to ensure effective communication, but the ultimate decision as to what measures to take rests with the public accommodation, provided that the method chosen results in effective communication.*

CMP went to great lengths to announce that not only are there so vanishingly few EMS sufferers that Maine CDC can't even recognize their existence with respect to public safety. But CMP claims there are no grounds for MHRC to rule in any way that would recognize this situation, despite their claimed fear of its cascading effect. But nothing in the Complainant's case will alter the way that CMP has done business or will be required to do business in the future. If gaps are a natural result of a natural demographic (or topography) then the invisible hand of the market place will produce for CMP- and its Foreign Direct Investor parent- a market based solution to its voluntary choice to gain unfettered access to a domestic US monopoly market. Even if annual reconciliations for rate adjustments with the PUC were not already a condition of the Opt Out Orders to accommodate variable opt out participant numbers and costs, CMP's description of a gap in its mesh network is irrelevant; this has already been addressed as such by MPUC as insufficient to create any significant effect.

**CMP's claims that opt outs would undermine the system's reliability is not proven**. The assertion is speculative and not any grounds for avoiding its duty to comply with removing the disparate impact of opt out fees that having discriminatory effects on the EMF disabled, or for dissolving my rights and surcharging my disability. Also, if they wish to claim a significant gap, the *Sprint v. San Diego* standard requires they show proof the gap exists and that it causes

45

ESI00054561

a significant and deleterious effect that cannot be cured otherwise. This cannot succeed because they can always adopt a market solution and amortize across the base as a real cost, rather than concealing from the public the true state of affairs. MHRC should reject this position as a disingenuous attempt to game the privatization of public utilities process to gain unjust "excessive" stability of contract.

If CMP's surcharges on this disadvantaged class stand then the 'mischief' will have been done. A successful reversion to *Plessy* reawakens, and Justice Harlan's dissent to *Plessy*, as a "pernicious" finding will invite a new era for 'separate but equal'. The very institutions of public commons designed to achieve equality will be new authors of inconsistence to personal liberty that is "*hostile to both the spirit and the letter of the Constitution of the United States.*"

CMP does not succeed in showing Complainant's request is an unreasonable burden. .

### III. CONCLUSION: In Reply to CMP

For the reasons discussed above, Complaint requests the Commission reject CMP's attempt to dismiss his complaint. There is ample evidence- both under Maine Legislative standards that adopt substantial federal equivalencies, and nationally with recognition and guidelines adapted specifically to the EMF disabled since 2002. There are reasonable grounds to show CMP has failed the second phase of the 3 part burden shifting test for assignment of liability under the discriminatory effects standard. CMP has failed to prove the challenged practice is necessary to achieve one or more of its substantial, legitimate and nondiscriminatory interests. And even if they succeed on the legitimate practice issue, the practice has an alternative cure less intrusive to me than the absolving of my disabled rights and surcharging me on the condition I am disabled. The consequence of CMP's opt out is not neutral, despite that it may have been intended so, on its face.

The Complainant has demonstrated CMP engages in a disparately discriminatory practice. The surcharging for removal of a non-emitting invoicing tool is a direct attack on my disability, and

46

ESI00054562

the problem can be solved less intrusively than this intrusion on my civil rights. The MHRC should find in my favor on all my requests for relief.  At MHRC Rules Chapter 7, 7.05:

> *A public accommodation shall not, directly or through contractual or other arrangements, utilize standards or criteria or methods or administration that have the effect of discriminating on the basis of physical or mental disability, or that perpetuate the discrimination of others who are subject to common administrative control.*

Dated: February 2nd, 2017

Ed Friedman
Bowdoinham, ME

ESI00054563