## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

**ED FRIEDMAN**

      *Plaintiff,*

                                **CIVIL ACTION**

v.

                                **NO. NO. 20-cv-00237-JDL**

**CENTRAL MAINE POWER COMPANY,**

      *Defendant.*

### PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

NOW INTO COURT, through undersigned counsel, comes Plaintiff Ed Friedman who files this *Opposition to Defendant's Motion for Summary Judgment*. For the reasons stated herein, Defendant's Motion should be denied in full.

Plaintiff Ed Friedman suffers from a rare, incurable form of lymphoma. He works closely with his several doctors to manage the progression of his disease. Mr. Friedman initiated this suit after Defendant Central Maine Power Company (CMP) began installing radiation-emitting "smart" meters in customers' homes refused to waive as a reasonable accommodation the perpetual, escalating "opt-out" fee for anyone who wishes to keep an analog meter. Mr. Friedman sued under the Americans with Disabilities Act, the Rehabilitation Act, and the Fair Housing Act.

Here, Defendant CMP's Motion for Summary Judgment attacks Plaintiff's case as if it were a personal injury or toxic tort lawsuit. But it is not that kind of case. It is a disability discrimination case. Plaintiff Ed Friedman's lawsuit does not allege that smart meters caused his cancer, or even that he will be injured in his home by them in the future. Such injury cannot happen because Mr. Friedman has chosen not to have a smart meter in his home.

Instead, the lawsuit is about whether CMP denied him a reasonable accommodation when Mr. Friedman asked CMP waive the perpetual, escalating monthly fee to not have a radiation-emitting meter in his home.

So when CMP argues, for example, that the "harm alleged in this case is one of enhanced [health] risk" (ECF 138 at 10; Page ID #6167) or that smart meters do not cause a "heightened risk of cancer" (*Id*. at 16; Page ID #6173), CMP fights against imagined claims that Mr. Friedman has not brought. The harm in this case is a certain one: Mr. Friedman will have to pay a perpetual, escalating monthly opt-out fee to CMP unless this Court rules that such fees violate the law.

Now, it is true that in order for Mr. Friedman to show that CMP's refusal to waive the fee violates federal anti-discrimination law, there must be some connection to Mr. Friedman's disability. Judge Levy articulated that standard in his ruling on the motion to dismiss, holding that to "prevail, Friedman must eventually prove his factual allegation that having a smart meter installed at his home actually risks worsening his lymphoma's progression or symptoms." ECF 26 at 9 (Page ID #512).

But CMP does not mention that standard anywhere in its motion for summary judgment. Instead, CMP attempts to reargue a number of issues - the definition of an illegal surcharge, collateral estoppel, etc. - that have already been decided and rejected by the Court and therefore are law of the case.

Furthermore, summary judgment is only appropriate when there is no genuine dispute of any material fact and the defendant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). CMP submitted 167 material facts that they believe to be undisputed and form the basis of their summary judgment motion, but a significant number of these are clearly disputed, not only

regarding the impacts of radiofrequency radiation – which is highly debated, as evidenced by the competing experts in this case and the contradictory findings by regulatory agencies – but also regarding case-specific facts, such Mr. Friedman's diagnosis and his request for accommodation. CMP's recitation of facts further excludes relevant information which supports Mr. Friedman's position, including medical advice he received from his treating physicians.

Because CMP's motion relies on disputed facts, does not track the standard for this case as determined by this Court, and reargues issues already decided, it should be denied.

## MEMORANDUM OF LAW

### A. PROCEDURAL HISTORY

Plaintiff Ed Friedman brought this lawsuit under the Americans with Disabilities Act (ADA), the Rehabilitation Act (RA), and the Fair Housing Amendments Act (FHAA) to enforce his rights against having to pay Defendant Central Maine Power Company's discriminatory opt-out fee because the presence of a smart meter in his home risks worsening his cancer treatment.

Prior to this suit, there was a separate proceeding under the Maine Public Utilities Commission regarding the safety of CMP's smart meters. That proceeding considered evidence on the safety of smart meters to the public at large, though the findings stopped short from determining whether they were safe for vulnerable populations, including individuals being treated for cancer. The MPUC findings neither prevent Plaintiff from bringing this case, nor preclude this Court from making factual determinations as applied to this case.

CMP moved to dismiss this action under Rule 12(b)(6), essentially arguing that the Plaintiff's claims were precluded by collateral estoppel due to the MPUC factual findings and that Plaintiff's injury was speculative. ECF 11 at 20-28 (Page ID #46-54). The Court denied the motion, finding in part that Mr. Friedman could not enjoy "the same physical experience and

3

peace of mind as a person without his disability" with regard to CMP's services. ECF 26 at 7 (Page ID #510).

Parties also filed *Daubert* motions regarding the several experts in this case. This Court determined that each still-designated expert may testify, but provided some limitations regarding the scope of testimony. ECF 124. For instance, two of Plaintiff's experts, Dr. Paul Heroux and Dr. David Carpenter, are allowed to opine about the effects of radiofrequency on the human body, generally, but not specifically to Plaintiff as they are not his treating physicians. *Id.* at 11, 14 (Page ID # 2560, 2563). Similarly, Plaintiff's expert Erik Anderson may only opine about electrical engineering components of radiofrequency and smart meters, as that is his area of expertise. *Id.* at 15 (Page ID #2564). Together, along with factual discussion of Plaintiff's specific diagnosis from his treating physicians, create a comprehensive expert analysis of the effect of CMP's smart meter in Plaintiff's home – a topic that cannot be practically covered by one expert.

Now, CMP seeks summary judgment, largely offering the same arguments as before, despite no changes in the record or additional information that would disrupt the Court's previous findings, beyond a mischaracterization of testimony from Plaintiff's oncologist.

### B. <u>LEGAL ARGUMENT</u>

Defendant Central Maine Power Company's motion for summary judgment argues that (1) Plaintiff lacks standing because of the so-called "speculative risk" of harm; (2) Plaintiff is collaterally estopped from bringing this action due to the MPUC proceeding; (3) Plaintiff cannot prove a risk of harm; and (4) Defendant imposes an opt-out fee on all customers. Each of these

arguments, some of which have already been litigated in this case, are based on disputed facts and fail as a matter of law. For the reasons stated herein, the motion must be denied.[1]

    **1.   The several experts offered by each party rely on disputed facts which preclude summary judgment.**

CMP's summary judgment argument relies heavily on the testimony of its experts regarding the science of radiofrequency, but there is a battle of the experts regarding the factual basis for radiofrequency concerns, thus precluding summary judgment. *Cf., Alphatech, Inc. v. MFS Network Techs., Inc.*, 2000 U.S. Dist. LEXIS 23069, *45 (D. Ma. Aug. 10, 2000) ("At this juncture, I treat the factual dispute as nothing more than a battle of expert testimony. This precludes summary judgment.") This is apparent from the declarations that CMP attached to its motion, which specifically contest the factual basis used by Plaintiff's experts in forming their opinions, calling each out by name. For example:

    a)  "As explained in more detail below, the overall scientific evidence does not support [Plaintiff expert] Dr. Carpenter's opinion that "elevated exposure to electromagnetic fields shortens survival of children diagnosed with leukemia, … a blood cancer." ECF 141 at ¶ 9 (Page ID #6264);

    b)  "Likewise, the overall scientific evidence does not support [Plaintiff expert] Dr. Heroux's opinion that exposure to RF "promotes" cancer." ECF 141 at ¶ 10 (Page ID #6264);

    c)  "As discussed below, neither the two studies cited by Carpenter nor the two studies cited by Dr. Heroux mentioned in the Order had any relevance to RF." ECF 141 at ¶ 7 (Page ID 6263-6264);

---

[1] Plaintiff concedes that Central Maine Power Company is not a covered entity under Title II of the Americans with Disabilities Act. However, they remain covered under Title III.

d) "For these reasons, neither the Foliart study nor the Svendsen study, which the Court identified as support for Dr. Carpenter's opinions, actually constitute reliable evidence of a causal connection between RF exposure and the promotion of cancer." ECF 141 at ¶ 23 (Page ID #6268); and

e) "For these reasons, neither the Yakymenko study nor the Khansari study, which the Court identified as support for Dr. Heroux's opinions, actually constitute reliable evidence of a causal connection between RF exposure and the promotion of cancer." ECG 141 at ¶ 27 (Page ID #6269).

Clearly, there is a factual dispute between the parties regarding the science of radiofrequency radiation impacts, as CMP uses that dispute in support of its argument. CMP's experts also specifically contest the factual findings of Plaintiff's experts in their reports. For example, the expert report of CMP expert Dr. Benjamin Cotts includes a section titled "Evaluation of the Opinions of Mr. Anderson," in which he methodically disputes certain <u>factual</u> findings underlining Mr. Anderson's report, such as

a) Whether "CMP smart meters are sources of both radiated (*i.e.*, transmitted through the air) and conducted (i.e., transmitted through wires) RF electromagnetic fields." ECF 140-1 at 34 (Page ID #6244);

b) The factual basis for Mr. Anderson's conclusion that "as a result of a smart meter installation, 'the entire house is transformed into a radiating RF antenna." ECF 140-1 at 34 (Page ID #6244);

c) Whether CMP smart meters comply with ANSI C12.1 standards. ECF 140-1 at 35 (Page ID #6245);

d) Whether smart meters exceed FCC limits, which Dr. Cotts says "is completely unsupported and contrary to demonstrable evidence." ECF 140-1 at 35 (Page ID #6245); and

e) The "interaction between people and electromagnetic signals." ECF 140-1 at 35 (Page ID #6245).

CMP expert Dr. Gabor Mezei includes a similar section, titled "Evaluation of the Opinions of Drs. Carpenter and Heroux," which again describes in great detail the factual disputes at the heart of CMP's summary judgment motion. ECF 102-5 at 50-55 (Page ID #2126-2131).

The competing conclusions offered by each party's experts creates a multitude of disputed facts, beyond the sections of the CMP expert reports specifically attacking Plaintiff's experts.[2] The effect of radiofrequency on the human body is an evolving and complicated science which will require a trial in order to properly weigh the opinions of the several experts in this case.

## 2. <u>Plaintiff has met all Title III standing requirements and this matter is properly before this Court for trial.</u>

Defendant first argues that Plaintiff lacks standing to bring this action, but Plaintiff meets all Title III requirements and this is the proper venue to resolve the issues at stake in this case.

"In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). "Standing doctrine embraces several judicially self-imposed limits on the exercise of federal jurisdiction, such as the general prohibition on a litigant's raising another person's legal

---

[2] It is impracticable to recite every disputed fact between the expert reports. Plaintiff refers the Court to the expert reports and deposition testimony which more fully flesh out each expert's position.

rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Allen v. Wright*, 468 U.S. 737, 751, (1984). Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision." *Gladstone, Realtors* v. *Village of Bellwood*, 441 U.S. 91, 99 (1979); *Simon* v. *Eastern Kentucky Welfare Rights Org*., 426 U.S. 26, 38, 41 (1976).

Title III of the Americans with Disabilities Act prohibits discrimination against persons with disabilities by places of public accommodation. *Spector v. Norwegian Cruise Line Ltd*., 545 U.S. 119, 128 (2005) ("Title III of the ADA prohibits discrimination against the disabled in the full and equal enjoyment of public accommodations, 42 U.S.C. § 12182(a), and public transportation services, § 12184(a)."). A covered entity denies the benefits of its services to a disabled person when it provides services that are not equal to services provided to non-disabled persons. 28 C.F.R. § 35.130(b)(1)(ii).

### a. The imposition of fees is a non-speculative injury which confers standing.

CMP's argument that Plaintiff must prove actual harm caused directly by exposure to a smart meter is misplaced. It is misplaced firstly because it is impossible; Mr. Friedman does not have a smart meter in his home, and so he cannot prove injury from something that does not exist. Secondly, as described below, there is an actual, concrete risk that Mr. Friedman's cancer prognosis and treatment could suffer if he is exposed to radiofrequency. But in any case, direct injury is not the harm complained of in this litigation: the harm is the imposition of fees that Mr. Friedman would be required to pay in perpetuity on the basis of his disability, as he has no

choice but to opt-out from the smart metering program. CMP admits that it is material to the issues here that Mr. Friedman is subject to these fees and that the fees will increase an unknown amount over time. ECF 139 ¶¶ 10, 12-13 (Page ID #6199-6200). Per Section 12.11 of CMP's Terms & Conditions, a customer who wishes to opt out of the smart meter program must pay an initial charge of $40.00, plus a recurring monthly charge. ECF 139 at ¶ 10 (Page ID #6199). The recurring monthly charge was $16.05 as of July 1, 2020, was $18.06 per month as of July 1, 2023, and is expected to increase over time. ECF 139 at ¶¶ 12-13 (Page ID #6199-6200). Although the perpetual charges are "expected to increase over time," CMP cannot say what those increases will be. *Id*. at ¶ 13. (Page ID #6200).

These are not hypothetical or imagined damages: Mr. Friedman must pay the increasing, perpetual charges to not have a smart meter in his home and ensure access to the same safe electricity his neighbors without disabilities get without paying an opt-out surcharge.

This is sufficient for Article III standing as even nominal damages can confer standing when a plaintiff's claim is based upon the violation of a legal right. *Uzuegbunam v. Preczewski*, 592 U.S. 279, 280 (2021). The charges are "imminent" as they exceed a "possible future injury" since Mr. Friedman cannot avoid the charges due to his disability. *See*, *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 415 (2013). This injury is also traceable to CMP, as the fees would be directly caused by CMP's actions. *Habecker v. Town of Estes Park, Colo*., 518 F.3d 1217, 1225 (10th Cir.2008).

For that reason, this case is unlike *Kerin v. Titeflex Corp.,* 770 F.3d 978 (1st Cir. 2014), cited by CMP. Defendants offer that case for the proposition that a Plaintiff cannot "manufacture" standing based on "plaintiff's response to an increased risk." ECF 138 at 22, citing *Kerin* at 982. But *Kerin* explained that principle by comparing *Friends of the Earth, Inc. v.*

9

*Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 184-85, (2000) (finding standing where plaintiffs responded to increased risk of health hazards from pollution by "refraining from use of the North Tyger River") with *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (denying standing for "incurr[ing] ... costs as a reasonable reaction to a risk" where risked harm was not "certainly impending"). Under that framework, Mr. Friedman is not "manufacturing" his standing. It is CMP's choice, not Mr. Friedman's, that he must pay a perpetual, escalating fee to not have the smart meter in his home. Because CMP has refused to waive the fee, it is a certainly impending harm – not a speculative one. The motion should be denied.

> **b. Regulatory agencies are split regarding the safety of smart meters, so Plaintiff does not have a "heightened burden" to show that there is a unique risk to him.**

CMP contends that Mr. Friedman has a "heightened burden" of proof because "this is not a case of 'regulatory silence'" given that there have been some PUC and FCC proceedings about radiofrequency radiation generally. ECF 138 at 16-17 (Page ID #6173-6174). CMP cites no case, however, for the proposition that the absence of "regulatory silence" leads to a heightened burden of proof. And although the Maine PUC and the FCC made determinations, a) those proceedings (particularly the FCC determination) have no applicability here;[3] and b) several regulatory organizations, such as the World Health Organization and the IARC, have come to opposite conclusions, finding that radiofrequency emissions may have damaging effects on a cancer diagnosis and are a possible human carcinogen.

That is why this Court has already rejected similar arguments. As this Court already ruled, the question in the PUC proceeding was "was whether the Smart Meter Program was safe for CMP's customers at large," and not how "RF exposure might interact with any particular

---

[3] Defendant even admits in its Motion that "The FCC's 2019 Order and the judicial decision affirming it are not preclusive as a matter of res judicata or collateral estoppel." ECF 138 at 16.

medical condition." ECF 26 at 10 (Page ID #513). The Court also noted that the "the two Commissioners who rendered the 2014 decision finding smart meters 'safe' for the general public explicitly disagreed about whether it might be appropriate for CMP to waive the opt-out fee for customers who submit a medical recommendation from a physician." *Id.* at 11 (Page ID #514). Thus, while there has been a great deal of regulatory assessment of smart meters generally, none of it addresses the particular issues of this case.

The FCC process, in particular, neglected to include relevant, updated research and limited its scope in such a way as to not have any binding precedent on this proceeding. ECF 99-2 (Deposition of Dr. David Carpenter) at 57:20-58:12; 59:10-60:5 (Page ID #1049-1050); ECF 102-1 (Deposition of Dr. Paul Heroux) at 81:12-83:6 (Page ID #1775). The National Toxicology Program also found clear evidence of a link between low-level radiofrequency emissions and various cancers, including heart tissue cancer. ECF 99-1 (Page ID #1031). At best, the regulatory agencies are split and CMP provides no argument as to why one agency's determination should hold greater weight over another's.

In any event, Judge Levy has already articulated Plaintiff's necessary burden of proof in his ruling on the motion to dismiss, holding that to "prevail, Friedman must eventually prove his factual allegation that having a smart meter installed at his home actually risks worsening his lymphoma's progression or symptoms." ECF 26 at 9 (Page ID #512).

### c.   Plaintiff has offered substantial evidence that radiofrequency emissions "actually risks worsening" his "lymphoma's progression or symptoms."

Defendant argues that Plaintiff lacks standing because the record "is legally insufficient to support Mr. Friedman's claim that a smart meter would cause such an injury" to afford him relief. ECF 138 at 14. Specifically, Defendant argues that Plaintiff's experts cannot establish that

Mr. Friedman would "*personally* suffer harm, *because of his cancer*, if *he* were exposed to the RF emitted by a smart meter." ECF 138 at 14 (Page ID #6171) (emphasis in original). But a review of the record shows that Plaintiff can, in fact, establish non-speculative injury in the event that there was a smart meter on his property.

>    1.   <u>Plaintiff's treating physicians agree that the palliative goals of his cancer treatment would be worsened by smart meter radiofrequency exposure.</u>

Plaintiff is diagnosed with lymphoplasmacytic lymphoma (also known as Waldenstrom's macroglobulinemia), which is an incurable form of non-Hodgkins lymphoma.[4] Because there is no cure, the goal of his treatment is not to eradicate the cancer, but to provide palliative treatment to maintain his comfort. ECF 137-19 (Deposition of Dr. David Benton) at 20:11-17. Any negative effect on that palliative treatment is a harm suffered by Plaintiff because of his cancer. In evaluating the effectiveness of palliative treatment, Mr. Friedman's oncologist, Dr. David Benton, "take[s] into account what I think they can tolerate in terms of physical tolerance, mental tolerance, how well they're going to tolerate side effects, mental state's important in that." *Id*. at 21:8-14. Dr. Benton clarified at deposition that the definition of a symptom, which he seeks to treat, is "self-complaint" because the patient is "the only person who could report a symptom." *Id*. at 23:4-8.

Mr. Friedman's primary symptoms from his disease include anemia and fatigue. *Id*. at 22:16-19. The side effects from his treatment include hypertension and bruising. *Id*. at 23:2-3.

---

[4] Since filing his original complaint, Plaintiff Ed Friedman as also been diagnosed with and is being treated for coronary artery disease and non-melanoma skin cancers in the form of multiple squamous cell carcinomas. The National Toxicology Program has found clear evidence of a link between radiofrequency emissions and various cancers, specifically heart tissue cancer. Any exacerbation of his originally diagnosed cancer might exacerbate the secondary cancer, for which Plaintiff has already had two surgeries. Further adding to potential risks from RFR is the metal implant from a left hip joint replacement, as metal implants have been shown through combinations of RFR reflections and absorptions to create RF thermal effects in the body.

Mr. Friedman elaborated on his cancer and cancer treatment symptoms at deposition, stating: "my stamina is – is much diminished, my ability to move, to lift things … to engage physically … fatigue and … bone, muscle, joint issues." ECF 137-20 (Deposition of Ed Friedman) at 6:6-19. Mr. Friedman also explained that, as of November 2016, he was experiencing memory issues, including "starting to forget people's names ... shorter-term memory stuff." *Id*. at 59:6-24. Mr. Friedman was also experiencing other cognitive issues, such as "taking me longer to get organized or to organize things, keep track of some things." *Id*. at 61:17-21. Mr. Friedman, who has an extensive biology and science background, is well read on the effects of radiofrequency emissions on these symptoms and his treatment and reasonably concluded, based on his own research and conversations with medical professionals, that he would be no exception to the prevailing science. *Id*. at 70:22-72:12.

It is in this context that the letter from Dr. Benton must be viewed. Mr. Friedman self-reported some combination of the above symptoms, which were in line with the expected symptoms for his cancer and treatment. ECF 137-18 at 22:12-23:8. Although Mr. Friedman made an initial draft of the letter available, the version provided to CMP was heavily edited by Dr. Benton and ultimately approved by him for distribution. *Id*. at 11:14-13:12. Dr. Benton's changes included removing language and assertions with which he was not comfortable and inserting his own language. *Id*. at 11:14-13:12. This is also reflected in Mr. Friedman's medical file, which includes entries by Dr. Benton such as "Reviewed letter to CMP, plan to make changes and get it back to the patient." *Id*. at 10:22-23. CMP seeks to discount this letter as something nefarious, drafted by Mr. Friedman without approval by his doctor. In reality, Dr. Benton had multiple, productive conversations with his patient about the content of the letter and

ultimately approved its language. That he may now edit the letter further does not undermine its veracity at the time it was submitted to CMP as part of a request for accommodation.

CMP also ignores the fact that Dr. Benton is just one of Mr. Friedman's doctors and others have also noted that his exposure to radiofrequency could have a negative effect because of his cancer and treatment. For instance, Dr. Stephen Goldbas, who has been one of Mr. Friedman's treating physicians since 2015, wrote in a May 25, 2020, letter that:

> Exposure to radiation may exacerbate the progression of Mr. Friedman's disease and exacerbate the symptoms of it, including fatigue, bone and joint soreness, cognitive difficulty, and memory issues. Even low-level non-ionizing radiation may exacerbate his disease and symptoms.
>
> For that reason, it is my professional medical judgment that Mr. Friedman should minimize exposure to all forms of ionizing or non-ionizing radiation, including exposure to wireless routers, Bluetooth devices, smart meters, microwave ovens, wireless garage door openers and alarm systems, wireless baby monitors, cell phones, portable phones with base stations, and any other "smart" devices that use wireless frequencies.
>
> It is my recommendation that Mr. Friedman be provided with the reasonable accommodation of not having to have a smart meter in his home, without financial penalty. Due to the progression of Mr. Friedman's disease, it is even more necessary and vital now than ever to minimize his risk of the exacerbation of his disease progression and the concomitant symptoms.

Exhibit A (Letter from Dr. Stephen Goldbas); Exhibit B (Declaration of Dr. Stephen Goldbas).

In short, while Mr. Friedman's physicians say only that radiofrequency "may" worsen his actual cancer, they agree that the *palliative* goals of the treatment would be hampered, whether through the onset of stress or other factors. Exhibit B. CMP's claim that Dr. Benton's letter was based solely on Mr. Friedman's subjective concerns and not a medical diagnosis is wrong. As Dr. Benton stated at deposition when asked "whether exposure to electromagnetic frequency radiation from smart meters posed any sort of a risk to human health": "I know in Mr. Friedman's care, he is extremely anxious about this issue, and I think that causes him stress. So I

was hoping that he could live his life with cancer without that stress and, therefore, I asked for a reasonable accommodation. Why you all are pushing back on that, I have no idea." ECF 137-18 at 14:6-24.

### 2. Plaintiff's experts provide further support to specific harm of radiofrequency exposure.

It is no surprise that Mr. Friedman's treating physicians stick to the factual observations of the cancer treatment, as the relationship between human health and radiofrequency requires specialized research that would not change his treatment *plan*, just its effectiveness. However, Plaintiff's experts are able to show the broader link between his radiofrequency exposure and its negative impact on cancer and its symptoms. Although Plaintiff's experts are precluded under the *Daubert* ruling from testifying about the effect on Mr. Friedman *specifically*, that is not why they have been offered. Rather, the factual record supports the specific injury risk while the experts provide a baseline understanding of the broader science.

Dr. David Carpenter is a public health physician and professor with a medical degree from Harvard Medical School, currently serving as the Director of the Institute for Health and the Environment at the University of Albany. He has published several studies regarding the effects of electromagnetic fields on human health and served as the spokesperson for the State of New York on the issue of health effects from electromagnetic fields.

Dr. Carpenter will be able to testify at trial about the health risks to individuals, especially those with cancer, from the cumulative, aggregate exposure to radiofrequency. He can speak to studies that have shown that elevated exposures to electromagnetic fields have shortened the remission period of children diagnosed with leukemia[5] and other direct links to

---

[5] Although not exactly the same disease, there is a substantial overlap between leukemia and Waldenstrom's macroglobulinemia to a degree that "there's every reason to believe that the risk factors are common among the

radiofrequency's effect on cancer, generally, including the "general body of evidence that there are adverse health effects at intensities of radiofrequency radiation that don't cause tissue heating." ECF 137-. at 85:7-10; 95:9-15; 110:3-112:6. Dr. Carpenter can testify that for related types of cancer "that the duration of the remission of that – of that cancer is reduced in relation to excessive exposure. [A person with lymphoma] is vulnerable to have a briefer period of remission … [E]levated exposure to electromagnetic fields from whatever source, including smart meters, is going to decrease the duration of that remission." Carpenter Depo. at 99:5-23.

Dr. Carpenter can also provide important context to the FCC determinations on the risks of radiofrequency exposure, specifically that the FCC standards fail to account for peak intensity, the rapid rise and fall of those peaks, and pulse modulations, which is what causes the most concern for human health.[6] Dr. Carpenter has also determined that the actual level of exposure which is unsafe for individuals with cancer is "much lower than the 10 microwatts per square centimeter that's the FCC standard," regardless of the particularly concerning peaks. ECF 99-2. at 57:20-28:12; 59:10-60:5 (Page ID #1049-1050) ("I believe it's much below [the FCC standard], a much lesser exposure than 10 by – by at least two orders of magnitude.").

Dr. Carpenter also provides valuable context to CMP's repeated claim that exposure from manmade sources of radiation, such as smart meters, has a similar or heightened effect on human health as natural sources of radiofrequency, like the sun. As described by Dr. Carpenter at deposition:

> The radiation from the sun includes many different wavelengths. There's the very high frequency radiation, the ionizing part of the spectrum, but also from the sun

---

difference kinds of cancer." Carpenter Depo. at 130:4-17. Mr. Friedman's specific type of cancer is rare and has not been specifically studied to the same extent as others, making leukemia, etc., the closest possible measure for radiofrequency's effect.

[6] This is also supported by another one of Plaintiff's experts, Dr. Paul Heroux, who articulated concerns about the limited scope of the FCC's determination, specifically that the FCC failed to include recent developments and relying too much on the relationship to heat. Heroux Depo. at 81:12-83:6.

there are radiofrequency waves that come, as well, some of them penetrate through the atmosphere. And so we're all exposed to low levels of radiofrequency radiation when we're outside.

Life, obviously, evolved with that exposure. That doesn't mean that even that low level is totally harmless, but it, obviously, has not prevented life on earth from developing. And our bodies have quite incredible mechanisms for dealing with these reactive oxygen species that come from both the nonionizing and the ionizing part of the electromagnetic spectrum.

*Id*. at 68:3-19 (Page ID #1052).

Dr. Carpenter can further provide his expert opinion that the sources relied on by Defendants' experts, including Exponent, have major flaws in how they arrived at their conclusions to a degree that makes them non-credible, including the failure to publish in peer-reviewed journals. *Id*. at 69:15-25 (Page ID #1052).

Mr. Friedman will also present testimony from another expert, Dr. Paul Heroux. Dr. Heroux has more than 30 years of experience as a scientist in the fields of physics, engineering, and health sciences and has earned international repute as an expert on electromagnetism. He has an extensive publishing and teaching history on the physical effects of electromagnetism on the human body and other topics relevant to this matter. He is currently the Director of the Occupational Health Program of McGill University's Department of Epidemiology, Biostatistics and Occupational Health where, among other duties, he teaches a course entitled "Health Effects of Electromagnetism."

Dr. Heroux can testify as to the effect of technological innovations – including smart meters – on the morbidity and mortality rate in humans. Specifically, he can discuss the effect of smart meter radiation on mitochondria, which are permanently injured through exposure to new forms of electromagnetic radiation. That effect on mitochondria informs Dr. Heroux's expert opinion that "these mutations in mitochondria should be able to affect all cancers. It doesn't

mean that we have detailed documentation of this; but on a physiological level, this is perfectly logical." ECF 102-1 at 31:24-32:3 (Page ID #1762).

Dr. Heroux has specific expertise in lymphoma, like Mr. Friedman's, and can testify to "the connection between electromagnetic radiation RF, and generation of reactive oxygen species" and that lymphoma causes a "subpopulation of cells that are very, very active, they are much more likely to be sensitive to the environment and to reactive oxygen species as created by electromagnetic radiation." *Id.* at 33:17-35:11 (Page ID #1763). In other words, exposure to radiation can cause a significant increase in the risk of death from cancer. *Id.* at 43:16-44:16 (Page ID #1765).

Dr. Heroux can also explain why there is not an overwhelming body of evidence regarding Waldenstrom's macroglobulinemia, specifically, as it is an incredibly rare type of cancer. As explained at deposition, it is difficult to conduct studies on any type of terminal cancer:

> You have to realize that if you want to confirm the principle that you want to see eliminated, you would have to recruit a number of cancer patients that may not necessarily have very, very long to live. What I mean by that is that these types of studies are much more difficult to perform than general studies on people than studies on animals or than studies on cells, even from the strict ethical point of view.
>
> So what I'm trying to say is that the fact that the evidence is relatively small in relation to this question does not mean that the case is weak. It simply means that in terms of feasibility, these studies were much more difficult to perform. … So the type of study that you're looking for, this type of study was only performed in very few cases. That's why there's not many of them.

*Id.* at 57:13-58:13 (Page ID #1769). But Dr. Heroux provides a broad overview of the science that does exist to explain the relationship between Mr. Friedman's cancer and radiofrequency emissions, including animal studies (*e.g.*, the Repacholi and Chou papers), geographic proximity studies (*e.g.*, the Dode study) and *in vitro* studies (*e.g.*, the Yakymenko review). One of CMP's

own experts, Dr. Gabor Mezei, supports the use of such studies, stating that "laboratory studies of animals or humans" is one of the three kinds of studies that "provide different but complementary information and … so a valid weight-of-evidence review will consider all three types of studies together." ECF 102-5 at 14 (Page ID #2090).

The expert opinions provide a scientific, broad-view backing to the Plaintiff-specific evidence from Mr. Friedman's several treating physicians.

> **d. The motion should be denied because th existence of natural sources of radiofrequency has no bearing on the harm caused by manmade sources or Plaintiff's redress from that harm.**

CMP next argues that Plaintiff lacks standing because radiofrequency emissions exist in the environment and have "become ubiquitous in modern society" (ECF 138 at 18; Page ID #6175), but, while true in a broad sense, this position ignores both the science of radiofrequency and the facts specific to this case. Simply put: Not all radiofrequency emissions are the same and therefore do not have the same effect on the human body.

Plaintiff's experts have explained that naturally occurring sources of radiofrequency – such as the Earth itself – have unique types of emissions, which humans have evolved to withstand. ECF 99-2. at 68:3-19 (Page ID #1052). Defendants' experts agree that naturally occurring sources of radiofrequency vary in type: "For example, hotter objects, such as the sun, produce visible light and ultraviolet rays in the visible and ultraviolet portions of the electromagnetic spectrum, respectively. Whereas colder objects, such as the earth, produce fields in the infrared portion of the electromagnetic spectrum." ECF 99-3 (Expert Report of Benjamin Cotts) at 16. To group all naturally occurring sources of radiofrequency together ignores the drastically different effect each has on the human body and how natural sources may differ from anthropogenic sources.

As for manmade sources such as radio towers, Wi-Fi, etc., Mr. Friedman has taken extraordinary measures to reduce his exposure at his home, including eliminating all sources of manmade radiofrequency (except a TV remote), forgoing a cell phone, microwave, and digital clocks, hardwiring all mechanical devices to the Internet modem (which is turned off when not actively in use), installing Stetzer filters throughout his home, installing aluminum window screens, sourcing solar equipment known to have minimal harmonic disturbances and driving older model vehicles without "smart" or communicative abilities. The solar equipment CMP refers to in their motion was specifically sourced to minimize harmonic disturbances and was installed in a barn outside of the living space of Plaintiff's home and with a metal backing which blocks radiofrequency emissions. He may not be able to get his exposure down to zero, but he has taken measures to reduce his exposure and should not be charged a fee for avoiding additional sources in his home. Further, CMP has not conducted or requested any testing to be done at Mr. Friedman's home so any discussion of specific exposure is purely hypothetical.

### 3. The motion should be denied because this Court already rejected CMP's surcharge argument.

The ADA prohibits discrimination against persons with disabilities by places of public accommodation and by public entities. *Spector v. Norwegian Cruise Line Ltd*., 545 U.S. 119, 128 (2005) ("Title III of the ADA prohibits discrimination against the disabled in the full and equal enjoyment of public accommodations, 42 U.S.C. § 12182(a), and public transportation services, § 12184(a)."). Under Section 12184(a)(2) of the ADA, discrimination includes the failure of an entity to "make reasonable modifications consistent with those required under section 12182(b)(2)(A)(ii) of this title." Section 504 of the Rehabilitation Act of 1973 similarly provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to

discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

Under these two laws, fees charged to persons with disabilities can constitute illegal "surcharges." Specifically, an entity engages in discriminatory conduct when it "place[s] a surcharge on a particular individual with a disability or any group of individuals with disabilities to cover the costs of measures . . . that are required to provide that individual or group with the nondiscriminatory treatment required by the [ADA]." 28 C.F.R. § 35.130(f); see also 28 C.F.R. § 36.301(c).

CMP argues that a surcharge for analog meters is not discriminatory because it is charged to anyone who opts-out of the smart meter program, regardless of disability. But that is not the end of the inquiry; rather, the question presented in this case is whether CMP has prevented Mr. Friedman from "full and equal" enjoyment of its services "in connection" with a dwelling in that he *must* pay the opt-out fee, while non-disabled customers can choose whether or not to opt out. 42 U.S.C § 12182(a) and § 12132 of the ADA broadly prohibit discrimination "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations" or a place of public accommodation or public entity. Similarly, the Fair Housing Act broadly prohibits discrimination "in the provision of services or facilities in connection with such dwelling, because of a handicap." 42 U.S.C. § 3604(f)(2).

This Court has already ruled on this argument, finding that "If, as Friedman contends, his medical condition prevents him from safely using a smart meter, CMP's requirement that he pay an opt-out fee to receive an analog meter is discriminatory if the analog meter is an accommodation required by the ADA." ECF 26 at 6-7 (Page ID #509-510). The Court further stated that "the question is not whether the modification is necessary to keep Friedman from

actually experiencing physical symptoms; rather, it is whether the modification is necessary to afford Friedman full and equal access to CMP's services, *i.e.,* the same access to the same services that people without his condition can obtain." ECF 26 at 7 (Page ID #510). This Court ultimately agreed that Mr. Friedman had sufficiently stated such a claim. Accordingly, this is the law of the case. *See United States v. Cheveres-Morales*, 83 F.4th 34, 40 (1st Cir. 2023) (the law of the case "doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."), *citing Arizona v. California*, 460 U.S. 605, 618 (1983).

The Court's decision is in line with similar regulations and case law where facially neutral laws were found to be unlawful when applied to individuals with disabilities. For example, federal regulations require the waiver of generally-applicable pet fees for service animals, even if persons without disabilities would have to pay the pet fee. *See* 28 CFR 35.136 ("Generally, a public entity shall modify its policies, practices, or procedures to permit the use of a service animal by an individual with a disability … A public entity shall not ask or require an individual with a disability to pay a surcharge, even if people accompanied by pets are required to pay fees, or to comply with other requirements generally not applicable to people without pets."). A landlord must modify his/her rent structure to accommodate a person with a disability in a ground floor apartment, even if the landlord would charge the maximum legal rent to a person without a disability. *Bentley v. Peace & Quiet Realty 2 LLC*, 367 F. Supp. 2d 341, 347-8 (E.D.N.Y. 2005) (discriminatory for housing provider to allow disabled plaintiff to move to the first floor unit, but only on the condition that she pay the maximum legal rent for that unit – even though that is what would be charged of a person without a disability). And a bank must allow blind customers to use an accessible ATM without paying a fee, even if non-blind customers

would have to pay the ATM fee. *Commonwealth v. E*Trade Access, Inc*., 464 F. Supp. 2d 52, 57-59 (D. Mass. 2006) ("the suggested modification to the Defendants' policies – allowing blind customers to use accessible ATMs operated by other companies without a surcharge – is generally reasonable.")

At least one court has held that opt-out fees for radiation-emitting smart meters *do* constitute unlawful surcharges under the ADA.  In *Metallo v. Orlando Utils. Comm'n*, 2015 U.S. Dist. LEXIS 116269 (M.D. Fla. Sep. 1, 2015), the plaintiff, whose hypersensitivity symptoms were exacerbated by a smart meter in his home, made a claim against his public utility company under Title II of the ADA, challenging the company's policy of charging opt-out fees for a non-radiation emitting smart meter. Just as CMP does here, the utility company in *Metallo* argued that the fees applied "equally to all customers who opt out of the digital meter upgrade, regardless of whether they are disabled or not" and argued that as such the "surcharges are not imposed because of a disability."  *Id.* at 8-9.  The court rejected that argument and denied the defendants' motion to dismiss the claim, holding that "a public entity engages in discriminatory conduct when it 'place[s] a surcharge on a particular individual with a disability or any group of individuals with disabilities to cover the costs of measures … that are required to provide that individual or group with the nondiscriminatory treatment required by the [ADA].'  28 C.F.R. § 35.130(f). … the Court can reasonably infer that OUC has placed impermissible surcharges on equipment and services that are required for OUC to comply with Metallo's ADA rights." *Id.* At 9-10.  The motion should be denied.

### 4.  The motion should be denied because the imposition of a fee to access CMP's services violates the RA and FHAA.

CMP also argues that its surcharge to avoid radiofrequency emissions is permissible under the Rehabilitation Act and the Fair Housing Amendments Act because it is not a

"required" measure since "Mr. Friedman has not presented admissible evidence that exposure to smart meter-emitted RF would worsen his cancer prognosis or exacerbate any cancer-related symptoms." But the reasonableness of an accommodation does not turn on whether something "would worsen" their condition. As noted above, Judge Levy ruled that the question is a "risk" of worsening; not a certainty of worsening. ECF 26 at 9 (Page ID #512). And in any case, Mr. Friedman *has* presented evidence that the exposure may worsen his cancer treatment. The motion should be denied.

> **a. The motion should be denied with regard to collateral estoppel, because this Court already ruled that "[c]ollateral estoppel simply does not apply here."**

In its motion, CMP argues again to this Court that Mr. Friedman is collaterally estopped from bringing his claims, because the Maine Public Utilities Commission investigated the safety of smart meters on the general population and decided they were generally safe. ECF 138 at 33. But this Court already assessed that argument and rejected it. This Court wrote that "the issue of whether persons with particular medical or physical conditions might experience adverse health impacts from using smart meters was neither presented nor resolved" by the PUC. ECF. 26 at 10-11 (Page ID #513-514). Accordingly, the Court held that "[c]ollateral estoppel simply does not apply here." ECF 26 at 10 (Page ID #511). That is the law of the case. *See Cheveres-Morales*, *supra*, 83 F.4th at 40.

In any case, for collateral estoppel to apply, four essential elements must be met: "1) that both the prior and subsequent proceedings involved 'the *same issue* of law or fact;' 2) that 'the parties *actually litigated*' the issue in the prior proceeding; 3) that the prior proceeding '*actually resolved* the issue in a final and binding judgment'; and 4) that 'its resolution of that issue of law or fact was *essential* to its judgment.'" *Ríos-Piñeiro v. United States*, 713 F.3d 688, 692 (1st Cir.

2013) (quoting *Monarch Life Ins. Co. v. Ropes & Gray*, 65 F.3d 973, 978 (1st Cir. 1995)) (emphasis in original); *see also Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26, 30 (1st Cir. 1994). Although not required, courts typically favor finding that administrative proceedings can trigger estoppel when they have "attained finality" on a particular legal issue and the proceeding adhered to all the essential elements. *Astoria Federal Savings and Loan Association v. Solimino*, 501 U.S. 104 (1991).

In its motion, CMP provides a general overview of hand-picked portions of the "extensive discovery" conducted by MPUC. *Id*. But the information presented to the MPUC only addressed the population at large, not whether Mr. Friedman's cancer treatment would be affected.

CMP suggests that the present proceeding has not added any evidence beyond what the MPUC already considered, but even if the MPUC determination was binding, which it is not, the present litigation has added substantial new information, most notably testimony from Mr. Friedman's treating physicians and his medical record which details the particular type of cancer and the treatment plan. In fact, Plaintiff was not diagnosed with cancer until two years after the MPUC hearing, so his particular diagnosis could not have been considered by the MPUC. Plaintiff's expert testimony is also updated from the MPUC proceeding, as this is a quickly evolving area of law and science and Plaintiff's experts are able to address significant strides in research and understanding from the decade since the MPUC issued its report. Only one of Plaintiff's experts participated in the MPUC proceeding.

CMP's argument fails to address any of the four essential elements. Although there is some subject-matter overlap, this proceeding does not involve the same issues or law or fact and therefore the pertinent issues could not have been "actually resolved." CMP provides zero

support for why a non-binding factual determination in an unrelated proceeding would handcuff this Court from weighing the evidence in front of it. This is a wholly distinct issue and proceeding from that presented in from the MPUC and this argument fails as a matter of law. The motion should be denied.

## CONCLUSION

Defendant Central Maine Power Company's motion for summary judgment must be denied because Plaintiff Ed Friedman has standing to bring suit, the motion relies on several genuine disputes of material fact, and Plaintiff can prove violations of the Americans with Disabilities Act, the Rehabilitation Act, and the Fair Housing Amendments Act at trial.

Respectfully submitted,

*/s/ David Lanser*
David Lanser, *Pro Hac Vice*
William Most, *Pro Hac Vice*
Most & Associates
201 St. Charles Avenue, Ste. 2500, # 9685
New Orleans, LA 70170
Phone: (504) 533-4521
E-mail: david.lanser@gmail.com

*/s/ Bruce M. Merrill*
Bruce M. Merrill
Law Offices of Bruce M. Merrill
P.O. Box 7933
Portland, ME 04112-7933 Phone : (207) 776-3591
Fax : (207) 775-2166
E-mail: mainelaw@maine.rr.com

ATTORNEYS FOR PLAINTIFF