UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| ED FRIEDMAN, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | 2:20-cv-00237-JCN |
| | ) | |
| CENTRAL MAINE POWER COMPANY, | ) | |
| | ) | |
| Defendant | ) | |

**DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT**

In the early 2010s, Central Maine Power Company (CMP or Defendant) began installing digital "smart meters" to measure its customers' electricity usage remotely, replacing the analog meters that Defendant's customers had previously used for that purpose. Smart meters emit a small amount of radiofrequency (RF) radiation. Plaintiff alleges that because of a medical condition, he cannot be exposed to a smart meter and that Defendant's refusal to waive the opt-out fee for him violates the Americans with Disabilities Act (ADA), the Rehabilitation Act (RA), and the Fair Housing Amendments Act (FHA). (Plaintiff's Complaint, ECF No. 1.) Defendant has moved for summary judgment. (Defendant's Mot. for Sum. J., ECF No. 138.)

Following a review of the summary judgment record, and after consideration of parties' arguments,[1] the Court grants in part and reserves ruling in part on Defendant's motion for summary judgment.

---

[1] While the matter was under advisement following oral argument, the Court convened a videoconference with the parties to identify and invite the parties to submit authority relevant to an issue that was not a

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "After the moving party has presented evidence in support of its motion for summary judgment, 'the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor.'"  *Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir. 1998)).

A court reviews the factual record in the light most favorable to the non-moving party, resolving evidentiary conflicts and drawing reasonable inferences in the non-movant's favor.  *Perry v. Roy*, 782 F.3d 73, 77 (1st Cir. 2015).  If a court's review of the record reveals evidence sufficient to support findings in favor of the non-moving party on one or more of the plaintiff's claims, a trial-worthy controversy exists, and summary judgment must be denied as to any supported claim.  *Id.*  ("The district court's role is limited to assessing whether there exists evidence such that a reasonable jury could return a verdict for the nonmoving party." (internal quotation marks omitted)).  Unsupported claims are properly dismissed.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

---

primary focus of the parties' initial filings or of the Court's inquiries at oral argument. The parties subsequently filed for the Court's consideration additional legal authority. (Plaintiff's Submission, ECF No. 154; Defendant's Submission, ECF No. 153.)  The Court has considered the additional authority.

S<small>UMMARY</small> J<small>UDGMENT</small> R<small>ECORD</small>

**A.      Record Evidence to be Considered**

In Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Plaintiff supported his legal arguments with expert witness deposition testimony that was not in a Statement of Material Facts or Additional Statement of Material Facts, contrary to District of Maine Local Rule 56.  Plaintiff also cited to evidence from his treating physicians who Defendant contends have not been designated as expert witnesses.

Defendant argues that most of its statements of fact should be deemed admitted in accordance with Local Rule 56(f) because Plaintiff failed to support his response of "Denied" or "Qualified" with a record citation as contemplated by Local Rule 56(c).  Defendant contends the Court should disregard (a) evidence that was not presented in accordance with the Local Rule 56 and (b) the treating physicians' opinions because Plaintiff did not designate the treating physicians as expert witnesses.

**1.      Treating Physicians**

Federal Rule of Civil Procedure 26(a)(2)(A) provides that "a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705."  Fed. R. Civ. P. 26(a)(2)(A).  "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or harmless."  Fed. R. Civ. P. 37(c)(1).  Although "Rule 37(c)(1) traditionally has been invoked to bar expert testimony at trial" the rule "applies with equal force to motions for summary judgment." *Lohnes v.*

*Level 3 Communications, Inc.*, 272 F.3d 49, 60 (1st Cir. 2001); Fed. R. Civ. P. 37(c)(1). The scheduling order in this case required disclosure of treating physician opinions. (Amended Scheduling Order, July 21, 2021, ECF No. 40.)

In Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Plaintiff offered evidence from his treating physicians, David Benton, M.D. and Stephen Goldbas, D.O., to support his argument that opting out of the smart meter program was reasonable or a medical necessity. Defendant contends that Plaintiff did not designate Drs. Benton and Goldbas as expert witnesses in accordance with Federal Rule of Civil Procedure 26 and the Scheduling Order and, therefore, Plaintiff cannot rely on the treating physicians' opinions in support of his claim. The Court will address the issue as part of the assessment of the motion for summary judgment.

### 2.    Local Rule 56 and Expert Witness Statements

Local Rule 56 provides in relevant part:

> A party opposing a motion for summary judgment shall submit with its opposition a separate, short, and concise statement of material facts. The opposing statement shall admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts and unless a fact is admitted, shall support each denial or qualification by a record citation as required by this rule. Each such statement shall begin with the designation "Admitted," "Denied," or "Qualified" and, in the case of an admission, shall end with such designation. The opposing statement may contain in a separately titled section additional facts, each set forth in a separately numbered paragraph and supported by a record citation as required by subsection (f) of this rule . . . . Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted. An assertion of fact set forth in a statement of material facts shall be followed by a citation to the specific page or paragraph of identified record material supporting the assertion. The court may disregard any statement of fact not

supported by a specific citation to record material properly considered on summary judgment.

Loc. R. 56(c), (f).

Most of Plaintiff's declarations of "Denied" or "Qualified" in the Opposition to Defendant's Statement of Undisputed Facts did not include a specific citation to record material. Further, in Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Plaintiff points to some evidence in the record that was not included in a statement of facts as required by Local Rule 56.

While the Court could arguably disregard some of Plaintiff's responses to Defendant's statements based on Plaintiff's failure to comply with Local Rule 56, the Court notes that many of Plaintiff's responses of "Denied" or "Qualified" are not necessarily based on a contrary record citation. For instance, some of the responses simply question the materiality or implication of a statement.  Although Plaintiff did not satisfy the requirements of the Local Rule in every respect, because many of the responses did not necessarily challenge the factual statements and because Plaintiff has otherwise substantially complied with the Rule, the Court will not deem Defendants' statements admitted but will assess in each instance the effect of Plaintiff's response.

As to citations to the record without a corresponding statement of fact, many of the citations are to testimony from Plaintiff's expert witnesses, which testimony is familiar to Defendant as it was the subject of Defendant's motion to exclude expert testimony.  Given that the parties' litigated extensively the substance of the experts' testimony and given that the Court reviewed the experts' testimony as Defendant cites to the testimony in support

of the motion for summary judgment, the Court will consider Plaintiff's reference to the experts' testimony. The remainder of the citations are to statements of Drs. Benton and Goldbas. Whether the Court should consider reference to those statements is more appropriately addressed in the discussion and resolution of the issues regarding the statements of Drs. Benton and Goldbas more generally, which the Court addresses below.

### 3.    Factual Record

Plaintiff is a resident of Bowdoinham, Maine. (Complaint, ECF No. 1.)[2] Defendant is a Maine business corporation that provides electricity to approximately 600,000 customers. (*Id.*) To measure customer electricity usage, Defendant places meters in or on customer homes. (Stipulation of Undisputed Material Facts ¶ 1, ECF No. 139 (hereinafter SUMF).) In 2007, Defendant sought approval from the Maine Public Utilities Commission (PUC) to implement an Advanced Metering Infrastructure ("AMI") to measure customer electricity usage. (*Id.* ¶¶ 2, 4.) AMI allows for automated and remote meter reading, detailed customer usage measurement and data storage, and communications to and from customer meters. (*Id.* ¶ 4.) The meters and other devices in the AMI network transmit data by sending radiofrequency ("RF") signals between various points in the network. (*Id.* ¶ 5.)

Since 1996, the Federal Communications Commission (FCC) has promulgated "a set of guidelines for evaluating the environmental effects of RF exposure," which guidelines include limits for (a) specific absorption rate (SAR), the metric for highly-

---

[2] The parties did not include in their stipulations or statements of material facts certain relevant background information about the parties. To provide more background information, the Court has supplemented the parties' statements with information from other filings, which information does not appear to be in dispute.

localized, close-in exposure at commonly-used frequencies; and (b) maximum permissible exposure (MPE), the measure for more-distant, whole-body exposure and for whole-body exposure at higher frequencies.  (Defendant's Statement of Material Facts ¶ 48, ECF No. 142 (hereinafter DSMF).)  Because "smart meters are designed generally to be used in such a way that a separation distance of at least 20 centimeters is normally maintained between the transmitter's radiating structure(s) and the bodies of any nearby persons [they] qualify for exposure evaluation using MPE limits rather than SAR limits."  (*Id.* ¶ 49.)  Defendant ensures that its smart meters comply with the FCC's RF exposure limits by having the meters tested and evaluated in certified laboratories.  (*Id.* ¶ 50.)

The PUC approved the installation of AMI technology on February 25, 2010. (SUMF ¶ 3.)  On October 25, 2010, the PUC received a complaint alleging that asserted:

a. The non-ionizing RF radiation that would be emitted by the smart meter mesh network could be a potential cause of cancer;

b. There are individuals who suffer from medically confirmed sensitivities to nonionizing RF radiation who would be exposed to such radiation involuntarily under Defendant's smart meter program; and

c. Therefore, Defendant's acts and practices with respect to the installation of smart meters were unreasonable, inadequate, and inconsistent with legislative mandates. (DSMF ¶ 52.)

Upon receiving the complaint, the PUC began an investigation as to whether Defendant's position of not providing opt-out alternatives in its smart meter installation program was "unreasonable, insufficient, or unjustly discriminatory."  (*Id.* ¶ 54.)  The PUC

declared that it would make no determination on the merits of the health concerns raised in the complaint. (*Id.* ¶ 55.) At the conclusion of its investigation, the PUC directed Defendant to allow customers to opt out of the smart meter program, either by using their existing meters or by using smart meters without transmitters. (*Id.* ¶ 56.) The PUC determined that customers who chose to opt out of the smart meter program would bear the incremental cost of doing so and that their costs would depend on whether they selected the existing meter option or the transmitter-off option. (*Id.* ¶ 57.) The PUC explained its decision as follows:

> The AMI smart meters are now CMP's standard meter. It has been the practice in Maine that customers that desire alternatives to the utility's standard meters pay the incremental costs of the alternative metering. See, e.g, Chapter 322, §5(A)(2). We see no reason to change this practice in the context of CMP's smart meter program. As a general utility ratemaking principle, customers that request non-standard services should pay the incremental costs of those services. In our view, it would be inconsistent with ratemaking principles and basically inequitable for CMP to recover the costs caused by an individual customer's decision to opt-out of receiving a standard wireless meter from its general body of ratepayers.

(*Id.* ¶ 58.)

Pursuant to the PUC's order, since 2011, Defendant's customers have been able to choose either (i) a "smart" meter which emits RF radiation through airborne and conducted emissions, (ii) a "smart" or solid state (digital) meter without transmitter which still emits RF radiation conducted emissions or (iii) an analog meter which does not emit RF radiation emissions. (SUMF ¶ 9.) Any customer who "opts out" of the smart meter program and chooses either a smart meter without transmitter or an analog meter must pay an initial charge and a recurring monthly charge. (*Id.* ¶ 10.) If a customer chooses to have a smart

meter without transmitter, the customer must pay an initial charge of $20 and, as of July 1, 2023, a recurring monthly charge of $16.09.  (*Id.* ¶¶ 11–12.)  An analog meter customer will pay an initial charge of $40 and a recurring monthly charge, as of July 1, 2023, of $18.06. (*Id.* ¶¶ 10, 12.)  The recurring monthly charge is expected to increase over time, although the amounts of the future increases are unknown.  (*Id.* ¶ 13.)

In July 2011, Plaintiff and eighteen other customers filed a complaint with the PUC against both the PUC and Defendant pursuant to 35-A M.R.S.A. § 1302. (*Id.* ¶ 70.)  The complainants alleged that AMI was unsafe and requested that the PUC "open an investigation" to consider "new and important evidence specifically addressing non-ionizing radiation of the type emitted by smart meters."  (*Id.* ¶ 71.)  On August 31, 2011, the PUC dismissed the complaint without a hearing.  (*Id.* ¶ 72.)  In its order dismissing the complaint, the PUC wrote: "All of the issues raised by the complainants in this matter were raised by one or more of the complainants in the Opt–Out Investigation and were considered by the Commission and resolved during that investigation or in subsequent orders on motions for reconsideration."  (*Id.* ¶ 73.)  On appeal, the Maine Law Court vacated in part the PUC's dismissal of Plaintiff's complaint, reasoning that although the PUC had "considered, to a limited extent, the health and safety issues [Plaintiff] raised, . . . it did not resolve those issues," and therefore was "in no position to conclude . . . that requiring customers who elect either of the opt-out alternatives to pay a fee is not 'unreasonable or unjustly discriminatory.'"  (*Id.* ¶ 74.)

On remand, the PUC commenced an investigation and conducted discovery on the health and safety issues.  (*Id.* ¶ 75.)  As part of its investigation, the PUC considered more

than one hundred peer-reviewed scientific studies, an investigation conducted by the Maine Centers for Disease Control, exposure regulations in the United States and Canada, data showing that smart meters comply with RF exposure regulations promulgated by the FCC, and "extensive field-testing of smart meters." (*Id.* ¶ 76.)

In a December 19, 2014, order, the PUC found that "AMI, including the use of smart meters, as implemented and operated by CMP, does not present a credible threat of harm to the health and safety of CMP's customers and, based on the record of this proceeding is, therefore, safe." (*Id.* ¶ 89.) The two Commissioners who joined in the decision took "slightly different approach[es] regarding customers with medical treatment recommendations to avoid the AMI meters." (*Id.* ¶ 90.) One Commissioner (Littell) would have had Defendant provide "an AMI meter with transmitter off" as an option for customers who objected to RF exposure at any level, while the other (Vannoy) would not have imposed such a requirement. (*Id.*) "Both Commissioner Littell and Commissioner Vannoy concur[red] that this difference in approach [did] not vitiate their concurrence regarding the safety of the AMI meters and network in use in Maine." (*Id.*)

On appeal, the Law Court affirmed the PUC's decision. (*Id.* ¶ 91.) The Court determined that: (i) CMP was not required to "ensure" safety beyond all doubt; (ii) "evidence of a hypothetical future risk is not sufficient to preclude a finding that CMP satisfied its burden; rather, the threat of harm must be probable and convincing;" (iii) Plaintiff had not established a "probable" threat of harm; (iv) the PUC had properly determined that "there have been no studies provided or cited that even purport to indicate negative health effects from the . . . RF exposure levels from smart meters;" and (v) because

the evidence in the record "was insufficient to conclude that smart meters amount to a credible threat of harm," CMP had met its burden of proving that its system for delivering electricity was "safe." (*Id.* ¶ 92.)

At some point prior to 2013, Plaintiff chose not to have a smart meter installed on his property. (SUMF ¶ 15.) Plaintiff's reasons for opposing smart meters prior to the diagnosis that he has cited in this case included, but were not limited to, his belief that: (i) smart meters have a general negative effect on public health, (ii) they constitute an electronic trespass, and (iii) they have an adverse effect on privacy. (*Id.* ¶ 17.)

In October or November of 2013, Plaintiff was diagnosed with lymphoplasmacytic lymphoma, a form of non-Hodgkins lymphoma. (*Id.* ¶ 14.) On or about October 5, 2016, Plaintiff presented his oncologist/hematologist, David Benton, M.D., with a letter he had written to support his request for a waiver of Defendant's opt-out fee and requested that Dr. Benton sign it. (DSMF ¶ 94.) The drafted letter stated that exposure to smart meters would "exacerbate problems already experienced" by Plaintiff. (*Id.* ¶ 95.) Dr. Benton stated that he was not comfortable with such language and modified it to say "may" exacerbate. (*Id.* ¶¶ 95–96.) The final version of the letter, signed by Dr. Benton, reads:

> My patient suffers from lymphoplasmacytic lymphoma, a type of non-Hodgkins lymphoma Waldenstrom's Macroglobulinemia (WM), a medical condition for which there is no cure. Treatment goals are to slow disease progression if possible. We are concerned that low-level non-ionizing radiation exposure of the type and level emitted by Electromagnetic Frequency (EMF) invoicing tools may exacerbate problems already experienced by my patient including fatigue, cognitive difficulties, memory issues and multiple cancer types. It is my recommendation Mr. Friedman's request for reasonable accommodation without penalty be granted to minimize his risk of disease progression symptoms exacerbation.

(*Id.* ¶ 97.)

The reference in the letter to cognitive difficulties or memory issues was language authored by Plaintiff, not Dr. Benton. (*Id.* ¶ 98.) Dr. Benton is not aware of Plaintiff having any problems with cognition or memory. (*Id.* ¶ 101.) The reference in the letter to "multiple cancer types" was language drafted by Plaintiff, not Dr. Benton. (*Id.* ¶ 99.) When Dr. Benton agreed to sign the letter, he had performed no research to support the proposition that exposure to RF may exacerbate any medical condition the Plaintiff had experienced or that exposure to RF had any negative effect on the physical health of any human being. (*Id.* ¶¶ 103–104.) Dr. Benton also had not formed the opinion that RF had any negative effect on the physical health of any human being when he agreed to sign the letter. (*Id.* ¶ 105.) Dr. Benton signed the letter in the hope that it would alleviate Plaintiff's extreme anxiety caused by the smart meters. (*Id.* ¶ 106.) In his practice, Dr. Benton never recommended to any patient that the patient not have a smart meter in the patient's home. (*Id.* ¶ 107.)

Plaintiff submitted the letter signed by Dr. Benton to Defendant as the basis for his request that Defendant waive the recurring monthly opt-out fee as an accommodation for his cancer. (*Id.* ¶ 108.) Defendant declined Plaintiff's request. (*Id.* ¶ 109.) After a period of months during which Plaintiff did not pay the recurring monthly opt-out fees, Defendant disconnected Plaintiff's electric service. (*Id.* ¶ 110.)

In January 2017, Plaintiff filed a complaint with the Maine Human Rights Commission. (*Id.* ¶ 111.) In a February 2, 2017, filing in the matter, Plaintiff represented that his oncologist, Dr. Benton, had "established through research, examination and

opinion a nexus of connection between [his] disability and low-level EMF exposure from EMF-emitting invoicing tools." (*Id.* ¶ 112.)

In 2021, Defendant petitioned the PUC for permission to waive the opt-out fee for Plaintiff. (*Id.* ¶ 113.) Plaintiff opposed the request because he was concerned the waiver might not be permanent if another company bought Defendant and because he "want[s] to see a federal court ruling on this." (*Id.* ¶¶ 114–116.)

In this case, Plaintiff designated Erik Anderson, Paul Heroux, Ph.D., and David Carpenter, M.D., as expert witnesses. (*Id.* ¶ 117.) Erik Anderson is an electrical engineer who prepared an expert report regarding the electrical transmissions associated with smart meters. (*Id.* ¶¶ 118, 119.) He did not take a position on whether RF radiation is bad for human health. (*See id.* ¶ 129–130.)

On Defendant's motions to exclude or limit the testimony of Plaintiff's expert witnesses, the Court (Levy, C.J.) determined that Drs. Heroux and Carpenter could not testify about the effect exposure to RF would have specifically on Plaintiff's cancer. (*Id.* ¶¶ 138, 166; Order, ECF No. 124.) The Court limited the experts' testimony to the general health effects of RF exposure.

According to Dr. Heroux, the RF emitted by smart meters generates reactive oxygen species (ROS), which in turn alter the mitochondrial genome. (*Id.* ¶ 132.) Each person who is exposed to RF has increased levels of ROS in the person's body. (*Id.* ¶ 133.) Based on certain studies, Dr. Heroux maintains that the exposure to RF increases the risk of death from preexisting cancer. (Heroux Dep. 43:16-44:1, ECF No. 137-24.) Dr. Heroux testified that there are not many studies on the consequences of exposure to RF on cancer patients

13

because it is difficult to recruit the necessary test subjects. (*Id.* 57:1-58:10.) Dr. Heroux acknowledges that the fact that cells can be affected by RF does not necessarily transmit or translate to a health hazard. (DSMF ¶ 134.) In support of his opinion on the relationship between exposure to RF and cancer, Dr. Heroux has cited the work of Yakymenko, et al. (2016) and Khansari, et al. (2009). (*Id.* ¶ 135.) Defendant's expert witness, Gabor Mezei, asserts that none of the studies reviewed by Yakymenko, et al., establishes a direct causal relationship between RF exposure and any specific disease or adverse health effect. (*Id.* ¶ 136.) He also asserts that Khansari, et al., provide no information on the potential adverse effects of RF fields on human health. (*Id.* ¶ 137.)

Dr. Carpenter opines that people are biologically affected continuously by unavoidable exposure to RF from the earth, the sun, radio, television, and other sources. (*Id.* ¶ 139) and that there are biological effects at any level of exposure to RF. (*Id.* ¶ 140.) Dr. Carpenter testified that as to leukemia, which he asserts is related to Plaintiff's cancer, the duration of remission is reduced in relation to excessive exposure and that "elevated exposure to electromagnetic fields from whatever source, including smart meters, is going to decrease the duration of that remission." (Carpenter Dep. 99:12-23, ECF No. 137-13.) Dr. Carpenter acknowledges that biological effects from exposure to RF do not necessarily translate to a human disease or hazard. (DSMF ¶ 141.) While Dr. Carpenter does not know the level of RF exposure where there is a clearly defined adverse human health effect (*Id.* ¶ 142), he asserts that there are studies "that deal with things like brain cancer" which found that at a level "very, very much lower than the 10 microwatts per square centimeter that's the FCC standard" symptoms of electrohypersensitivity were triggered. (Carpenter Dep.

14

57:23–58:3, ECF No. 137–13.)  Dr. Carpenter testified that there is evidence of biological effects "at least in isolated systems at intensity exposures below" the FCC standard.  (*Id.* 60:2–5.)  In Dr. Carpenter's opinion, the generation of reactive oxygen species is the basic mechanism by which non-ionizing electromagnetic fields cause biological effects on the human body (DSMF ¶ 143), and there is some evidence that the superimposed rapid rises and falls of sine waves generate reactive oxygen species, and cause adverse health symptoms.  (*Id.* ¶ 144.)

Dr. Carpenter asserts that the rapid rise and fall of the information superimposed on the sine wave, as opposed to the "natural sine wave" itself, causes adverse health symptoms.  (*Id.* ¶ 145.)  Dr. Carpenter does not know of a good explanation for why rapid pulsing of electromagnetic energy would generate reactive oxygen species more than the sine wave.  (*Id.* ¶ 146.)  Dr. Carpenter believes that "dirty electricity" produced by the magnetic fields of power lines has been related to the risk of leukemia in children.  (*Id.* ¶ 147.)  ELF and RF fields interact with body tissues (and other types of matter) very differently from one another.  (*Id.* ¶ 148.)

Benjamin Cotts, an expert designated by Defendant, stated that the difference in frequency between ELF fields and RF fields is so vast that there is no overlap in the biological effects of the two sources and therefore they are subject to completely separate health and safety standards.  (*Id.* ¶ 149.) He also asserts that biological exposure standard limits of ELF fields protect against nerve induction in the form of very small electric fields in body tissue.  (*Id.* ¶ 150.)  Biological exposure standard limits for RF fields are based upon protecting against tissue heating.  (*Id.* ¶ 151.)  He further stated that because of the

15

vast differences in the frequencies of ELF and RF fields, studies of human exposure to ELF fields such as those produced by power lines and similar sources are not biologically relevant to studies of RF fields, and vice versa. (*Id.* ¶ 152.)

Dr. Carpenter believes the risk of leukemia in children, and the risk of other diseases, is increased by exposure to the rapid rises and falls of sine waves produced by power line magnetic fields, a phenomenon which he believes contributes to the generation of reactive oxygen species. (*Id.* ¶ 153.) Dr. Carpenter's theory, that the superimposition of high peaks on sine waves makes RF emissions generated by smart meters potentially hazardous, has not been proven. (*Id.* ¶ 154.) In Dr. Carpenter's opinion, radiofrequency fields cause the generation of free radicals in reactive oxygen species; the generation of free radicals in turn causes damage to proteins, carbohydrates, and DNA; and the damage to DNA can cause mutations, cancer, and birth defects. (*Id.* ¶ 155.) Dr. Carpenter believes it is biologically possible that RF emissions from a smart meter could cause harm to a human being. (*Id.* ¶ 156.) Dr. Carpenter believes that everyone in the world is at some heightened risk of harm if they have a smart meter. (*Id.* ¶ 157.) Dr. Carpenter is aware of no published article that describes the phenomenon of a person suffering harm from the generation of reactive oxygen species as a result of exposure to a smart meter. (*Id.* ¶ 158.) Dr. Carpenter does not know the specific health risks of having smart meters but believes there are several health risks associated with RF radiation generally. (*Id.* ¶ 159.)

In support of his opinion on general causation – i.e., that RF can have a "deleterious effect on human health" – Dr. Carpenter "relies on two studies that examined the relationship between magnetic field exposure and survival rates among children previously

diagnosed with leukemia." (*Id.* ¶ 160.)  In both studies, the exposure of interest to the investigators was exposure to extremely low frequency (ELF) electromagnetic fields, not exposure to RF.  (*Id.* ¶ 161.)  Because neither study examined children exposed to RF fields, neither constitutes evidence of a relationship between exposure to RF fields and survival in persons with leukemia.  (*Id.* ¶ 162.)  The two leukemia studies report only a statistical association, and not a causal link, between exposure to a specific frequency range of EMF and shorter survival in children with leukemia.  (*Id.* ¶ 163.)

Defense expert witness Gabor Mezei, M.D., Ph.D., asserts that neither of the leukemia studies relied on by Dr. Carpenter constitutes reliable evidence of a causal connection between RF exposure and the promotion of cancer.  (*Id.* ¶ 164.)  The fact that lower frequency emissions may be transmitted through building wiring does not inform Dr. Carpenter's opinions regarding Plaintiff's exposure, because the exposure Plaintiff would experience in his home, remote from a smart meter, has never been measured.  (*Id.* ¶ 165.)

## DISCUSSION

### A.    Standing

Defendant contends that Plaintiff lacks standing to assert his claims because his claims are "based entirely on [Plaintiff's] irrational fear of a speculative risk of future harm that is neither traceable to [Defendant's] conduct nor redressable by an injunction." (Defendant's Motion for Summary Judgment at 2.)

The United States Constitution's limitation on the federal courts' jurisdiction to "Cases" and "Controversies" requires that a party invoking federal jurisdiction establish:

(1) an injury in fact that is concrete and particularized, and actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and conduct complained of; and (3) it must be likely as opposed to merely speculative that the injury could be redressed with a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 –61 (1992). "As the Supreme Court [has] emphasized, 'plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages).'" *Roe v. Healey*, 78 F.4th 11, 20 (1st Cir. 2023) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)). "'The party invoking federal jurisdiction bears the burden of establishing' standing—and, at the summary judgment stage, such a party 'can no longer rest on . . . "mere allegations," but must "set forth" by affidavit or other evidence "specific facts."'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411 (2013) (quoting *Lujan*, 504 U.S. at 561).

"'A material risk of future harm can satisfy the concrete-harm requirement' . . . when 'the risk of harm is sufficiently imminent and substantial.'" *Webb v. Injured Workers Pharmacy, LLC*, 72 F.4th 365, 375 (1st Cir. 2023) (quoting *TransUnion*, 594 U.S. at 435). "A threatened harm that is too attenuated or too speculative does not provide standing. . . ." *Healey*, 78 F.4th at 20.

A plaintiff "cannot manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 402. Further, cases in which a plaintiff asserts standing based on a cost created by the increased risk of a future injury "require greater caution and scrutiny because the assessment of risk is both less certain, and whether the risk constitutes injury is likely to be more

controversial." *Kerin v. Titeflex Corp.*, 770 F.3d 978, 982 (1st Cir. 2014).  A future injury is too speculative to meet the requirements of standing if the plaintiffs are unable to provide evidence that the risk for which they are incurring costs is probable to occur.  *Id.* at 983; *Clapper*, 568 U.S. at 415.

For example, in *Clapp*er, the Supreme Court held that the costly and burdensome measures undertaken by the respondents because of the risk of surveillance under 50 U.S.C. § 1881a were inadequate to satisfy standing. *Clapper*, 568 U.S. at 401 ("50 U.S.C. § 1881a[] allows the Attorney General and the Director of National Intelligence to acquire foreign intelligence information by jointly authorizing the surveillance of individuals who are not "United States persons" and are reasonably believed to be located outside the United States.")  The respondents alleged that as part of their work, they were required "to engage in sensitive international communications with individuals who they believe[d] [were] likely targets of surveillance under § 1881a." *Id.*  To avoid such surveillance, the respondents avoided certain email and phone conversations, spoke in generalities rather than specifics, and traveled to have in-person conversations.  *Id.* at 415.  Because the respondents did not "face a threat of certainly impending interception under § 1881a, the costs that they [had] incurred to avoid surveillance [were] simply the product of their fear of surveillance." *Id.* at 417.  The Court found that the actions and associated cost to avoid surveillance were insufficient for standing because, if the rule were otherwise, "an enterprising plaintiff would be able to secure a lower standing for Article III standing simply by making an expenditure based on a nonparanoid fear." *Id.* at 416.

In a product liability case, the First Circuit held the plaintiff did not have standing when he failed to allege sufficient facts to show that the claimed risk was probable. *Kerin*, 770 F.3d at 983. The plaintiff had corrugated stainless steel tubing (CSST) installed at his home to provide gas for his outdoor firepit. *Id.* at 979. CSST might fail due to direct or indirect lightning strikes, which can "cause an electrical arc that can puncture CSST, igniting the natural gas within." *Id.* at 979–80. No actual incident had occurred when the plaintiff filed suit; instead, the plaintiff sought damages for the plaintiff's "overpayment" or "cost of remedying the safety issue." *Id.* at 980. The Court found that the plaintiff did not allege facts "sufficient to even calculate or estimate the risk" and "even in the instances where [the plaintiff] allege[d] there ha[d] been 'actual damage,' it [was] unclear that CSST was the source." *Id.* at 983. The plaintiff failed to demonstrate that the risk that CSST would cause a lightning fire in his home was not mere speculation. *Id.* The First Circuit thus found that "the alleged risk of harm [was] too speculative to give rise to a case or controversy." *Id.* at 985.

Whether a risk of harm in a particular case is sufficient to support a claim at least in part depends on the nature of the claim. Here, while Plaintiff's underlying concern is the health impact of his exposure to RF radiation, he does not seek to recover damages for the impact of RF radiation on his cancer. Rather, Plaintiff argues that the harm for which he seeks redress is the opt-out fee that he must incur to avoid the risk that exposure to RF radiation would adversely impact his condition. In other words, Plaintiff contends that the fee is part of the harm and is not speculative. In this way, because payment of the fee is required to opt-out, Plaintiff's claimed injury is arguably distinguishable from the situation

20

in *Kerin* where the plaintiff unilaterally incurred costs to avoid the plaintiff's perception of the consequences of what he deemed to be a defective product.

Plaintiff's payment of the fee, however, is inextricably linked to the reason he is opting out of the smart meter program—his health concern. If the mere payment of the opt-out fee was enough to confer standing, any consumer of Defendant's services who suffered from a disabling condition could assert a claim based on the alleged impact of RF radiation on the condition regardless of the merit of the allegation. Plaintiff's claim, therefore, would appear to exemplify the type of claim the Supreme Court contemplated when it observed that for standing purposes, a plaintiff "cannot manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 402.

Despite the "certainly impending" standard articulated by the Supreme Court, Plaintiff argues in part that "[a]ny negative effect on [Plaintiff's] palliative treatment is a harm suffered by Plaintiff because of his cancer." (Plaintiff's Response at 12.) While theoretically, and practically in most cases, the standing analysis is separate from an assessment of the merits, in some circumstances, "the issue of standing and 'the merits' substantially overlap." *Town of Norwood v. FERC*, 202 F.3d 392, 406 (1st Cir. 2000); 13A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2043 n.6 (3d ed.) (arguing that standing and the merits are generally separate inquiries that should not be conflated, but "[t]he separation of injury from the merits can become indistinct when considering merely potential, not realized injury"). Although Defendant's standing argument is not without merit, because of the overlap of the standing and merits issues in

21

this case, the Court will assess the relevant portions of the merits (i.e., whether the record would support a finding in favor of Plaintiff on the harm-related elements of his failure to accommodate claim), which assessment could further inform the standing analysis.

## B.    Title III of the ADA[3]

In this ADA claim, Plaintiff contends that the denial of his request for a waiver of the opt-out of the program is discriminatory because the waiver of the fee represents a reasonable accommodation for Plaintiff's disability. As asserted in the opposition to the motion for summary judgment and as the Court (Levy, J.) recognized in its order denying Defendant's motion to dismiss, the essence of Plaintiff's claim is that without the waiver of the fee, he is being deprived of the opportunity to have access to Defendant's services with his electricity usage measured at no cost like those whose usage is measured with a smart meter.[4]

"Title III of the ADA targets discrimination by privately operated places of public accommodation. . . ." *Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 303–04 (1st Cir. 2003). [5] The law's general prohibition provides that: "No individual shall be discriminated

---

[3] As the Court (Levy, C.J.) noted in its order on the motion to dismiss, the standards "are generally the same under all three statutes [on which Plaintiff bases his claim]." (Order on Motion to Dismiss at 5 n.2, ECF No. 26.) (citing *Astralis Condo. Ass'n v. U.S. Dep't of Housing and Urban Dev.*, 620 F.3d 62, 66 (1st Cir. 2010); *Calero-Cerezo v. U.S. DOJ*, 355 F.3d 6 (1st Cir. 2004); *Theriault v. Flynn*, 162 F.3d 46 (1st Cir. 1998)). Consistent with this principle, while the Court will primarily refer to Plaintiff's ADA claim, the Court's analysis applies equally to Plaintiff's RA and FHA claims.

[4] The Court wrote, "the question is not whether modification is necessary to keep [Plaintiff] from actually experiencing symptoms; rather, it is whether the modification is necessary to afford [Plaintiff] full and equal access to [Defendant's] services, i.e., the same access to the same services that people without his condition can obtain." (Order on Motion to Dismiss at 7, ECF No. 26.)

[5] The ADA "forbids discrimination against persons with disabilities in three major areas of public life: employment, which is covered by Title I of the statute; public services programs and activities, which are the subject of Title II; and public accommodations, which are covered by Title III." *Bd. of Tr. of Univ. of*

against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation. . . ." 42 U.S.C. § 12182(a).  The law also provides that "a failure to make reasonable modifications . . . when such modifications are necessary" constitutes discrimination unless the entity in question can show that "such modifications would fundamentally alter the nature" of the program. *Doe v. Rhode Island Interscholastic League*, No. 23-414 WES, 2024 WL 2725475, at *7 (D. R. I. May 28, 2024) (quoting 42 U.S.C. § 12182(b)(2)(A)(ii).

Because the opt-out fee is central to Plaintiff's failure to accommodate claim, on Defendant's motion to dismiss and at summary judgment, the parties have debated whether the fee constitutes an unlawful surcharge. To the extent Plaintiff's claim or argument is construed to allege that the fee is an unlawful surcharge, the Court addresses the issue.

The relevant Department of Justice regulation provides:

> A public accommodation may not impose a surcharge on a particular individual with a disability or any group of individuals with disabilities to cover the costs of measures . . . that are required to provide that individual or group with the nondiscriminatory treatment required by the Act or this part.

28 C.F.R. § 36.301(c). Courts have construed the regulation using a two-prong test under which "charges for services violate the ADA (1) when the fee pays for services required

---

*Ala. v. Garrett*, 531 U.S. 356, 372 (2001). Plaintiff has asserted claims under Title II and III.  Plaintiff alleges that Defendant, as a "quasi-public entity," violated Title II of the ADA which prohibits discrimination based on disabilities by public entities.  In Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Plaintiff concedes that Defendant is not a covered entity of Title II. (Pl.'s Opp'n to Def.'s Mot. for Summ. J., ECF No. 143.) Defendant, therefore, is entitled to summary judgment on Plaintiff's ADA Title II claim.  The Court, therefore, will assess the merits of Plaintiff's Title III claim.

by the ADA; and (2) when nondisabled people do not also incur the fee." *Robishaw v. Providence Probate Court*, 206 F. Supp. 723, 730-31 (D. R.I. 2016); *Dare v. California*, 191 F.3d 1167, 1171 (9th Cir. 1999); *Anderson v. Macy's, Inc.*, 943 F. Supp. 2d 531, 546 (W.D. Penn. 2013); *see also Duprey v. State of Conn., Dept. of Motor Vehicles*, 28 F. Supp. 2d 702, 706 (D. Conn. 1998) (construing the rule as a three-prong test).

A fee satisfies the first prong of the test if the fee's purpose is to cover the costs of an ADA accommodation. *See Duprey*, 28 F. Supp. 2d at 709-10; *Meagley v. City of Little Rock*, 639 F.3d 384, 390–91 (8th Cir. 2011); *Anderson*, 943 F. Supp. 2d at 546 (holding that the ADA did not require Macy's to carry plus-size clothing and therefore the higher prices for women's plus-size clothes did not violate the ADA surcharge regulation). "If the measure is 'not required under the ADA, the inquiry ends' because the regulation only forbids surcharges for ADA 'required' measures." *Anderson v. Macy's, Inc.*, 943 F. Supp. 2d 531, 546 (W.D. Penn. 2013) (quoting *Dare*, 191 F. 3d at 1171.).

The distinction is illustrated by the reasoning in *Duprey*, where the court concluded that charges to cover the cost of a disability windshield placard program satisfied the first prong of the test. *Duprey*, 28 F. Supp. 2d at 710. The State of Connecticut allowed individuals with a disability that impaired or limited their ability to walk to apply for "a special license plate or a removable windshield placard to access parking spaces reserved for persons with disabilities." *Id.* at 703–04. The state charged a five-dollar fee for the removable windshield placards, which could be used for five years. *Id.* at 704. To renew their placard, individuals had to complete a renewable application and pay a five-dollar application fee. *Id.* The fee to receive a special license plate was also five dollars. *Id.*

24

Because the court found that accessible parking was "required by the ADA to be reserved for individuals with disabilities," the five-dollar fees were considered the cost of an ADA-mandated measure. *Id.* at 710 (quoting DOJ Opinion Letter from Deval L. Patrick, Assistant Attorney General, Civil Rights Division to Congressman C.W. Bill Young, http://www.usdoj.gov/crt/foia/tal689.txt (Apr. 29, 1996)).

In contrast, in *Meagley v. City of Little Rock*, the court held that a scooter rental service at a zoo was not an ADA-mandated measure and therefore the first prong was not met. *Meagley v. City of Little Rock*, 639 F.3d 384, 390–91 (8th Cir. 2011). The plaintiff argued that "because the zoo [was] 'obviously a large place the require[d] the ability to move,' the scooters were mobility aids necessary for program access." *Id.* at 390. The court disagreed and found that the scooter rental service "was not intended to meet ADA requirements, but was merely a convenience for all zoo visitors." *Id.* Because the zoo was not required to provide scooters to disabled zoo visitors, the fee to rent a scooter was not an illegal surcharge under the ADA. *Id.* at 391.

In this case, the undisputed record establishes that the opt-out program and its associated fees are mandated by the PUC and were not adopted to cover the cost of a service required by the ADA. Although the one-time charge and recurring monthly charges were designed to allow Defendant to recoup the costs of the opt-out program, the opt-out program was not established to satisfy an ADA requirement. Instead, the PUC established the opt-out program in response to concerns voiced by Defendant's ratepayers. The monthly opt-out fees fail the first prong of the surcharge test.

Even if the charges were designed to cover a service required by the ADA, the charges still would not be an unlawful surcharge as the charges do not satisfy the second prong. Under the regulations, charges to fund an ADA-mandated service cannot be borne by "a particular individual with a disability or any group of individuals with disabilities," 28 C.F.R. § 36.301, but "[s]urcharges are permitted . . . if they are borne by an entire class of individuals that uses a particular service, or participates in or attends a program or event." *Duprey*, 28 F. Supp. 2d at 709; *Robishaw*, 206 F. Supp. 3d at 733 ("Since Plaintiff has not shown that Rhode Island only levies the Probate Court Fee on the disabled, Plaintiff has failed to establish the second element of a surcharge. . . .").

For example, in *Robishaw*, the court found that a fee paid to a probate court to adjudicate a potential guardianship case failed the second part of the surcharge test and therefore was not an illegal surcharge. *Robishaw*, 206 F. Supp. 3d at 733. The plaintiff sued the probate court which had charged $1,100 for the court's adjudication of a guardianship petition. *Id.* at 726. Part of the court costs was a thirty-dollar fee for filing the guardianship petition. *Id.* at 727–28. The plaintiff argued the fee violated the ADA. *Id.* at 726. The court disagreed because "the Probate Court Fee applies to all users of the probate court, not just those involved in adult guardianship proceedings." *Id.* at 733 ("What matters is whether or not a fee is levied exclusively on the disabled or whether it is shared among all entities using a service.").

In this case, it is undisputed that every individual who chooses to opt-out of the smart meter program must pay the applicable fee and recurring monthly charge regardless of their reason for opting out. The costs of the opt-out program are covered by all those

who opt-out, not just disabled individuals.  *See Munoz v. Peets Coffee, Inc.*, No. 24-CV-01764-JST, 2024 WL 4700646, at *2 (N.D. Cal. Nov. 5, 2024) ("'If nondisabled people pay the same fee for an equivalent service, the charge to disabled people would not constitute a surcharge'") (quoting *Dare v. California*, 191 F.3d 1167, 1171 (9th Cir. 1999)). As such, the second prong of the test is not satisfied.

The analysis of Plaintiff's fee-related failure to accommodate claim, however, requires more than a surcharge analysis.  *See Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1226 (11th Cir. 2008) (noting that the law can require "waiving an ordinance that applies to both handicapped and non-handicapped people" in order to ensure equal opportunity); *Birdwell v. AvalonBay Communities, Inc.*, No. 21-CV-00864-JST, 2024 WL 3588544, at *6 (N.D. Cal. July 29, 2024) (concluding that reasonable accommodation analysis applies to requests that included fee waivers).  To prevail on a Title III disability discrimination claim based on a failure to accommodate, a plaintiff

> must show that he comes within the protections of the ADA as a person with a disability, 42 U.S.C. § 12102(2), and that the defendant's establishment is subject to the mandates of Title III as a place of public accommodation, *id.* § 12181(7). Above and beyond these two abecedarian points, the plaintiff must show that the defendant has a discriminatory policy or practice in effect; that he (the plaintiff) requested a reasonable modification in that policy or practice which, if granted, would have afforded him access to the desired goods; that the requested modification— or a modification like it—was necessary to afford that access; and that the defendant nonetheless refused to modify the policy or practice.

*Dudley v. Hannaford Bros. Co*., 333 F.3d 299, 307 (1st Cir. 2003).

In the Court's view, the principal question raised by Defendant's summary judgment motion is whether the fee-free opt-out accommodation is reasonable and

necessary. "The reasonableness inquiry considers whether the requested accommodation 'is both efficacious and proportional to the costs to implement it.'" *Schaw v. Habitat for Humanity of Citrus County, Inc*., 938 F.3d 1259, 1265 (11th Cir. 2019) (quoting *Bhogaita v. Altamonte Heights Condo. Ass'n, Inc*., 765 f.3d 1277, 1289 (11th Cir. 2014)). "[A] necessary accommodation is one that alleviates the effects of a disability." *Bhogaita*, 765 F.3d at 1288. "The necessity element is, in other words, a causation inquiry that examines whether the requested accommodation or modification would redress injuries" that would prevent equal access. *Hollis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 541 (6th Cir. 2014); *see also Wisconsin Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 749 (7th Cir. 2006) ("[T]he requested accommodation must be 'necessary,' meaning that, without the accommodation, the plaintiff will be denied an equal opportunity to obtain the housing of her choice. . . . This has been described by courts essentially as a causation inquiry").

As to the reasonableness element, because the amount of the fee and the administrative burden of implementing the fee waiver are relatively modest, a fact finder could supportably determine that requested accommodation is reasonable. The more pertinent inquiry in this case is whether Plaintiff can satisfy the "necessary" element of a failure to accommodate claim.

The court's reasoning in *Madej v. Maiden*, 951 F.3d 364 (6th Cir. 2020) is instructive when assessing whether an accommodation is necessary. In *Madej*, the

plaintiff,[6] who suffered from multiple chemical sensitivity, claimed that the use of asphalt on a road near her home would cause her harm.  She sued to stop the roadwork, alleging claims under the ADA and the FHA.  As part of the claim, the plaintiff argued that the defendant, who was using the asphalt, failed to accommodate her request to use an alternative to the seal material that did not contain asphalt.  The trial court excluded the opinions of the plaintiff's experts that exposure to the asphalt would harm plaintiff.

The court found that under the ADA and the FHA, the plaintiff must prove causation.  When assessing the ADA claim,[7] the court noted that the relevant regulation requires a reasonable accommodation or modification "when the modifications are *necessary* to avoid discrimination on the basis of disability." *Madej*, 951 F.3d at 373 (emphasis in original) (quoting 28 C.F.R. § 35.130(b)(7)(i)).  The court reasoned:

> [I]f the asphalt in the chip seal could not cause [the plaintiff's] reactions, the [plaintiff] could not show that the chip seal would deny her access to the road.  Without that causal connection, the [plaintiff's] proposed modifications would not be necessary "to avoid" that non-existent denial of access.

*Id*.

Similarly, in the context of an FHA claim, the Fourth Circuit noted that a plaintiff must prove each element of a failure to accommodate claim by a preponderance of the evidence.  *Bryant Woods Inn, Inc. v. Howard County, Md*., 124 F.3d 597, 603-604 (4th Cir. 1997).  As to the necessary element, the court explained:

---

[6] The plaintiff's husband was also a named plaintiff.  For purposes of this discussion, the Court will refer to the plaintiff in the singular, referencing the individual who suffers from multiple chemical sensitivity.

[7] Although the court ultimately determined that the plaintiff's claim was more appropriately asserted under Title II rather than Title III, the reasoning is equally applicable to a Title III claim.

> The "necessary" element . . . requires the demonstration of a direct linkage between the proposed accommodation and the "equal opportunity" to be provided to the handicapped person. This requirement has attributes of a causation requirement.  And if the proposed accommodation provides no direct amelioration of a disability's effect, it cannot be said to be "necessary."

*Id*. at 604.

The courts' reasoning is sound and consistent with the standard requirement that a plaintiff must establish a causation to prevail on a civil claim.  Applying the reasoning to this case, the question is whether Plaintiff could prove that exposure to RF emissions from Defendant's smart meter would adversely impact his condition such that the use of a non-smart meter is necessary to ensure equal access to Defendant's services.  This is consistent with the Court's observation in its ruling on Defendant's motion to dismiss.  As Plaintiff noted, the Court (Levy, C.J.) previously wrote that to prevail on his claim, Plaintiff "must eventually prove his factual allegation that having a smart meter installed at his home actually risks worsening his lymphoma's progression or symptoms."  (Plaintiff's Response at 11, quoting Order on Motion to Dismiss at 9).

Whether exposure to RF emissions from Defendant's smart meter would "actually worsen" Plaintiff's cancer or symptoms is not an issue within the common knowledge of a layperson and thus requires expert testimony.  *See Montany v. Univ. of New England*, 858 F.3d 34, 37 (1st Cir. 2017) (quoting *Cyr v. Giesen*, 108 A.2d 316, 318 (Me. 1954)) ("[E]xpert testimony may be necessary 'where the matter in issue is within the knowledge of experts only, and not with the common knowledge of lay[persons].'"); *Matarese v. Archstone Pentagon City*, 761 F. Supp. 2d 346, 365 (E.D. Va. 2011) ("[W]hether a proposed accommodation will ameliorate the effects allegedly caused by certain chemicals

to the degree necessary to afford [the plaintiff] equal opportunity in housing and not just ameliorate the burdens shared by all individuals exposed to chemicals, is not within the knowledge of a layperson").  To prove his case, Plaintiff relies in part on two retained experts, David Carpenter, M.D. and Paul Heroux, Ph.D.[8]  After a hearing on Defendant's challenge to Plaintiff's expert witnesses, the Court determined that David Carpenter, M.D., could testify as to the general causal relationship "between exposure to RF radiation and its potential to worsen cancer prognoses and symptoms."  (Order on Motions to Exclude Expert Witness Testimony at 11.)  The Court also concluded that Paul Heroux, Ph.D., could testify as to "the relative risk of harm that increased exposure to RF radiation poses to individuals with a cancer diagnosis affecting cells, like white blood cells, that have been the subject of his scholarly and experimental work." (*Id*. at 12.)  The Court thus determined that the experts could testify to general causation but could not testify to specific causation—that exposure to RF radiation likely exacerbated Plaintiff's cancer or impeded the treatment of his cancer.

Plaintiff also relies on his treating physicians to establish causation. Plaintiff contends the records and testimony of Drs. Benton and Goldbas show that RF radiation could cause Plaintiff's cancer to worsen and would hamper the treatment.  Based on Plaintiff's reported symptoms, as reflected by the records of his treating physicians, the

---

[8] Plaintiff in part cites Defendant's arguments regarding the expert testimony and argues that the differing opinions between and among the parties' experts regarding the effect of the RF emissions from Defendant's smart meter constitutes a material fact in dispute that precludes summary judgment.  Regardless of whether the parties' experts disagree, at summary judgment, the Court views the evidence in the light most favorable to Plaintiff and thus considers whether the opinions of Plaintiff's experts are sufficient to prove that the requested accommodation is necessary.

opinions of the retained experts, and the treating physicians' observations regarding Plaintiff's symptoms and treatment, Plaintiff argues that a fact finder could reasonably conclude that exposure to the RF radiation from Defendant's smart meter could adversely impact Plaintiff's medical condition and his treatment.

Plaintiff's retained experts' general causation opinions would permit a reasonable fact finder to conclude that there is an unquantified risk to human health, including related to cancer treatment, from all sources of RF radiation.  The experts' testimony, however, would not allow a fact finder to determine the extent of the impact of exposure to RF radiation from smart meters relative to other natural and human-created sources.  Plaintiff's expert witnesses, therefore, provide no evidence upon which a fact finder could quantify in any meaningful way the impact of exposure to the RF emissions from a smart meter on Plaintiff's health. The most that a fact finder could conclude, based on the experts' opinions, is that exposure to RF generally could *possibly* worsen to an *unspecified degree* Plaintiff's condition.  Because expert testimony is required to establish causation in this case, a fact finder cannot find causation based on the experts' general causation opinions and Plaintiff's reported symptoms.  Such a determination would be beyond the expertise of a fact finder.

Given the Supreme Court's reluctance to permit claims to proceed based on a small risk of harm, *see TransUnion*, 594 U.S. at 435–38; *Clapper*, 568 U.S. at 415, logic and persuasive caselaw suggest that for an accommodation to be deemed necessary (i.e. "indispensable, essential, something that cannot be done without"), *Madej*, 951 F.3d at 372 (cleaned up); *see also*, *Vorchheimer v. Philadelphian Owners Ass'n*, 903 F.3d 100, 105–07

32

(3d Cir. 2018), a plaintiff must demonstrate more than a possibility that the lack of an accommodation would cause harm. *Compare*, *Daniel v. Avesta Hous. Mgmt. Corp.*, No. 13-2341, 2014 WL 12971821, at *2 (1st Cir. Dec. 11, 2014) (reasonable accommodation claim for utility cost exemption based on alleged sensitivity to heat and cold from health conditions failed because the plaintiff failed to prove the "medical necessity" of the therapies and temperature adjustments that produced the additional costs); *and Palencar v. Raijski*, No. 3:15-CV-1189, 2016 WL 6908116, at *6 (M.D. Pa. Nov. 9, 2016) (a plaintiff must show more than a "speculative prospective fear" of additional noise that might exacerbate disability symptoms in order to establish the "direct causation necessary" between the accommodation and the disability); *with Douglas Cnty. Sch. Dist. RE-1 v. Douglas Cnty. Health Dep't*, 568 F. Supp. 3d 1158, 1164–65 (D. Colo. 2021) (granting injunctive relief for an accommodation to avoid potential health harms because the plaintiffs "presented ample credible evidence that disabled students face a *much greater* risk of harm upon contraction of COVID-19" such that without the accommodation meaningful participation at school would be illusory) (emphasis supplied). For example, in the context of a disparate impact claim (which Plaintiff pled and which Plaintiff's disparate-health-risk accommodation claim resembles), a plaintiff must prove "the policy or practice at issue had a *significantly* greater negative impact on people with a certain disability than it did on people without that disability." *Forsyth v. Univ. of Alabama, Bd. of Trustees*, No. 20-12513, 2021 WL 4075728, at *6 (11th Cir. Sept. 8, 2021) (emphasis supplied).

33

As reflected by the relevant caselaw, Plaintiff's claim underscores the need to distinguish between the level of proof required to impose liability on a third party for failing to make an accommodation from the proof a person might consider sufficient to alter the person's behavior or to take some precaution.  A person with a debilitating illness or disease would understandably avoid exposure to any source that could possibly worsen the person's condition even if the risk proved to be extremely remote.  This concept is evident in the deposition testimony of Dr. Benton, Plaintiff's oncologist.  After stating that he has never recommended to a patient that the patient not have a smart meter in the patient's home, Dr. Benton testified:

> I know in [Plaintiff's] care, he is extremely anxious about this issue, and I think that causes him stress.  So I was hoping that he could live his life with cancer without that stress and, therefore, I asked for a reasonable accommodation.

(Benton Dep. 14: 19-23).

From a patient care perspective, Dr. Benton's observation is understandable and reasonable.  That is, if a patient's exposure to some element causes the patient to worry that the exposure might impact the patient's health, regardless of the likelihood that the patient's health will be impacted by the exposure, a physician logically would recommend that the patient avoid the exposure, if possible.  The patient would just as logically follow the recommendation.  To impose legal liability on a party for not taking certain measures to facilitate the avoidance (e.g., waiving a related fee), however, more than a mere possibility that the exposure could cause harm is required.  Otherwise, liability would potentially attach whenever an individual with a condition was worried that exposure to

34

some substance or phenomenon might negatively impact the person's condition, even if the exposure was slight or the worry was unfounded. *See Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 677–78 (6th Cir. 2010) (noting that in the face of biological uncertainty, "[l]aw lags science; it does not lead it," because even though there is chance of overlooking harms that later gain acceptance, "the alternative route—allowing the law to get ahead of science—would be just as unfair" because it would impose widespread economic losses unnecessarily).

Here, Plaintiff decided to opt out of the smart meter program based on his assessment of the potential impact on his physical and emotional health of exposure to the RF emissions from the smart meter. The Court does not question Plaintiff's decision to opt-out of the smart meter program. A defendant's legal liability on a failure to accommodate claim, however, is not governed by a plaintiff's risk assessment and the reasonableness of the plaintiff's actions based on that assessment. Rather, a defendant's liability on a failure to accommodate claim is determined in part by whether a plaintiff can establish by a preponderance of the evidence that the requested accommodation was necessary to ensure equal access (i.e., whether a plaintiff can establish the causal relationship between the accommodation and the plaintiff's disability). Given that expert testimony is required for Plaintiff to establish a causal relationship between Plaintiff's exposure to RF emissions from Defendant's smart meter and the worsening of Plaintiff's condition, a reasonable fact finder could not conclude that the requested accommodation is necessary based on the general causation opinions of Drs. Carpenter and Heroux.

35

Because the experts' general causation opinions are insufficient on their own to prove that the requested accommodation is necessary, the question is whether the Court should consider the opinions of Plaintiff's treating physicians and, if so, whether the opinions constitute evidence that on the summary judgment record could support a finding that the accommodation is necessary. As noted above, in his opposition to the motion for summary judgment, Plaintiff cited statements from his treating physicians, Drs. Benton and Goldbas. Although Plaintiff characterized the evidence as factual, in the Court's view, some of the more pertinent evidence can fairly be characterized as expert opinion evidence (e.g., how exposure to RF emissions might impact Plaintiff's health).

Defendant contends that the Court should not consider the treating physicians' opinions because Plaintiff did not designate the physicians as expert witnesses. Based on that assertion and because Plaintiff did not directly contest Defendant's assertion, the Court did not discuss the opinions of Drs. Benton and Goldbas as part of the summary judgment analysis. The Court, however, recognizes that the scope of the permissible testimony of Drs. Benton and Goldbas was not litigated prior to Defendant's summary judgment filing. Given the importance of expert opinion evidence to the summary judgment analysis on Plaintiff's failure to accommodate claim, given Plaintiff's submission of opinions from Drs. Benton and Goldbas, and given Defendant's argument that the Court should not consider the opinions, the Court believes that an assessment of whether the evidence is properly before the Court and, if so, the significance of the evidence, with a presentation by the parties focused on the opinions of record of Drs. Benton and Goldbas, is warranted.

## CONCLUSION

Based on the foregoing analysis, the Court grants in part and reserves ruling in part on Defendant's motion for summary judgment as follows:

1. The Court enters judgment in favor of Defendant on Plaintiff's Title II ADA claim.

2. The Court finds as a matter of law that the fee to opt out of the Defendant's smart meter program is not an unlawful surcharge.

3. The Court otherwise reserves ruling on Defendant's motion for summary judgment to permit the parties to address further (a) Defendant's contention that Plaintiff is foreclosed from relying on the opinions of Drs. Benton and Goldbas, and (b) if the opinions are considered, whether the opinions that are part of the summary judgment record would allow a fact finder to conclude that the requested accommodation is necessary.  The Court will schedule a conference with counsel to discuss further proceedings on the matter consistent with this order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 21st day of February, 2025