UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| ED FRIEDMAN, )<br>)<br>    Plaintiff, )<br>) | 2:20-cv-00237-JCN |
| v. )<br>) | |
| CENTRAL MAINE POWER COMPANY, )<br>) | |
|     Defendant ) | |

**<u>DEFENDANT'S RESPONSE TO PLAINTIFF'S SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT</u>**

The Defendant Central Maine Power Company ("CMP"), through counsel, files this Response to Plaintiff's Supplemental Summary Judgment Briefing (ECF 160).

## INTRODUCTION

CMP respectfully submits that Plaintiff has offered no justification for his failure to designate Dr. Stephen Goldbas and Dr. David Benton as expert witnesses, and his failure to make the disclosures mandated by the Scheduling Order.

Alternatively, even if the Court chooses to overlook those important procedural missteps, CMP contends that it is nevertheless entitled to summary judgment, because (i) the Goldbas affidavit is inadmissible, (ii) Dr. Benton's testimony does not support a causal connection between exposure to RF and Mr. Friedman's cancer, and (iii) the proffered opinion testimony of both Dr. Goldbas and Dr. Benton advances a theory which was not pleaded and which, in any event, is legally groundless.

With respect to the first question posed by the Court – whether the expert opinion testimony on causation of Drs. Benton and Goldbas should be considered, despite the Plaintiff's failure to

designate them as experts, and despite his failure to disclose the information mandated by the Scheduling Order (ECF 32) – the Plaintiff argues that:

1. Regardless of whether the *causation opinions* of Drs. Goldbas and Benton are admissible, those witnesses "have factual knowledge of Plaintiff's particular treatment," so they can "describe Plaintiff's specific diagnosis and specific treatment," ECF 160, at 3;

2. "Late designations [of experts] are appropriate in circumstances where the late designation is "harmless," ECF 160, at 4-5; and

3. This is a case where the failure to disclose is harmless, because "both Drs. Benton and Goldbas have been known to Defendant throughout this litigation," as both had written letters supporting Plaintiff's accommodation request and both had been identified as treating physicians in Plaintiff's Initial Disclosure, ECF 160, at 3.  Thus, "[t]here is no unfair surprise as to the contents of [the] testimony" of Drs. Goldbas and Benton. ECF 160, at 5.

With respect to the Court's second question – whether, if the opinion testimony of Dr. Goldbas and Dr. Benton is taken into account, that opinion testimony "makes a difference" to the summary judgment analysis – the Plaintiff answers in the affirmative, arguing *not* that it will show an actual causal connection between exposure to RF and cancer, but *only* that it will (1) "assist the trier of fact by articulating how the presence of a smart meter in [his] home would negatively impact his quality of life," ECF 160, at 6, and (2) help the Court "determine[e] the extent to which Defendant's smart meter would increase the risk of harm for Plaintiff."  ECF 160, at 7.

As a preliminary matter, although this should already be perfectly clear, CMP reiterates that it does *not* challenge Plaintiff's right to have his treating physicians testify as "fact" witnesses. ECF 159, at 3. Insofar as they "have factual knowledge of Plaintiff's particular treatment," they can "describe Plaintiff's specific diagnosis and specific treatment." There, however, the parties' agreement ends. On every other point, the Plaintiff is wrong.

First, the fact that Drs. Benton and Goldbas were identified as treating physicians in Plaintiff's Initial Disclosure did not put CMP on notice that he intended to offer them as causation experts.

Second, the "To Whom It May Concern" letters signed by Drs. Benton and Goldbas did not fulfill the roles of expert designations and disclosures, so they did not make Plaintiff's violation of the Scheduling Order and the Rules of Civil Procedure "harmless."

Third, Plaintiff's formulation of the legal standard the Court must apply – his suggestion that an accommodation is "necessary" if the failure to provide it would "negatively impact" a disabled person's "quality of life" – is contrary to the claims actually asserted in his Complaint, and in any event it is legally incorrect.

### A. Plaintiff's Initial Disclosure did not put CMP on notice of his intention to offer Dr. Goldbas and Dr. Benton as causation experts.

As explained in CMP's Supplemental Memorandum, there is a fundamental difference between, on the one hand, a treating physician's factual description of a patient's diagnosis and treatment, and, on the other, testimony which consists of "hypothesizing" about what caused the patient's condition, and what might influence its future course. The latter "'crosses the line from lay to expert testimony, and must comply with the requirements of Rule 702 and the strictures of *Daubert.*'" ECF 159, at 3-4 (citations omitted). It was, therefore, perfectly reasonable for CMP to conclude, once Plaintiff made his expert witness disclosures, that Drs. Goldbas and Benton –

who were *not* designated – would limit themselves to giving purely *factual* testimony. Indeed, the Plaintiff admits that that was his intention all along. ECF 160, at 3 ("[T]he purpose of their testimony . . . would be to describe Plaintiff's specific diagnosis and specific treatment."). His plan changed only after the specific causation testimony of his designated experts was excluded.

In short, CMP could not have predicted in 2021, when Initial Disclosures were made, that Plaintiff's litigation strategy would be fundamentally transformed in 2024, when the Court made its ruling on CMP's *Daubert* motions (ECF 124). Thus, there was no reason for CMP to treat Dr. Goldbas and Dr. Benton as expert witnesses, by deposing them to explore opinions that had not been articulated, based on data that had not been disclosed.

### B. The letters signed by Drs. Benton and Goldbas, supporting Plaintiff's accommodation request, did not fulfill the roles of expert disclosures.

Plaintiff also points out that Drs. Benton and Goldbas both signed letters that were sent to CMP in support of his accommodation request. We have learned through discovery that Mr. Friedman himself was largely responsible for authoring the letter signed by Dr. Benton. ECF 142, ¶¶94-105, at 19-21. Because Dr. Goldbas was not deposed, we do not know what sort of give-and-take occurred between him and Mr. Friedman. The Benton and Goldbas letters, though, are closely similar (compare ECF 1, ¶40, at 5 and ECF 143-1), suggesting that Mr. Friedman played a substantial role in authoring the Goldbas letter as well.

Although CMP generally was aware that Plaintiff's treating physicians supported his accommodation request, that awareness did not put CMP on notice that Dr. Goldbas or Dr. Benton would offer expert opinion testimony at trial. The letters stated only the doctors' conclusions and recommendations, and they contained none of the detail that is required in an expert witness disclosure. Neither letter explained how or why exposure to RF from a CMP smart meter would adversely affect Ed Friedman's health. Neither letter identified any research or analysis supporting

the doctors' hypotheses and recommendations. Finally, neither doctor described his qualifications for opining that exposure to RF from a smart meter might harm Mr. Friedman.

Although aware that Mr. Friedman's doctors supported his accommodation request, CMP was entitled to conclude that *if* Mr. Friedman intended to offer opinion testimony from either of them, he would communicate that intention by making a formal disclosure that satisfied the Rules of Civil Procedure and the Court's Scheduling Order. That conclusion was even more clearly justified *after* Plaintiff served his expert disclosures, which included reports purporting to establish medical causation. As in *Samaan v. St. Joseph Hosp.*, 274 F.R.D. 41 (D. Me. 2011), *aff'd* 670 F.3d 21 (1st Cir. 2012), Mr. Friedman's expert witness disclosures "indicate[d] [he] knew it was necessary to designate an expert" on causation. *Id.* at 47. By omitting Drs. Goldbas and Benton from his expert disclosures, Plaintiff effectively disavowed any intention to rely on them to establish causation. Thus, when his designated experts' specific causation opinions were excluded under *Daubert*, he could *not* fill the gap in his case by shifting his reliance to Drs. Benton and Goldbas, who had *not* (and still have not) been designated as experts, and whose opinions have not been disclosed as the law requires.

### C. The accommodation requested by Plaintiff was not made "necessary" by the fact that CMP's refusal to provide it would cause him stress, thereby "negatively impacting" his "quality of life"

Finally, Plaintiff argues that if the Goldbas and Benton opinions are admitted, they will preclude summary judgment. That is so, he says, because their testimony will (1) "assist the trier of fact by articulating how the presence of a smart meter in [his] home would negatively impact his quality of life," ECF 160, at 6, and (2) help the Court "determine[e] the extent to which Defendant's smart meter would increase the risk of harm for Plaintiff." ECF 160, at 7. The second assertion is inaccurate, and the first is irrelevant.

Neither the testimony of Dr. Benton nor the Affidavit of Dr. Goldbas will help the Court "determine[e] the extent to which Defendant's smart meter would increase the risk of harm for Plaintiff." As CMP has explained in its Supplemental Memorandum (ECF 159, at 11), Dr. Benton has *not* said that exposure to RF would have a negative effect on Ed Friedman's physical health. To the contrary, he admitted that has *no* concern that RF emitted by a smart meter "may exacerbate problems already experienced" by Mr. Friedman, or that it would have *any* negative effect on the physical health of *any* human being. In fact, Dr. Benton effectively acknowledged that he is not qualified to opine that there is any reason to be concerned about the health effects of RF, since he has never researched the issue.

Dr. Goldbas, unlike Dr. Benton, evidently does believe that exposure to RF will be harmful to Mr. Friedman. However, the Affidavit in which he offers that opinion is so conclusory as to be wholly inadmissible for purposes of the Court's summary judgment analysis. ECF 159, at 9-10 (citing cases from the First, Third, Fourth, Fifth, Sixth, Seventh, Eleventh, and D.C. Circuits). Thus, Dr. Goldbas' Affidavit most certainly will *not* help the Court "determine[e] the extent to which Defendant's smart meter would increase the risk of harm for Plaintiff."

Plaintiff's other contention – that the Court should consider the testimony of Dr. Benton and Dr. Goldbas because it will "articulat[e] how the presence of a smart meter in [his] home would negatively impact his quality of life" – is legally irrelevant. That is so for two reasons.

First of all, Plaintiff's effort to make this a case about his "quality of life" – an imprecise term, at best – rather than his medical condition, comes too late in the litigation. In his Complaint and in his expert witness disclosures, Plaintiff consistently has asserted that exposure to the additional RF that would be emitted by a smart meter in his home would pose a substantial risk of

causing him medical injury. ECF 1 (Complaint), ¶¶5, 27, 29 & 64; ECF 99-1 (Carpenter Report)[1] ECF 102-1, at 213-214 & 243-245 (Heroux Reports). The key question, under this theory, was whether the risk was real, and if so whether it was so great that it entitled Mr. Friedman to the accommodation he requested.

Now, because of the Court's ruling on CMP's *Daubert* motions, we know that Plaintiff's original theory was factually baseless. He can present *no* evidence that having a smart meter in his home will pose *any* risk of harm to him. As a result of that ruling, Plaintiff wants to change his theory of the case. He now says that having a smart meter in his home would cause him "stress" – presumably because of his idiosyncratic belief that the incremental exposure would cause him some undefined harm – and this stress would "negatively impact his quality of life." But, as CMP has argued in its Supplemental Memorandum (ECF 159, at 12-13), when a plaintiff advances a new argument for the first time in response to a motion for summary judgment, "chang[ing] the complaint's factual theory in an important way," a court should "deny the *de facto* amendment and . . . refuse to consider the new factual claims." *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 860 (7th Cir. 2017). That is precisely what the Plaintiff is trying to do here, and the Court should not permit it.

Even if the Court were inclined to permit an eleventh-hour makeover of the Plaintiff's theory of the case, that theory would fail. The parties have agreed that a requested accommodation is "necessary" under the ADA, the Rehabilitation Act, and the Fair Housing Act only if it "directly ameliorates," "alleviates," or "addresses the need created by" a "disability" or "handicap." ECF

---

[1] In ECF 99-1, Dr. Carpenter proposed to testify "with a reasonable degree of medical certainty that if a smart meter were placed on Mr. Friedman's house, the elevated exposure coming from it would increase the risk his cancer could worsen which in turn logically may exacerbate his symptoms affecting his quality of life and likely shortening it." The Court's ruling on CMP's *Daubert* motion established that Dr. Carpenter's opinions on specific causation are scientifically groundless and therefore inadmissible.

159, at 13 (citing ECF 153 & 154). Furthermore, for an accommodation to be "necessary," it must be "essential, not just preferable." ECF 159, at 13-14 (quoting *Vorchheimer v. Philadelphian Owners Ass'n,* 903 F.3d 100, 107 (3d Cir. 2018), and citing *Rood v. Town of Ft. Myers Beach, Fla.,* 622 F. Supp. 3d 1217, 1233 (M.D. Fla. 2022)).

Here, there is a fundamental disconnect between the interests protected by the disability discrimination laws and the Plaintiff's new theory of the case. The Plaintiff says he should be allowed to present the testimony of Drs. Benton and Goldbas because that testimony would "assist the trier of fact by articulating how the presence of a smart meter in [his] home would negatively impact his quality of life." Although he does not explain exactly how his "quality of life" would be "negatively impacted," he must be referring to something different than his *medical* quality of life, since the testimony of his specific causation experts has been excluded. Thus, he seems to be arguing that he should not have to live in fear that RF exposure from a smart meter might cause him harm.

On this record, though, the risk that Plaintiff might be harmed by being exposed to the RF emitted by a CMP smart meter is simply non-existent. As a general proposition, there is no obligation to "accommodate irrational fears." *Adams v. Mass. General Brigham, Inc.*, 2023 WL 6318821, *1 (D. Mass., Sept. 28, 2023). It is conceivable that in some situations, a person who suffers from a mental disability might be entitled to an accommodation that he believes – even without a sound basis in fact – will protect him from harm. This, however, is not such a case. This Plaintiff, who does *not* allege that he suffers from a mental disorder, cannot claim that he is entitled to an accommodation that would "alleviate" only his "stress," rather than the medical condition that is the source of his stress.

## CONCLUSION

CMP has established that the testimony of Plaintiff's properly designated expert witnesses is legally insufficient to carry his burden of proving a causal link between exposure to RF and Plaintiff's cancer. In his opposition to CMP's motion, and in his Supplemental Briefing, Plaintiff tries to salvage his case by asking the Court to consider the causation opinions of witnesses he did not designate as experts, and a theory of harm that he did not assert in his Complaint. However, he fails to raise any factual or legal arguments that would justify that result.

For the reasons stated above, as well as those set forth more fully in the earlier summary judgment briefing, CMP requests that the Court exclude from consideration the opinion testimony of Drs. Goldbas and Benton, disregard the new theory of liability advanced by Plaintiff, and enter judgment as a matter of law in CMP's favor on every count of the Complaint.

Dated at Portland, Maine this 10th day of April, 2025.

NORMAN, HANSON & DETROY, LLC

/s/ Christopher C. Taintor
Christopher C. Taintor, Esq.
Russell B. Pierce, Esq.
Attorneys for Defendant Central Maine Power Company

Norman, Hanson & DeTroy, LLC
Two Canal Plaza, P.O. Box 4600
Portland, ME  04112-4600
(207) 774-7000
ctaintor@nhdlaw.com

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

## Certificate of Service

I hereby certify that on April 10, 2025, I electronically filed the Defendant's Response to Plaintiff's Supplemental Memorandum of Law in Opposition to Motion for Summary Judgment with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ Russell B. Pierce, Jr.*
Russell B. Pierce, Jr.
Attorney for Defendant Central Maine Power Company

Norman, Hanson & DeTroy, LLC
Two Canal Plaza, P.O. Box 4600
Portland, ME  04112-4600
(207) 774-7000
ctaintor@nhdlaw.com